# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAVE LONG BEACH ISLAND, a nonprofit corporation,<br>P.O. Box 579, Ship Bottom, NJ 08008; and<br>ROBERT STERN, Ph.D., an individual,<br>329 4th Street, Beach Haven, NJ 08008;<br><br>     Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR,<br>1849 C Street NW, Washington, DC 20240;<br><br>DEB HAALAND, Secretary of the Interior, acting in her official capacity,<br>1849 C Street NW, Washington, DC 20240;<br><br>UNITED STATES BUREAU OF OCEAN ENERGY MANAGEMENT,<br>1849 C Street NW, Washington, DC 20240; and<br><br>AMANDA LEFTON, Director of United States Bureau of Ocean Energy Management, acting in her official capacity,<br>1849 C Street NW, Washington, DC 20240;<br><br>     Defendants. | Case No. 22-55 |

## Complaint for Declaratory & Injunctive Relief under the National Environmental Policy Act, Endangered Species Act, & Administrative Procedure Act

This is an action to reverse and set aside the United States Bureau of Ocean Energy Management's (BOEM's) decision, which determined the final Wind Energy Areas in the New York Bight, because it is arbitrary, capricious, and otherwise not in accordance with the law.[1]

---

[1] Attached as Exhibit 1, U.S. Bureau of Ocean Energy Management: New York Bight Area Identification Memorandum Pursuant to 30 C.F.R. § 585.211(b) (Mar. 26, 2021), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/Memorandum%20for%20Area%20ID%20in%20the%20NY%20Bight.pdf. Note that Wind Energy Areas are not the same as wind lease areas.

Specifically, when selecting Wind Energy Areas within the New York Bight as part of the federal government's large-scale offshore wind energy program for the Atlantic coast, Defendants failed to comply with the National Environmental Policy Act (NEPA)[2] and the Endangered Species Act (ESA).[3]

Defendants did not prepare a regional programmatic environmental impact statement that would (1) comprehensively address the cumulative impacts of the five Wind Energy Areas Defendants selected for the New York Bight and other connected Wind Energy Areas, and (2) consider alternative levels of wind energy development in the selected Wind Energy Areas and Wind Energy Area locations different from those that Defendants have proposed. Instead, Defendants elected to forego any such analysis, and has indicated that it will defer its NEPA review of wind energy development in the New York Bight until after wind leases are issued and the leaseholders submit specific wind energy projects. As a result, BOEM has not prepared, and will not prepare, any NEPA document that will adequately address the cumulative impacts of wind energy development within the five New York Bight Wind Energy Areas and other connected Wind Energy Areas, as required by NEPA.

Further, Defendants' decision to not prepare a programmatic environmental impact statement effectively forecloses any opportunity for the public to comment upon, critique, and offer alternatives to the Wind Energy Areas selected by Defendants. In effect, Defendants have committed themselves to a particular course of action and the use of a particular public ocean resource without first conducting a full and adequate alternatives analysis at the program level. This is a violation of NEPA.

---

[2] 42 U.S.C. §§ 4321-4347.
[3] 16 U.S.C. §§ 1531-1544.

In addition, the New York Bight Wind Energy Areas, as well as related Wind Energy Areas located immediately south of the New York Bight, lie within habitat used by various marine animals that have been listed as "threatened" or "endangered" under the ESA.[4] Among these is the critically-imperiled North Atlantic right whale, whose total population has declined sharply in the last decade and now stands at approximately 300 individuals. BOEM's selection of the New York Bight Wind Energy Areas, and the related Wind Energy Areas to the south, will directly facilitate construction and operation of offshore wind arrays within the habitat areas and migration corridors for North Atlantic right whale and other listed species, potentially affecting and resulting in take of these species. Pursuant to Section 7 of the ESA, any federal agency whose actions or decisions may affect a federally listed species must consult with the federal wildlife agency—the U.S. Fish and Wildlife Service—that has jurisdiction over the species in question.[5] In this case, the affected species are marine animals and fall within the jurisdiction of the National Marine Fisheries Service. BOEM, therefore, was required under Section 7 to consult with the National Marine Fisheries Service prior to selecting the Wind Energy Areas challenged here to determine if installation of wind arrays in these locations would affect listed species, including the North Atlantic right whale. BOEM, however, failed to consult with the National Marine Fisheries Service on this issue. Consequently, no biological assessment or biological opinion has been prepared to analyze and disclose the potential effects of BOEM's actions on listed species. In failing to consult with the National Marine Fisheries Service, BOEM violated the ESA.

---

[4] 16 U.S.C. § 1531, *et seq.*
[5] 16 U.S.C. § 1536(a); 50 C.F.R. § 402.14.

## JURISDICTION AND VENUE

1.       The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201 (declaratory judgment), and 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701 through 706 (APA).

