TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
SARA E. COSTELLO
DEVON LEA FLANAGAN
Trial Attorneys
P.O. Box 7611
Washington, DC 20044-7611
(202) 305-0484 (Costello)
(202) 305-0201 (Flanagan)
sara.costello2@usdoj.gov
devon.flanagan@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

SAVE LONG BEACH ISLAND, and
ROBERT STERN, Ph.D.,

                 *Plaintiffs*,

        v.                                      Civil Case No. 1:22-cv-00055-DLF

U.S. DEPARTMENT OF THE INTERIOR,
DEB HAALAND, in her official capacity as
Secretary of the Interior, U.S. BUREAU OF
OCEAN ENERGY MANAGEMENT, and
AMANDA LEFTON, in her official capacity
as Director of Bureau of Ocean Energy
Management,

                 *Defendants*.
_____

## MOTION TO DISMISS

      Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), Defendants the U.S.

Department of the Interior; Debra Haaland, in her official capacity as Secretary of the U.S.

Department of the Interior; the U.S. Bureau of Ocean Energy Management (BOEM); and Amanda

Lefton, in her official capacity as Director of BOEM, move to dismiss Plaintiffs' Complaint for

Declaratory and Injunctive Relief for lack of jurisdiction.   Pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court lacks jurisdiction over their Complaint.

In the alternative, pursuant to Federal Rule of Civil Procedure 12(b)(6), the United States moves to dismiss the Complaint for failure to state a claim under the Administrative Procedure Act or Endangered Species Act because Plaintiffs do not challenge a final agency action that is judicially reviewable. As is more fully detailed in the accompanying memorandum, Defendants' motion should be granted and the Complaint should be dismissed in its entirety.

Respectfully submitted this 21st day of March, 2022.

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Sara E. Costello*
SARA E. COSTELLO (KS Bar No. 20898)
Trial Attorney
Natural Resources Section
(202) 305-0484
sara.costello2@usdoj.gov
DEVON FLANAGAN (D.C. Bar No. 1022195)
Trial Attorney
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0201
devon.flanagan@usdoj.gov

*Counsel for Defendants*

Of Counsel:

KATHRYN SARVER
ROBERT L. SEBASTIAN
Attorney-Advisors
Office of the Solicitor
Division of Mineral Resources
Department of the Interior
1849 C Street NW
Washington, D.C. 20240

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

SAVE LONG BEACH ISLAND, and
ROBERT STERN, Ph.D.,

                        *Plaintiffs*,

       v.

                                            Civil  Case No. 1:22-cv-00055-DLF

U.S. DEPARTMENT OF THE INTERIOR,
DEB HAALAND, in her official capacity as
Secretary of the Interior, U.S. BUREAU OF
OCEAN ENERGY MANAGEMENT, and
AMANDA LEFTON, in her official capacity
as Director of Bureau of Ocean Energy
Management,

                        *Defendants*.

_____

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

PERTINENT STATUTES ............................................................................................... 2

    I.     Outer Continental Shelf Lands Act ...................................................... 2

    II.    National Environmental Policy Act ....................................................... 3

    III.   Endangered Species Act ....................................................................... 4

    IV.   The Administrative Procedure Act ....................................................... 5

BACKGROUND ............................................................................................................. 5

    I.     BOEM's commercial leasing program ................................................. 5

         A.    The area identification process .............................................. 5

         B.    Leases for renewable-energy production ................................. 6

         C.    Approval requirements for on-site activities ........................... 7

    II.    Additional federal authorizations ........................................................ 8

    III.   Identification of the New York Bight wind energy areas .................... 9

    IV.   Environmental review and pre-auction processes ............................... 11

    V.    Auction .............................................................................................. 13

    VI.   The present litigation ......................................................................... 15

STANDARD OF REVIEW ............................................................................................ 16

ARGUMENT ................................................................................................................. 17

    I.     Plaintiffs' claims should be dismissed because they are not ripe for review ........ 17

         A.    Plaintiffs' NEPA Claim is not ripe because BOEM has not made an irretrievable commitment of resources to wind energy development in the New York Bight .......................................................... 18

         B.    Plaintiffs' ESA Claim is not ripe for review ........................... 23

    II.    Plaintiffs lack standing because they have not alleged an actual or imminent injury that is traceable to the Area ID Memorandum ........................... 25

III.    The Area ID Memorandum is not a final agency action subject to challenge.......31

        A.    The Area ID Memorandum is not the consummation of the agency's
              decision-making process .......................................................................33

        B.    No legal consequences flow from the Area ID Memorandum ................35

IV.    Plaintiffs failed to provide the mandatory 60-Day notice for their ESA claim.....37

CONCLUSION.....................................................................................................39

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)..........................................................................................18, 19

*Am. Bar Ass'n v. Fed. Trade Comm'n*,
   636 F.3d 641 (D.C. Cir. 2011) ......................................................................................31

*Baker v. Carr*,
   369 U.S. 186 (1962)..........................................................................................................16

*Banner Health v. Sebelius*,
   797 F. Supp. 2d 97 (D.D.C. 2011) ..............................................................................34

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................................16

*Bennett v. Spear*,
   520 U.S. 154 (1997)..................................................................................5, 32, 35, 38

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988)..........................................................................................................38

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*,
   685 F.2d 678 (D.C. Cir. 1982) ......................................................................................32

*Cal. Communities Against Toxics v. EPA*,
   934 F.3d 627 (D.C. Cir. 2019) ......................................................................................32

*Chamber of Commerce of the U.S. v. EPA*,
   642 F.3d 192 (D.C. Cir. 2011) ......................................................................................26

*Clarke v. United States*,
   915 F.2d 699 (D.C. Cir. 1990) ......................................................................................31

*Coal. for Mercury-Free Drugs v. Sebelius*,
   671 F.3d 1275 (D.C. Cir. 2012) ...............................................................................26, 27

*Coal. for Underground Expansion v. Mineta*,
   333 F.3d 193 (D.C. Cir. 2003) ......................................................................................17

*Conley v. Gibson*,
   355 U.S. 41 (1957)............................................................................................................16

*Conservation Law Found. v. Ross*,
   422 F. Supp. 3d 12 (D.D.C. 2019) ..............................................................................39

*\*Ctr. for Biological Diversity v. Jewell*,
   563 F.3d 466 (D.C. Cir. 2009) ...............................2, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30

*Ctr. for Sustainable Econ. v. Jewell*,
   779 F.3d 588 (D.C. Cir. 2015) ......................................................................................19

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) .................................................................................................17

*Del. Riverkeeper Network v. FERC*,
  753 F.3d 1304 (D.C. Cir. 2014) ............................................................................3, 19

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
  76 F.3d 1212 (D.C. Cir. 1996) ................................................................................37

*Exxon Mobil Corp. v. FERC*,
  501 F.3d 204 (D.C. Cir. 2007) ................................................................................17

*\*Fisheries Survival Fund v. Haaland*,
  858 F. App'x 371 (D.C. Cir. 2021) ........................................... 20, 21, 22, 23, 34

*Food & Water Watch, Inc. v. Vilack*,
  808 F.3d 905 (D.C. Cir. 2015) ................................................................................29

*Friends of Animals v. Ashe*,
  808 F.3d 900 (D.C. Cir. 2015) ................................................................................38

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000) .................................................................................................26

*Gov't of Manitoba v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019) ................................................................................. 3

*Gov't of Manitoba v. Zinke*,
  849 F.3d 1111 (D.C. Cir. 2017) ............................................................................... 3

*Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries Serv.*,
  730 F. Supp. 2d 157 (D.D.C. 2010) .......................................................................28

*Hallstrom v. Tillamook Cnty.*,
  493 U.S. 20 (1989) ...................................................................................................38

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .................................................................................................26

*Hurd v. Dist. of Columbia*,
  864 F.3d 671 (D.C. Cir. 2017) .............................................................................7, 34

*Jerome Stevens Pharms. Inc. v. Food & Drug Admin.*,
  402 F.3d 1249 (D.C. Cir. 2005) ...........................................................................7, 17

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) .............................................................................17, 33

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
  475 F.3d 1291 (D.C. Cir. 2007) ..............................................................................31

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
  376 F.3d 1123 (D.C. Cir. 2004) ............................................................................... 7

*La. Envt'l. Action Network v. Browner*,
   87 F.3d 1379 (D.C. Cir. 1996) .................................................................25

*\*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ....................................................................17, 26

*MediNatura, Inc. v. FDA*,
   998 F.3d 931 (D.C. Cir. 2021) ................................................................35

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) .............................................................................26

*Narragansett Indian Tribal Historic Pres. Off. v. Fed. Energy Regul. Comm'n*,
   949 F.3d 8 (D.C. Cir. 2020) ....................................................................30

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) .............................................................................32

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   417 F.3d 1272 (D.C. Cir. 2005) ..............................................................17

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ................................................................37

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) .............................................................................18

*Nat'l Treasury Emps. Union v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996) ..............................................................18

*National Ass'n of Home Builders v. EPA*,
   667 F.3d 6 (D.C. Cir. 2011) ...................................................................29

*Nevada v. Dep't of Energy*,
   457 F.3d 78 (D.C. Cir. 2006) ..................................................................19

*NRDC v. NRC*,
   879 F.3d 1202 (D.C. Cir. 2018) ................................................................3

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
   523 U.S. 726 (1998) .............................................................................19

*Papasan v. Allain*,
   478 U.S. 265 (1986) ....................................................................17, 32

*Publ. Emps. for Envtl. Resp. v. Hopper*,
   827 F.3d 1077 (D.C. Cir. 2016) ................................................................3

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
   324 F.3d 726 (D.C. Cir. 2003) ................................................................32

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ..............................................................................4

*Rochester Tel. Corp. v. United States*,
   307 U.S. 125 (1939) ................................................................................37

*Safari Club Int'l v. Jewell*,
   960 F. Supp. 2d 17 (D.D.C. 2013) ........................................................39

*Salmon Spawning & Recovery All. v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008) ..............................................................30

*Sec'y of Interior v. California*,
   464 U.S. 312 (1984) ................................................................................. 3

*Sierra Club v. EPA*,
   754 F.3d 995 (D.C. Cir. 2014) ..............................................................29

*Silver v. IRS*,
   531 F. Supp. 3d 346 (D.D.C. 2021) ......................................................30

*Slope Borough v. Andrus*,
   642 F.2d 589 (D.C. Cir. 1980) ..............................................................24

