**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAVE LONG BEACH ISLAND, a nonprofit corporation; and ROBERT STERN, Ph.D., an individual, | Case No. 1:22-cv-00055-DLF |
|       Plaintiff, | |
|       v. | |
| United States Department of the Interior; DEB HAALAND, Secretary of the Interior, acting in her official capacity; and The United States BUREAU OF OCEAN ENERGY MANAGEMENT, | |
|       Defendants. | |

**OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS**

Nancie G. Marzulla (D.C. Bar No. 400985)
Roger J. Marzulla (D.C. Bar No. 394907)
Marzulla Law, LLC
1150 Connecticut Ave NW, Suite 1050
Washington, D.C. 20036
Phone: (202) 822-6760
Email: nancie@marzulla.com
roger@marzulla.com

David P. Hubbard, *Pro Hac Vice* (CA Bar No. 148660)
Gatzke Dillon & Ballance LLP
2762 Gateway Road
Carlsbad, CA 92009
Phone: (760) 431-9501
Email: dhubbard@gdandb.com

Counsel for Plaintiffs

# TABLE OF CONTENTS

**Page**

OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS ...................................1

I.     INTRODUCTION ..............................................................................................................1

II.    STANDARD OF REVIEW ..............................................................................................5

III.   REGULATORY BACKGROUND ...................................................................................6

    A.   National Environmental Policy Act (NEPA)...........................................................6

    B.   Endangered Species Act (ESA) ...............................................................................7

    C.   Outer Continental Shelf Lands Act (OCSLA) .........................................................8

IV.   FACTUAL ALLEGATIONS ...........................................................................................9

    A.   The New York Bight.................................................................................................10

    B.   BOEM's Commencement of the Commercial Leasing Process
for the New York Bight ............................................................................................10

    C.   The March 26, 2021 Memorandum Designating the Wind Energy Areas ..............11

    D.   Defendants' "Environmental Review" and Award of Wind Energy Leases ............12

    E.   Plaintiffs' Complaint.................................................................................................13

V.    ARGUMENT .....................................................................................................................14

    A.   The Complaint is Ripe for Review ...........................................................................15

        1.   BOEM Attempts to "Overextend" OCSLA Ripeness Precedent....................17

            a.   The *Fisheries* Case Did Not Address Programmatic
Environmental Review....................................................................18

            b.   The CBD Case Enjoyed NEPA-Level Environmental Review ................19

            c.   The Wyoming Case Was Also Supported by an EIS, and
Involved Premature Project-Level Claims..................................................22

        2.   This Case Is Ripe Because BOEM Made an "Irreversible
and Irretrievable Commitment of Resources" .................................................24

            a.   NEPA Review Must Start at the Earliest Possible Time ...........................24

            b.   The Area ID Memorandum Required a Programmatic EIS.......................26

        3.   The OCSLA Energy Lease Process Must Comply With NEPA and ESA ......28

        4.   BOEM's "Just Trust Us" Approach Violates NEPA and ESA ......................30

i

# TABLE OF CONTENTS

**Page**

     5.    Plaintiffs' ESA Claim is Also Fully Ripe for Review ....................................33

B.    Plaintiffs Have Standing to Bring this Action .................................................34

C.    The Area ID Memorandum is a Final Agency Action......................................37

     1.    The Area Identification Memorandum is the Consummation
of BOEM's Area Identification Process ............................................37

     2.    Important Obligations and Legal Consequences Flow from the Area
Identification Memorandum ..............................................................40

D.    The ESA Citizen-Suit 60-Day Notice Requirement Does Not Apply
to Plaintiffs' ESA Claim, Which is Brought Under the APA...................................42

E.    The Court Should Grant Leave To Amend If It Dismisses Any Part
of the Complaint ............................................................................................43

VI.    CONCLUSION....................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbot Lab'ys v. Gardner*
387 U.S. 136 (1967)..........................................................................................17

*Andrus v. Sierra Club*
442 U.S. 347 (1979)..........................................................................................25

*Back Country Horsemen of Am. v. Johanns*
424 F. Supp. 2d 89 (D.D.C. 2006)...................................................................16

*Balistreri v. Pacifica Police Dep't*
901 F.2d 696 (9th Cir. 1988) ...........................................................................43

*Barr v. Clinton*
370 F.3d 1196 (D.C. Cir. 2004) .........................................................................5

*Bell Atl. Corp. v. Twombly*
550 U.S. 544, 555 (2007)....................................................................................5

*Bell v. New Jersey*
461 U.S. 773 (1983)....................................................................................28, 38

*Bennett v. Spear*
520 U.S. 154 (1997)......................................................................37, 42, 43

*California ex rel. Lockyer v. U.S. Dep't of Agric.*
575 F.3d 999 (9th Cir. 2009) ...........................................................................23

*Center for Biological Diversity v. Env't Prot. Agency*
861 F.3d 174 (D.C. Cir. 2017) ............................................................16, 35, 36

*Center for Biological Diversity v. Jackson*
815 F.Supp.2d 85 (D.D.C. 2011) ........................................................................5

*Center for Biological Diversity v. U.S. Dept. of Interior*
563 F.3d 466 (D.C. Cir. 2009)........................3, 8, 19, 20, 21, 22, 23, 33, 35

*Center for Biological Diversity v. Zinke*
260 F. Supp. 3d 11 (D.D.C. 2017) ...................................................................20

*Center for Food Safety v. Salazar*
900 F. Supp. 2d 1 (D.D.C. 2012) .....................................................................36

*Center for Sustainable Economy v. Jewell*
779 F.3d 588 (D.C. Cir. 2015) ............................................................23, 38, 41

# TABLE OF AUTHORITIES

**Page(s)**

*Chiang v. Kempthorne*
503 F. Supp. 2d 343 (D.D.C. 2007) ............................................................................................38

*Churchill Cty. v. Norton*
276 F.3d 1060 (9th Cir. 2001) ...................................................................................................6

*Citizens for Better Forestry v. U.S. Dep't of Agric.*
481 F.Supp.2d 1059 (N.D. Cal. 2007) .......................................................................................34

*City of Tenakee Springs v. Clough*
915 F.2d 1308 (9th Cir. 1990) ..................................................................................................26

*Cloud Found., Inc. v. Salazar*
738 F. Supp. 2d 35 (D.D.C. 2010) .............................................................................................37

*Conner v. Burford*
848 F.2d 1441 (9th Cir. 1988) ..................................................................................................24

*CropLife Am. v. E.P.A.*
329 F.3d 876 (D.C. Cir. 2003) ..................................................................................................38

*Dep't of Transp. v. Pub. Citizen*
541 U.S. 752 (2004) ..................................................................................................................17

*Eagle-Picher Indus., Inc. v. U.S. E.P.A.*
759 F.2d 905 (D.C. Cir. 1985) ..................................................................................................16

*Fisheries Survival Fund v. Haaland*
858 F. App'x 371 (D.C. Cir. 2021) ......................................................................................18, 23

*Fisheries Survival Fund v. Jewell*
2018 WL 4705795 (D.D.C. Sept. 30, 2018) ............................................................8, 18, 21, 34

*Foman v. Davis*
371 U.S. 178 (1962) ....................................................................................................................5

*Forest Conservation Council v. Rosboro Lumber Co.*
50 F.3d 781 (9th Cir. 1995) ......................................................................................................43

*Friends of Animals v. Haugrud*
236 F. Supp. 3d 131 (D.D.C. 2017) ..........................................................................................29

*Friends of the Earth v. Haaland*
2022 WL 254526 (D.D.C. Jan. 27, 2022) ......................................................................... passim

*Friends of the River v. U.S. Army Corps of Engineers*
870 F. Supp. 2d 966 (E.D. Cal. 2012) .................................................................23, 34, 39, 42

# TABLE OF AUTHORITIES

**Page(s)**

*Growth Energy v. Env't Prot. Agency*
5 F.4th 1 (D.C. Cir. 2021)..................................................................................7, 16, 29, 36

*Gulf Restoration Network v. Bernhardt*
456 F. Supp. 3d 81 (D.D.C. 2020) .........................................................................8, 16, 20

*Hall v. Santa Barbara*
833 F.2d 1270 (9th Cir. 1986) ......................................................................................5

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*
387 F.3d 989 (9th Cir. 2004) .......................................................................................6

*Kleppe v. Sierra Club*
427 U.S. 390 (1976)...............................................................................................18, 27

*League v. Ross*
2020 WL 5441356 (N.D. Cal. 2020) ...........................................................................39

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992)..................................................................................................35

*Mayo v. Jarvis*
177 F. Supp. 3d 91 (D.D.C. 2016)................................................................................6

*MediNatura, Inc. v. Food & Drug Admin.*
998 F.3d 931 (D.C. Cir. 2021)....................................................................................39

*Mekuria v. Washington Metro. Area Transit Auth.*
975 F. Supp. 1 (D.D.C. 1997)......................................................................................5

*Metcalf v. Daley*
214 F.3d 1135 (9th Cir. 2000) ...............................................................................24, 25

*Nat. Res. Def. Council, Inc. v. Hodel*
865 F.2d 288 (D.C. Cir. 1988)........................................................................19, 28, 29, 41

*Nat'l Min. Ass'n v. Fowler*
324 F.3d 752 (D.C. Cir. 2003)................................................................................15, 17

*Nat'l Wildlife Fed'n v. Brownlee*
402 F. Supp. 2d 1 (D.D.C. 2005).........................................................................15, 23, 37

*Native Vill. of Point Hope v. Jewell*
740 F.3d 489 (9th Cir. 2014) ................................................................................19, 28

*Nevada v. Dep't of Energy*
457 F.3d 78 (D.C. Cir. 2006)...........................................................................20, 21, 26, 29

# TABLE OF AUTHORITIES

**Page(s)**

*Ohio Forestry Ass'n v. Sierra Club*
523 U.S. 726 (1998)................................................................................................15, 17

*Pac. Rivers Council v. Thomas*
30 F.3d 1050 (9th Cir.1994) ...............................................................................34

*Piedmont Env't Council v. FERC*
558 F.3d 304 (4th Cir. 2009) ................................................................................7

*Pub. Emps. for Env't Resp. v. Beaudreau*
25 F. Supp. 3d 67 (D.D.C. 2014) ...................................................................7, 21

*Pub. Emps. for Env't Resp. v. Hopper*
827 F.3d 1077 (D.C. Cir. 2016) ...........................................................21, 27, 36, 43

*Sec'y of the Interior v. California*
464 U.S. 312 (1984)...........................................................................................20, 38

*Sierra Club v. FERC*
867 F.3d 1357 (D.C. Cir. 2017) .................................................................................6

*Sprint Corp. v. FCC*
331 F.3d 952 (D.C. Cir. 2003) ...............................................................................17

*State of Cal. By & Through Brown v. Watt*
668 F.2d 1290 (D.C. Cir. 1981) .................................................................8, 20, 28, 41

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*
636 F.3d 650 (D.C. Cir. 2011) ...............................................................................29

*Vill. of False Pass v. Clark*
733 F.2d 605 (9th Cir. 1984) ...................................................................29, 34, 39

*W. Watersheds Project v. Kraayenbrink*
632 F.3d 472 (9th Cir. 2011) ...................................................................................23

*WildEarth Guardians v. Jewell*
738 F.3d 298 (D.C. Cir. 2013)................................................................................35

*WildEarth Guardians v. Zinke*
368 F. Supp. 3d 41 (D.D.C. 2019) ..........................................................................25