2.       For all claims brought under the APA, Plaintiffs have exhausted all administrative remedies available to them. Following BOEM's selection of the New York Bight Wind Energy Areas— a final agency action under NEPA and the APA—Plaintiff Save Long Beach Island sent a letter to BOEM, dated July 22, 2021, asking BOEM to prepare the programmatic environmental impact statement demanded in this complaint. BOEM failed to do so or even acknowledge the request. Therefore, there was no administrative process under either NEPA or the APA leading up to the federal action in question—the selection of the Wind Energy Areas. For this same reason, there was no administrative process that resulted in the adoption of an environmental impact statement.

3.       Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are federal agencies and officials whose offices are located in Washington, D.C.

## PARTIES

4.       Plaintiff, SAVE LONG BEACH ISLAND, is a 501(c)(3) non-profit corporation, organized under the laws of New Jersey, established to protect the natural and human resources, including but not limited to: the fish, marine mammals, and other species that reside in, use, or migrate through the New York Bight Wind Energy Areas and the related Wind Energy Areas directly south of the New York Bight; the seascape and other aesthetic elements of Long Beach Island and the New York Bight; the local economic interests that rely on the continued preservation of the environmental features that make Long Beach Island and the waters of the

New York Bight a unique and desirable place to live and visit; and the cultural values that are tied to Long Beach Island and the waters that surround it, including the New York Bight. These natural and human resources are threatened by the BOEM's massive, offshore wind-energy program and its component elements, including the wind arrays planned for the five New York Bight Wind Energy Areas and other connected Wind Energy Areas south of the Bight. Save Long Beach Island has approximately 900 members who will be able to view the proposed wind farms from public and private vantage points along the coast of Long Beach Island and other locations in New York and New Jersey. Save Long Beach Island's members routinely engage in recreation in coastal waters that would be affected by one or more offshore wind projects in the proposed New York Bight and other connected Wind Energy Areas, including waters that support marine mammals and turtles listed as endangered or threatened under the ESA. Such recreation includes sailing, fishing, whale watching, and diving. Save Long Beach Island and its members have a legally protected interest in preserving the listed species that are native to the New York Bight and likely to be harmed by the proposed offshore wind arrays. Save Long Beach Island and its members also have an interest in protecting the cultural and historical heritage of this part of the Atlantic seaboard, as well as an interest in protecting the natural beauty of Long Beach Island, New Jersey—an 18-mile-long barrier island with an unobstructed seascape. Save Long Beach Island and its members also own or patronize businesses that will be adversely affected by the environmental degradation that will occur as a result of the proposed offshore wind projects in the New York Bight. Finally, some members of Save Long Beach rent their properties to tourists and tenants so that they, too, can enjoy, recreate in, and use the natural resources described above.

5.      Plaintiff ROBERT STERN, Ph.D., is an individual who resides on Long Beach Island. He formerly managed the Office of Environmental Compliance within the United States Department of Energy. Dr. Stern is the President of Save Long Beach Island. He considers it his responsibility to protect those waters and all the plant and animal life within it. Dr. Stern has particular concern over the impacts of operational turbine noise on endangered whales frequenting the area, he has researched the subject, and provided specific technical recommendations to BOEM regarding North Atlantic right whale migration in the Wind Energy Areas. As a resident of Long Beach Island, he routinely visits the beaches along the island's shores, where currently the vistas are unobstructed. This will change once offshore wind projects are constructed in the Wind Energy Areas selected by BOEM, as the wind turbines will be clearly visible from the Long Beach Island shoreline. BOEM's entire offshore wind program—including and especially the wind arrays proposed for the New York Bight Wind Energy Areas and the Wind Energy Areas directly south of the Bight—threatens the very resources that make Long Beach Island the unique place that Dr. Stern has chosen to call home. Dr. Stern is also deeply committed to the historical and cultural heritage of Long Beach Island, which the proposed wind energy projects are sure to damage. The failure of BOEM to comply with NEPA and the ESA will degrade the natural and human environment on Long Beach Island and the waters proximate to it, resulting in harm to Dr. Stern.

6.      Defendant, the UNITED STATES DEPARTMENT OF THE INTERIOR, is an agency of the federal government, which is authorized to grant a lease, easement, or right-of-way on the Outer Continental Shelf for activities that produce or support production of energy from sources other than oil and gas.[6]

---

[6] 43 U.S.C. § 1337(p)(1)(C).

7.     Defendant, DEB HAALAND, is the Secretary of the United States Department of the Interior and, among other things, is charged with overseeing the management of the nation's Outer Continental Shelf lands and oceans, including those affected by the offshore wind projects that will ultimately be developed within the five New York Bight Wind Energy Areas described in the Area Identification Memorandum. In this regard, Secretary Haaland oversees BOEM and is ultimately responsible for the decisions taken by BOEM. Further, Secretary Haaland is responsible for ensuring that all agencies within the Department of the Interior, including BOEM, comply with NEPA and the ESA. In this action, Plaintiffs are suing Secretary Haaland in her official capacity as Secretary of the Interior.