*Soundboard Ass'n v. Fed. Trade Comm'n*,
   888 F.3d 1261 (D.C. Cir. 2018) ............................................................32

*Sprint Corp. v. FCC*,
   331 F.3d 952 (D.C. Cir. 2003) ..............................................................18

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ................................................................................16

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ..............................................................................26

*Sw. Airlines Co. v. U.S. Dep't of Transp.*,
   832 F.3d 270 (D.C. Cir. 2016) ..............................................................32

*Texas v. United States*,
   523 U.S. 296 (1998) ..............................................................................25

*Trudeau v. Fed. Trade Comm'n*,
   456 F.3d 178 (D.C. Cir. 2006) ........................................................17, 32

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ..............................................................................32

*VanderKam v. VanderKam*,
   776 F.3d 883 (D.C. Cir. 2015) ..............................................................18

*Venetian Casino Resort, LLC v. EEOC*,
   409 F.3d 359 (D.C. Cir. 2005) ..............................................................25

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978) ................................................................................. 3

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ............................................................................... 26

*Wyo. Outdoor Council v. Bosworth*,
    284 F. Supp. 2d 81 (D.D.C. 2003) ........................................................ 24

*\*Wyo. Outdoor Council v. U.S. Forest Serv.*,
    165 F.3d 43 (D.C. Cir. 1999) ....................................... 19, 20, 21, 24

**Statutes**

16 U.S.C § 1539(a)(1) .................................................................................. 9

16 U.S.C. §§ 1371(a)(5)(A), (D) ................................................................. 9

16 U.S.C. § 1532(15) .................................................................................... 4

16 U.S.C. § 1536 ........................................................................................... 4

16 U.S.C. § 1536(a)(2) ................................................................... 4, 17, 23

16 U.S.C. § 1540(g) ..................................................................................... 31

16 U.S.C. §§ 1540(g)(1)(A), (2)(A) ................................................... 37, 39

33 U.S.C. § 1344 ........................................................................................... 9

33 U.S.C. § 403 ............................................................................................. 9

42 U.S.C. § 4332(2)(C) ................................................................................. 3

43 U.S.C. § 1331(a) ...................................................................................... 2

43 U.S.C. § 1332(3) ...................................................................................... 2

43 U.S.C. § 1337(c) ..................................................................................... 15

43 U.S.C. §§ 1337(p)(1)(C), (4), (8) .................................................. 3, 8, 23, 6

43 U.S.C. § 1344(a) ..................................................................................... 20

44 U.S.C. § 1507 ......................................................................................... 34

5 U.S.C. § 702 ............................................................................................... 5

5 U.S.C. § 704 ........................................................................... 5, 31, 32, 38

5 U.S.C. § 706(2)(A) ..................................................................................... 5

U.S. Const. art. III, § 2, cl. 1 .................................................................... 18

**Rules**

Fed. R. Civ. P. 12(b)(1) ......................................................................... 7, 16

Fed. R. Civ. P. 12(b)(6) ......................................................................... 7, 17

**Regulations**

30 C.F.R. § 528.628(f)(2) ................................................................ 8

30 C.F.R. § 585.100 ....................................................................... 6

30 C.F.R. § 585.102(a) ................................................................... 3

30 C.F.R. § 585.200(a)(2) ............................................................... 7

30 C.F.R. § 585.203 ....................................................................... 7

30 C.F.R. § 585.204 ....................................................................... 7

30 C.F.R. § 585.206(a) ................................................................... 7

30 C.F.R. § 585.210 ....................................................................... 6

30 C.F.R. § 585.211 ................................................................... 30, 33

30 C.F.R. § 585.211(a) ........................................................... 6, 9, 33

30 C.F.R. §§ 585.211(b), (b)(2), (b)(3) ..................................... 6, 21, 33

30 C.F.R. § 585.215 ....................................................................... 6

30 C.F.R. § 585.216 ....................................................................... 6

30 C.F.R. § 585.224(a) ................................................................... 15

30 C.F.R. § 585.230 .................................................................. 6, 37

30 C.F.R. §§ 585.231(a), (b), (c) ................................................. 6, 37

30 C.F.R. § 585.600 ................................................................ *passim*

30 C.F.R. § 585.611 ....................................................................... 8

30 C.F.R. §§ 585.613, (b), (e), (e)(2) .............................................. 8

30 C.F.R. §§ 585.621, (d) .......................................................... 23, 28

30 C.F.R. § 585.626 ....................................................................... 27

30 C.F.R. §§ 585.627, (b), (f) ............................................... 8, 27, 28

30 C.F.R. § 585.628(a), (b), (f) ........................... 8, 22, 23, 28, 34, 35

30 C.F.R. §§ 585.210–585.225 ....................................................... 6

30 C.F.R. §§ 585.231(d)–(f) ........................................................... 6

30 C.F.R. §§ 585.235(a)(1)–(2) ..................................................... 22

30 C.F.R. §§ 585.515–585.537 ..................................................... 15

30 C.F.R. §§ 585.605–585.613 ....................................................... 8

30 C.F.R. §§ 585.610–585.611 ....................................................... 8

30 C.F.R. §§ 585.620–585.629 .................................................................................. 8

30 C.F.R. §§ 585.626–585.627 .................................................................................. 8

50 C.F.R. § 17.11 ...................................................................................................... 4

50 C.F.R. § 17.2(b) ................................................................................................... 4

50 C.F.R. § 402.01(b) ............................................................................................... 4

50 C.F.R. § 402.02 ...............................................................................................4, 36

50 C.F.R. §§ 402.13–402.14 ....................................................................................23

50 C.F.R. § 402.13(c) ................................................................................................ 5

50 C.F.R. § 402.14(a)–(b), (g)(4), (h)(3) ..............................................................4, 5

50 C.F.R. Part 402 .................................................................................................... 4

74 Fed. Reg. 19,638 (Apr. 29, 2009) ...................................................................6, 35

83 Fed. Reg. 15,602 (Apr. 11, 2018) ..........................................................9, 29, 33

83 Fed. Reg. 32,896 (July 16, 2018) .......................................................................29

86 Fed. Reg. 31,524 (June 14, 2021) ...........................................................10, 11, 29, 34

87 Fed. Reg. 2,446 (Jan. 14, 2022) ...........................................7, 11, 13, 15, 27, 34

## INTRODUCTION

Plaintiffs Save Long Beach Island and Robert Stern, Ph.D., challenge a U.S. Bureau of Ocean Energy Management (BOEM) memorandum dated March 26, 2021, identifying wind energy areas within the New York Bight to be considered for possible renewable energy leasing. The BOEM memorandum—referred to as the Area ID Memorandum—does not authorize any activities on the outer continental shelf. Rather, it is only a preliminary regulatory step that BOEM uses to identify areas for environmental analysis and consideration for possible future leasing. BOEM retains the right to disapprove the construction or operation of any future wind energy development within the New York Bight that would have "unacceptable environmental consequences," would violate the Endangered Species Act (ESA), or would conflict with the Outer Continental Shelf Lands Act (OCSLA) requirements.

Plaintiffs contend that BOEM acted arbitrarily or contrary to law by issuing the Area ID Memorandum (1) without first assessing under the National Environmental Policy Act (NEPA) the potential environmental effects of the New York Bight wind energy areas and other wind energy areas in the region, and alternative levels of wind energy development and locations; and (2) without consulting under the ESA with the National Marine Fisheries Service.

The Court should dismiss Plaintiffs' claims on four independent grounds. First, Plaintiffs' NEPA claim is unripe because BOEM has neither approved a construction and operations plan for a wind energy facility in the New York Bight nor otherwise made an irreversible and irretrievable commitment of resources to development of any wind energy project. Similarly, Plaintiffs' ESA claim is unripe because BOEM has not taken any action that may affect species listed as threatened or endangered under the ESA or any designated critical habitat.

Second, Plaintiffs lack standing. Plaintiffs have not alleged that they will suffer a

"certainly impending and immediate" injury. Plaintiffs' alleged injuries are all based on an anticipated eventual construction and operation of wind energy facilities in the New York Bight. But the Area ID Memorandum does not authorize such development, and a series of subsequent federal approvals, many of which are still hypothetical, must be given before any offshore wind facilities in the New York Bight can be built.

Third, Plaintiffs do not challenge any final agency action as required by the Administrative Procedure Act (APA) and the ESA. The Area ID Memorandum does not represent the consummation of BOEM's decision-making process regarding the approval or siting of any wind energy development projects in the New York Bight. And no legal consequences flow from the Area ID Memorandum—it does not approve any activities within the wind energy areas or even award any leases (which themselves do not result in an irreversible or irretrievable commitment of resources).

Finally, Plaintiffs' ESA claim should be dismissed because Plaintiffs failed to provide the mandatory 60-day notice prior to filing suit under the ESA. For all these reasons, the Complaint must be dismissed.

## PERTINENT STATUTES

### I.      Outer Continental Shelf Lands Act

The outer continental shelf consists of the submerged lands beneath the ocean, generally the area from 3 to 200 nautical miles seaward of the coastline. *Ctr. for Biological Diversity v. Jewell*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under OCSLA, the United States holds the outer continental shelf as a "vital national resource reserve . . . for the public," which Congress declared "should be made available for expeditious and orderly development, subject to environmental safeguards." 43 U.S.C. § 1332(3). Congress enacted OCSLA in 1953 to authorize

oil and gas leasing. *Sec'y of Interior v. California*, 464 U.S. 312, 336 (1984). In 2005, Congress amended OCSLA to authorize the Secretary of the Interior to issue leases on the outer continental shelf to "support production, transportation, storage, or transmission of energy from sources other than oil and gas," including wind, waves, and ocean currents. 43 U.S.C. § 1337(p)(1)(C); *Publ. Emps. for Envtl. Resp. v. Hopper*, 827 F.3d 1077, 1080–81 (D.C. Cir. 2016). In Section 8(p)(4) of OCSLA, Congress directed that, in approving any lease, easement, or right-of-way, the Secretary "shall ensure" that all authorized activities within the outer continental shelf are "carried out in a manner that provides for" twelve enumerated goals. 43 U.S.C. § 1337(p)(4)(A)–(L). These include, inter alia, protection of the environment; conservation of natural resources; prevention of interference with reasonable uses of the exclusive economic zone, high seas, and territorial seas; consideration of other uses of the sea and seabed, including fishing and navigation concerns; and the opportunity for public notice and comment on lease proposals. *Id.*; *see also* 30 C.F.R. § 585.102(a).