*Wilson v. District of Columbia*
269 F.R.D. 8 (D.D.C. 2010)......................................................................................5

## TABLE OF AUTHORITIES

**Page(s)**

*Wyoming Outdoor Council v. Bosworth*
284 F. Supp. 2d 81 (D.D.C. 2003) ..........................................................................17, 18

*Wyoming Outdoor Council v. U.S. Forest Service*
165 F.3d 43 (D.C. Cir. 1999) ................................................3, 15, 16, 22, 23, 35

**Statutes, Rules and Regulations**

U.S. Codes

5 U.S.C. § 702 ..............................................................................................42

5 U.S.C. § 704 ..........................................................................................37, 42

5 U.S.C. § 706 ..............................................................................................43

5 U.S.C. § 706(2)(A) ......................................................................................17

16 U.S.C. § 1536(a)(2) .....................................................................................7

16 U.S.C. § 1540(g)(1)(A) ...............................................................................43

42 U.S.C. § 4321 .............................................................................................6

42 U.S.C. § 4332(2)(C) ..........................................................................6, 27, 29

42 U.S.C. § 4332(2)(C)(iii) ...............................................................................6

43 U.S.C. § 1331(a) .........................................................................................8

43 U.S.C. § 1337(p)(1)(C) ................................................................................8

43 U.S.C. § 1337(p)(4) .....................................................................................8

43 U.S.C. § 1866(a) ........................................................................................29

Federal Rules of Civil Procedure

8(a)(2) ..........................................................................................................5

12(b)(1) .........................................................................................................5

12(b)(6) .........................................................................................................5

# TABLE OF AUTHORITIES

**Page(s)**

Code of Federal Regulations

30 C.F.R. § 585 ...................................................................................8, 31

30 C.F.R. § 585.211(a) .............................................................................9

30 C.F.R. § 585.211(b) ............................................8, 9, 11, 25, 28, 39, 40,41

30 C.F.R. § 585.211(c) .............................................................................9

30 C.F.R. § 585.211(d) ........................................................................9, 13

40 C.F.R. § 1501.2 ................................................................................25

40 C.F.R. § 1502.4(b) ............................................................................27

40 C.F.R. § 1502.4(b)(3) ........................................................................27

40 C.F.R. § 1502.5 ................................................................................25

40 C.F.R. § 1502.20 ..............................................................................26

40 C.F.R. § 1505.1(b) ............................................................................25

40 C.F.R. § 1508.18 ................................................................................7

40 C.F.R. § 1508.18(b) ............................................................................7

40 C.F.R. § 1508.25(a) ..........................................................................26

40 C.F.R. § 1508.28 ..............................................................................21

40 C.F.R. §§ 1501.1–1508.28 ...................................................................6

50 C.F.R. § 402.02 ................................................................................33

50 C.F.R. § 402.14(a) ..............................................................................7

## Other Authorities

Federal Register

74 Fed. Reg. 19,638 (Apr. 29, 2009) ................................................27, 31, 40

74 Fed. Reg. 19,659 (Apr. 29, 2009) ................................................27, 31, 40

83 Fed. Reg. 15,602 (Apr. 11, 2018) ....................................................8, 10

83 Fed. Reg. 15,603 (Apr. 11, 2018) .........................................................8

83 Fed. Reg. at 15,604 (Apr. 11, 2018) ................................................10, 32

## TABLE OF AUTHORITIES

**Page(s)**

83 Fed. Reg. at 15,606 (Apr. 11, 2018) ..............................................................................32

83 Fed. Reg. at 15,607 (Apr. 11, 2018) ........................................................................10, 32

86 Fed. Reg. 31,525 (June 14, 2021) ......................................................................11, 12, 13

87 Fed. Reg. 2,447 (Jan. 14, 2022) ....................................................................................10

87 Fed. Reg. 2,450 (Jan. 14, 2022) ...............................................................................12, 13

Endangered Species Act, Section 7 ........................................................................2, 7, 17, 29, 33

**OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS**

Plaintiffs Save Long Beach Island, Inc. and Robert Stern, Ph.D. (collectively, "Plaintiffs or "SLBI") submit the following brief in opposition to the Motion to Dismiss (ECF No. 14) filed by Defendants United States Department of the Interior, Secretary of the Interior Deb Haaland, the Bureau of Ocean Energy Management ("BOEM"), and Amanda Lefton, Director of BOEM (collectively, "Defendants" or "BOEM").

I.      **INTRODUCTION**

Since 2009, BOEM has been methodically implementing the federal government's Outer Continental Shelf (OCS) Renewable Energy Program (REP), a major component of which is the establishment of offshore wind energy projects along the Atlantic Coast of the United States. The offshore wind element of the REP involves multiple stages, each with its own procedures and decision points. One of those decision points — and arguably the most important — is the selection of Wind Energy Areas (WEAs) within certain regions of the Atlantic OCS.

The WEAs define with specific boundaries the locations where offshore wind leases will be offered for sale and development. And once the WEAs are identified for a particular region, they become fixed; they do not change. All lease sales, all project-specific applications, and all environmental documents assume that the WEA boundaries, once identified and selected, will remain in place. For this reason, BOEM's Environmental Assessments (EAs) and Environmental Impact Statements (EISs) for offshore wind projects never consider alternatives that call for constructing wind arrays *outside* the selected WEAs.

The question posed by this litigation — and by the present Motion to Dismiss — is whether BOEM, by issuing the Wind Energy Area Identification Memorandum (the "Area Identification Memorandum") for the New York Bight OCS, took a "final agency action" as to the location of

offshore wind projects in New York Bight, thereby foreclosing the possibility of *alternative* WEA locations that are less environmentally sensitive (e.g., areas outside the habitat for the federally-endangered North Atlantic right whale). It is Plaintiffs' position that the Area Identification Memorandum, once it was issued, functionally committed BOEM to the selected WEA locations. For this reason, the Area Identification Memorandum should have been subjected to a full environmental review under the National Environmental Policy Act (NEPA), leading to the preparation of a Programmatic EIS. Unfortunately, BOEM conducted no NEPA review for the Area Identification Memorandum.

Likewise, once BOEM settled on the locations of the WEAs and fixed them into place, which is what the Area Identification Memorandum did, BOEM was in a position to determine whether construction of offshore wind arrays in those locations "may affect" federally listed species, such as the North Atlantic right whale. Thus, as part of the WEA selection process, BOEM was required by Section 7 of the Endangered Species Act to consult with the National Marine Fisheries Service ("NMFS") as to whether development of wind projects in the proposed WEAs would cause impacts on such species. Unfortunately, BOEM did not consult NMFS on this issue. As a result, NMFS was never given the opportunity to prepare a Programmatic Biological Opinion, which is exactly what the situation calls for, given that the entire North Atlantic right whale population consists of approximately 320 individuals and is poised to crash into extinction.

BOEM' Motion to Dismiss proceeds from the premise that because none of the winning lease bidders has yet submitted a Construction and Operations Plan ("COP") to BOEM for approval, there is no need for NEPA review at this stage of the process. BOEM contends that even the lease sales do not trigger NEPA because the terms of those leases allow BOEM to back out of the deal if it later chooses to disapprove the COP. But BOEM has largely missed the point of

Plaintiffs' lawsuit. Plaintiffs recognize that it is too early to demand a *project-specific* EIS, and Plaintiffs are not asking that BOEM be ordered to prepare one. Instead, Plaintiffs are focused on BOEM's selection of the WEA locations — a decision that occurs long before leaseholders submit their COPs to BOEM. Once BOEM selects the WEA locations and issues the Area Identification Memorandum, those locations are fixed. They become the locations described in the leases offered for sale, and they define the geographic parameters of the actual wind projects set forth in the COPs themselves. This explains why the EISs for the Vineyard Wind and South Fork offshore wind arrays — the only two wind projects that BOEM has thus far subjected to NEPA review — include no alternatives outside the pre-selected WEAs. This evidence demonstrates that issuance of the Area Identification Memorandum does indeed constitute an "irretrievable commitment of resources", because it forecloses any further discussion of alternative wind array locations.

*Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43 (D.C. Cir. 1999) — a case cited in BOEM's moving papers — addressed the NEPA process the Forest Service used when considering which areas of the Shoshone National Forest should be opened up for oil and gas development. In that case, the Forest Service did precisely what Plaintiffs are demanding BOEM do here: It prepared an EIS to determine which lands within the Shoshone should be carved out and made available for oil and gas extraction. *Wyo. Council*, 165 F.3d at 46–47. The same scenario played out in *Center for Biological Diversity v. U.S. Dept. of Interior*, 563 F.3d 466 (D.C. Cir. 2009). That case involved the Department of Interior's offshore oil and gas leasing program in the Alaska OCS. The leasing program was multi-tiered, and the Department of the Interior prepared an early-stage EIS to assess the impacts of making certain areas in the OCS available for oil and gas drilling. *Center for Biological Diversity*, 563 F.3d at 475. Plaintiffs are demanding that the Defendants here, which include the Department of the Interior, prepare a similar programmatic

EIS to analyze the impacts of locating the New York Bight wind energy projects in the WEAs identified in the  Area Identification Memorandum.

The thrust of Plaintiffs' Complaint is that the Area Identification Memorandum represents a major and irreversible decision point in BOEM's offshore wind energy program. Because BOEM did not prepare a Programmatic EIS to accompany its WEA identification decision, no member of the public was able to question the proposed WEAs, identify potentially significant environmental effects of allowing offshore wind projects in those locations, or offer alternative WEA locations that would result in fewer or less intense impacts. Instead, the key decision as to where the WEAs will be located took place outside the NEPA process, never to be addressed or considered again.

For these reasons, Plaintiffs' Complaint presents an existing controversy ripe for judicial review. In addition, Plaintiffs have standing to demand that BOEM comply with NEPA's procedures, as those procedures are the only way Plaintiffs can guarantee that the environmental impacts of BOEM's decisions are analyzed, disclosed, and exposed to public scrutiny. In failing to conduct NEPA review at the WEA selection stage, BOEM has caused "injury in fact" to Plaintiffs, because Plaintiffs will never have an opportunity to provide NEPA-style input on BOEM's proposed WEA locations or propose alternatives to those locations in a NEPA forum.

Plaintiffs' Endangered Species Act cause of action is also ripe. The time for BOEM to consult with NMFS and examine potential effects on listed species is not *after* the WEA locations have been determined but *prior* to such determination, as that is the only time alternative locations can be proposed and evaluated. BOEM's failure to follow this common-sense approach to its Section 7 consultation duties constitutes a controversy ripe for judicial intervention under Article III. And because Plaintiffs' ESA claim is procedural and brought under the APA, Plaintiffs were not required to satisfy the 60-day notice requirement set forth in the ESA's "citizen suit" provision.

## II.    STANDARD OF REVIEW

BOEM brings its motion to dismiss under FRCP 12(b)(1), claiming the court lacks subject matter jurisdiction, and under FRCP 12(b)(6), asserting Plaintiffs have failed to state a claim.

Under FRCP 12(b)(1), when considering a motion to dismiss for lack of subject matter jurisdiction, the Court must "accept as true all of the factual allegations contained in the complaint," *Wilson v. District of Columbia*, 269 F.R.D. 8, 11 (D.D.C. 2010), and should review the complaint liberally while accepting all inferences favorable to the plaintiff, *see Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004). The Court may consider materials outside the pleadings where necessary to resolve disputed jurisdictional facts. *Ctr. For Biological Diversity v. Jackson*, 815 F.Supp.2d 85, 89–90 (D.D.C. 2011).