8.     Defendant, UNITED STATES BUREAU OF OCEAN ENERGY MANAGEMENT (BOEM) is an agency of the United States government within and under the jurisdiction of the Department of the Interior. BOEM's stated mission "is to manage development of U.S. Outer Continental Shelf energy and mineral resources in an environmentally and economically responsible way."[7] For purposes of this action, BOEM is the federal agency that issues leases and permits for offshore wind projects within the New York Bight Wind Energy Areas and elsewhere along the Atlantic coast of the United States. More specifically, BOEM is the federal agency which, on April 11, 2018, published a Call for Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight, and on March 26, 2021, issued the New York Bight Area Identification Memorandum (the "Area Identification Memorandum") that recommended five Wind Energy Areas for offshore wind projects in the New York Bight. The five Wind Energy Areas identified in the memorandum are

---

[7] U.S. Department of the Interior: Bureau of Ocean Energy Management, About Us (last visited Jan. 5, 2022), available at https://www.boem.gov/about-boem.

(1) the Fairways North Wind Energy Area, (2) the Fairways South Wind Energy Area, (3) the Hudson North Wind Energy Area, (4) the Central Bight Wind Energy Area, and (5) the Hudson South Wind Energy Area. BOEM is also responsible for ensuring that its actions, including authorization of offshore wind projects, comply with NEPA and the ESA. To this end, BOEM must prepare an environmental impact statement (environmental impact statement) to assess and disclose whether and to what extent "major federal actions", such as the offshore wind development program in the New York Bight, will adversely affect the natural and human environment. Here, BOEM has failed/refused to prepare a programmatic environmental impact statement that addresses the cumulative, connected, and synergistic impacts of implementing offshore wind projects at the five New York Bight Wind Energy Areas described in the Area Identification Memorandum. In addition, Section 7 of the ESA requires that BOEM consult with the National Marine Fisheries Service as to whether and to what extent selection of the Wind Energy Areas in question, as well as the wind energy projects such selection will facilitate, may affect federally listed species. Here, however, BOEM failed to engage in consultation with the National Marine Fisheries Service.

9.      Defendant, AMANDA LEFTON, is the Director of BOEM. She issued the decision challenged here, approving the five Wind Energy Areas. She is responsible for the offshore wind projects that will ultimately be developed within the five New York Bight Wind Energy Areas described in the Area Identification Memorandum. In this regard, Director Lefton oversees BOEM and is responsible for the decisions taken by BOEM. In this action, Plaintiffs are suing Director Lefton in her official capacity as Director of BOEM.

## STATUTORY AND REGULATORY FRAMEWORK

**A.     The National Environmental Policy Act**

10.     NEPA is the "basic national charter for protection of the environment."[8]

11.     The purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment."[9] NEPA's fundamental purpose is to guarantee that agencies take a "hard look" at the environmental consequences of their actions before such actions occur. To conduct a "hard look" the agency in question must (1) carefully consider detailed information regarding the action's potentially significant environment effects, and (2) make relevant information available to the public so that it may play a role in both the decision-making process and the implementation of the decision itself.[10]

12.     An environmental assessment under NEPA is a "concise public document . . . [that] provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant environmental impact."[11] It is designed to help public officials make decisions that are based on an understanding of the human and physical environmental consequences of the proposed project and take actions, in the location and design of the project, that protect, restore and enhance the environment.

13.     For any "major federal action" that "significantly affects" the "human environment," NEPA requires the federal agency in question (here, BOEM) to prepare a detailed environmental impact statement that analyzes and discloses the action's environmental

---

[8] *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1072, (quoting 40 C.F.R. § 1500.1(a)).
[9] 42. U.S.C. § 4321.
[10] *See, e.g.*, 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.
[11] 40 C.F.R. § 1508.9.

consequences.[12] If the agency does not conduct this analysis prior to the point of commitment, the agency deprives itself of the ability to "foster excellent action."[13]

14.     Major federal actions include the "adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based."[14] BOEM's issuance of the "New York Bight Area Identification Memorandum", dated March 26, 2021, which adopted five Wind Energy Areas in the New York Bight, totaling a combined 807,383 acres for future leasing actions, meets those criteria and therefore constituted such a formal plan and a major federal action.

15.     Relatedly, NEPA requires that an environmental impact statement fully analyze all direct, indirect, and cumulative impacts of a proposed federal action or project. Direct effects include those "which are caused by the action and occur at the same time and place."[15] Indirect effects include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[16] Indirect effects may also include growth inducing impacts and other effects that prompt changes in land use patterns, population density or growth rates, and related effects on air and water and other natural systems, including ecosystems.[17] Cumulative impacts include those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative

---

[12] 42 USC § 4332(c); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).
[13] *See* 40 CFR § 1500.1(c); *Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 371 (1989).
[14] 40 C.F.R. § 1508.1 (q)(3)(ii).
[15] 40 CFR § 1508.8(a).
[16] 40 CFR § 1508(b).
[17] *Id.*

impacts can result from individually minor but collectively significant actions taking place over time.