## II.   National Environmental Policy Act

Under NEPA, before taking any "major Federal action[] significantly affecting the quality of the human environment," a federal agency must prepare, for public review, a detailed statement discussing the likely environmental impacts of the action and potential alternatives. 42 U.S.C. § 4332(2)(C); *NRDC v. NRC*, 879 F.3d 1202, 1207 (D.C. Cir. 2018). This requirement is "essentially procedural," designed to ensure that agency decisions are "fully informed and well considered." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1309–10 (D.C. Cir. 2014) (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)). NEPA imposes "action-forcing procedures" to ensure that agencies take a "hard look" at environmental consequences. *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 176 (D.C. Cir. 2019) (quoting *Gov't*

*of Manitoba v. Zinke*, 849 F.3d 1111, 1115 (D.C. Cir. 2017)).  NEPA does not mandate particular outcomes.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

## III.    Endangered Species Act

Section 7 of the ESA provides that each federal agency must, in consultation with the Fish and Wildlife Service (FWS) and/or the National Marine Fisheries Service (NMFS) (the "consulting agencies"),[1] insure that "any action authorized, funded, or carried out by such agency" is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of any designated "critical habitat" for listed species. 16 U.S.C. § 1536(a)(2).  To "[j]eopardize the continued existence of" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  To assist action agencies in complying with this provision, Section 7 of the ESA and its implementing regulations set out a detailed consultation process for determining the biological impacts of a proposed activity.  16 U.S.C. § 1536; 50 C.F.R. Part 402.

Section 7 consultation requirements are triggered only where an action authorized, funded or carried out by an agency "may affect" a listed species or critical habitat; that is, if an action has no effect on listed species or critical habitat, the consultation requirements do not apply.  If an agency determines that its proposed action "may affect" a listed species or critical habitat, the agency must engage in "informal" or "formal" consultation with the consulting agencies.  50

---

[1] The Secretaries of the Interior and Commerce are responsible for implementing the ESA, and they have delegated their respective responsibilities to FWS and NMFS. 16 U.S.C. § 1532(15); 50 C.F.R. § 402.01(b).  In general, FWS is the consulting agency regarding terrestrial and freshwater species, and NMFS is the consulting agency regarding most marine species and anadromous fish.  *See* 50 C.F.R. §§ 17.2(b), 17.11, 402.01(b) .

C.F.R. § 402.14(a)–(b).  In informal consultation,  if the action agency determines, "with the written concurrence of [the consulting  agency], that the action is not likely  to adversely affect listed  species or critical habitat, the consultation  process is terminated, and no further action is necessary."  50 C.F.R. § 402.13(c).  If, however, the action agency or the consulting  agency determines that the action is "likely  to adversely affect" listed species or designated critical habitat, the agencies must engage in formal consultation, culminating  in a "biological  opinion" determining  whether the action is likely  to jeopardize  a listed  species or destroy or adversely modify  critical habitat. 50 C.F.R. §§ 402.13(c), 402.14(a)–(b),  (g)(4), (h)(3) .

## IV.     The Administrative Procedure Act

The APA identifies  who may challenge  agency action and what actions may be challenged. Section 702 provides  a cause of action for those suffering actual injury  as a result of a final agency action.  5 U.S.C. § 702.  A "final agency action"  may be challenged  judicially  under the APA. 5 U.S.C. § 704 ("Agency  action  made reviewable  by statute and *final agency action for which there is no other adequate remedy in a court* are subject to judicial  review." (emphasis  added)). "Final  agency action" is the consummation  of the agency's decision-making  process from which "legal consequences will  flow" or "rights or obligations  have been determined."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Under the APA, the court may "hold unlawful and set aside" final agency action that it finds to be "arbitrary, capricious,  an abuse of discretion,  or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## BACKGROUND

## I.     BOEM's commercial leasing program

### A.     The area identification process

Pursuant to agency regulations,  BOEM exercises the Secretary's authority  to issue leases

for energy development on the outer continental shelf. *See* 30 C.F.R. § 585.100; *see also* 43 U.S.C. § 1337(p)(8) (authority to issue regulations). Under the regulations, BOEM may publish a notice to solicit interest in renewable energy leasing on the outer continental shelf, 30 C.F.R. § 585.210, and may publish a call for information and nominations of potential lease areas, *id.* § 585.211(a). [2] Based on information and nominations received and the agency's own consideration of relevant factors, BOEM will then "identify areas for environmental analysis and consideration for leasing." *Id.* § 585.211(b). In so doing, BOEM "will evaluate potential effects of leasing on the human, marine, and coastal environments," *id.* § 585.211(b)(2), and will consult with "appropriate Federal agencies, States, local governments, affected Indian Tribes, and other interested parties." *Id.* § 585.211(b)(3). The goal of the area identification process is to identify "the geographical area of the proposed action to be analyzed in an ensuing environmental analysis document (e.g., EIS, EA), any alternatives to the proposed action, and mitigation measures and other issues to be analyzed and considered further" to "help industry and the Federal Government (and ultimately the taxpayer) focus on promising acreage and avoid needless expense." 74 Fed. Reg. 19,638, 19,659 (Apr. 29, 2009).

**B.**     **Leases for renewable-energy production**

After identifying "wind energy areas," BOEM may proceed to offer the identified areas or portions of those areas for lease sale by auction. 30 C.F.R. §§ 585.215, 585.216. Prior to issuing

---

[2] Even if BOEM has not issued a call for a particular area, commercial entities may submit unsolicited requests to lease areas not already scheduled for a lease sale. 30 C.F.R. §§ 585.230, 585.231(a). In such a case, BOEM will issue a "request for interest" to determine if there is competitive interest in the proposed lease area. *Id.* § 585.231(b). If commercial interest is identified, BOEM will proceed under the rules governing competitive leasing, including the consultation process for identifying the lease area. *Id.* § 585.231(c) (referring to *id.* §§ 585.210–585.225). If no competitive interest is identified, BOEM may offer a noncompetitive lease on specific terms, again after public notice, and after consultation and coordination with affected federal agencies, states, local governments, and Native American Tribes. *Id.* § 585.231(d)–(f).

any lease, BOEM will coordinate and consult with relevant Federal agencies and other governmental entities, as directed by OCSLA or other relevant Federal laws. *Id.* § 585.203. "BOEM will determine the size for each lease based on the area required to accommodate the anticipated activities." *Id.* § 585.206(a). BOEM may not lease any area "within the exterior boundaries of any unit of the National Park System, National Wildlife Refuge System, National Marine Sanctuary System, or any National Monument." *Id.* § 585.204.

### C.    Approval requirements for on-site activities

Under BOEM's renewable energy program, a lease does not authorize any on-site activities. *See, e.g.*, 87 Fed. Reg. 2446, 2451–52 (Jan. 14, 2022) (discussing BOEM's most recent renewable energy commercial form (BOEM-0008)).[3] Rather, a lease only provides the lessee with the exclusive right to submit plans (e.g., a site assessment plan and a construction and operations plan) for BOEM's consideration. Area ID Memorandum, ECF No. 1-6 (attached for the Court's convenience as Ex. 1) at 5;[4] *see also* BOEM-0008. Therefore, a lessee's right to "install and operate facilities" for the "production of energy from a renewable energy source," is "subject to obtaining the necessary approvals." 30 C.F.R. § 585.200(a)(2); *id.* § 585.600.

---

[3] BOEM-0008 can be found at https://www.boem.gov/sites/default/files/about-boem/Procurement-Business-Opportunities/BOEM-OCS-Operation-Forms/BOEM-0008-Oct-2016.pdf (last visited March 17, 2022).

[4] A motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) or 12(b)(6) may rely upon "the facts alleged in the complaint, any documents either attached to or incorporated in the com-plaint and matters of which [the court] may take judicial notice." *Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (citation omitted). The Area ID Memorandum was referenced in and attached to Plaintiffs' Complaint and therefore can be considered in regard to all of Defendants' arguments without converting this motion into one for summary judgment. *See* Compl. at 1 n.1, ECF No. 1; ECF No. 1-6. Additionally, when ruling on a motion pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court may consider materials outside of the pleadings to determine whether, as a factual matter, the Court lacks jurisdiction. *See Jerome Stevens Pharms. Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004).

Before conducting "any site assessment activities," for example, deployment of meteorological buoys or installation of meteorological towers for data collection, on a leasehold, a lessee must submit and obtain BOEM approval of a "site assessment plan" adhering to specified regulatory requirements. *Id*. § 585.600 (referring to *id*. §§ 585.605–585.613).

Likewise, before conducting "any activities pertaining to [the] construction of facilities for commercial operation," a lessee must submit and obtain BOEM's approval of a "construction and operations plan" that adheres to additional regulatory requirements. *Id*. § 585.600 (referring to *id*. §§ 585.620–585.629). After reviewing any site assessment or construction and operations plan for compliance with these requirements—and to ensure that the plan provides for the goals specified in OCSLA § 8(p)(4), 43 U.S.C. § 1337(p)(4)—BOEM may "approve, disapprove, or approve [the plan] with modifications." 30 C.F.R. §§ 585.613(e), 585.628(f). If BOEM disapproves a site assessment or construction and operations plan, BOEM will inform the lessee of the reasons and provide the lessee an opportunity to submit a revised plan with corrective changes to address the concerns identified. *Id*. §§ 585.613(e)(2), 528.628(f)(2). But the regulations do not guarantee that the lessee will ultimately obtain an approval. *Id*.

Decision points for project-related NEPA review are specified in BOEM's regulations. *See* 30 C.F.R. §§ 585.611, 585.613, 585.627, 585.628. Specifically, BOEM will conduct NEPA review prior to or in connection with the approval of any site assessment plan, *id*. §§ 585.611, 585.613(b), and prior to any approval of a construction and operations plan, *id*. § 585.628(b). Lessees must provide detailed information at each stage to enable such review. *Id*. §§ 585.610–585.611, 585.626–585.627 (tables).