As to FRCP 12(b)(6), a "motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Hall v. Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986). A complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mekuria v. Washington Metro. Area Transit Auth.*, 975 F. Supp. 1, 3–4 (D.D.C. 1997). The factual allegations of the complaint must be presumed true and liberally construed in favor of the plaintiff. *Id.* FRCP 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Even if a court grants a motion to dismiss, it should "freely" give leave to amend to cure any defects or omissions in the original pleading. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## III.    REGULATORY BACKGROUND

### A.    National Environmental Policy Act (NEPA)

NEPA provides "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[1] NEPA was enacted in 1970 "to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. The Act "declares a broad national commitment to protecting and promoting environmental quality," and requires agencies to "consider fully the environmental effects of their proposed actions." *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 106 (D.D.C. 2016). NEPA "commands agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017).

When a federal agency contemplates a "major Federal action[] significantly affecting the quality of the human environment," NEPA mandates that the agency prepare a "detailed statement" discussing and disclosing the environmental impact of the action – i.e., an environmental impact statement (EIS). *Id.* (citing 42 U.S.C. § 4332(2)(C)). The EIS forces the agency to take a "hard look" at the environmental consequences of its actions, "including alternatives to its proposed course." *Id.* (citing 42 U.S.C. § 4332(2)(C)(iii)). It also ensures that these environmental consequences, and the agency's consideration of them, are disclosed to the public. *Id.*

---

[1]    The NEPA statute is accompanied by implementing regulations promulgated by the Council on Environmental Quality ("CEQ") and found at 40 C.F.R. §§ 1501.1–1508.28. Courts must "strictly interpret the procedural requirements in NEPA and the CEQ regulations "to the fullest extent possible" consistent with the policies embodied in NEPA. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004); *Churchill Cty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001).

The NEPA regulations define "major federal action" to include "actions with effects that may be major and which are potentially subject to federal control and responsibility." *Piedmont Env't Council v. FERC*, 558 F.3d 304, 316 (4th Cir. 2009) (citing 40 C.F.R. § 1508.18). According to the regulations, "[f]ederal actions tend to fall within one of the following categories": (1) adoption of official policy (rules, regulations, and interpretations), (2) adoption of formal plans, (3) adoption of programs, and (4) approval of specific projects. *Id* (citing § 1508.18(b)).

### B.        Endangered Species Act (ESA)

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 80–81 (D.D.C. 2014). Section 7 of the ESA demands that federal agencies prevent harm to endangered wildlife and flora, reflecting a "conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Growth Energy v. Env't Prot. Agency*, 5 F.4th 1, 26 (D.C. Cir. 2021).

Specifically, under Section 7(a)(2), each federal agency "shall, in consultation with and with assistance of the Secretary, insure that any action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id*. (citing 16 U.S.C. § 1536(a)(2)). Each federal agency shall review its actions "at the earliest possible time" to determine whether its proposed action "may affect listed species or critical habitat." *Id.*; 50 C.F.R. § 402.14(a). If so, then the agency must engage in either formal or informal consultation with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service (Services), depending on the species in question. *Id.*

### C.        Outer Continental Shelf Lands Act (OCSLA)

The Outer Continental Shelf (OCS) is an area of submerged lands, subsoil, and seabed lying seaward of state coastal waters (i.e., generally 3 miles offshore) that are under U.S. jurisdiction. 43 U.S.C. § 1331(a); *Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 88 (D.D.C. 2020). The OCSLA, enacted in 1953, establishes a procedural framework for "exploitation of OCS resources," under which Interior may lease areas of the OCS for exploring and developing the oil and gas deposits of the OCS's submerged lands. *State of Cal. By & Through Brown v. Watt*, 668 F.2d 1290, 1295 (D.C. Cir. 1981); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009).

In the Energy Policy Act of 2005, the OCSLA was amended to authorize the Secretary of the Interior to grant leases on the OCS for energy production from sources "other than oil or gas," i.e., renewable energy leases. 43 U.S.C. §1337(p)(1)(C); Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight—Call for Information and Nominations, 83 Fed. Reg. 15,602, 15,603 (Apr. 11, 2018) [hereinafter *Call*]. The Secretary must ensure that such activities are carried out in a manner that satisfies 13 specific requirements, including protection of the environment, conservation of the natural resources of the OCS, and consideration of other uses of the sea or seabed. 43 U.S.C. § 1337(p)(4); Compl. Ex. 1 at 2, ECF No. 1-6 (New York Bight Area Identification Memorandum Pursuant to 30 C.F.R. § 585.211(b)). In addition, the location of a lease for an area of the OCS is a critical factor that must be considered. *Fisheries Survival Fund v. Jewell*, No. 16-CV-2409 (TSC), 2018 WL 4705795, at *1 (D.D.C. Sept. 30, 2018).

BOEM has published regulations that govern the leasing and management of offshore renewable energy projects. 30 C.F.R. Part 585; *Fisheries Survival Fund v. Jewell*, 2018 WL

4705795, at *2. As with oil & gas, before issuing a renewable energy lease on the OCS, BOEM

follows a multi-step procedure:

- First, for solicited competitive leases (as applicable here), BOEM identifies the potential development site and initiates the leasing process by publishing a Call for Information and Nominations (Call). *Id.*; 30 C.F.R. § 585.211(a).

- Second, BOEM completes the Area Identification Process. In this stage, BOEM identifies areas for environmental analysis and consideration for leasing. 30 C.F.R. § 585.211(b). In this stage, BOEM must evaluate the potential effect of leasing on the human, marine, and costal environments, and develop measures to mitigate adverse impacts, including lease stipulations. *Id.* BOEM "may hold public hearings on the environmental analysis after appropriate notice." *Id.*

- Third, BOEM publishes a Proposed Sale Notice, followed by a Final Sale Notice. 30 C.F.R. § 585.211(c)–(d).

- Fourth, once BOEM has issued a lease, the lessee must submit a Site Assessment Plan for review before any assessment activity takes place.

- Fifth, a lessee may not begin construction until it has submitted, and BOEM has approved, a Construction and Operations Plan.

This case centers on the second step, where BOEM selects the WEAs and *internally*

assesses the environmental impacts of developing wind energy projects in those locations.

Plaintiffs contend that the environmental impact evaluation that BOEM conducts at this stage must

be done out in the open – not internally – and pursuant to the procedural and substantive

requirements of NEPA.

## IV.    FACTUAL ALLEGATIONS

BOEM has embarked on a large-scale campaign to develop offshore wind energy projects

along much of the U.S. Atlantic coast, from Massachusetts to South Carolina. BOEM's goal is to

issue at least 17 wind energy leases covering thousands of square miles of near-shore ocean.

Compl. ¶ 58, ECF No. 1. When fully developed, BOEM's Atlantic wind energy system will consist

of more than 2,000 wind turbines, many of them located in or near habitat and migration corridors

used by ESA-listed marine species, including the North Atlantic right whale. *Id.*

### A.     The New York Bight

The New York Bight is an offshore area that extends northeast from Cape May in New Jersey to Montauk Point on the eastern tip of Long Island, New York. Compl. ¶ 39, ECF No. 1. The Bight supports a variety of uses and resources, including commercial fisheries and marine mammal habitat. *Id*. More than 35 marine mammal species live in or use the Bight, including the ESA-listed sei whale, sperm whale, fin, and North Atlantic right whale, and five ESA-listed sea turtle species. The Bight also supports more than 50 bird species and hundreds of fish species. *Id*. ¶ 40.

### B.     BOEM's Commencement of the Commercial Leasing Process
         for the New York Bight

BOEM began its lease process for the New York Bight on April 11, 2018, by issuing a Call for commercial leasing for wind power on the OCS in the NY Bight. *Call*, 83 Fed. Reg. 15,602. This notice was to determine whether there was competitive interest in acquiring a lease within the Call Areas for the purpose of offshore wind development. *Call*, 83 Fed. Reg. at 15,604. The Call provided a 45-day comment period for interested parties to submit nominations in response to the Call. *Call*, 83 Fed. Reg. at 15,602.

The Call Areas totaled 1,735,154 acres in the NY Bight. Atlantic Wind Lease Sale 8 (ATLW–8) for Commercial Leasing for Wind Power on the Outer Continental Shelf (OCS) in the New York (NY) Bight— Final Sale Notice (FSN), 87 Fed. Reg. 2,447 (Jan. 14, 2022) [hereinafter *Final Sale Notice*]. The Call states that "[t]hese areas will be analyzed by BOEM during the area identification (Area ID) portion of the leasing process." *Call*, 83 Fed. Reg. at 15,603. The Call also states that "BOEM will consider all the best available information to identify and assess potential areas of conflict with marine protected species within the Call Areas and consult with resource agencies during the Area Identification process, as necessary." *Call*, 83 Fed. Reg. at 15,607. Note

10

however, that despite the importance of this "conflict analysis", BOEM did <u>not</u> conduct this assessment openly under NEPA, but internally, shielded from public view or scrutiny. After the close of the Call period, on July 30, 2018, BOEM initiated the Area Identification process by reviewing the inputs received. Atlantic Wind Lease Sale 8 (ATLW–8) for Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight—Proposed Sale Notice, 86 Fed. Reg. 31,525 (June 14, 2021) [hereinafter *Proposed Sale Notice*].

### C.       The March 26, 2021 Memorandum Designating the Wind Energy Areas

On March 26, 2021, BOEM of the Department of the Interior, issued a 39-page memorandum that documents the analysis and rationale used to select WEAs in the Bight. Compl. Ex. 1 at 1, ECF No. 1-6 (New York Bight Area Identification Memorandum Pursuant to 30 C.F.R. § 585.211(b)). BOEM recommended 807,383 total acres of the Bight as WEAs. *Id.* The Area Identification Memorandum states:

> An Area ID determination is a required regulatory step under the renewable energy competitive leasing process used to identify areas for environmental analysis and consideration for leasing. See 30 C.F.R. § 585.211(b). The goal of BOEM's Area ID process is to identify the offshore locations that are most suitable for leasing. The Area ID determination must take into consideration multiple competing uses and environmental concerns that may be associated with a proposed area's potential for commercial wind energy development. Potential impacts of a specific proposed renewable energy facility in the identified areas would be addressed during the review of a Construction and Operations Plan (COP), since it is then when project-specific information becomes available.

*Id.* at 4. The Area ID "informs the environmental review process by identifying and informing the geographic scope of environmental analysis for any future lease sales in the area." *Id.* at 5. "BOEM's WEA recommendations are a result of balancing key existing interests and resources in the region, energy goals, and anticipated future uses based on the best available information and statutory obligations." *Id.* at 28.

The Area Identification Memorandum states that in developing the initial Call Areas, from which the Wind Energy Areas were derived, BOEM considered multiple existing uses of the NY Bight via a "thorough internal analysis." *Id.* at 13. The Memorandum also states that BOEM "considered several other potential factors that ***did not*** significantly influence the spatial orientation" of the Wind Energy Areas. *Id.* at 25 (emphasis added). These factors include visual impacts; the presence of avian species; marine mammals and other protected species; and radar, cables, and other existing infrastructure. The Memorandum claims: "These factors were already adequately addressed through the designation of the Call Area and/or will be further analyzed later in the BOEM process." *Id.* Again, this determination took place outside of NEPA.