16.     NEPA requires that agencies ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Impacts such as those to endangered species cannot be dealt with piecemeal, project by project, and be scientifically credible.

17.     The environmental impact statement must provide a complete and accurate discussion of the proposed project's foreseeable environmental impacts, including those that cannot be avoided.[18] However, when information is incomplete or unavailable, the environmental impact statement must "always make clear that such information is lacking."[19] And if the missing information can be feasibly obtained and is necessary for a "reasoned choice among alternatives,"[20] the agency must include the information in the environmental impact statement. Where the cost of the data is too expensive to secure, the agency must still attempt to analyze the impacts in question.[21]

18.     The environmental impact statement must provide an accurate presentation of key facts and environmental impacts, as this is "necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA."[22] An environmental impact statement that is incomplete or provides misleading information can "impair[] the agency's consideration of the adverse environmental effects and . . . skew . . . the public's evaluation of

---

[18] 5 USC § 706(2)(D); 40 CFR § 1502.22.
[19] 40 CFR § 1502.22.
[20] *Id.*
[21] *Id.*
[22] *Natural Resources Defense Council v. U.S. Forest Serv.,* 421 F.3d 797, 812 (9th Cir. 2005).

the proposed agency action."[23] For this reason, erroneous factual assumptions and misrepresentations of important facts can fatally undermine the information value of the environmental impact statement to the public and decision-makers.[24]

19.     In addition, if the environmental impact statement identifies a significant effect, the environmental impact statement must propose and analyze "appropriate mitigation measures."[25] Finally, the environmental impact statement must examine a reasonable range of alternatives to the proposed action and focus on those that reduce the identified impacts of that action.[26]

20.     NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making and to guarantee "the [action] agency will not act on incomplete information, only to regret its decision after it is too late to correct."[27]

21.     NEPA regulations require that an environmental impact statement "[e]valuate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination."[28] NEPA regulations also state that the consideration of alternatives is "the heart of the environmental impact statement."[29]

---

[23] *Id.* at 811.
[24] *Id.* at 808.
[25] 40 CFR § 1502.14; *see Robertson v. Methow Valley Citizens Council*, 490 U.S. at 352-53 ("omission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA").
[26] 42 U.S.C. § 4332(2)(e); 40 CFR § 1502.1.
[27] *Marsh v. Ore. Natural Resources Council*, 490 U.S. 360, 371 (1989).
[28] 40 C.F.R. § 1502.14(a).
[29] 40 C.F.R. § 1502.

22.     NEPA requires that agencies evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action.

23.     NEPA requires that a programmatic environmental impact statement be relevant to the program decision and timed to coincide with meaningful points in agency planning and decision-making.

24.     A federal program, such as BOEM's offshore wind energy program in the New York Bight and other connected Wind Energy Area's, constitutes a "major federal action" and is defined as follows: "a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive."[30]

25.     A major federal action includes the "adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based."[31] BOEM's approval on March 26, 2021 of the "New York Bight Area Identification Memorandum," which adopted five Wind Energy Areas in the New York Bight, totaling a combined 807,383 acres for future leasing actions meets those criteria precisely, and thus constituted such a formal plan and a final federal action that should have been preceded by a regional programmatic environmental impact statement.

26.     Such "broad actions" can be evaluated in at least three ways:

(1) Geographically, including actions occurring in the same general location, such as a body of water, region, or metropolitan area;

---

[30] 40 C.F.R. § 1508.1(q)(3)(iii).
[31] 40 C.F.R. § 1508.1(q)(3)(ii).

(2) Generically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter;

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment.[32]

27.     NEPA does not allow an acting federal agency to "segment" the overall program, as this would unreasonably restrict the scope of the environmental evaluation.[33] Nor does NEPA allow an agency to break up a "large or cumulative project into smaller components in order to avoid designating the project as a major federal action."[34] Moreover, a "programmatic environmental impact statement should be prepared if it can be forward-looking and if its absence will obstruct environmental review."[35]

28.     When there are multiple projects contemplated in a particular geographical region, "NEPA calls for an examination of their impact in a single [environmental impact statement]."[36] And "[w]here there are large-scale plans for regional development, NEPA requires both a programmatic and a site-specific [environmental impact statement]."[37]

29.     Failure to prepare an environmental impact statement where one is required is arbitrary and capricious and an abuse of federal agency discretion.