## II.   Additional federal authorizations

BOEM is not the only federal agency involved in authorizing and permitting activities

related to offshore wind energy development.  For example, if a lessee proposes to discharge fill below the high tide line of waters of the United States and to perform work and place structures below the mean high water mark of navigable waters of the United States, such activities would require authorization from the U.S Army of Corps of Engineers.  *See* 33 U.S.C. § 403; 33 U.S.C. § 1344.  Additionally, if the project may incidentally harass or otherwise take a marine mammal, the lessee must obtain authorization from NMFS pursuant to the Marine Mammal Protection Act. *See* 16 U.S.C. § 1371(a)(5)(A), (D).  Similarly, if private activities pertaining to offshore wind development, which are not authorized by a federal agency and therefore not subject to ESA Section 7 consultation, may take listed species, the lessee must apply for an incidental take permit under the ESA.  *See* 16 U.S.C § 1539(a)(1).

## III. Identification of the New York Bight wind energy areas

The New York Bight—an offshore area extending roughly from Cape May in New Jersey to Montauk Point on the eastern tip of Long Island—"contains three elements that are critical for successful offshore wind development—sustainable wind speeds, relatively shallow water depths with buildable substrate and robust regional energy demand."  Area ID Memorandum at 6–7.

On April 11, 2018, BOEM issued a Call for Information and Nominations for Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight.  83 Fed. Reg. 15,602 (Apr. 11, 2018); *see also* 30 C.F.R. § 585.211(a).  At this preliminary stage, BOEM invited the submission of information and nominations for commercial wind energy leases that would allow a lessee to propose the construction of a wind energy project on the outer continental shelf in the New York Bight.  83 Fed. Reg. at 15,602.  The "Call" contained four proposed areas for leasing.  *Id.* at 15,603.  BOEM delineated the Call Areas in consultation with various parties and government entities, and sought input from the public.  BOEM received roughly 130 public

comments and nominations from nine offshore wind developers in response to the Call. 86 Fed. Reg. 31,524, 31,525 (June 14, 2021).

On March 26, 2021, the Chief of the Office of Renewable Energy Programs transmitted the Area ID Memorandum to the Director of BOEM recommending five wind energy areas in the New York Bight. Area ID Memorandum at 1, 29–39. After considering public comments, input from the intergovernmental task forces, and other feedback, BOEM identified 807,383 acres of wind energy areas, a reduction from the more than 1,700,000 acres identified in the Call. *Id*. at 1. Through the area identification process, BOEM identified the offshore locations most suitable for leasing, while considering multiple competing uses and environmental concerns that may be associated with a proposed area's potential for commercial wind development. *Id*. at 4, 13–24.

The Area ID Memorandum includes the following map of the wind energy areas:



The Director of BOEM concurred in the recommendation that same day. *Id.* at 39.

## IV.   Environmental review and pre-auction processes

In June 2021, BOEM published notice of a proposed lease sale of the New York Bight wind energy areas. 86 Fed. Reg. at 31,524. In the notice, BOEM reduced the proposed areas available to lease to 627,331 acres. *Id.* at 31,525–26. Shortly afterwards, BOEM published a draft environmental assessment (EA) under NEPA analyzing the potential effects of site characterization (i.e., geotechnical, geophysical, and biological surveys of the lease area) and site assessment activities. *Id.* at 31,525; Final EA (attached as Ex. 2) at 77.[5] In the course of preparing the EA, BOEM conducted a series of meetings and outreach to hear concerns from the public. Final EA at 76–77. Following publication of the EA and notice of the proposed sale, BOEM held additional public meetings and received further written comments. *Id.* at 77–78. Upon consideration of all comments, BOEM published a final EA in December 2021. *Id.* BOEM determined that the effects of lease issuance and site characterization and assessment would be "negligible" to "minor," and so it issued a finding of no significant impact. *Id.* at ES-3; 87 Fed. Reg. at 2,450.

Consistent with the limited legal rights bestowed by an offshore wind lease, the EA did not consider potential impacts from the construction or operation of any commercial wind power facilities. Final EA at 3. BOEM explained that the issuance of a lease did not constitute an "irreversible and irretrievable commitment" of resources for development activities: BOEM retained the authority, as part of its review of any construction and operation plan, to "prevent"

---

[5] The EA explains that the issuance of the lease itself and the associated rights-of-way or rights-of-use and easement merely allow lessees the exclusive right to submit plans to BOEM for future development, and therefore are not themselves "an irreversible and irretrievable commitment of resources." Final EA at ES-1–2.

environmental impacts by "disapproving" any plan or any aspect of a plan for "failure to meet the statutory standards set forth in the Outer Continental Shelf Lands Act." *Id.* BOEM observed that the environmental effects of any construction and operations plan would depend in part on design parameters to be determined from data gathered during site characterization and assessment activities. *Id.* at 4.

BOEM also engaged in informal ESA consultation with FWS prior to issuing the final sale notice. Final EA at 78. On August 10, 2021, BOEM submitted a biological assessment to FWS regarding species and critical habitat that may be affected by activities associated with the issuance of a lease and preparation of a site assessment plan within the New York Bight. On October 25, 2021, FWS concurred with BOEM's determination that the activities were "not likely to adversely affect" the species at issue for FWS. *Id.*

BOEM also engaged in informal ESA consultation with NMFS, but did so on a programmatic basis. In February 2021, BOEM submitted a revised programmatic biological assessment to NMFS regarding the "effects of installing met buoys, conducting geophysical and geotechnical surveys with specified HRG equipment, and conducting associated vessel activities for offshore wind energy development projects off the U.S. Atlantic Coast." *Id.* In June 2021, NMFS issued a letter stating that the programmatic consultation was complete and concurring in the determination that the analyzed activities, subject to the attached project design criteria, were "not likely to adversely affect" listed species or critical habitat. *Id.*

If and when they occur, BOEM will engage in further ESA analysis for any activities it authorizes in the future that are not covered by these consultations with FWS and NMFS, including analyzing the impacts of constructing and operating wind energy projects prior to any approval of a construction and operations plan. *Id.*; Area ID Memorandum at 4 ("Potential

impacts of a specific proposed renewable energy facility in the identified areas would be addressed during the review of a Construction and Operations Plan (COP), since it is then when project-specific information becomes available."); Area ID Memorandum at 2–3, 5–6.

## V.     Auction

BOEM then proceeded to issue a final notice of sale.  In response to the comments BOEM received after proposing the lease sale, BOEM again reduced the total acreage available to lease to 488,201 acres. 87 Fed. Reg. at 2,447.  After issuing the Final EA and finding of no significant impact for lease issuance and site characterization and assessment activities, on January 14, 2022, BOEM published a final sale notice, announcing its intent to offer the modified lease area for sale by public auction.  *Id.* at 2,446, 2,450.  BOEM explained that it reduced the available acreage by 22% based on comments from ocean users, such as the fishing industry, the U.S. Coast Guard, the National Marine Fisheries Service, and the Department of Defense.  *Id.* at 2,448.

The final lease sale notice included the following map of the area offered for leasing:



Figure 1 to Section IV - ATLW-8 Final Lease Areas

In its notice, BOEM alerted bidders that the "issuance of any lease resulting from this sale would not constitute an approval of project-specific plans to develop offshore wind energy." *Id.* at 2,446. BOEM explained that "[s]uch plans, if submitted by the lessee, would be subject to subsequent environmental, technical, and public reviews prior to a decision on whether the proposed development should be authorized." *Id.*

The lease sale was held in February 2022 and BOEM announced the provisional winners of leases. *See* Dep't of the Interior Press Release (Feb. 25, 2022) (attached for the Court's convenience as Ex. 3).[6] Following the conclusion of the auction, BOEM must allow the Department of Justice and Federal Trade Commission up to 30 days to review the auction results. 43 U.S.C. § 1337(c). BOEM will then deliver leases to the auction winners. 87 Fed. Reg. at 2,448.

After the auction winners sign the leases, post financial assurance (30 C.F.R. §§ 585.515–585.537), and pay the full balance of the winning bids (*id*. § 585.224(a)), "BOEM will make a final determination regarding its issuances of the leases and will execute the leases, if appropriate." 87 Fed. Reg. at 2,448.

## VI.   The present litigation

Plaintiffs filed their two-count complaint before BOEM published its final sale notice. Plaintiffs include a non-profit organization, Save Long Beach Island, allegedly established to protect the natural and human resources of the New York Bight Wind Energy Area and those directly to the south, and Robert Stern, Ph.D., who resides on Long Beach Island and is the president of Save Long Beach Island. Compl. ¶¶ 4–5.[7]

---

[6] Available at https://www.doi.gov/pressreleases/biden-harris-administration-sets-offshore-energy-records-437-billion-winning-bids-wind (last visited March 17, 2022).

[7] For purposes of this Rule 12 motion, Defendants cite the Complaint for applicable background.

Plaintiffs contend that BOEM's Area ID Memorandum identifying wind energy areas in the New York Bight is arbitrary, capricious, and otherwise not in accordance with law. Compl. at 1. Specifically, Plaintiffs allege that BOEM violated NEPA by failing to prepare a programmatic environmental impact statement (EIS) (1) evaluating the impacts of developing the New York Bight Wind Energy Areas and other "connected" wind energy areas, and (2) considering alternative levels of wind energy development and locations. *Id.* ¶¶ 50–64. Plaintiffs also allege that BOEM violated the ESA by failing to consult with NMFS prior to selecting the New York Bight wind energy areas. *Id.* ¶¶ 65–70.[8] Plaintiffs request that the Area ID Memorandum be reversed and set aside, and that attorneys' fees and costs be awarded to Plaintiffs. Compl. at 27, Prayer for Relief.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of claims where the court lacks jurisdiction. *Baker v. Carr*, 369 U.S. 186, 198 (1962). Jurisdiction is a threshold issue that a court must determine first. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause."). No subject matter

---

However, in the event the Court denies the motion and the case proceeds, Defendants reserve the right to challenge the validity of any of Plaintiffs' allegations.