### D.     Defendants' "Environmental Review" and Award of Wind Energy Leases

On March 29, 2021, BOEM published a notice to stakeholders (NTS) regarding its intent to prepare an environmental assessment (EA) of leases within the identified Wind Energy Areas. *Proposed Sale Notice*, 86 Fed. Reg. 31,525. As defined by BOEM, the scope of the EA is limited to potential environmental consequences of site characterization activities (*i.e.*, biological, archeological, geological, and geophysical surveys and core samples) and site assessment activities (*i.e.*, installation of meteorological buoys) associated with issuing wind energy leases in the Wind Energy Areas. *Id.* BOEM also initiated consultations under the ESA for ESA-listed species but, again, the scope of the consultations only covered initial lease "due diligence" activities of site characterization and site assessment. *Id.*

BOEM announced the notice of availability of the draft EA on August 10, 2021. *Final Sale Notice*, 87 Fed. Reg. 2,450. On December 16, 2021, BOEM announced the availability of the Final EA and Finding of No Significant Impact (FONSI). *Id.* BOEM determined that the site assessment due diligence activities would not cause any significant impacts and do not constitute a "major

Federal action" requiring preparation of an environmental impact statement (EIS) within the meaning of NEPA. *Id.* BOEM stated that it will "conduct additional environmental reviews upon receipt of a lessee's proposed project-specific plans, such as a Site Assessment Plan (SAP) or a Construction and Operations Plan (COP)." *Id.*

On June 14, 2021, BOEM published a Proposed Sale Notice (PSN) for the NY Bight, providing detailed information about potential areas that could be available for leasing. *Proposed Sale Notice*, 86 Fed. Reg. 31,525. The PSN encompassed 627,331 acres of the Wind Energy Areas. *Id.*

On January 14, 2022, BOEM published the Final Sale Notice (FSN), which is the last step, before the sale itself, in the competitive lease award process. *Final Sale Notice*, 87 Fed. Reg. 2,450; *see* 30 C.F.R. § 585.211(d). The FSN offered six lease areas from within the Wind Energy Areas for sale, totaling 488,201 acres. *Final Sale Notice*, 87 Fed. Reg. at 2,447–48. Though BOEM reduced the total acres for sale, the leases remained within the pre-established WEA boundaries. *Id.*

The lease sale for six lease areas in the Bight was held in February 2022. To illustrate the massive scale of this program, this was the highest-grossing competitive offshore energy lease sale in history, including oil and gas lease sales. The winning bids totaled approximately $4.37 billion. Motion at 15 n.6, ECF No. 14.

### E.   Plaintiffs' Complaint

On January 10, 2022, Plaintiffs filed a Complaint for declaratory and injunctive relief under the National Environmental Policy Act (NEPA), Endangered Species Act (ESA), and Administrative Procedure Act (APA). Compl., ECF No. 1.

The Complaint alleges that BOEM's decision to determine the Wind Energy Areas was a "major federal action" that triggered the agency's NEPA obligations to prepare an EA or EIS. *Id.* ¶ 42. However, BOEM did not prepare an EIS or conduct any kind of NEPA review prior to selecting the Wind Energy Areas and issuing the Area Identification Memorandum. *Id.* ¶ 45. Instead, BOEM elected to forego any such analysis, and has indicated that it will defer NEPA review until after individual wind leases are issued and leaseholders submit specific wind energy projects. Thus, BOEM decided it will prepare project-specific EISs only. At that late stage of the process, however, the locations of the Wind Energy Areas will have already become fixed and thus not subject to NEPA review. *Id.* ¶ 63. For this reason, project-level environmental reviews cannot fully or adequately evaluate alternative locations outside the boundaries of the already-established Wind Energy Areas, and cannot fully or adequately evaluate the cumulative impacts of all wind energy projects contemplated within the Wind Energy Areas at a programmatic level. *Id.* ¶¶ 57, 63.

In addition, the Complaint alleges Defendants violated Section 7 of the ESA by failing to consult with the National Marine Fisheries Service regarding whether and to what extent the selection of the Wind Energy Areas, in facilitating construction and operation of wind energy arrays, could affect North Atlantic right whales and other listed species. *Id.* ¶ 67.

## V.    ARGUMENT

This action is ripe for judicial review, and Plaintiffs have standing to compel BOEM's compliance with NEPA and ESA. BOEM has improperly *deferred* its environmental obligations making judicial review at this time essential. No matter how BOEM wishes to characterize it, no matter how much BOEM downplays its importance, the Area ID Memorandum is a "final agency action" because it establishes where in the New York/New Jersey OCS wind leases will be sold

14

and developed into offshore wind projects. Thus, the Area ID Memorandum functions as an inflection point critical in the offshore wind energy lease program, from which there is no practical opportunity to turn back. In addition, the ESA citizen-suit 60-day notice provision does not apply because the Complaint's ESA cause of action is governed by the Administrative Procedure Act (APA), which contains no such requirement. Finally, in the event the Court is inclined to grant BOEM's motion, Plaintiffs request leave to amend, and that request should be approved.

A.      **The Complaint is Ripe for Review**

As an initial matter, both the NEPA and ESA claims are ripe for review because they involve procedural challenges and questions of law. The ripeness doctrine limits Article III courts to hearing cases that are "constitutionally and prudentially ripe," meaning that they involve a "present injury" and "take into account prudential concerns" of whether judicial resolution is appropriate at that time. *Wyo. Outdoor Council*, 165 F.3d at 48. When addressing the ripeness of federal claims, courts must consider 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 756 (D.C. Cir. 2003).

In *Ohio Forestry Ass'n v. Sierra Club*, the Supreme Court stated that "a person with standing who is injured by a failure to comply with the NEPA ***procedure*** [or other procedural requirement such as ESA consultation] may complain of that failure at the time the failure takes place, ***for the claim can never get riper***." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998) (emphasis added); *see also Wyo. Outdoor Council*, 165 F.3d at 51; *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 8 (D.D.C. 2005). In fact, where a plaintiff mounts a procedural challenge to an agency's failure to engage in statutory requirements, delaying review will impose

a substantial hardship by failing to vindicate plaintiff's procedural right. *Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 94 (D.D.C. 2006).

Here, the case is ripe because the Complaint alleges BOEM failed to comply with NEPA and ESA procedures in issuing the March 26, 2021 Area Identification Memorandum. NEPA's requirements are "essentially procedural," as the statute does "not mandate particular substantive environmental results" but "focuses Government and public attention on environmental effects of proposed agency action." *Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 88 (D.D.C. 2020). In addition, the ESA claim involves "procedural-rights" because the required "consultation" process is designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species. *Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 178, 182–83 (D.C. Cir. 2017); *see also Growth Energy v. Env't Prot. Agency*, 5 F.4th 1, 27 (D.C. Cir. 2021) (A claim that the agency "failed to meet its statutory consultation obligation" is a procedural deprivation).

Plaintiffs' procedural claims have become "concrete and final," because BOEM already issued the Area Identification Memorandum without complying with the NEPA and ESA requirements and "there no longer exists the possibility that further agency action will alter the claim in any fashion." *Wyo. Outdoor Council*, 165 F.3d at 51. The alleged injury is not that wind energy arrays may ultimately be constructed and operated in the Wind Energy Area described in the Area ID Memorandum, but that BOEM selected the Wind Energy Areas without the "hard look" that NEPA demands. *Friends of the Earth v. Haaland*, No. CV 21-2317, 2022 WL 254526, at *7 n.5 (D.D.C. Jan. 27, 2022).

In addition, the Complaint is ripe for review because it raises purely legal questions. Claims are generally fit for judicial review if the issues tendered are purely legal. *Eagle-Picher Indus.,*

*Inc. v. U.S. E.P.A.*, 759 F.2d 905, 915 (D.C. Cir. 1985) (citing *Abbot Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)); *see also Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003) ("[W]e ask first whether the issue raised in the petition for review presents a purely legal question, in which case it is presumptively reviewable.") Here, the Complaint alleges that BOEM acted arbitrarily and capriciously in violation of NEPA and ESA, because it failed to conduct NEPA-compliant environmental review, and failed to consult with NMFS, prior to determining the Wind Energy Areas. Compl. ¶¶ 64, 69, ECF No. 1.[2] Whether an agency decision is "arbitrary and capricious" is a purely legal question. *Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003).

In short, this action alleges that BOEM failed to follow essential required procedures when it issued the March 26, 2021 Area Identification Memorandum. This issue can never get riper, and the Court would not benefit from any "further factual development" of the issues presented. *Ohio Forestry Ass'n*, 523 U.S. at 733, 737. Regardless of whether Plaintiffs will ultimately prevail on the *merits*, the claims are currently *ripe* for review.

### 1.  BOEM Attempts to "Overextend" OCSLA Ripeness Precedent

BOEM argues that Plaintiffs' NEPA claim is not ripe because the Area Identification Memorandum "does not authorize any activities on the outer continental shelf." Mot at 1, ECF No. 14. An agency's NEPA obligations mature once it reaches a "critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment." *Friends of the Earth*, 2022 WL 254526, at *5. BOEM relies on a line of cases indicating that, in the context of multi-stage leasing programs such as OCSLA, so long as BOEM

---

[2]     An agency's decision not to prepare an EIS can be set aside upon a showing that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004) (citing 5 U.S.C. § 706(2)(A)); *see also Wyo. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 89 (D.D.C. 2003) (arbitrary and capricious standard of review in Section 7 ESA claim).

can still theoretically prevent physical activities, NEPA claims are unripe and unreviewable. Mot. at 20–22, ECF No. 14. However, BOEM's interpretation "overextends the relevant precedent." *Friends of the Earth*, 2022 WL 254526, at *7. Importantly, ripeness is a "flexible" doctrine and must not be converted into a *per se* rule. *Wyo. Outdoor Council*, 284 F. Supp. 2d at 93.

a.     The *Fisheries* Case Did Not Address
Programmatic Environmental Review

BOEM's first case, *Fisheries Survival Fund*, involved a NEPA challenge to BOEM's decision to issue an offshore lease for a windfarm off the coast of New York. *Fisheries Survival Fund v. Haaland*, 858 F. App'x 371, 372 (D.C. Cir. 2021) (unpublished per curiam opinion). *Fisheries* thus involved the same OCS renewable energy lease framework at issue here. Importantly, however, *Fisheries* involved a single proposed lease site where all future development would be approved or disapproved in the later analysis. *Fisheries Survival Fund v. Jewell*, No. 16-CV-2409 (TSC), 2018 WL 4705795, at *2–3 (D.D.C. Sept. 30, 2018). In fact, as opposed to the broad program at issue here, *Fisheries* involved an unsolicited request for a commercial wind lease. *Id.* As a result, the "need for consideration of cumulative impacts of multiple leases was notably absent from *Fisheries*." *Friends of the Earth*, 2022 WL 254526, at *9. In other words, *Fisheries* did not address the selection of Wind Energy Areas or the need to prepare a programmatic EIS to assess the impacts of establishing such Wind Energy Areas. For this reason, *Fisheries* is factually distinguishable from this case and inappropriate.