---

[32] 40 C.F.R. § 1502.4(c).
[33] *Nat'l Wildlife Found'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 888 (D.C. Cir. 1981).
[34] *Id.* at 890.
[35] *Found'n on Economic Trends v. Heckler*, 756 F.2d 143, 159 (D.C. Cir. 1985).
[36] *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990).
[37] *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407; *see also* 40 C.F.R. §§ 1508.28, 1502.20.

**B.     The Endangered Species Act**

30.     The ESA was enacted, in part, to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered species and threatened species . . . ."[38]

31.     The ESA vests the Secretary of Commerce with primary responsibility for administering and enforcing that statute with respect to marine and anadromous species. The Secretary has delegated this responsibility to the National Marine Fisheries Service.[39] The National Oceanic Atmospheric Administration of the Department of Commerce, through the National Marine Fisheries Service, is responsible for implementing the ESA with respect to marine and anadromous species. The United States Fish and Wildlife Service is responsible for implementing the ESA with respect to terrestrial and freshwater species.

32.     Section 2(c) of the ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act."[40] The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."[41]

33.     Section 7(a)(1) of the ESA requires that all federal agencies "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species . . . ."[42] Section 7(a)(1) also directs that the National Marine

---

[38] 16 U.S.C. § 1531(b).
[39] 50 C.F.R. § 402.01(b).
[40] 16 U.S.C. § 1531(c)(1).
[41] 16 U.S.C. § 1532(3).
[42] 16 U.S.C. § 1536(a)(1).

Fisheries Service (or, as the case may be, Fish and Wildlife Service) review other programs administered by the Secretary and utilize such programs in furtherance of the purposes of the Act.[43]

34.     In order to fulfill the substantive purposes of the ESA, federal agencies are required to engage in consultation with the National Marine Fisheries Service to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species . . . determined . . . to be critical . . . ."[44]

35.     Section 7 consultation is required for "any action [that] may affect listed species or critical habitat."[45] Agency "action" is broadly defined in the ESA's implementing regulations to include "(a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air."[46] When engaging in Section 7 consultation, both the National Marine Fisheries Service and the "action agency" must "use the best scientific and commercial data available."[47]

36.     The National Marine Fisheries Service and Fish and Wildlife Service follow a jointly prepared consultation handbook which states that a "may affect" determination is:

> [T]he appropriate conclusion when a proposed action may pose *any* effects on listed species or designated critical habitat. When the Federal agency proposing the action determines that a "may affect" situation exists, then they must either initiate formal

---

[43] 16 U.S.C. § 1536(a)(1).
[44] 16 U.S.C. § 1536(a)(2) ("Section 7 consultation").
[45] 50 C.F.R. § 402.14.
[46] 50 C.F.R. § 402.02.
[47] 16 U.S.C. § 1536(a)(2).

consultation or seek written concurrence from the Services that the action 'is not likely to adversely affect' listed species.[48]

37.     A "may affect" determination triggering formal consultation is required when "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character"[49] occurs. Further, when determining whether any such effects may occur, the National Marine Fisheries Service (or Fish and Wildlife Service) and the action agency must consider not only the direct effects of the action, but also the "indirect effects", which are defined as those that are "caused by the proposed action and are later in time, but still are reasonably certain to occur."[50]

38.     Once an action agency makes a "may affect" determination, the agency may elect to enter informal consultation with either the National Marine Fisheries Service or Fish and Wildlife Service, depending on which Service has jurisdiction over the species in question. The action agency then must complete a Biological Assessment (BA) and make one of two determinations – a "not likely to adversely affect" (NLAA) determination or a "likely to adversely affect" (LAA) determination. If the action agency arrives at an LAA determination, then formal consultation is required. Joint Consultation Handbook at 2-6. If the relevant Service does not concur with the NLAA determination, or if the action agency elects to bypass the informal consultation process and initiate formal consultation, then the relevant Service works towards the completion of a biological opinion for the proposed action. If the National Marine Fisheries Service issues a biological opinion that concludes the proposed action is likely to jeopardize the species, the opinion may specify reasonable and prudent alternatives that will

---

[48] *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* at xiv (hereafter "Joint Consultation Handbook") (emphasis in original).
[49] 51 Fed. Reg. 19,926, 19,949 (June 3, 1986).
[50] 50 C.F.R. § 402.02.

avoid jeopardy and allow the agency to proceed with the action.[51] The National Marine Fisheries Service may also suggest modifications to the action during the course of consultation to "avoid the likelihood of adverse effects"[52] to the listed species even when not necessary to avoid jeopardy.

## FACTUAL BACKGROUND

### A.    The New York Bight

39.    The New York Bight is an offshore area that extends northeast from Cape May in New Jersey to Montauk Point on the eastern tip of Long Island, New York. The New York Bight supports a variety of uses and resources, including commercial fisheries and marine mammal habitat. The Bight also contains the third largest port in the United States, which services more than 8,500 deep-sea vessel transits per year. In the southern portion of the New York Bight lies Long Beach Island, New Jersey, an 18-mile-long barrier island that is home to approximately 10,000 year-round residents. The island is also a popular tourist destination during the summer.