[8] Plaintiffs' Complaint additionally mentions an alleged violation of the Marine Mammal Protection Act in one paragraph of the section labeled "Count Two: Violation of the ESA." *See* Compl. ¶ 69; *see also id.* at 26-27. Plaintiffs do not provide any allegations explaining how Defendants allegedly violated the Marine Mammal Protection Act or identifying which provision of the Act is at issue. Plaintiffs have failed to state a claim under the Marine Mammal Protection Act by providing no supporting allegations or identifying the precise violation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (the complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'" (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957))). But to the extent the Court construes this single unsupported allegation as a claim, it is subject to dismissal for the same reasons as the other claims: it is unripe, Plaintiffs lack standing, and Plaintiffs have not challenged a final agency action.

jurisdiction exists without establishing standing and ripeness. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1286 (D.C. Cir. 2005); *Exxon Mobil Corp. v. FERC*, 501 F.3d 204, 207–08 (D.C. Cir. 2007). Plaintiffs bear the burden of establishing each element of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Generally, the Court must accept the factual allegations in the complaint as true, but may also consider materials outside of the pleadings. *Jerome Stevens Pharm.*, 402 F.3d at 1253–54; *see also Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (the court may resolve "disputed facts" when ruling on a motion under Rule 12(b)(1)).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of claims where Plaintiffs have failed to state a claim upon which relief can be granted. While the Court must treat every factual allegation as true, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Additionally, the Court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

## ARGUMENT

**I.    Plaintiffs' claims should be dismissed because they are not ripe for review.**

Plaintiffs' NEPA claim is not ripe because BOEM has not made an irreversible and irretrievable commitment of resources to an action that may affect the environment and Plaintiffs' stated interests therein. Similarly, Plaintiffs' ESA claim is not ripe because BOEM has not taken any action that may affect species listed as threatened or endangered under the ESA or any designated critical habitat. 16 U.S.C. § 1536(a)(2).

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies."   U.S. Const. art. III, § 2, cl. 1.   One aspect of this limitation is the "ripeness" doctrine, which precludes courts from prematurely adjudicating "abstract disagreements" that have not yet "fully crystalized."   *VanderKam v. VanderKam*, 776 F.3d 883, 888 (D.C. Cir. 2015) (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996)).   In the context of suits for judicial review of agency action, the ripeness doctrine allows courts to avoid "entangling themselves in abstract disagreements over administrative policies," and it "protect[s] . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."   *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).   The existence of "final agency action" is "'a crucial prerequisit[e]' to ripeness."   *Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003) (citation omitted).[9]

### A.   Plaintiffs' NEPA Claim is not ripe because BOEM has not made an irretrievable commitment of resources to wind energy development in the New York Bight.

NEPA obligations are triggered—and, assuming all other jurisprudential requirements are met, claims for NEPA noncompliance are fit for judicial review—when an agency makes a decision that will result in an "irreversible and irretrievable" commitment of resources. In alleging that BOEM failed to comply with NEPA when selecting wind energy areas within the New York Bight, Plaintiffs assume that BOEM has made an irreversible and irretrievable commitment of resources to wind power development in that area. *See* Compl. ¶¶ 46, 49, 52, 57.   But BOEM's Area ID Memorandum only identifies areas for environmental analysis and consideration for leasing.   It does not authorize any physical activities that could impact any marine animals or the

---

[9] As explained in Argument Part IV, the Area ID Memorandum is not a final agency action.

environment of the outer continental shelf. Moreover, as directed by its regulations—and as Plaintiffs acknowledge—BOEM must conduct further NEPA review and approve a construction and operations plan (that has yet to be submitted) before any wind energy facilities can be constructed within the New York Bight. *See, e.g., id.* ¶¶ 48, 57, 63. And critically, BOEM retains the right to preclude the construction of such facilities. For these reasons, Plaintiffs' NEPA claim is unripe.

For purposes of NEPA, the D.C. Circuit has held that a claim is not ripe until an agency's NEPA obligations "mature," which is the point at which an agency makes an "irreversible and irretrievable" commitment of resources to an action that may affect the environment. *Ctr. for Biological Diversity*, 563 F.3d at 480; *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999). Further, a potential NEPA plaintiff suffers no hardship from having to participate in ongoing NEPA proceedings prior to the commitment of resources to a particular action and before environmental effects can occur. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 599–600 (D.C. Cir. 2015).

The "irreversible and irretrievable commitment" requirement flows from NEPA itself. The statute is aimed at ensuring federal decision-makers consider the potential environmental impacts of their actions before taking them. *See Del. Riverkeeper Network*, 753 F.3d at 1309–10. There can be no violation of that principle prior to when a decision has been made to take the action in question. *See Nevada v. Dep't of Energy*, 457 F.3d 78, 84–85 (D.C. Cir. 2006) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733–37 (1998)). Stated differently, absent an irreversible and irretrievable commitment of resources, a NEPA claim is not fit for judicial review. *See Abbot Labs.*, 387 U.S. at 149.

Last year, the D.C. Circuit applied this principle to BOEM's multi-step process for issuing leases for energy development on the outer continental shelf and held that a NEPA challenge brought at the threshold stage is not ripe. In *Fisheries Survival Fund v. Haaland*, the D.C. Circuit reviewed a challenge to a BOEM lease for a potential wind energy facility off the Atlantic Coast between New York and New Jersey. 858 F. App'x 371, 371–72 (D.C. Cir. 2021). As the Circuit recognized, the lease did not "authorize *any activity* within the leased area;" rather, it only permitted the lessee to submit development plans for BOEM to review under NEPA, OCSLA, and other statutes. *Id*. at 372. Because the lease reserved BOEM's right to disapprove any site assessment or any construction and operations plan that would have unacceptable environmental consequences, the D.C. Circuit concluded that the "lease did not trigger the Bureau's NEPA obligations." *Id*.

Although it arose in a different context involving oil and gas leasing, the D.C. Circuit reached a similar conclusion in *Center for Biological Diversity*. There, the D.C. Circuit addressed NEPA and ESA challenges to a five-year program adopted as the first step in a process for issuing offshore oil and gas leases under OCSLA. 563 F.3d at 473–74. OCSLA requires the five-year program to include a schedule of proposed lease sales, "indicating, as precisely as possible, the size, timing, and location of leasing activity." *Id*. at 473 (quoting 43 U.S.C. § 1344(a)). The appellate court held that a NEPA challenge brought at this threshold stage was unripe, because the leasing program had not reached the "critical stage" of an "irreversible and irretrievable commitment of resources" to an action with environmental impacts. *Id*. at 480 (quoting *Wyo. Outdoor Council*, 165 F.3d at 49).

The D.C. Circuit's decision in *Wyoming Outdoor Council* is also instructive. In that case, the plaintiffs brought their NEPA challenge at an early stage of the process for issuing oil and gas

leases on National Forest land.  165 F.3d at 47.  At this first stage, the Forest Service only identifies and maps "areas that might be suitable for leasing."  *Id*. at 45.  The D.C. Circuit concluded that the plaintiffs' NEPA claim was "premature."  *Id*. at 50.  Because the Forest Service had authorized no surface-disturbing activities, the "point of irreversible and irretrievable commitment of resources" had not been reached.  *Id*.

The processes for developing oil and gas leases in *Center for Biological Diversity* and *Wyoming Outdoor Council* are ultimately different than those used in BOEM's offshore wind energy leasing program.  *See*, *e.g.*, 563 F.3d at 472–73 (describing the latter exploration, production, and development stages for offshore oil and gas leases); 165 F.3d at 145 (prior to offering specific lands for leasing, the Forest Service certifies that development could be allowed on the leases).  And as explained in *Fisheries Survival Fund*, neither case "examined under what circumstances an energy lease constitutes an irreversible and irretrievable commitment of resources for NEPA purposes."  858 F. App'x at 372.  But both *Center for Biological Diversity* and *Wyoming Outdoor Council* show that a NEPA claim is unripe when, like here, an agency has not made a decision that will result in an "irreversible and irretrievable" commitment of resources.

Plaintiffs' NEPA claim is incompatible with this D.C. Circuit precedent.  BOEM has not committed to an action with potential environmental effects and acknowledges that further NEPA review is required *before* BOEM might make such a commitment.  Indeed, Plaintiffs challenge an even earlier step in the process—the designation of the wind energy areas—than the lease sale analyzed in *Fisheries Survival Fund*.  Compl. at 1; 858 F. App'x at 371.  The Area ID Memorandum does not authorize any wind energy development in the New York Bight.  Rather, the Area ID Memorandum is only a preliminary regulatory step "used to identify areas for environmental analysis and consideration for leasing."  Area ID Memorandum at 4; 30 C.F.R.

§ 585.211(b).  The identification of wind energy areas in the New York Bight "does not constitute a final leasing decision," nor does it authorize any physical activities.  Area ID Memorandum at 2, 5.  And the Area ID Memorandum makes clear that BOEM reserves authority "under its regulations to issue leases in smaller, fewer and/or different areas—or issue no leases." *Id*. at 2–3; *see also id*. at 28 (some of the wind energy areas "may ultimately not be offered as lease areas").  BOEM also must conduct further NEPA analysis "if wind energy facilities are proposed on those leases." *Id*. at 3; 30 C.F.R. § 585.628(b) (BOEM will prepare NEPA analysis if and when it receives a construction and operations plan). *See also* Compl. ¶¶ 48, 57, 63 (alleging that BOEM will undertake future NEPA analysis).

Plaintiffs err in asserting that BOEM has made "an irretrievable commitment of resources" merely by defining the areas in the New York Bight within which wind energy development may be considered. *Id*. ¶ 52.  When Plaintiffs filed their complaint, BOEM had not yet held a lease sale auction and any potential lessees are far—up to six years—from potentially submitting a construction and operations plan for BOEM's NEPA review (if they opt to do so at all). 30 C.F.R. § 585.235(a)(1)–(2);  Decl. of James F. Bennett (Decl.) ¶¶ 5–6.[10]  Until a construction and

---

[10] The fact that BOEM held a lease sale auction after the filing of the Complaint does not cure the ripeness defects present in this case.  Any leases executed as a result of the lease sale auction will not authorize on-the-ground activity without further approvals. *See supra* Background Part I(C).  As discussed above, the D.C. Circuit has made clear that the issuance of a BOEM lease for a potential facility does not amount to an "irreversible and irretrievable commitment" to wind energy development. *Fisheries Survival Fund*, 858 F. App'x at 372.  In addition, *Center for Biological Diversity* addressed similar circumstances and found (even assuming that a lease sale in the oil and gas context would constitute an irreversible and irretrievable commitment of resources) that "the fact that Interior conducted one lease-sale in the Chukchi Sea since the time these petitions for review were filed does not make either Petitioners' NEPA claims or its ESA claim more ripe," noting that the agency conducted environmental analyses prior to the lease sale. 563 F.3d at 481 n.1.  The same is true here: BOEM completed a Final EA on impacts expected to occur as a result of the lease sales and subsequent approvals prior to the lease sale auction.  BOEM also completed the ESA consultations described above. *See supra* Background Part IV.  Plaintiffs have not challenged those NEPA or ESA determinations.

operations plan is presented and approved by BOEM, no wind energy development or associated construction and operational impacts are authorized within the New York Bight. 30 C.F.R. § 585.600 (before conducting "any activities pertaining to construction of facilities for . . . commercial lease," lessees must submit a construction and operations plan and obtain BOEM approval). If BOEM determines—after NEPA analysis of any construction and operations plan— that the proposed activities will cause "undue harm or damage" to marine animals or other environmental resources, BOEM would disapprove the plan. *Id*. §§ 585.621(d), 585.628(f); *see also* 43 U.S.C. § 1337(p)(4). Because the potential impacts to the environment (and to Plaintiffs' interests) remain to be fully evaluated under NEPA, and because BOEM retains authority to disapprove any wind energy facility proposed within the New York Bight depending on the results of future NEPA review, it would be premature to review Plaintiffs' NEPA claim now. *Fisheries Survival Fund*, 858 F. App'x at 372; *Center for Biological Diversity*, 563 F.3d at 480.