In contrast, *Friends of the Earth*, *supra*, is similar to the present case — it involved an OCS lease sale in the Gulf of Mexico (albeit for oil and gas production), which was regionwide and encompassed three planning areas and 80.8 million acres. *Friends of the Earth* noted that NEPA requires agencies to consider the collective impacts of the leases together. *Id.* (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976)) ("[W]hen several proposals . . . will have cumulative or

synergistic environmental impact upon a region . . . their environmental consequences must be considered together. . . ."); *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988) (finding inadequate under NEPA an EIS that did not consider the cumulative impact of multiple leases); *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 503 (9th Cir. 2014) ("Once BOEM made the determination that production is reasonably foreseeable, it was required to consider the full cumulative impact of that production."). Thus, *Friends of the Earth* distinguished *Fisheries* and found that a challenge to the lease sale was ripe for review. *Friends of the Earth*, 2022 WL 254526, at *7–10.

Here, like *Friends of the Earth*, this case is ripe because it involves a large-scale cumulative program that now involves multiple leases. This case is also distinguishable from *Fisheries*, because this case does not involve a single unsolicited proposed lease. As a result, NEPA requires BOEM to address the cumulative synergistic impacts of the New York Bight Wind Energy Areas in a single programmatic document that considers alternative WEA locations, complies with NEPA's rigorous procedural and analytical standards, and is subject to judicial review.

### b.    The *CBD* Case Enjoyed NEPA-Level Environmental Review

BOEM also relies on *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) ("*CBD*"). *CBD* involved a NEPA challenge to BOEM's oil and gas leasing program — also known as the "Five-Year Program." The Court found the challenge was unripe for purposes of examining the climate change impacts of the program, given that such impacts will be project-specific. However, there is a key difference between the *CBD* case and this one — namely, in *CBD*, BOEM prepared a programmatic EIS for the "approval stage of the leasing program". *CBD*, 563 F.3d at 475. Here, however, BOEM did not prepare a programmatic EIS for the Area Identification Memorandum or for the subsequent lease sales, asserting it has the right to

defer NEPA review until the final, project-approval stage of the process. Consequently, the *CBD* decision is factually distinct and does not support BOEM's Motion to Dismiss.

The OCS oil and gas lease programs encompass four distinct phases of regulatory responsibility: (1) formulation of a five-year leasing plan; (2) lease sales; (3) exploration by the lessees; and (4) development and production. *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). *CBD* notes that the leasing program's four-stage process is "pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent." *CBD*, 563 F.3d at 473 (citing *Watt I,* 668 F.2d at 1297)). Each stage involves separate regulatory review, and it is well established that NEPA's requirements apply of their own force to each stage of the OCSLA regulatory process. *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 18 (D.D.C. 2017).

In addition, in the oil and gas context, the early phase of the OCS lease program — preparation of a Five-Year Program — "will normally require the preparation of an EIS." *Friends of the Earth*, 2022 WL 254526, at *8; *see, e.g.*, *Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 89 (D.D.C. 2020) (BOEM prepared programmatic EIS for Five-Year OCS Leasing Program, and three EISs in connection with lease sales); *State of Cal. By & Through Brown v. Watt*, 668 F.2d 1290, 1299 (D.C. Cir. 1981) (EIS prepared for Five-Year OCS leasing program).

In light of the NEPA-level programmatic environmental review that takes place from the start in OCS oil and gas leases, it is understandable that courts have balanced the ripeness inquiry in that context in the most judicially deferential manner possible. *See Nevada v. Dep't of Energy*, 457 F.3d 78, 83–84 (D.C. Cir. 2006) (the ripeness doctrine takes into account questions regarding "the institutional capabilities of, and the relationship between, courts and agencies.").

The *Friends of the Earth* case provides another example of the NEPA-level tiered environmental review that takes place in oil and gas leases. When developing the Five-Year program, BOEM issued both a programmatic EIS for the entire program and a Multi-sale EIS for 10 subsequent sales planned to occur in the Gulf of Mexico. *Friends of the Earth*, 2022 WL 254526, at *3. For multi-step agency programs such as oil and gas leases authorized under OCSLA, "NEPA provides that the environmental analysis conducted at each stage may incorporate by reference previous, related analyses," a method known as "tiering." *Id.*; *see CBD*, 563 F.3d at 487 (noting the "pyramidic structure" of a five-year leasing program).[3]

The obvious rigor employed in the Gulf of Mexico oil and gas lease program shown above is in stark contrast to the environmental review process BOEM used for the New York Bight Renewable Energy Program at issue here. Mot. at 8, ECF No. 14 (describing the "decision points" in BOEM's OCS wind energy lease award process and stating NEPA review will not occur until the "site assessment plan" and "construction and operations plan" phases). BOEM concedes it has not performed ***any*** NEPA-compliant environmental review, other than an EA covering the initial due diligence — and very limited — "site assessment" activities.[4] Thus, not only has BOEM marked vast swaths of the Bight as available for energy leasing through the Area Identification process,[5] they have sold a record $4.37 billion worth of leases in those areas — all without the

---

[3]    Tiering is specifically appropriate where the initial broad analysis involves need or **<u>site selection</u>**. Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for discussion and exclude from consideration issues already decided or not yet ripe. *Nevada v. Dep't of Energy*, 457 F.3d 78, 91, n.9 (D.C. Cir. 2006) (citing 40 C.F.R. § 1508.28).

[4]    However, other OCS renewable lease programs have recognized that timely NEPA review is required. *Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 86, 90 (D.D.C. 2014) (two EISs prepared prior to offering lease and prior to submittal of COP for Cape Wind offshore wind energy project); *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016) (same).

[5]    The Area Identification process marks the area as available for lease. *Fisheries Survival Fund v. Jewell*, 2018 WL 4705795, at *3 (D.D.C. Sept. 30, 2018).

benefit a single EIS where alternative and potentially less environmentally-sensitive lease locations could have been considered under the bright light of public scrutiny. That BOEM conducted an *internal* review of environmental conflicts and impacts associated with the Area ID Memorandum is of no moment, because such internal reviews are no substitute for the procedural and substantive requirements of NEPA. *Friends of the Earth*, 2022 WL 254526, at *8.

c.      **The *Wyoming* Case Was Also Supported by an EIS, and Involved Premature Project-Level Claims**

Defendants also rely on *Wyo. Outdoor Council*, 165 F.3d 43, 54 (D.C. Cir. 1999). *Wyoming* involved a terrestrial oil and gas lease. There, the acting federal agency had prepared an EIS for the lease process, which studied "a number of alternatives for oil and gas leasing." *Id.* at 47.

The court in *Wyoming* dismissed the case as unripe based on the specific nature of petitioners' challenge. *Wyoming* involved a multistage lease process, and the petitioners' challenge was brought at the early stage of the program, which involved only the identification and mapping of areas that might be suitable for leasing. *Id.* at 45. However, petitioners' claim was that the Forest Service violated NEPA because it approved the overall program stage without first determining whether an adequate ***site-specific*** environmental review had been performed. *Id.*; *see CBD*, 563 F.3d at 480. *Wyoming* found that the site-specific NEPA claims were unripe at the program stage. However, the Court stated: "Concededly, the application of these principles does not necessarily presuppose that an obligation could not occur at an earlier stage." *Wyo. Outdoor Council*, 165 F.3d at 49. For purposes of BOEM's motion here, the key factual point is that the process for analyzing and selecting the oil and gas leasing locations was subjected to NEPA review and resulted in the preparation of a programmatic EIS — the very thing that *did not* happen here.

_____

The *Fisheries* and *CBD* cases on which Defendants rely merely apply the reasoning of *Wyoming* to the circumstances at issue in those cases. *Fisheries*, 858 F. App'x at 372; *CBD*, 563 F.3d at 480. Thus, contrary to Defendants' suggestion, there is simply no hard-and-fast rule that NEPA claims in a multi-stage lease process only ripen upon lease issuance. Defendants' motion must fail because this Court does not set jurisdictional precedents "*sub silentio*." *Fisheries Survival Fund*, 858 F. App'x at 373; *Center for Sustainable Economy v. Jewell*, 779 F.3d 588, 600 (D.C. Cir. 2015). Instead, "[d]etermining which NEPA claims are ripe at which stages of the OCSLA process will necessarily overlap somewhat with the merits of the challenge." *Friends of the Earth*, 2022 WL 254526, at *7; *see also Wyo. Outdoor Council*, 165 F.3d at 49.

Furthermore, BOEM's claim that its leasing programs are beyond review until on-the-ground impacts occur is contrary to established precedent that environmental plaintiffs "need not wait for environmental damage to occur to challenge an agency's NEPA compliance." *Friends of the River v. U.S. Army Corps of Engineers*, 870 F. Supp. 2d 966, 981 (E.D. Cal. 2012); *see, e.g., Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 7 (D.D.C. 2005) (rejecting claim that challenge to initial approval unripe simply because no dredge-and-fill action in panther habitat can proceed without subsequent site-specific approval); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 486 (9th Cir. 2011) (finding NEPA and ESA challenges to revised grazing regulations ripe, even though the regulations have not yet been applied); *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1011 (9th Cir. 2009) (finding challenge to rule ripe where it would be plaintiffs' only opportunity to challenge the rule on a programmatic basis). In short, environmental challenges to agency actions may be ripe, even if the action does not immediately authorize on-the-ground environmental impacts.

2.      **This Case Is Ripe Because BOEM Made an**
**"Irreversible and Irretrievable Commitment of Resources"**

This case is ripe because in issuing the Area Identification Memorandum, BOEM reached

the critical decision point beyond which requires the irreversible and irretrievable commitments of

resources to an action that will affect the environment. *Friends of the Earth*, 2022 WL 254526, at

*5. The "irreversible and irretrievable commitment of resources" criterion is derived from NEPA,

which requires an impact statement to include a statement of "any irreversible and irretrievable

commitments of resources which would be involved in the proposed action should it be

implemented." *Conner v. Burford*, 848 F.2d 1441, 1446 n.13 (9th Cir. 1988) ("Obviously this

requirement only makes sense if the EIS is prepared prior to the commitment of resources.").

When it issued the Area Identification Memorandum, BOEM passed the point where it

could continue deferring its NEPA obligations. Simply put, given the enormity and complexity of

the OCS wind energy lease program, BOEM could not postpone all NEPA review to the project-

specific approval stage, which would functionally and practically preclude consideration of

alternative Wind Energy Area locations and boundaries. To assert, as BOEM does, that a project-

specific EIS will address alternative Wind Energy Area locations — after leases have been sold,

after ocean bed surveys have been conducted, and after Construction and Operations Plans have

been developed — is absurd.

a.      **NEPA Review Must Start at the Earliest Possible Time**

Proper timing is one of NEPA's central themes. *Metcalf v. Daley*, 214 F.3d 1135, 1142

(9th Cir. 2000). An agency shall begin the preparation of an EIS

> as close as possible to the time the agency is developing or is presented with a
> proposal. . . . The statement shall be prepared early enough so that it can serve
> practically as an important contribution to the decisionmaking process and will not
> be used to rationalize or justify decisions already made.

40 C.F.R. §1502.5. The phrase "early enough" means "at the earliest possible time to insure that planning and decisions reflect environmental values." *Metcalf*, 214 F.3d at 1142 (citing *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979); 40 C.F.R. § 1501.2.)) Since NEPA's requirements are "action forcing," for projects directly undertaken by Federal agencies, environmental assessments "shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary." *Id.*; *see also* 40 C.F.R. § 1502.5. NEPA's effectiveness depends entirely on involving environmental considerations in the initial decision-making process. *Metcalf*, 214 F.3d at 1145. Stated differently, NEPA's requirement that agencies take a "hard look" at the environmental consequences of their decisions requires that agencies assess the "reasonably foreseeable" impacts of a proposed action before an "irretrievable commitment of resources" is made that would trigger those impacts. The appropriate time for preparing and EIS is *prior* to a decision, when the decisionmaker retains a maximum range of options. *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 64 (D.D.C. 2019).