40.    The New York Bight supports more than 35 marine mammal species, including the listed sei whale, sperm whale, fin, and North Atlantic right whale; five sea turtle species, including the listed green sea turtle, loggerhead sea turtle, Kemp's ridley sea turtle, and leatherback sea turtle; more than 50 bird species; and hundreds of fish species.

### B.    BOEM's Competitive Wind Lease Process for the New York Bight

41.    BOEM's competitive offshore wind lease process begins with the publication of a Call for Information and Nominations, which seeks information regarding areas within the Outer Continental Shelf that should receive special consideration for potential development of

---

[51] 16 U.S.C. § 1536(b).
[52] 50 C.F.R. § 402.13.

renewable energy. In this case, BOEM, on April 11, 2018, published a Call for Commercial

Leasing for Wind power on the Outer Continental Shelf in the New York Bight. BOEM

delineated the Call Areas in consultation with various parties and government entities, including

the State of New York and the Intergovernmental Renewable Energy Task Force, and BOEM

sought input from the public.

42.     BOEM then spent the better part of three years deciding which areas within the

New York Bight should be selected as Wind Energy Areas. On March 26, 2021, BOEM issued

the "New York Bight Area Identification Memorandum," which adopted five Wind Energy

Areas in the New York Bight, totaling a combined 807,383 acres. BOEM's designation of these

Wind Energy Areas was a major federal action that triggered the agency's NEPA obligation to

prepare an environmental assessment and, since the installation of hundreds or thousands of wind

turbines would have a significant effect on the human environment, to commence preparation of

an environmental impact statement.

43.     The five Wind Energy Areas are:

(1) Fairways North—consisting of 88,246 acres, with a power production of
3,754,037 megawatt hours per year;

(2) Fairways South—consisting of 23,841 acres, with a power production of
1,014,210 megawatt hours per year;

(3) Hudson North—consisting of 43,056 acres, with a power production of
1,831,628 megawatt hours per year;

(4) Central Bight—consisting of 84,688 acres, with a power production of
3,602,678 megawatt hours per year; and

(5) Hudson South—consisting of 567,552 acres, with a power production of
24,143,998 megawatt hours per year.

44.     The Fairways North and Fairways South Wind Energy Areas are located

approximately 15 miles from the New York shoreline and approximately 69 miles from the New

Jersey shoreline. The Hudson North Wind Energy Area is located approximately 21 miles from

the New York shoreline and approximately 36 miles from the New Jersey shoreline. The Central

Bight Wind Energy Area is located approximately 38 miles from the New York shoreline and

approximately 53 miles from the New Jersey shoreline. The Hudson South Wind Energy Area is

located approximately 45 miles from the New York shoreline and approximately 30 miles from

the New Jersey shoreline.

45.    BOEM did not prepare an environmental impact statement or conduct any kind of

NEPA review prior to selecting the Wind Energy Areas and issuing the Area Identification

Memorandum. When it issued the Area Identification Memorandum and adopted the Wind

Energy Areas described therein, BOEM took a final agency action that effectively foreclosed

discussion or consideration of alternative Wind Energy Areas.

46.    Now that the New York Bight Wind Energy Areas have been identified, BOEM

will initiate the lease issuance stage of the process. BOEM has indicated that, pursuant to NEPA,

it will prepare a "Lease Sale Environmental Assessment" to assess the potential environmental

impacts associated with lease issuance. However, this belated attempt to comply with NEPA

comes too late in the process, well after BOEM has made a substantial commitment of resources

by designating the areas of the New York Bight that will be open for leasing and excluding other

areas where this activity might be far less environmentally damaging. Based on BOEM's past

practice in the Rhode Island/Massachusetts Wind Energy Area, this environmental review will

be very limited and will not address the impacts of constructing and operating the actual wind

energy projects. Nor will this review consider alternative Wind Energy Area locations. Instead,

the only alternatives to be discussed in the proposed "Lease Sale Environmental Assessment"

will be survey and measurement alternatives within the identified Wind Energy Areas.

47.     Once BOEM offers leases for sale within the five Wind Energy Areas, the winning bidders will prepare and submit to BOEM draft Construction and Operations Plans for the actual wind energy projects they intend to build.

48.     For each proposed Construction and Operations Plan, BOEM will prepare a Draft environmental impact statement that is designed to evaluate the environmental impacts of constructing and operating the wind energy project in question. Pursuant to BOEM's pattern and practice, as established in its review of the Vineyard Wind 1 project in the Rhode Island/Massachusetts Wind Energy Area, the Construction and Operations Plan-specific environmental impact statements for the New York Bight Wind Energy Areas will not consider alternatives that involve locations other than the Wind Energy Areas previously described in the Area Identification Memorandum, dated March 26, 2021. Instead, each Construction and Operations Plan-specific environmental impact statement will only consider limited project alternatives that are located within the now-established Wind Energy Areas.