**B.      Plaintiffs' ESA Claim is not ripe for review.**

Plaintiffs' ESA claim is likewise unripe. Plaintiffs assert that BOEM violated the ESA by failing to consult with NMFS regarding the selection of wind energy areas. *See* Compl. ¶¶ 65–70. No duty to consult under Section 7 has arisen, however, because BOEM's identification of wind energy areas is not an "agency action" that "may affect" ESA-listed species or designated critical habitat. 16 U.S.C. § 1536(a)(2).

The Section 7(a)(2) duty to consult only attaches when an agency action "may affect" listed species. 50 C.F.R. §§ 402.13–402.14. Because the Area ID Memorandum is a preliminary determination that has no physical effect on the environment or any listed species, Plaintiffs' ESA failure-to-consult claim is not ripe. In *Center for Biological Diversity*, the D.C. Circuit considered and rejected the approach Plaintiffs seem to adopt here: a theory that the agency must treat several

separate and discrete steps as a collective "whole," such that the agency must consider all future actions that may be traceable to the Area ID process when deciding if endangered species may be affected.  *See* 563 F.3d at 482.  Rejecting that approach, the Court of Appeals held that "courts must consider the ESA's requirements in light of each particular leasing program stage at issue because those stages are there by design."  *Id.* at 483; *N. Slope Borough v. Andrus,* 642 F.2d 589, 609 (D.C. Cir. 1980) (determining whether and when ESA consultation was required by considering "the full contingent of OCSLA checks and balances and all mitigating measures adopted in pursuance thereof").  Applying this "stage-by-stage" approach to the five-year program for oil and gas leasing reviewed in that case (which as noted above has some differences from the wind energy process), the court held that the action challenged in that case "does not cause any harm to anything because it does not require any action or infringe on the welfare of animals." *Ctr. for Biological Diversity*, 563 F.3d at 483.  As is true for the Area ID Memorandum, "[t]he welfare of animals is, by design, only implicated at later stages of the program, each of which requires ESA consultation and additional environmental review by Interior."  *Id.*; *see also Wyo. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 92–93 (D.D.C. 2003) (concluding that an ESA failure to initiate consultation claim was not ripe where development would occur only through future agency decisions, following the same logic of *Wyoming Outdoor Council*, 165 F.3d at 49–50).

        In addition to having no concrete effect on listed species, the Area ID Memorandum is not fit for judicial review because it is not the final word on where or even whether future wind energy development might be approved.  The Area ID Memorandum explicitly states: "[t]he identification of [wind energy areas] for environmental analysis and leasing consideration does not constitute a final leasing decision.  BOEM reserves the right under its regulations to issue leases in smaller,

fewer and/or different areas—or issue no leases." Area ID Memorandum at 2–3; *id.* at 28–29. And even after leases are issued, additional steps must occur before BOEM decides whether to approve any physical activities within those leases. *See supra* Background Part I(C), III; *see also infra* Argument Part III. Nor is it clear at this initial stage how future approvals may impact ESA-listed species, as key details regarding pre-construction activities, as well as the size, placement, timing, and construction methods associated with future facilities have not yet been determined. *See* Area ID Memorandum at 6 ("[A]ny analysis of project-specific impacts prior to [construction and operations plan] submittal is speculative"). Therefore, given the level of conjecture undergirding Plaintiffs' professed injuries, "both this court and the Secretary of the Interior 'would benefit from postponing review until the policy in question has sufficiently crystallized by taking on a more definite form.'" *Ctr. for Biological Diversity*, 563 F.3d at 483 (quoting *Venetian Casino Resort, LLC v. EEOC,* 409 F.3d 359, 364 (D.C. Cir. 2005)); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (citation omitted)).

In conclusion, the Area ID Memorandum is not a final agency action that results in an irreversible and irretrievable commitment of resources under NEPA or that may affect ESA-listed species or designated critical habitat. Therefore, the Court lacks jurisdiction and should dismiss both of Plaintiffs' claims as unripe.

## II.    Plaintiffs lack standing because they have not alleged an actual or imminent injury that is traceable to the Area ID Memorandum.

Plaintiffs also lack standing to challenge the Area ID Memorandum. The doctrines of standing and ripeness overlap in cases like this, where the challenged action has not led to any concrete injury to Plaintiffs, and any harm that may accrue in the future will be the result of subsequent actions which have not yet occurred. *See La. Envt'l. Action Network v. Browner*, 87

F.3d 1379, 1384 (D.C. Cir. 1996) ("That ripeness considerations should influence our standing analysis, however, is neither surprising nor troublesome."). Plaintiffs have not alleged that they or Plaintiff Save Long Beach Island's members have suffered a concrete, particularized, and actual or imminent injury that is traceable to the Area ID Memorandum or redressable through this suit. Hence, Plaintiffs' claims should also be dismissed because they lack standing.

Article III standing is an "irreducible constitutional minimum" for federal court jurisdiction. *Lujan*, 504 U.S. at 560. "Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *Lujan*, 504 U.S. at 561. Plaintiff Save Long Beach Island is a non-profit organization. Compl. ¶ 4. As an organization, its standing rests on its members' ability to individually bring suit. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000). A plaintiff organization may also attempt to demonstrate that the organization itself has been harmed. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).

Allegations of speculative future injury, like those made by Plaintiffs, are insufficient to establish standing. *See Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011). "A threatened injury must be certainly impending to constitute injury in fact." *Ctr. for Biological Diversity*, 563 F.3d at 478 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Although the standards for imminence and redressability are relaxed when plaintiffs rely on an alleged procedural injury, "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009). This is because Article III confers judicial power "to redress or otherwise to protect against injury to the complaining party, not to review the legality of governmental conduct in a vacuum." *Coal.*

*for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1279 (D.C. Cir. 2012) (internal quotation marks omitted).

Here, Plaintiffs lack standing because their alleged injury is neither actual nor imminent. Plaintiffs' alleged injuries are tied entirely to the possible construction and operation of wind energy facilities in the New York Bight. *See* Compl. ¶ 4 (alleging that natural and human resources are "threatened" by "the wind arrays planned for the New York Bight Wind Energy Areas"); *id.* (alleging that offshore wind projects will affect the view along the coast of Long Beach Island and recreation in coastal waters); *id.* (alleging that marine mammals and turtles are "likely to be harmed" by offshore wind arrays); *id.* ¶ 5 (Plaintiff Robert Stern is concerned about the "impacts of operational turbine noise on endangered whales frequenting the area"); *id.* (contending that offshore wind projects will obstruct the vistas from the Long Beach Island shoreline). But no proposals for constructing or operating wind energy facilities in the New York Bight have been submitted to BOEM, Decl. ¶ 6, nor is it guaranteed that any proposals will ever be submitted or approved.

An entire sequence of multiple events would need to transpire before the harms alleged by Plaintiffs could possibly occur. BOEM must make a final determination regarding the issuance of the leases in the New York Bight and approve any site assessment activities on the leases. 87 Fed. Reg. at 2448; 30 C.F.R. § 585.600; Decl. ¶¶ 5–6. The potential lessees must collect the data necessary to prepare and submit a construction and operations plan for BOEM's approval. *See* 30 C.F.R. § 585.626 (detailing survey results and project-specific information that must be included in a construction and operations plan); *id.* § 585.627 (describing ten types of information that must be submitted with a construction and operations plan); Decl. ¶ 6 (no construction and operations plans have been submitted to BOEM). At this point, the design parameters of any plan,

such as the turbine size, foundation type, project layout, and onshore facilities, are highly speculative and will depend on the data gathered, evaluation of the site, and the market for offshore renewable energy. *See, e.g.*, Final EA at 4. BOEM would then need to review the construction and operations plan, 30 C.F.R. § 585.628(a); prepare an appropriate NEPA analysis, *id.* § 585.627(b); coordinate and consult with relevant federal, state, and local agencies and Native American Tribes, *id.* § 585.627(d); complete additional technical and environmental reviews and other reviews required by federal law (such as the ESA), *id.* § 585.627(f); and then issue a decision approving (or approving with modifications) the construction and operations plan, *id.* Lessees would also need to secure additional authorizations from the U.S. Army Corps of Engineers and, if applicable, NMFS and FWS. *See supra* Background Part II.

Indeed, Plaintiffs tacitly acknowledge their claims of injury are dependent on future events. *See, e.g.,* Compl. ¶ 46 (predicting that BOEM's future environmental review "will be very limited"); *id.* ¶¶ 47–49 (acknowledging that construction and operations plans will be submitted for "the actual wind energy projects," that BOEM will conduct future environmental review of such plans, and that other federal authorizations must be "secured"). In short, the construction of any wind energy facilities in the New York Bight is not authorized by the Area ID Memorandum process and would nonetheless require additional government approvals, which are not guaranteed. Area ID Memorandum at 5–6 (summarizing BOEM's future review process if a lease is issued and a lessee submits a construction and operations plan on that lease); 30 C.F.R. §§ 585.600, 585.621, 585.628. "This does not amount to the actual, imminent, or certainly impending injury required to establish standing." *Ctr. for Biological Diversity*, 563 F.3d at 478 (internal quotation marks omitted); *see also Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries Serv.*, 730 F. Supp. 2d 157, 166–68 (D.D.C. 2010) (finding that the plaintiffs lacked standing to challenge a plan for

regulating offshore aquaculture because an aquaculture facility had not yet been developed).