To effectuate these requirements, federal agencies are required to designate the major decision points for their principal programs likely to have a significant effect on the human environment and assure that the NEPA process corresponds with them. 40 C.F.R. § 1505.1(b). Here, BOEM's regulations state that during the Area Identification stage, it will:

1) Consider for lease those areas nominated in response to the Call, together with other areas that BOEM determines appropriate for leasing.
2) evaluate the potential effect of leasing on the human, marine, and coastal environments, and develop measures to mitigate adverse impacts, including lease stipulations.
3) consult to develop measures, including lease stipulations and conditions, to mitigate adverse impacts on the environment; and
4) hold public meetings on the environmental analysis after appropriate notice.

30 C.F.R. § 585.211(b). As a result, the regulations correctly acknowledge that the Area Identification stage is a major decision point in offshore wind energy leasing. This stage has a

significant effect on the environment and is a foundation for future decisions. Yet BOEM has refused to align its leasing program with NEPA, even though crucial environmental considerations were required to take place at this stage.

The Complaint sufficiently alleges that the Area Identification Memorandum triggered the requirement to comply with NEPA. The Complaint alleges that the Area Identification Memorandum forecloses consideration of all potential impacts and feasible alternatives, including alternative locations in the Bight outside the Wind Energy Areas. *See, e.g.*, Complaint, ECF 1, ¶¶ 45, 57. The Area Identification Memorandum was both an "irretrievable commitment of resources" and a "major federal action" triggering the requirement for NEPA environmental review.

### b.     The Area ID Memorandum Required a Programmatic EIS

As shown above, this case is ripe, pursuant to *Friends of the Earth*, because NEPA requires that the collective impacts of multiple leases must be considered together. *Friends of the Earth*, 2022 WL 254526, at *9. The Complaint sufficiently alleges that where there are multiple projects contemplated in a particular geographical region, "NEPA calls for an examination of their impact in a single EIS." Compl. ¶¶ 22, 28 (citing *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990)). And "[w]here there are large-scale plans for regional development, NEPA requires both a programmatic and a site-specific EIS." *Id.* (citing *City of Tenakee Springs*, 778 F.2d at 1407); *see also* 40 C.F.R. §§ 1508.28, 1502.20).

A programmatic EIS *should* be prepared if actions are "connected," "cumulative," or sufficiently "similar" that a programmatic EIS is "the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions." *Nevada v. Dep't of Energy*, 457 F.3d 78, 92 (D.C. Cir. 2006) (citing 40 C.F.R. § 1508.25(a)). NEPA may **require** a

comprehensive impact statement in certain situations where several proposed actions are pending at the same time. *Id.* (citing 42 U.S.C. § 4332(2)(C); *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976)). The Supreme Court elaborated that "[b]y requiring an impact statement Congress intended to assure such consideration during the development of a proposal or . . . during the formulation of a position on a proposal submitted by private parties." *Id.*; *see also* 40 C.F.R. § 1502.4(b) (EISs "are sometimes required" for broad federal actions such as the adoption of new agency programs. "Agencies shall prepare [EISs] on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.").

BOEM has violated NEPA by not timing its environmental review so that it corresponds to the decision points within its broad program to develop wind energy in the New York Bight. Acting agencies must prepare programmatic impact statements or assessments on "broad" federal actions **before** they reach a stage of investment or commitment "likely to determine subsequent development or restrict later alternatives." 40 C.F.R. §1502.4(b)(3). Here, the Complaint alleges that the Area Identification Memorandum represents that stage of investment which requires NEPA review. As BOEM acknowledges, the Area Identification step identifies the geographical area of the proposed action to be analyzed in an ensuing environmental analysis document (e.g., EIS, EA), any alternatives to the proposed action, and mitigation measures and other issues to be analyzed and considered further. Mot. at 6, ECF No. 14 (citing Renewable Energy and Alternate Uses of Existing Facilities on the Outer Continental Shelf, 74 Fed. Reg. 19,638, 19,659 (Apr. 29, 2009)).

BOEM cannot claim this action is unripe simply because there is not enough information for site-specific review. Under NEPA, an agency must "consider every significant aspect of the environmental impact of a proposed action." *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077,

1081–82 (D.C. Cir. 2016). In programmatic-level reviews, as was required for identifying the Wind Energy Areas, information "may be predictive or speculative in nature." *State of Cal. By & Through Brown v. Watt*, 668 F.2d 1290, 1307 (D.C. Cir. 1981); *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 493–94 (9th Cir. 2014) ("An agency is not required at the lease sale stage to analyze potential environmental effects on a site-specific level of detail.").

This does not mean, however, that environmental considerations may be deferred until some later date. *Watt*, 668 F.2d at 1307. In fact, the D.C. Circuit has stated that the cumulative impacts of multiple proposed offshore leases must be analyzed together, at the planning stage. *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 298–300 (D.C. Cir. 1988). Adequate NEPA review requires examining cumulative impacts of simultaneous inter-regional OCS development in a single, coherent section rather than fragmenting the analysis by area. *Id.* BOEM was required to perform this cumulative impact analysis *before* it issued the Area ID Memorandum, which designated the final Wind Energy Areas. *See* 30 C.F.R. § 585.211(b). This case is ripe and BOEM violated NEPA and ESA by not undertaking such a review. BOEM is unable to provide any rationale for why judicial review of its failure to timely study cumulative impacts and alternatives should wait.

### 3. The OCSLA Energy Lease Process Must Comply With NEPA and ESA

This case is ripe because there is no "hardship" in requiring BOEM to timely comply with their NEPA and ESA obligations. In no way would judicial review at this time inappropriately interfere with or "hinder" BOEM's administrative efforts in the OCSLA wind lease program. [6]

---

[6] In fact, timely review at the critical Area Identification stage "may expedite" the leasing program, since BOEM and stakeholders will know their obligations with certainty. *Bell v. New Jersey*, 461 U.S. 773, 780 (1983).

*Nevada v. Dep't of Energy*, 457 F.3d 78, 84 (D.C. Cir. 2006) (prudential ripeness analysis includes whether judicial intervention would inappropriately interfere with further administrative action); *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 135 (D.D.C. 2017) (Where a court's review may "hinder agency efforts to refine its polies"—such as through revision or application of a long-term plan—judicial interference is inappropriate.). NEPA and ESA are statutory obligations that supersede the OCSLA leasing process. OCSLA's "multi-stage" leasing process cannot shield BOEM from timely judicial review of its environmental obligations.

NEPA requires government agencies to comply with its strictures "to the fullest extent possible." 42 U.S.C. § 4332(2)(C). As such, courts have been especially reluctant to hold that another statute overrules it. *Friends of the Earth*, 2022 WL 254526, at *3. To the contrary, "NEPA may, within the boundaries set by Congress, authorize the agency to make decisions based on environmental factors not expressly identified in the agency's underlying statute." *Id.* (citing *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 665 (D.C. Cir. 2011)). In other words, NEPA sets a floor that agencies must comply with even if an agency's underlying statute, such as OCSLA, could be construed to set a lower one. *Id.* In addition, the ESA's Section 7 requirements take priority over the "primary missions" of federal agencies. *Growth Energy v. Env't Prot. Agency*, 5 F.4th 1, 26 (D.C. Cir. 2021).

In fact, OCSLA explicitly provides that nothing in the Act diminishes the requirements of NEPA. 43 U.S.C. § 1866(a); *see Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 296 (D.C. Cir. 1988). Accordingly, the multi-step framework of OCSLA does not "purport to lessen the rigor of the 'hard look' that NEPA requires." *Friends of the Earth*, 2022 WL 254526, at *3.)In addition, ESA applies to the OCSLA lease process "of its own force and effect." *Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984).

### 4.    BOEM's "Just Trust Us" Approach Violates NEPA and ESA

Throughout their brief, BOEM repeatedly seeks to avoid judicial review by detailing how "[a]n entire sequence of multiple events would need to transpire before the harms alleged by Plaintiffs could possibly occur." BOEM asks the public to wait until the entire table is set and the meal prepared before assessing whether the kitchen is safe and complies with health requirements. *See, e.g.*, Mot. at 27, ECF No. 14. To be clear, Defendants mischaracterize "the harms alleged by Plaintiffs" as "the possible construction and operation of wind energy facilities." *See id.* While Plaintiffs have serious concerns about BOEM's large-scale campaign to develop offshore wind energy projects along much of the Atlantic coast, as discussed above, the gravamen of the Complaint is that in its haste to implement this campaign, BOEM has failed to comply with the critically important requirements of NEPA and ESA.[7]

While Defendants claim they performed a "thorough internal" — i.e., non-NEPA compliant — environmental analysis, Compl. Ex. 1 at 13, ECF No. 1-6, such procedures are an inadequate substitute for the rigorous and comprehensive "hard look" NEPA imposes. *Friends of the Earth*, 2022 WL 254526, at *8.

> An agency cannot avoid its procedural obligations under NEPA by deferring its analysis to processes that do not meet the same standard. Allowing it to avoid review of an allegedly inadequate NEPA action it did take on the basis that it will

---

[7]    As stated in a 2019 Columbia Journal of Environmental Law Note:

> Although haste is necessary given the predictable effects of climate change, we must also consider other aspects of environmental protection, such as the protection of biodiversity. Renewable energy generation facilities will occupy extensive amounts of space on land or at sea and may impact important habitats or species. Laws such as [NEPA] require federal agencies to analyze the environmental impacts of proposed agency action (including the permitting of facilities) and consider this information when determining whether to allow said action.[] The procedural requirements of NEPA are necessary to guard against unreasonable impacts to the environment."

Mitchell Hokanson, *Avoiding the Doldrums: Evaluating the Need for Change in the Offshore Wind Permitting Process*, 44 Colum. J. Envtl. L. 181, 184 (2019).

undertake further discretionary review down the road would amount to an impermissible 'just trust us' from the agency.

*Id.* at \*9.

As alleged in the Complaint, NEPA requires that agencies ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Impacts such as those to endangered species cannot be dealt with piecemeal, project by project, and must be scientifically credible. Compl. ¶ 16, ECF No. 1.

At the time that the final regulations for OCS renewable energy leases (30 C.F.R. Part 585) were published, BOEM itself understood that NEPA compliance for OCS leases would require an EA or EIS. "We believe that at the outset of the OCS Alternative Energy Program, it is likely that an EIS will be required for a competitive lease sale. However, it is possible, especially as the program matures, that less-costly environmental documentation, an EA, may be appropriate." Renewable Energy and Alternate Uses of Existing Facilities on the Outer Continental Shelf, 74 Fed. Reg. 19,638, 19,659. In fact, BOEM noted that the Area Identification step "determines the geographical area of the proposed action to be analyzed in an ensuing environmental analysis document (e.g., EIS, EA), any alternatives to the proposed action, and mitigation measures and other issues to be analyzed and considered further." *Id.* Defendants contemplated that NEPA documentation — including "site assessment, construction, and generation activities that might occur; reasonable alternatives to the leasing proposal" — would be prepared **before** issuance of the Proposed Sale Notice. *Id.* Unfortunately, BOEM has not implemented its OCS renewable energy lease program as promised or advertised, because BOEM has not conduced any such NEPA-compliant environmental review.