49.     Under existing procedures, after BOEM's NEPA review is completed and other required federal authorizations are secured, BOEM will issue a Record of Decision (ROD) adopting the Final environmental impact statement. Soon thereafter, BOEM will approve the Construction and Operations Plan. This process will be repeated for each Construction and Operations Plan at each leasehold within the five New York Bight Wind Energy Areas. However, there is no indication that BOEM will prepare an environmental impact statement that covers all the Construction and Operations Plans collectively or analyzes their cumulative and synergistic effects. And, even if BOEM did prepare a programmatic environmental impact statement at this late date, it would be far too late to alter the commitments of resources BOEM will have made by that time to the construction of hundreds or thousands of wind energy turbines

up and down the Atlantic coast—without ever considering their cumulative effects on the environment or on listed endangered species.

## COUNT ONE:
## VIOLATION OF NEPA AND THE APA

50.     Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

51.     NEPA requires federal agencies, such as BOEM, to analyze the direct, indirect, and cumulative impacts of the proposed action and to take a hard look at those impacts. In addition, NEPA requires federal agencies to consider mitigation measures and alternatives that are capable of minimizing the environmental impacts of a proposed action.

52.     NEPA compliance, which is intended to inform the agency decision-maker of the environmental impacts of proposed actions, must occur before the agency has made a decision or an irretrievable commitment of resources to a particular action. In designating large areas of the New York Bight as available for wind energy development, Defendants failed to comply with NEPA's requirements to prepare an environmental assessment and where, as here, the project will significantly impact the quality of the human environment, take a hard look at those environmental impacts by preparing an environmental impact statement.

53.     NEPA prohibits a federal agency from segmenting into pieces an action that is part of a single, connected program, as doing so often results in an underreporting (or non-reporting) of the program's cumulative impacts.

54.     Instead, NEPA requires the connected elements of a program to be assessed in a single environmental impact statement that covers the entire action being contemplated by the federal agency in question.

55.     NEPA requires that BOEM evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action.

56.     NEPA requires that the federal agency prepare such a "programmatic" environmental impact statement before committing itself to a particular course of action. This allows the acting agency and the public to present and consider alternatives to the proposed action – including "offsite" alternatives – while there is still time to change direction.

57.     The designation of Wind Energy Areas constitutes a final agency action and is perhaps the most environmentally critical decision that BOEM makes, as it commits large public ocean areas to wind energy development versus other uses, and forecloses other areas, and should have been supported by a regional programmatic environmental impact statement. Further, the adoption of the Wind Energy Areas constitutes a major and final federal action triggering BOEM's legal obligation under NEPA and the APA to prepare a programmatic environmental impact statement. As explained above, BOEM will eventually prepare project-specific environmental impact statements for the individual wind projects in the New York Bight region, but these will not consider or evaluate any alternative that calls for construction of the project outside the boundaries of the Wind Energy Areas described and adopted in the Area Identification Memorandum. Plaintiffs know this to be the case because BOEM recently approved RODs for two offshore wind projects—Vineyard Wind 1 off the coast of Nantucket and South Fork off the coast of Rhode Island—and in each case, the environmental impact statement for the project in question included no alternative that contemplated construction of the wind array at a location other than in the predetermined Wind Energy Areas. Therefore, as a practical matter, the issuance of the Area Identification Memorandum permanently fixes the

future locations of the wind energy projects and thus constitutes a final agency action on the part of BOEM. For this reason, NEPA requires that BOEM conduct a full environmental review of the proposed Wind Energy Areas at the Area Identification stage of the process. BOEM, however, failed to accomplish this task, resulting in a violation of the statute.

58.     BOEM has embarked on a large-scale campaign to develop offshore wind energy projects along much of the U.S. Atlantic coast, from Massachusetts to South Carolina. BOEM's goal is to issue at least 17 wind energy leases covering thousands of square miles of near-shore ocean. When fully developed, BOEM's Atlantic wind energy system will include more than 2,000 wind turbines, many of them located in or near habitat and migration corridors used by listed marine species, such as the North Atlantic right whale.

59.     As part of its overall offshore wind energy program, BOEM has identified five Wind Energy Areas for the New York Bight, just as it had previously identified a New Jersey Wind Energy Area and Wind Energy Areas in the Rhode Island and Massachusetts Outer Continental Shelf.

60.     The New Jersey Wind Energy Area is in the New York Bight. It and the five recent New York Bight Wind Energy Areas are connected actions under NEPA implementing rule §1501.9(e)(1)(iii) because wind energy development in both areas is needed to meet New Jersey's offshore wind plan for 7500 megawatts of power to the State by 2035, which plan the BOEM has been adhering to in its project proposals, and therefore are interdependent parts of a larger action.