To the extent that Plaintiffs assert procedural injuries because BOEM allegedly failed to comply with NEPA and the ESA, this theory also fails. "[T]he omission of a procedural requirement does not, by itself, give a party standing to sue." *Ctr. for Biological Diversity*, 563 F.3d at 479. Instead, a party must show "a substantive injury that would otherwise confer Article III standing." *National Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15 (D.C. Cir. 2011). So, it is not enough for Plaintiffs to allege that they or their members' interests are harmed because they did not (or would not) have the opportunity to review a NEPA document or submit public comments on the wind energy areas. *See, e.g.*, Compl. at 1.[11] Rather, Plaintiffs must allege some concrete interest that is actually affected by the Area ID Memorandum. As detailed above, Plaintiffs cannot make this showing. Thus, Plaintiffs' alleged procedural injuries are also insufficient to establish standing. *See Food & Water Watch, Inc. v. Vilack*, 808 F.3d 905, 921 (D.C. Cir. 2015) ("Because Plaintiffs 'have failed to establish that they will likely suffer a substantive injury, their claimed procedural injury necessarily fails.'" (quoting *Sierra Club v. EPA*, 754 F.3d 995, 1002 (D.C. Cir. 2014) (cleaned up))); *National Ass'n of Home Builders*, 667 F.3d at 15 (rejecting plaintiffs' procedural standing argument because "no imminent injury in fact has been alleged").

Plaintiffs also cannot satisfy the causation element of standing. "To properly establish

---

[11] Moreover, Plaintiffs had numerous opportunities to submit public comments regarding the consideration of wind energy development in the New York Bight prior to the filing of their Complaint. *See* 83 Fed. Reg. 15,602 (soliciting public comments on the Call); 83 Fed. Reg. 32,896 (extending the public comment period on the Call); 86 Fed. Reg. 31,524 (soliciting public comments on the notice of proposed lease sale); https://www.boem.gov/renewable-energy/state-activities/new-york-bight (explaining under the "Environmental Assessment" tab that BOEM issued a public notice of its intent to prepare an EA on March 29, 2021, solicited public comments to inform scoping on the EA, and later publicly noticed the availability of the Draft EA and solicited public comments) (last visited March 17, 2022).

causation, the injury must be fairly traceable to the challenged action." *Ctr. for Biological Diversity*, 563 F.3d at 478 (internal quotation marks omitted).  But the Area ID Memorandum— challenged by Plaintiffs—does not authorize the construction of any offshore wind projects or any other physical activities.   Area ID Memorandum at 2, 5; 30 C.F.R. § 585.211 (during this regulatory step, BOEM identifies areas for environmental analysis and potential leasing); *id.* § 585.600 (no activities on leases can be conducted without receiving further BOEM approval). The construction of any wind energy facility will be the result of a combination of future actions by parties who are not present in this case and future agency actions by BOEM and other federal agencies.  And even if this attenuated chain of events were to occur, any injury to Plaintiffs' interests would be caused by the actual decision to authorize the construction of a wind facility, not the Area ID Memorandum.  The causal link between the Area ID Memorandum and Plaintiffs' purported injuries is simply too tenuous to support standing.  *See Ctr. for Biological Diversity*, 563 F.3d at 479 (plaintiffs could not show that their injuries based on future climate change were caused by Interior's action in the first stage of a multi-step leasing program).

Finally, Plaintiffs cannot satisfy the redressability element of standing.  The "redressability requirement for standing is 'relaxed' in procedural rights cases," "[b]ut 'relaxed' does not mean 'eliminated.'"  *Silver v. IRS*, 531 F. Supp. 3d 346, 358–59 (D.D.C. 2021), *appeal docketed*, No. 21-5116 (D.C. Cir. May 27, 2021) (citations omitted); *see also Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) ("the redressability requirement is not toothless in procedural injury cases").  Plaintiffs seek an order "reversing and setting aside" the Area ID Memorandum.  Compl. at 27, Prayer for Relief.  But vacatur of the Area ID Memorandum would do nothing to redress Plaintiffs' claimed injuries.  *Narragansett Indian Tribal Historic Pres. Off. v. Fed. Energy Regul. Comm'n*, 949 F.3d 8, 13 (D.C. Cir. 2020) ("the relaxed redressability

requirement is met when correcting the alleged procedural violation *could* still change the substantive outcome in the petitioner's favor."). Here, no legal consequences flow from the Area ID Memorandum. *See infra* Argument Part III(B). Further, the lease sale has been completed. Vacating the Area ID Memorandum that merely served to identify possible areas for environmental analysis and leasing could not alter that outcome, nor would it affect the ability of potential lessees to submit construction and operations plans for BOEM's consideration.[12]

Plaintiffs fail to allege facts supporting their conclusory claim that they or Plaintiff Save Long Beach Island's members will be harmed by the Area ID Memorandum in a manner that meets the Article III requirements: they allege no actual, concrete injury-in-fact, no facts suggesting such harm is imminent, no plausible traceability to the Area ID Memorandum, and nothing to show that their claimed injuries are redressable.

## III.    The Area ID Memorandum is not a final agency action subject to challenge.

Both of Plaintiffs' claims are also subject to dismissal under Rule 12(b)(6) because they do not challenge any final agency action, which is a critical element in the review of agency decision-making.[13]   Under the APA, a court may only review "final agency action." 5 U.S.C. § 704. While

---

[12] For the same reasons, Plaintiffs' claims also appear to be moot. The lease sale was completed after the filing of the Complaint, and Plaintiffs cannot show that there is a continuing controversy over the Area ID Memorandum. *Am. Bar Ass'n v. Fed. Trade Comm'n*, 636 F.3d 641, 645 (D.C. Cir. 2011) (the mootness doctrine limits "federal courts to deciding actual, ongoing controversies") (internal quotations omitted); *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (a case is moot "if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future") (internal quotations omitted).

[13] NEPA does not contain a private right of action, so Plaintiffs' NEPA claim arises under the APA. Compl. ¶¶ 1–2, 50–64; *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (recognizing no private right of action under NEPA). Plaintiffs' ESA claim, Compl. ¶¶ 65–70, arises under the ESA citizen-suit provision, 16 U.S.C. § 1540(g), *see supra* Pertinent Statutes Part III, but such claim is still reviewed under the standard of review provided

the finality requirement is not jurisdictional, it is essential to state a claim for relief under the APA. *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018), *cert. denied* 139 S. Ct. 1544 (2019); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003). "[T]wo conditions must be satisfied for agency action to be 'final': First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal citations and quotations omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). "An order must satisfy both prongs of the *Bennett* test to be considered final." *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). In determining whether a final agency action exists, no one-size-fits-all approach applies. "[T]o ascertain the nature of an agency action, courts should ground the analysis in the idiosyncratic regime of statutes and regulations that govern it." *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 632 (D.C. Cir. 2019).

While Plaintiffs' Complaint incorrectly asserts that the selection of wind energy areas in the New York Bight was a final agency action, Compl. ¶¶ 2, 45, 57, the Court need not accept Plaintiffs' "legal conclusion[s]," nor inferences that are unsupported by the facts set out in the Complaint. *Trudeau*, 456 F.3d at 193 (quoting *Papasan*, 478 U.S. at 286). Additionally, the Court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to

---

in the APA and is still bound by the APA's requirement for final agency action. *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982) ("Since the ESA does not specify a standard of review, judicial review is governed by section 706 of the [APA]."); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) (noting, when reviewing a claim that an agency had failed to comply with ESA Section 7(a)(2), that "[t]he federal courts ordinarily are empowered to review only an agency's *final* action, *see* 5 U.S.C. § 704").

the complaint," such as the Area ID Memorandum itself.  *Kaempe*, 367 F.3d at 963.  The Area ID Memorandum, on its face, does not satisfy either of the two conditions set forth in *Bennett v. Spear*. The Memorandum is neither the consummation of the agency's decision-making process, nor does it determine any legal obligations, rights, or consequences.

### A.   The Area ID Memorandum is not the consummation of the agency's decision-making process.

The Area ID Memorandum is not the consummation of the agency's decision-making process regarding the approval or siting of any wind energy development projects in the New York Bight, or even regarding the location and dimensions of leases offered for sale. Rather, it is one administrative step in a lengthy process built to ensure multiple points of public input and thorough consideration of the commercial, environmental, and social impacts of offshore wind development before any final authorization occurs.

OCSLA and its accompanying regulations establish a multi-stage process for authorizing offshore wind energy development projects. Even the lease sale stage, which culminates in the sale of a lease but does not actually approve any physical activity in the lease area, involves several component "steps." 30 C.F.R. § 585.211. Complying with this multi-stage process, BOEM first issued a call for information and nominations identifying four "call areas" in the New York Bight in April 2018. *See* Compl. ¶ 41; 83 Fed. Reg. at 15,602–03; 30 C.F.R. § 585.211(a). BOEM selected these call areas based on consideration of the New York State Area for Consideration for the Potential Locating of Offshore Wind Energy Areas and consultation with state officials. 83 Fed. Reg. at 15,603. BOEM then commenced the "Area Identification" process, in which it identifies areas for "consideration for leasing" and further environmental analysis. 30 C.F.R. § 585.211(b). BOEM considered the public comments and nominations received following the Call, as well as information gathered through several public meetings and dialogue with

stakeholders.   Area ID Memorandum at 3–5.   The Area ID Memorandum made clear that the identification of wind energy areas "does not constitute a final leasing decision" and that BOEM may "issue leases in smaller, fewer and/or different areas—or issue no leases."  *Id.* at 2–3; *see also id.* at 28 ("BOEM understands that some of the recommended [wind energy areas] (or portions thereof) may ultimately not be offered as lease areas.").

The Area ID Memorandum's statement that it is not a final determination of leasing areas was not merely theoretical.   The Court may take judicial notice of the fact that BOEM has significantly reduced the areas under consideration as the multi-staged OCSLA process has continued.[14]   BOEM issued a Proposed Sale Notice proposing leases in only three of the five wind energy areas, with one of the three significantly reduced from the Area ID Memorandum dimensions.   *Compare* 86 Fed. Reg. at 31,525–26, *with* Area ID Memorandum at 1.   After soliciting and reviewing public comments on both the Proposed Sale Notice and a draft EA, the Final Sale Notice further reduced the size of the proposed leases by 22 percent.   87 Fed. Reg. at 2,447–48; *see also id.* at 2,450.   In the Final Sale Notice, BOEM also expressly "reserve[d] the right to withdraw all or portions of the Lease Areas prior to executing the leases with the winning bidders."  *Id.* at 2,455.[15]

---

[14] "In determining whether a complaint fails to state a claim," the court may consider matters of which the court may take judicial notice.   *Hurd*, 864 F.3d at 678.   "[A] court may generally take judicial notice of materials published in the Federal Register without converting the motion to one for summary judgment."  *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 112 (D.D.C. 2011); 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed.").