In fact, contradictions between the Call and the Area Identification Memorandum illustrate the problems with BOEM's "thorough internal" analysis. Compl. Ex. 1 at 13, ECF No. 1-6. The

document that started the leasing process, the Call, states that BOEM "will consider" all the best available information to identify and assess potential areas of conflict with marine protected species within the Call Areas and consult with resource agencies during the Area Identification process, as necessary." *Call*, 83 Fed. Reg. at 15,607. However, when the time came for BOEM to make the final decision on which of the Call Areas would be selected for the Wind Energy Areas, BOEM claimed that factors such as marine protected species **did not** influence this decision. Instead, BOEM claimed that "[t]hese factors were already adequately addressed through the designation of the Call Area and/or will be further analyzed later in the BOEM process." Compl. Ex. 1 at 25, ECF No. 1-6.[8]

Indeed, BOEM claims that "[p]rior to deciding whether and where leases may be issued, BOEM will prepare an [EA] and conduct consultations to consider the environmental consequences associated with issuing commercial wind leases." *Call*, 83 Fed. Reg. at 15,604. However, such an EA is wholly deficient to assess "whether and where" leases may be issued, because, as BOEM repeatedly concedes, the scope of such EA is extremely limited — it only covers "characterization activities (including geophysical, geotechnical, archaeological, and biological surveys)." *Id.* What we have is a process where BOEM only intends to show us the cat one whisker at a time, never giving us a full examination of the whole.

---

[8]     As to avian species, the Call states that BOEM "attempts to avoid" leasing areas with high concentrations of marine bird species that may be most impacted by offshore wind development. *Call*, 83 Fed. Reg. at 15,606. However, recent maps, aerial surveys, and satellite tracking suggest that the Hudson South Call Area may have relatively high concentrations of Northern Gannets. In addition, a roseate tern (listed as endangered under ESA) was identified north of the Fairways North Call Area. *Id.* BOEM claimed it "will further analyze and assess available avian data as part of its Area Identification process." *Id.* However, the Area Identification Memorandum shows that BOEM entirely failed to further analyze such impacts, let alone conduct any NEPA- or ESA-compliant analyses, during the Area Identification process. The subsequent EA for "site assessment" activities also fails to assess such impacts; however, the Fairways North Call Area was subsequently removed from consideration for leasing due, in part, to marine protected species.

5.      **Plaintiffs' ESA Claim is Also Fully Ripe for Review**

BOEM argues that the Complaint's ESA claim is not ripe for review, because the Area

Identification Memorandum is only a "preliminary determination." Mot. at 24, ECF No. 14

(relying on *CBD*, 563 F.3d at 482). BOEM is wrong. The ESA claim is ripe for the reasons shown

above — Defendants may not defer Section 7 consultation just because the OCSLA lease process

has multiple stages.

The Complaint adequately alleges that BOEM violated Section 7 of the ESA by failing to

consult with the Services regarding whether and to what extent the selection of the New York

Bight Wind Energy Areas and the Wind Energy Areas directly south of the Bight, in facilitating

wind energy arrays, could affect North Atlantic right whales and other listed species. Compl. ¶ 67,

ECF No. 1.

In claiming otherwise, BOEM apparently assumes the Complaint seeks project-level

consultation. BOEM claims "[n]or is it clear at this initial stage how future approvals may impact

ESA-listed species, as key details regarding pre-construction activities, as well as the size,

placement, timing, and construction methods associated with future facilities have not yet been

determined." Mot. at 23–24, ECF No. 14. However, the alleged ESA violation is the failure to

undertake a "programmatic consultation," for which the ESA itself provides. As defined in 50

C.F.R. § 402.02:

> [P]rogrammatic consultation is a consultation addressing an agency's multiple
> actions on a program, region, or other basis. Programmatic consultations allow
> NMFS to consult on the effects of programmatic actions such as: (1) Multiple
> similar, frequently occurring, or routine actions expected to be implemented in
> particular geographic areas; and, (2) A proposed program, plan, policy, or
> regulation providing a framework for future proposed actions.

The Ninth Circuit has also interpreted ESA "to require consultation on programmatic

actions and rules, including consultation at the planning stage, not just at the site-specific

33

stage." *Friends of the River*, 870 F. Supp. 2d at 978 (citing *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F.Supp.2d 1059, 1095 (N.D. Cal. 2007); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir.1994)) (holding that the Forest Service's LRMPs which established comprehensible management plans governing a multitude of individual projects required ESA consultation because they may affect listed species).

Thus, agencies must apply the ESA at each phase of the OCSLA process. *Friends of the Earth*, 2022 WL 254526, at *7; *Vill. of False Pass v. Clark*, 733 F.2d 605, 611 (9th Cir. 1984). At the Area Identification stage at issue here, only area siting related issues needed to be addressed.

The Area Identification Memorandum, which made available for leasing 807,383 total acres of the Bight as Wind Energy Areas, states that five species ESA-listed whales and four ESA-listed sea turtles are found in the vicinity of the Bight. Compl. Ex. 1 at 4, 25–26, ECF No. 1-6. Nonetheless, BOEM asserts that its "broad analysis indicates that wind development within the Call Areas poses a minimal risk to marine mammal diversity and even lower risk to overall cetacean abundance and diversity because most species have habitat preferences for waters farther offshore than the Call Areas." *Id.* at 25. Yet BOEM is not the expert agency on impacts to marine mammals. The ESA assigns that role to NMFS, whom BOEM did not consult regarding the proposed WEA locations.

### B.      Plaintiffs Have Standing to Bring this Action

BOEM argues that Plaintiffs — a local environmental organization and its president — somehow do not have standing to allege violations of NEPA and the ESA. (Mot. at 25–31, ECF No. 14. Defendants make this argument despite the fact that every case upon which they rely for ripeness found that similarly situated plaintiffs had standing to bring their cases. *Fisheries Survival Fund*, 2018 WL 4705795, at *5 ("Plaintiffs are entitled to bring their OCSLA and NEPA claims

under a procedural standing theory"); *CBD*, 563 F.3d at 475 (petitioners had procedural standing, even for tenuous climate change claims); *Wyo. Outdoor Council*, 165 F.3d at 51 (finding procedural standing). Plaintiffs here also have standing. Compl. ¶¶ 4–5, ECF No. 1.

Plaintiffs bear the burden of establishing the following elements: **(1)** that the plaintiff has suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical; **(2)** that there is a causal connection between the injury and the conduct complained of; and **(3)** that it is likely the injury can be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

**First,** as to injury in fact, the Complaint alleges that BOEM failed to meet its statutory NEPA and ESA obligations and thus describes an "archetypal procedural injury." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). As such, courts relax the "imminence" and "redressability" requirements of standing. *Id.* at 305; *see also Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 182–83 (D.C. Cir. 2017)). A procedural injury claim must nonetheless be tethered to some concrete interest adversely affected by the procedural deprivation. *WildEarth Guardians*, 738 F.3d at 305. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id*.

Here, the Complaint made such averments. *See* Compl. ¶ 4, ECF No. 1 (Plaintiff Save Long Beach Island — "has approximately 900 members who will be able to view the proposed wind farms from public and private vantage points . . . . [its] members routinely engage in recreation in coastal waters that would be affected by one or more offshore wind projects in the proposed New York Bight and other connected Wind Energy Areas . . . ."]; *see id.* ¶5 (Plaintiff Robert Stern, Ph.D. — "resides on Long Beach Island . . . considers it his responsibility to protect those waters

and all the plant and animal life within it . . . he routinely visits the beaches along the island's shores, where currently the vistas are unobstructed . . . .").

Nonetheless, BOEM contends that Plaintiffs lack standing because their alleged injury is "neither actual nor imminent" — as construction of wind arrays is contingent on future events/approvals. Mot. at 27, ECF No. 14. However, *Fisheries* directly rejected such a claim. *Fisheries Survival Fund*, 2018 WL 4705795, at *6 (lease is undeniably a "milestone" in plan to transform area and increases the "probability" that planned development will occur).

**Second,** as to causation, BOEM also cannot challenge the relaxed causation element of procedural standing. As the Complaint indicates, the Area ID Memorandum may have identified different, less environmentally sensitive locations for the Wind Energy Areas had BOEM complied with its NEPA and ESA obligations. *Growth Energy v*, 5 F.4th at 29. Nothing more need be alleged to satisfy the causation requirement in a procedural claim.

**Third,** the redressability element is also relaxed in the procedural standing context. *Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 182 (D.C. Cir. 2017). Plaintiffs need not show that court-ordered compliance with the required procedures would necessarily alter the final agency decision. *Id*. at 185. Defendants claim that setting aside the Area Identification Memorandum could not alter the fact that BOEM completed the lease sale after the Complaint was filed. Thus, Defendants contend that not only is this case unripe, it also "appear[s] to be moot." Mot. at 31 n.12, ECF No.14. However, if Plaintiffs prevail on the merits, this Court would retain a range of options to grant effective relief, including orders to halt the project and redo the regulatory approval process. *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1083–84 (D.C. Cir. 2016). In addition, a case is only moot if the court is unable to grant "*any effectual relief whatsoever* to the prevailing party." *Ctr. for Food Safety v. Salazar*, 900 F. Supp. 2d 1, 5 (D.D.C.

36

2012). BOEM has made no such showing. To the contrary, BOEM states throughout its motion that it retains full discretion to preclude or prevent any and all lease activities in the Bight. In any event, the "capable of repetition yet evading review" exception to mootness would apply. *Cloud Found., Inc. v. Salazar*, 738 F. Supp. 2d 35, 39 (D.D.C. 2010).

### C.   The Area ID Memorandum is a Final Agency Action

The Complaint sufficiently alleges that the Area Identification Memorandum is a final agency action within the meaning of the APA. 5 U.S.C. §704. The Complaint alleges: "When it issued the Area Identification Memorandum and adopted the Wind Energy Areas described therein, BOEM took a final agency action that effectively foreclosed discussion or consideration of alternative Wind Energy Areas." Compl. ¶ 45, ECF No. 1.

Actions are final for APA purposes when they meet two conditions: "**First**, the action must mark the 'consummation' of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature. **Second**, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 7 (D.D.C. 2005) (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). As shown below, the Area Identification Memorandum clearly meets the two conditions for a "final agency action."

### 1.   The Area Identification Memorandum is the Consummation of BOEM's Area Identification Process

As to the first criterion, Plaintiffs' Complaint alleges the Area Identification Memorandum is the "consummation" of the Area Identification stage of the offshore leasing process. Nonetheless, BOEM claims that the Area Identification Memorandum is not final, because the leasing process does not conclude until a specific project, including its detailed Construction and Operations Plan, is approved. Mot. at 33, ECF No. 14. In effect, BOEM takes a "30,000-foot view"

and self-defines the process as the overall leasing program as opposed to the discrete Area Identification regulatory step. However, Defendants' "self-serving characterization" of their own action is not controlling. *CropLife Am. v. E.P.A.*, 329 F.3d 876, 883 (D.C. Cir. 2003); *see also Chiang v. Kempthorne*, 503 F. Supp. 2d 343, 350 (D.D.C. 2007).

Instead, the relevant inquiry is whether the Memorandum is "finally determinative of the issues or rights **to which it is addressed**." *CropLife Am.*, 329 F.3d at 88 (emphasis added); *see also Bell v. New Jersey*, 461 U.S. 773, 780 (1983) (agency's action final notwithstanding "the possibility of further proceedings" on related issues). Here, the Area Identification Memorandum addresses the discrete Area Identification stage of the leasing program. Thus, the Area Identification Memorandum is the final agency action as to that discrete regulatory stage. *Id.* Importantly, BOEM does not claim otherwise.