61.     Significant new project circumstances and highly relevant new information relevant to environment concerns has come to light since the New Jersey Wind Energy Area was adopted. That includes the explosion in turbine size and attendant increase in turbine operational

noise that is expected to have a severe impact on several endangered whale species using the area, thus requiring supplemental NEPA documentation.

62.     The five New York Bight Wind Energy Areas and the New Jersey Wind Energy Area therefore comprise a connected and synergistic offshore wind energy system that is itself part of BOEM's larger offshore wind energy program for the Atlantic seaboard. Because these Wind Energy Areas are part of a singular, connected system/program, will serve distinct electric power markets, and are located within the same Outer Continental Shelf region and will be developed into fully functioning wind arrays within the next three to six years, BOEM was required to prepare a regional programmatic environmental impact statement that assesses all six Wind Energy Areas at once, in combination with one another. By law, this programmatic environmental impact statement should have been prepared prior to, and as part of, BOEM's decision to select the five recent New York Bight Wind Energy Area locations.

63.     BOEM, however, failed to prepare the requisite programmatic environmental impact statement for the Wind Energy Areas. Instead, BOEM has decided it will prepare project-specific (or Construction and Operations Plan-specific) environmental impact statements only, where the locations of the Wind Energy Areas are fixed and not subject to debate. These project-specific and Construction and Operations Plan-specific environmental impact statements will not fully or adequately evaluate the cumulative impacts of all wind energy projects contemplated within the Wind Energy Areas. Nor will these project-specific and Construction and Operations Plan-specific environmental impact statements consider (a) alternative power levels within and among the various Wind Energy Areas that collectively can meet the State's power objective in a more environmentally benign manner or (b) "offsite" alternatives, i.e., alternatives at locations outside the boundaries of the previously adopted Wind Energy Areas.

64.     By failing to prepare an environmental assessment and an environmental impact statement prior to designating areas of the New York Bight for wind energy production, BOEM has taken final agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law because it fails to comply with NEPA. Accordingly, BOEM's final agency action violates the Administrative Procedure Act and must be vacated and set aside.

## COUNT TWO:
## VIOLATION OF THE ESA

65.     Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

66.     Consultation under Section 7 of the ESA is required whenever a discretionary agency action "may affect" any listed species or its critical habitat, and the assessment of whether that low threshold has been satisfied must be based on the "best available" science.

67.     BOEM violated Section 7 of the ESA by failing to consult with the National Marine Fisheries Service regarding whether and to what extent the selection of the New York Bight Wind Energy Areas and the Wind Energy Areas directly south of the Bight, in facilitating construction and operation of wind energy arrays, could affect North Atlantic right whales and other listed species. Such effects include, but are not limited to, noise-induced physical damage; noise-induced behavioral changes and related sublethal impacts; vessel collisions; loss of foraging opportunities; alteration of key life history stages and elements.

68.     The best available science indicates that BOEM's selection of the New York Bight Wind Energy Areas and those Wind Energy Areas directly south of the Bight (1) will lock BOEM into these particular locations when approving offshore wind energy projects for this part of the eastern seaboard and (2) "may affect" listed species, including the North Atlantic right whale.

69.     BOEM'S designation of five Wind Energy Areas within the New York Bight, without any consideration of the possible effects the program might have on listed endangered species like the North Atlantic right whale, acted arbitrarily, capriciously, and contrary to the mandates of law, including the ESA and Marine Mammal Protection Act.[53]

70.     BOEM's adoption of the designated Wind Energy Areas while failing to consult with the National Marine Fisheries Service, as described above, was arbitrary, capricious, an abuse of discretion, and violates the ESA and its implementing regulations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     Enter an order reversing and setting aside BOEM's March 26, 2021 Decision designating the five Wind Energy Areas within the New York Bight as arbitrary, capricious, and contrary to law, including NEPA, the ESA, and Marine Mammal Protection Act;

(2)     Award Plaintiffs reasonable attorneys' fees and costs under the Equal Access to Justice Act; and

(3)     Provide such other and further relief as the Court may deem just.

Dated: January 10, 2022                                      Respectfully submitted,

                                                  s/Nancie G. Marzulla
                                                  Nancie G. Marzulla
                                                  Marzulla Law, LLC
                                                  1150 Connecticut Ave NW,
                                                  Suite 1050
                                                  Washington, D.C. 20036
                                                  (202) 822-6760
                                                  nancie@marzulla.com
                                                  D.C. Bar No. 400985

                                                  s/David P. Hubbard
                                                  David P. Hubbard

---

[53] 16 U.S.C. §§ 1361-1423h.

Gatzke Dillon & Ballance LLP
2762 Gateway Road
Carlsbad, CA 92009
(760) 431-9501
dhubbard@gdandb.com
*Pro Hac Vice pending*
(CA Bar No. 148660)

*Counsel for Plaintiffs*