[15] Even after a lease is awarded, BOEM retains full discretion to preclude or prevent some or all activities in the leased area if the environmental consequences are unacceptable.   *Fisheries Survival Fund*, 858 F. App'x at 372–73.   BOEM engages in further NEPA and ESA review prior to the issuance of any construction and operations plan, which provides yet another opportunity for BOEM to reduce or alter the geographic siting of the proposed project, require mitigation measures, or disapprove the plan.   Area ID Memorandum at 5–6; 30 C.F.R. § 585.628(b)

Thus, the Area ID Memorandum is neither the first nor last step in determining which areas will be offered for leases and ultimately developed into wind energy projects. Rather, it is an intermediary step in a lengthy and deliberate process of narrowing and defining the area under consideration. BOEM has described the Area ID process as an opportunity "to develop, evaluate, and recommend *options* for continued environmental analysis and for consideration of leasing." 74 Fed. Reg. at 19,659 (emphasis added). It is meant to "avoid needless expense" by focusing future analysis on "promising acreage," *id.*, while maintaining "flexibility" for BOEM to adjust the areas later in the process, Area ID Memorandum at 28. In other words, the selection of wind energy areas is of a "tentative and interlocutory nature," exactly the type of intermediate determination that *Bennett v. Spear* holds does *not* constitute the culmination of agency decision-making. 520 U.S. at 177–78; *see also MediNatura, Inc. v. FDA*, 998 F.3d 931, 939 (D.C. Cir. 2021) (an agency decision that is of an "interlocutory nature" is not a final agency action, and the court should allow the agency to complete its decision-making process before engaging in judicial review).

**B.    No legal consequences flow from the Area ID Memorandum.**

The Area ID Memorandum also does not determine any "rights or obligations" or impose any "legal consequences." *Bennett*, 520 U.S. at 178. As explained above, the Area ID determination does not award leases or approve any activities within the wind energy areas.[16]

_____

(requiring NEPA analysis when processing the construction and operations plan); 30 C.F.R. § 585.628(f) (allowing BOEM to approve, disapprove, or approve with modifications a construction and operations plan).

[16] For this same reason, the Area ID Memorandum is not an "agency action" as that term is defined by the ESA, which (although it sounds similar) is a separate prerequisite for an ESA Section 7 claim and is defined slightly differently than "final agency action" under the APA. The ESA defines agency action as "all activities or programs of any kind authorized, funded, or

BOEM retains full flexibility and discretion to "issue leases in smaller, fewer and/or different areas—or issue no leases" and to approve, disapprove, or modify future requests for approval of activity in the lease areas. Area ID Memorandum at 2–3, 6. Indeed, Plaintiffs' Complaint does not identify any rights or obligations determined by the Area ID Memorandum.

In terms of legal consequences, Plaintiffs' allegations are contrary to the text of the Area ID Memorandum itself as well as the regulatory framework of OCSLA. Plaintiffs allege that the Area ID Memorandum "commits large public ocean areas to wind energy development versus other uses, and forecloses other areas." Compl. ¶ 57. First, the Area ID Memorandum does not "commit" any areas to wind energy development versus other uses. As explained above, the Area ID Memorandum does not commit BOEM to actually approve wind energy development in any of the wind energy areas, or even to offer those areas for leasing. Area ID Memorandum at 2–3, 28–29. Nor does it forbid other uses or activities in the wind energy areas. It has no effect whatsoever on the ability of other individuals or entities to utilize those areas. The Area ID Memorandum does consider the fact that *if* the numerous subsequent decisions and approvals occur to actually authorize the construction of a wind energy facility within the wind energy areas, such a project could interfere with some other outer continental shelf uses. *See id*. at 13–28. But it would be subsequent approvals, not the Area ID Memorandum, that actually produce that consequence. As the D.C. Circuit has held, an action like the Area ID Memorandum, which

---

carried out, in whole or in part" including "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid." 50 C.F.R. § 402.02. Plaintiffs do not identify any activity authorized, funded, or carried out by the Area ID Memorandum; they merely claim that the Area ID "facilitat[es] construction and operation of wind energy arrays." *See* Compl. ¶ 67. The Area ID Memorandum, by its explicit terms, does not "authorize, fund, or carry out" any action that may affect listed species and in fact results in no physical effect on the environment or listed species at all. Thus, in addition to not challenging a "final agency action," Plaintiffs do not even challenge an "agency action" subject to the Section 7 requirements.

"does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" is not final. *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States,* 307 U.S. 125, 130 (1939)).

Second, the Area ID Memorandum does not "foreclose" BOEM's ability to consider other areas for development in the future. While the Area ID Memorandum recommends promising areas that may be further analyzed as potential lease areas, it does not make any final determination about the suitability of the remaining areas in or near the New York Bight. BOEM could, in the future, identify other wind energy areas in the region. *See* Area ID Memorandum at 29 (explaining that areas excluded from the wind energy areas were not being designated "at this time"). Additionally, commercial entities may submit unsolicited requests to lease additional areas, which BOEM would consider in accordance with its regulations. 30 C.F.R. §§ 585.230, 585.231(a).

In sum, the Area ID Memorandum and identification of wind energy areas have no legal consequences and no impact on the rights and obligations of regulated entities. *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) ("The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities."). It is not a final agency action and, therefore, not subject to review pursuant to the APA or the ESA.

## IV.     Plaintiffs failed to provide the mandatory 60-Day notice for their ESA claim.

This Court should dismiss Plaintiffs' ESA claim for yet another reason: Plaintiffs failed to send the requisite 60-day notice prior to filing suit under the ESA. The ESA citizen-suit provision expressly provides that "[n]o action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A). "The notice requirement of the Endangered Species

Act serves the important purpose of giving the [agency] 'an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'" *Friends of Animals v. Ashe*, 808 F.3d 900, 904 (D.C. Cir. 2015) (quoting *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989)).

Plaintiffs' Complaint does not allege that they sent the required 60-day notice pursuant to the ESA, alleging only that they sent a letter regarding "asking BOEM to prepare the programmatic environmental impact statement demanded in this complaint" in their NEPA claim. Compl. ¶ 2. Therefore, on the face of the Complaint, Plaintiffs have failed to satisfy this mandatory prerequisite for suit,[17] and the Court must dismiss their ESA claim. *See Hallstrom*, 493 U.S. at 31 (interpreting analogous 60-day notice requirement under the Resource Conservation and Recovery Act as a "mandatory condition[] precedent to commencing suit"); *Friends of Animals*, 808 F.3d at 903 (applying *Hallstrom* to the 60-day notice provision in the ESA citizen-suit provision and dismissing an ESA suit for insufficient notice).

To the extent Plaintiffs attempt to rely upon the APA—instead of the ESA citizen-suit provision—as the jurisdictional basis for their ESA claim, *see* Compl. ¶ 1, the APA cannot support such a claim. Plaintiffs' second claim asserts that BOEM failed to engage in consultation pursuant to Section 7 of the ESA prior to making the wind energy areas determination. Compl. ¶¶ 65–70. As the Supreme Court requires, when a claim could lie under both the APA and ESA, "we look first at the ESA . . . because the APA by its terms independently authorizes review only when 'there is no other adequate remedy in a court.'" *Bennett*, 520 U.S. at 161–62 (quoting 5 U.S.C. § 704); *see also Bowen v. Massachusetts,* 487 U.S. 879, 903 (1988) ("Congress did not intend the

---

[17] Moreover, neither the Secretary of the Interior nor any of the other Defendants in this lawsuit have any record of receiving a 60-day notice of intent to sue letter from the Plaintiffs in connection with this case.

general grant of review in the APA to duplicate existing procedures for review of agency action."). The ESA citizen-suit provision permits judicial review "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . , who is alleged to be in violation of any provision of [the ESA]." 16 U.S.C. § 1540(g)(1)(A). Plaintiffs' claim that BOEM violated Section 7 of the ESA falls squarely within this subsection of the ESA citizen-suit provision and, therefore, cannot be alternatively raised under the APA to avoid the 60-day notice requirement. *See, e.g.*, *Conservation Law Found. v. Ross*, 422 F. Supp. 3d 12, 16 (D.D.C. 2019) (finding that the ESA, not the APA, provides the cause of action for a Section 7 claim); *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 58–59 (D.D.C. 2013) (same).

In sum, Plaintiffs' ESA claim may be raised only under the ESA citizen-suit provision, but fails to comply with that provision's mandatory 60-day notice requirement. For this additional reason, the Court should dismiss Plaintiffs' second claim.

## CONCLUSION

Plaintiffs' Complaint suffers from numerous deficiencies and should be dismissed. The Area ID Memorandum, challenged by Plaintiffs, is a preliminary administrative step that allows BOEM to identify areas for environmental analysis and potential future leasing. BOEM has not authorized the construction of any wind energy facilities in the New York Bight and has reserved the right to deny construction if, after NEPA review, BOEM determines that a proposed project would have unacceptable environmental impacts. Hence, Plaintiffs' claims should be dismissed because they are unripe, lack standing, and fail to challenge a final agency action as required by the APA and ESA. Plaintiffs also failed to provide the mandatory 60-day notice necessary to proceed with their ESA claim. For the foregoing reasons, Defendants' motion to dismiss should be granted and Plaintiffs' Complaint dismissed.

Respectfully submitted this 21st day of March, 2022.

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Sara E. Costello*
SARA E. COSTELLO (KS Bar No. 20898)
Trial Attorney
Natural Resources Section
(202) 305-0484
sara.costello2@usdoj.gov
DEVON FLANAGAN (D.C. Bar No. 1022195)
Trial Attorney
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0201
devon.flanagan@usdoj.gov

*Counsel for Defendants*

Of Counsel:

KATHRYN SARVER
ROBERT L. SEBASTIAN
Attorney-Advisors
Office of the Solicitor
Division of Mineral Resources
Department of the Interior
1849 C Street NW
Washington, DC 20240