In addition, Defendants cannot self-define the applicable decisionmaking process as the overall leasing program, because Congress and Defendants specifically designed the process to ***not*** to be so generalized and intertwined. The OCSLA is a statute with a "structure for every conceivable step to be taken" on the path to development of an OCS leasing site. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 593 (D.C. Cir. 2015). It establishes both a procedural framework and a set of substantive requirements to govern how Interior opens up areas of the OCS for resource development. *Id.* at 594. "Rigorous substantive requirements accompany each procedural stage." *Id.* Each stage involves "separate regulatory review" and includes "specific requirements." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). "Congress has thus taken pains to separate the various federal decisions involved in formulating a leasing program, conducting lease sales, authorizing exploration, and allowing development and production." *Id.* at 340; *see also Tribal Vill. of Akutan*, 869 F.2d at 1187 ("Each stage involves separate regulatory

review"); *Vill. of False Pass*, 733 F.2d at 608 (the stages for offshore leasing are "separate and distinct").[9] Here, Area Identification is a discrete regulatory stage in the process for issuance of OCS renewable energy leases, as codified in 30 C.F.R. § 585.211(b).

Finally, Defendants cannot argue that the Area Identification stage is merely "interlocutory" or not final on grounds the final Wind Energy Areas may not ultimately become lease areas, or because the Area Identification stage does not award any leases or authorize any construction. Such arguments are analyzed under the <u>second</u> prong of the finality analysis — they cannot be "bootstrapped" into the <u>first</u> prong. *MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 938 n.5 (D.C. Cir. 2021) ("The point where an agency's decisionmaking process is complete cannot be pulled to and fro by the gravity of any particular decision.").

In short, Area Identification is a "required regulatory step under the renewable energy competitive leasing process." Compl. Ex. 1 at 4, ECF No. 1-6. The Area Identification Memorandum identifies the "final WEAs" and is the final agency action as to that regulatory step. *Id.* at 1. As a result, the Memorandum meets the first prong of finality.[10]

---

[9]    The OCSLA legal framework for oil and gas leases is "analogous and appropriate" to OCSLA wind energy leases because the regulations are "similar, but not identical." *Fisheries Survival Fund*, 2018 WL 4705795, at *7 n.4; *Friends of the Earth*, 2022 WL 254526, at *10.

[10]    Any argument that the Area Identification Memorandum is not a final agency action would require a review of the administrative record. As such, it should not be considered in response to a motion to dismiss. *League v. Ross*, 2020 WL 5441356, at *12 (N.D. Cal. 2020) (citing *Friends of the River*, 870 F. Supp. 2d at 976) ("Determining whether [the challenged actions] are final agency actions in the instant case requires a review of the full administrative record, because . . . 'the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of [the] action.").

####    2.    Important Obligations and Legal Consequences Flow from
####          the Area Identification Memorandum

The Area Identification Memorandum also meets the second prong of finality because it is one by which "rights or obligations have been determined," or from which "legal consequences will flow."[11]

Specifically, the Area Identification step determines the geographical area of the proposed action to be analyzed in an ensuing environmental analysis document (e.g., EIS, EA), any alternatives to the proposed action, and mitigation measures and other issues to be analyzed and considered further. Renewable Energy and Alternate Uses of Existing Facilities on the Outer Continental Shelf, 74 Fed. Reg. 19,638, 19,659 (Apr. 29, 2009). Thus, as alleged in the Complaint, the Area Identification stage is "perhaps the most environmentally critical decision that BOEM makes, as it commits large ocean areas to wind energy development versus other uses, and forecloses other areas." Compl. ¶ 57, ECF No. 1. The Area ID Memorandum, by selecting the Wind Energy Areas, also establishes the boundaries for the subsequent lease sales, ocean bed surveys, and project-specific Construction and Operation Plans. Combined, these subsequent activities – all of which are based on the Wind Energy Area boundaries set forth in the Area ID Memorandum – involve intense amounts of financial and administrative resources, public and private. Unless and until the Area ID Memorandum is issued, these other events and the legal authorizations giving rise to them, do not occur. And as discussed above, the OCSLA regulations

---

[11]    Direct rights and legal consequences flow from the Area Identification Memorandum, because the OCSLA includes a citizen-suit provision. 43 U.S.C. § 1349. The citizen-suit provision provides that any person having a valid legal interest may commence a civil action to compel compliance with the Act for any alleged violation of any provision of the Act "or any regulation promulgated under this subchapter." 43 U.S.C. § 1349(a)(1). The Area Identification Memorandum was issued "Pursuant to 30 C.F.R. § 585.211(b)," which is a regulation promulgated under the subchapter. Compl. Ex. 1 at 1, ECF No. 1-6. Thus, explicit rights and legal consequences flow from the Area Identification stage of the regulatory process.

required environmental review to take place during the Area Identification stage. 30 C.F.R. § 585.211(b).

The only case referencing the Area Identification regulatory step for OCS renewable energy leases, 30 C.F.R. § 585.211(b), states that completion of the Area Identification process marks the area as "available for lease." *Fisheries Survival Fund*, 2018 WL 4705795, at *3 (D.D.C. Sept. 30, 2018). This is also a legal consequence meeting the second prong of finality.

In addition, the Area Identification stage in renewable energy leases is analogous to the first stage of the OCS oil & gas leasing process, the preparation of a "five-year schedule." *See supra* Section III.C. The five-year schedule stage "carries enormous practical and legal significance." *Ctr. for Sustainable Econ*, 779 F.3d at 595. The five-year schedule must indicate, as precisely as possible, the size, timing, and location of leasing activity for the five-year period following its approval. *Id.* at 594. Key national decisions as to these issues takes place at this stage. *Id.* In addition, no lease may be issued for an area unless the area is included in the approved leasing program, and the program becomes the basis for future planning by all affected entities. *State of Cal. By & Through Brown v. Watt*, 668 F.2d 1290, 1299 (D.C. Cir. 1981).

Thus, in *Hodel*, the D.C. Circuit held that the "scope of decisions narrows" as the OCSLA process proceeds from planning stage to lease and later stages, and arbitrary and capricious decisions "either to include or exclude nominated areas . . . may materially affect the program-stage inter-area analysis." *Hodel*, 865 F.2d at 300. As a result, *Hodel* held that these decisions "must be subject to program-stage review to ensure meaningful review of the program." Accordingly, *Hodel* held that area exclusion decisions are sufficiently final for judicial review. *Id.* As alleged in the Complaint, the Area Identification step in renewable leases carries similar enormous consequences. In the "pyramidic structure" of OCS planning, the final Wind Energy

Areas define the scope of future environmental analysis, including the geographic area considered for leasing. The Area Identification Memorandum is a final agency action that must be subject to program-stage review. *Id.*

In arguing that no consequences flow from the Area Identification Memorandum, BOEM again reverts to its theme that Area Identification "does not award leases or approve any activities" within the Wind Energy Areas. Mot. at 35, ECF No. 14. However, NEPA's EIS requirement is not limited to site- or project-specific impacts or activities — programmatic EISs may be required. *See supra* Section V.2.b; *Friends of the River*, 870 F. Supp. 2d at 978 ("Indeed, Plaintiffs' procedural challenges to the alleged programmatic NEPA decisions are immediately ripe for review because they 'will influence subsequent site-specific actions' and 'predetermine the future.'").

### D.   The ESA Citizen-Suit 60-Day Notice Requirement Does Not Apply to Plaintiffs' ESA Claim, Which is Brought Under the APA

Defendants incorrectly claim that the 60-day notice provision of the ESA citizen suits applies to the Complaint's ESA claim. Mot. at 37, ECF No. 14. This case was not brought under the ESA citizen-suit provision, but was brought under the APA, which, as Defendants recognize, is not subject to any notice provision.[12] "The APA by its terms independently authorizes review only when 'there is no other adequate remedy in a court,' 5 U.S.C. § 704." *Bennett v. Spear*, 520 U.S. 154, 161–62 (1997).

Here, the Complaint seeks an order reversing and setting aside BOEM's March 26, 2021 Area Identification Memorandum, including because Defendants violated Section 7 of the ESA by failing to consult with NMFS before issuing. Compl. ¶ 67, ECF No. 1 (Prayer for Relief). Judicial review of agency actions under the ESA is governed by the APA. *Wyo. Outdoor Council*, 284 F.

---

[12]   The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." (5 U.S.C. § 702.)

Supp. 2d at 89. The Complaint's requested remedy is not covered by the ESA citizen-suit provision. Specifically, the ESA citizen-suit provision authorizes civil suits to **enjoin** alleged violations of the ESA. 16 U.S.C. § 1540(g)(1)(A). The injunctive relief authorized by the ESA citizen-suit provision is directed at future actions. *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995).

Thus, the APA authorizes courts to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Bennett*, 520 U.S. at 174 (citing 5 U.S.C. §706). The ESA citizen-suit provision does not preclude such review under the APA. *Bennett*, 520 U.S. at 175. In short, because the ESA claim is brought under the APA, to set aside the Area Identification Memorandum, no 60-day notice provision applies.

## E. The Court Should Grant Leave To Amend If It Dismisses Any Part of the Complaint

If the Court is inclined to grant any part of the motion, Plaintiffs request that they be given leave to amend the Complaint accordingly. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988) ("Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect."). Here, for example, Plaintiffs can amend the Complaint to also allege NEPA and EPA violations in connection with the Defendants' final agency action of adopting the Final EA and Finding of No Significant Impact (FONSI), which cover the lease issuance within the identified Wind Energy Areas. *See supra* Section IV.D (discussing OCS EIS/EA BOEM 2021-073) (December 16, 2021).

The Final EA and accompanying FONSI are deficient because the scope of EAs must cover the effects of a major federal action *and consequences* of that action. *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1083 (D.C. Cir. 2016). However, as discussed above and as Defendants

readily acknowledge, the EA and FONSI only cover the "initial decision" to issue leases — *i.e.*, the impacts of "site assessment" and "site characterization" activities — and not potential construction and operation of actual wind energy facilities. However, "NEPA does not allow agencies to slice and dice proposals in this way." *Id.* The EA must therefore look beyond the decision to offer a lease and consider the predictable consequences of that decision. *Id.* This case is also ripe, as shown by *Friends of the Earth v. Haaland*, which was decided 17 days after the Complaint in this action was filed. 2022 WL 254526, at *9 (D.D.C. Jan. 27, 2022).

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' motion in its entirety.

Dated: April 11, 2022                                                    Respectfully submitted,

/s/ Nancie G. Marzulla
Nancie G. Marzulla (D.C. Bar No. 400985)
Roger J. Marzulla (D.C. Bar No. 394907)
Marzulla Law, LLC
1150 Connecticut Ave NW, Suite 1050
Washington, D.C.  20036
Phone:   (202) 822-6760
Email:   nancie@marzulla.com
roger@marzulla.com

/s/ David P. Hubbard
David P. Hubbard, *Pro Hac Vice* (CA Bar No. 148660)
Gatzke Dillon & Ballance LLP
2762 Gateway Road
Carlsbad, CA 92009
Phone:   (760) 431-9501
Email:   dhubbard@gdandb.com

Counsel for Plaintiffs