## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAVE LONG BEACH ISLAND, *et al.*,

     Plaintiffs,

   v.

U.S. DEPARTMENT OF THE INTERIOR, DEB HAALAND, in her official capacity as Secretary of the Interior, U.S. BUREAU OF OCEAN ENERGY MANAGEMENT, and AMANDA LEFTON, in her official capacity as Director of Bureau of Ocean Energy Management,

     Defendants.

Case No. 1:22-cv-00055-DLF

## AMICUS BRIEF OF AMERICAN CLEAN POWER ASSOCIATION, ALLIANCE FOR CLEAN ENERGY NEW YORK AND MAREC ACTION IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

INTRODUCTION................................................................................................................1

POLICY FRAMEWORK FOR OCSLA LEASING OF OFFSHORE WIND ENERGY.............4

   I.    The United States is moving towards a clean energy future that depends upon offshore wind.......................................................................................................4

   II.   BOEM's multi-stage planning and permitting process for offshore wind development is efficient and implements OCSLA's environmental values...........6

        A.   OCSLA's staged leasing process is well designed to provide stakeholder engagement and environmental review at appropriate junctures...............7

        B.   The New York Bight WEA identification process was thorough, reflects years of work, and significantly narrowed the areas potentially available for leasing..........................................................................................10

        C.   The deconfliction process that occurs during WEA identification may significantly reduce the geographic scope of areas ultimately offered for lease, as it did here...............................................................................12

III.   Allowing Plaintiffs' claims to proceed could chill the industry by upending the legal certainty provided by *Fisheries Survival Fund v. Haaland* and related precedents....................................................................................................... 14

ARGUMENT.................................................................................................................................. 16

I.   Plaintiffs' Complaint fails to state a claim under NEPA..................................... 17

A.   WEA identification is not a "major federal action."............................... 17

B.   Under NEPA, federal agencies have discretion to determine whether to analyze related actions programmatically.............................................. 23

II.   Plaintiffs have not articulated any harms from the absence of formal NEPA at the WEA identification stage.................................................................................... 24

CONCLUSION.............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

\* *Center for Biological Diversity v. Ilano,*
928 F.3d 774 (9th Cir. 2019).....................................................................20, 21

\* *Fisheries Survival Fund v. Haaland,*
858 F. App'x 371 (D.C. Cir. 2021).................................................................3, 15

\* *Fisheries Survival Fund v. Jewell,*
No. 16-CV-2409, 2018 WL 4705795 (D.D.C. 2018).................................9, 10, 15

*Found'n on Economic Trends v. Heckler,*
756 F.2d 143 (D.C. Cir. 1985)............................................................... 23

*Foundation on Economic Trends v. Lyng,*
943 F.2d 79 (D.C. Cir. 1991)..................................................................4, 20

*Izaak Walton League of Am. v. Marsh,*
655 F.2d 346 (D.C. Cir. 1981)............................................................... 23

\* *Kleppe v. Sierra Club,*
427 U.S. 390 (1976)....................................................................18, 19, 22, 23

*La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U. S. Dep't of the
Interior,*
No. 2:11-cv-00395, 2012 WL 12888325 (C.D. Cal. Mar. 21, 2012)................... 24

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990).......................................................................... 20

*Nat'l Ass'n for the Advancement of Colored People v. Trump,*
298 F. Supp. 3d 209 (D.D.C. 2018) ....................................................... 5

*Nat'l Wildlife Found'n v. Appalachian Reg'l Comm'n,*
677 F.2d 883 (D.C. Cir. 1981)............................................................... 23

\* *Nevada v. Dep't of Energy,*
457 F.3d 78 (D.C. Cir. 2006)................................................................ 23

*Northcoast Env't Ctr. v. Glickman,*
136 F.3d 660 (9th Cir. 1998).................................................................19, 20

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
523 U.S. 726 (1998)........................................................................... 22

*Pub. Citizen v. Off. of U.S. Trade Representatives*,
    970 F.2d 916 (D.C. Cir. 1992)...................................................................... 18

*Sparrow v. United Air Lines, Inc.*,
    216 F.3d 1111 (D.C. Cir. 2000)................................................................... 17

*Trudeau v. Fed. Trade Comm'n*,
    456 F.3d 178 (D.C. Cir. 2006)..................................................................... 17

*Vasser v. McDonald*,
    228 F. Supp. 3d 1 (D.D.C. 2016).................................................................... 4

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
    5 F.4th 997 (9th Cir. 2021)........................................................................... 24

## STATUTES

42 U.S.C. §§ 4321–4370m............................................................................... 9

42 U.S.C. § 4332(2)(C).................................................................................. 18

43 U.S.C. § 1337............................................................................................. 6

43 U.S.C. § 1337(p)(1)(C)............................................................................... 7

43 U.S.C. § 1337(p)(8).................................................................................... 7

Pub. L. No. 109-58, 119 Stat. 594 (2005) (Energy Policy Act)......................... 7

Pub. L. No. 113-79, § 8204, 128 Stat. 649 (2014) (Healthy Forest Restoration
    Act).............................................................................................................. 21

## RULES

Fed. R. App. P. 29(a)(4)(E)............................................................................. 1

Fed. R. Evid. 201............................................................................................. 4

LCvR 7(o)(5)................................................................................................... 1

## REGULATIONS

30 C.F.R. part 585.......................................................................................... 7

30 C.F.R. § 585.203......................................................................................... 9

30 C.F.R. § 585.211......................................................................................... 9

30 C.F.R. § 585.211(a)..................................................................................... 8

30 C.F.R. § 585.211(b).................................................................................8, 11

30 C.F.R. § 585.211(c)-(d)................................................................................9

30 C.F.R. § 585.215............................................................................................9

30 C.F.R. § 585.216............................................................................................9

30 C.F.R. §§ 585.230–231...............................................................................19

30 C.F.R. § 585.600.............................................................................9, 10, 20

30 C.F.R. § 585.601(c)(1).................................................................................10

30 C.F.R. § 585.613........................................................................................9, 10

30 C.F.R. §§ 585.620–627...............................................................................10

30 C.F.R. § 585.621..........................................................................................12

30 C.F.R. § 585.628(f)......................................................................................10

40 C.F.R. § 1502.4(b).......................................................................................23

40 C.F.R. § 1508.1(x).......................................................................................18

40 C.F.R. § 1508.1(q)(3)..............................................................................19, 20

73 Fed. Reg. 39376 (July 9, 2008)..................................................................22

74 Fed. Reg. 19638 (Apr. 29, 2009)............................................................8, 22

79 Fed. Reg. 76986 (Dec. 23, 2014)...............................................................23

83 Fed. Reg. 15602 (Apr. 11, 2018).................................................................11

86 Fed. Reg. 31524 (June 14, 2021).................................................................11

**OTHER AUTHORITIES**

*Atlantic Wind Lease Sale 8 (ATLW-8) for Commercial Leasing for Wind Power
   on the Outer Continental Shelf (OCS) in the New York (NY) Bight—Final Sale
   Notice (FSN)*, 87 Fed. Reg. 2446 (Jan. 14, 2022)..................................11, 13, 19

BOEM, *Finding of No Significant Impact* (Dec. 13, 2021),
   https://www.boem.gov/sites/default/files/documents//NYBightFinalEA_2021-
   073_FONSI.pdf............................................................................................11

Dep't of Energy, *DOE Fact Sheet: The Bipartisan Infrastructure Deal Will Deliver For American Workers, Families and Usher in the Clean Energy Future*, (Nov. 9, 2021), https://www.energy.gov/articles/doe-fact-sheet-bipartisan-infrastructure-deal-will-deliver-american-workers-families-and-0 ........................ 5

Dep't of Energy, *Energy Secretary Granholm Announces Ambitious New 30 GW Offshore Wind Deployment Target by 2030*, (Mar. 29, 2021), https://www.energy.gov/articles/energy-secretary-granholm-announces-ambitious-new-30gw-offshore-wind-deployment-target ...................................................... 4

Dep't of the Interior, *Biden-Harris Administration Sets Offshore Energy Records with $4.37 Billion in Winning Bids for Wind Sale* (Feb. 25, 2022), https://www.doi.gov/pressreleases/biden-harris-administration-sets-offshore-energy-records-437-billion-winning-bids-wind .................................................................. 12

Dep't of the Interior, *New York Bight Area Identification Memorandum Pursuant to 30 C.F.R. § 585.211(b)*, Mar. 26, 2021, https://www.boem.gov/sites/default/files/documents/renewable-energy/Memorandum%20for%20Area%20ID%20in%20the%20NY%20Bight .pdf .......................................................................................................... 8, 9, 11, 18

Exec. Order No. 14057, *Executive Order on Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability* (Dec. 08, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/12/08/executive-order-on-catalyzing-clean-energy-industries-and-jobs-through-federal-sustainability/ ............................................................... 4

N.J. Exec. Order No. 92 (Nov. 19, 2019), https://nj.gov/infobank/eo/056murphy/pdf/EO-92.pdf ........................................................ 5

Nat'l Renewable Energy Lab., *2016 Offshore Wind Energy Resource Assessment for the United States* (Sept. 2016), https://www.nrel.gov/docs/fy16osti/66599.pdf ...................................................... 6

NYSERDA, *2022 Offshore Wind Solicitation*, https://www.nyserda.ny.gov/All-Programs/Offshore-Wind/Focus-Areas/Offshore-Wind-Solicitations/2022-Solicitation (last accessed Apr. 29, 2022) ......................................................... 5, 6

NYSERDA, *Area for Consideration for the Potential Locating of Offshore Wind Energy Areas*, Report 17-25u (Sept. 2017), available at https://www.nyserda.ny.gov/All-Programs/Offshore-Wind/Focus-Areas/Leading-a-Regional-Industry/Siting-Offshore-Wind; *Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight—Call for Information and Nominations* .................................................... 11

State of New Jersey Board of Public Utilities, *In the Matter of Offshore Wind Transmission*, Docket No. QO20100630 (Nov. 18, 2020) .................................................... 6

State of New York Energy Research and Development Authority, *Offshore Wind Policy Options Paper* (2018) .............................................................................................. 6

U.S. Dep't of Energy and U.S. Dep't of the Interior, *National Offshore Wind Strategy* (2016) .......................................................................................................5, 6

White House, *Fact Sheet: President Biden Announces Support for the Bipartisan Infrastructure Framework* (June 24, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/24/fact-sheet-president-biden-announces-support-for-the-bipartisan-infrastructure-framework/ .................................................................... 5

**\*   denotes authorities cases replied upon**

## INTRODUCTION[1]

*Amici* are leading nonprofit organizations dedicated to promoting clean, renewable energy in New York and the United States. **The American Clean Power Association (ACP) is a** nonprofit national trade association representing a broad range of entities with the common purpose of encouraging the expansion and facilitation of both onshore and offshore wind energy resources in the United States. ACP represents the interests of wind turbine manufacturers, component suppliers, project developers, project owners and operators, financiers, researchers, renewable energy supporters, utilities, marketers, customers, and their advocates. Through actions such as participation as *amicus curiae* in state and federal courts, ACP seeks to promote offshore wind energy as a clean, low-cost source of electricity for consumers. ACP's member companies, including several companies that hold offshore wind leases in the New York Bight issued by the Bureau of Ocean Energy Management (BOEM), are actively pursuing offshore wind energy projects in waters off the United States. **The Alliance for Clean Energy New York ("ACE NY")[2]** is a nonprofit organization dedicated to promoting the use of clean, renewable electricity technologies and energy efficiency in New York State in order to increase energy diversity and security, boost economic development, improve public health, and reduce air pollution. ACE NY's members are a mix of private companies and non-profit organizations interested in promoting clean energy and creating opportunities for growth in New York's clean energy economy. **MAREC Action** is a nonprofit organization formed to help advance the opportunities for renewable energy development primarily in the region where the Regional Transmission Organization PJM Interconnection operates. MAREC Action's advocacy footprint includes New

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) and LCvR 7(o)(5), no counsel for a party authored this brief in whole or in part and no person or entity other than *Amici*, its members, or counsel, made a monetary contribution to its preparation or submission.

[2] This brief does not necessarily reflect the positions of all ACE NY members or board members.

Jersey and nine other jurisdictions in the region. MAREC Action members include utility-scale wind (including offshore wind) and solar developers, wind turbine manufacturers and non-profit organizations dedicated to the growth of renewable energy technologies.

The issues presented in this case have implications for leaseholders in the New York Bight, including *Amici's* members, and offshore wind development in New York and around the country. *Amici* submit this brief to provide the Court with the unique perspective of the offshore wind industry as well as organizations that support increased deployment of renewable energy to decarbonize the United States electrical grid and create a clean energy economy. BOEM must be able to continue its offshore wind energy leasing program using its current approach, in which Wind Energy Area (WEA) identification represents merely one of many steps in an intentionally staged development process with sequential and appropriate agency review, as well as informal or formal public participation, at each step. *Amici* present three arguments below.

First, the agency's approach to WEA identification sensibly balances the requirements of the Outer Continental Shelf Lands Act, (OCSLA) and National Environmental Policy Act (NEPA), with the business realities and exigencies of the offshore wind industry. BOEM's multi-stage planning effort is robust and includes significant public participation throughout the process, but focuses NEPA analysis on those stages where project proponents, leasehold interests, and project parameters have been identified and BOEM can analyze offshore wind development in a meaningful way. Allowing Plaintiffs' claims to proceed would ignore the compelling policies that undergird BOEM's regulatory process, which carefully balances rigorous environmental review at appropriate junctures with the needs of the agency and developers to avoid burdensome and premature NEPA analysis before either the scope of leases or the key parameters of development are known.

Second, the agency's approach has been validated by D.C. Circuit precedents that Plaintiffs provide no reason to distinguish or disturb. Allowing Plaintiffs' claims to proceed would undermine *Amici*'s reasonable reliance on this Circuit's precedents governing when NEPA obligations arise during the OCSLA process. The D.C. Circuit Court's decision in *Fisheries Survival Fund v. Haaland*, 858 F. App'x 371 (D.C. Cir. 2021), established that NEPA obligations for offshore wind development do not attach at the lease sale stage of the process, let alone the even *earlier* stage of WEA identification. A contrary holding in this case would upset investment-backed expectations that rely on that decision and related precedents and cause severe disruption to a dynamic new industry that is at last starting to take hold in the United States.

In addition to explaining the sound policy reasons that should inform the court's consideration in this case, *Amici* offer three additional legal arguments that support the government's motion to dismiss. In their Complaint, Plaintiffs allege that BOEM's selection of the WEAs was not only a "final agency action" for purposes of the Administrative Procedure Act (APA) (a prerequisite to review under that statute), but also a "major federal action" subject to NEPA, and an "irretrievable commitment of resources" sufficient to trigger obligations under NEPA's implementing regulations. Plaintiffs also allege that BOEM violated NEPA by not preparing a regional, programmatic environmental impact statement (PEIS) before issuing the WEA identification memorandum to address the impacts of all WEAs in and around the New York Bight.[3] These conclusions of law, which need not be credited on a motion to dismiss, are wrong.

The law is clear that Plaintiffs' Complaint should be dismissed, not only based on the APA and standing defects discussed in the Federal Defendants' motion to dismiss, but because it fails

---

[3] Plaintiffs also contend that BOEM violated the Endangered Species Act (ESA) by failing to consult with the National Marine Fisheries Service before selecting the WEAs. Federal Defendants' arguments in their motion to dismiss suffice to dispose of this claim.

to state a claim under NEPA upon which relief may be granted for three reasons. First, the lack of any major federal action under NEPA—while related to the lack of any "final agency action" under the APA identified by Federal Defendants—provides an independent reason to dismiss Plaintiffs' claims.[4] BOEM was under no obligation to complete NEPA for the administrative exercise of drawing lines on a map. Second, there is also no requirement under NEPA that BOEM prepare a PEIS for WEA identification. Third, Plaintiffs fail to articulate any harms resulting from the lack of NEPA at the WEA identification stage. Plaintiffs' claims should be dismissed.

<u>**OFFSHORE WIND ENERGY LEASING UNDER OCSLA**</u>

I.     **The United States is moving towards a clean energy future that depends upon offshore wind.**

Offshore wind energy is critical to meeting the requirements of Executive Order 14057,[5] which directs the federal government to slash carbon emissions by 65 percent by 2030 and achieve a net zero carbon economy by 2050. To meet this goal, the Departments of the Interior, Energy, and Commerce have pledged to develop 30 gigawatts (GW) of offshore wind by 2030.[6] Congress

---

[4] The two statutory requirements are often complementary.  For example, in *Foundation on Economic Trends v. Lyng*, the D.C. Circuit held that "Plaintiffs fail to target their complaint to a particular proposal for federal action and fail to identify any revisions or changes taken by any of the defendants in the germplasm program that would trigger the obligation to prepare an environmental impact statement under NEPA." 943 F.2d 79, 86 (D.C. Cir. 1991).  The panel divided, however, over whether to uphold a lower court's ruling on the basis set forth in the decision (that there was no "major federal action" sufficient to trigger NEPA) or on the grounds that there was insufficient final agency action under the APA.

[5] Exec. Order No. 14057, *Executive Order on Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability* (Dec. 08, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/12/08/executive-order-on-catalyzing-clean-energy-industries-and-jobs-through-federal-sustainability/.

[6] Dep't of Energy, *Energy Secretary Granholm Announces Ambitious New 30 GW Offshore Wind Deployment Target by 2030*, (Mar. 29, 2021), https://www.energy.gov/articles/energy-secretary-granholm-announces-ambitious-new-30gw-offshore-wind-deployment-target. At the motion to dismiss stage, courts can take judicial notice of facts not subject to reasonable dispute, which include matters of a general public nature. Fed. R. Evid. 201; *Vasser v. McDonald*, 228 F. Supp. 3d 1, 10 (D.D.C. 2016). This court has interpreted "matters of a general public nature" to include

has given the agencies the resources to realize these commitments by passing legislation, including the $1.2 trillion Infrastructure Investment and Jobs Act, which allocates $47 billion toward climate-related funding, and $2.5 billion towards transmission facilitation, including for offshore wind.[7] States have set similar goals; for example, New York's Climate Leadership and Protection Act requires the State to achieve a 100 percent carbon free electricity system by 2040 and directs that New York develop 9,000 megawatts (MW) of offshore wind energy by 2035.[8] New Jersey has set similarly ambitious climate and offshore wind goals to develop 7.5 GW of offshore wind energy by 2035.[9]  The development of offshore wind energy provides important benefits, including:

- environmental and public health benefits through the displacement and retirement of fossil-fuel energy production, which is associated with higher carbon emissions, air pollution, and mortality;[10]

---

agency statements and agency policy. *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 248 (D.D.C. 2018).

[7] The White House, *Fact Sheet: President Biden Announces Support for the Bipartisan Infrastructure Framework* (June 24, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/24/fact-sheet-president-biden-announces-support-for-the-bipartisan-infrastructure-framework/; Dep't of Energy, *DOE Fact Sheet: The Bipartisan Infrastructure Deal Will Deliver For American Workers, Families and Usher in the Clean Energy Future*, (Nov. 9, 2021), https://www.energy.gov/articles/doe-fact-sheet-bipartisan-infrastructure-deal-will-deliver-american-workers-families-and-0.

[8] New York State Energy Research & Development Authority (NYSERDA), *About Offshore Wind*, https://www.nyserda.ny.gov/All-Programs/Offshore-Wind/About-Offshore-Wind (last accessed Apr. 29, 2022).

[9] N.J. Exec. Order No. 92 (Nov. 19, 2019), https://nj.gov/infobank/eo/056murphy/pdf/EO-92.pdf

[10] U.S. Dep't of Energy and U.S. Dep't of the Interior, *National Offshore Wind Strategy* (2016) at 1, 22 (offshore wind reduces mortality by displacing harmful sulfur dioxide, nitrogen dioxide, and fine particulate matter emissions), at 38 ("[O]ffshore wind development carries with it substantial positive environmental benefits, both on land and at sea, including significant reduction in cumulative [greenhouse gas] emissions, air pollution, and water usage by the electricity sector.").

- a more robust and reliable electricity system that reduces transmission congestion and the need for transmission from upstate regions;[11]

- the development of domestic energy sources near coastal states, where 80 percent of electricity demand is located;[12]

- an abundant, no-carbon fuel source that will be available as thousands of megawatts of legacy fossil fuel and nuclear generators retire because of age, cost, or as part of the move toward lower-carbon sources of electricity;[13]

- thousands of jobs and spurred economic growth;[14] and

- the promotion of municipal, regional, and national public policy goals, including support for environmental justice.[15]

## II.   BOEM's multi-stage planning and permitting process for offshore wind development is efficient and implements OCSLA's environmental values.

Congress, to encourage renewable energy development on the Outer Continental Shelf, passed the Energy Policy Act of 2005, which amended the Outer Continental Shelf Lands Act, 43

---

[11] State of New York Energy Research and Development Authority, *Offshore Wind Policy Options Paper* at 55 (2018); State of New Jersey Board of Public Utilities, *In the Matter of Offshore Wind Transmission*, Docket No. QO20100630 at 1 (Nov. 18, 2020).

[12] Nat'l Renewable Energy Lab., *2016 Offshore Wind Energy Resource Assessment for the United States*, at 33 (Sept. 2016), https://www.nrel.gov/docs/fy16osti/66599.pdf.

[13] U.S. Dep't of Energy and U.S. Dep't of the Interior, *National Offshore Wind Strategy* (2016) at vii.

[14] *Id.* at 22 (projecting 32,000–34,000 offshore wind-related jobs around the country by 2020 and 76,000–80,000 by 2030).

[15] NYSERDA, *2022 Offshore Wind Solicitation*, https://www.nyserda.ny.gov/All-Programs/Offshore-Wind/Focus-Areas/Offshore-Wind-Solicitations/2022-Solicitation (last accessed Apr. 29, 2022) (noting that NYSERDA plans to procure at least 2,000 MW (and up to 4,640 MW) of offshore wind energy to help meet decarbonization goals in the New York Climate Leadership and Community Protection Act.

U.S.C. § 1337.[16] The Act authorizes the Secretary of the Interior to issue "leases, easements, or rights-of-way for energy and related purposes" on the Outer Continental Shelf to "support production, transportation, storage, or transmission of energy from sources other than oil and gas," including offshore wind, 43 U.S.C. § 1337(p)(1)(C), and directs the Secretary to create regulations to accomplish those ends. 43 U.S.C. § 1337(p)(8). In 2009, BOEM (originally, Minerals Management Service (MMS)) finalized its offshore wind leasing regulations, codified at 30 C.F.R. part 585. The regulations are designed to accommodate the realities of an emergent and rapidly evolving industry—offshore wind—while ensuring that appropriate environmental reviews and opportunities for public input commensurate with the information available would be completed, and inform the agency's decision-making, at each stage of the process. BOEM's regulations establish a stepwise process that gathers and analyzes environmental information to deconflict at early stages and identify the most suitable areas for offshore wind, but wisely does not require a detailed NEPA analysis before a project is proposed on a granted lease.

**A.     OCSLA's staged leasing process is well designed to provide stakeholder engagement and environmental review at appropriate junctures.**

Because Plaintiffs' lawsuit in essence challenges how well BOEM's staged leasing process for offshore renewable energy development addresses environmental values, it is worth discussing why that process is well suited to address the economic and technological realities of the offshore wind industry. The OCSLA process for offshore wind development includes multiple stages of agency review, not just the WEA identification stage challenged in Plaintiffs' Complaint.

As Federal Defendants explain in their motion to dismiss, there are five formal components to BOEM's process for competitive lease award. At the first formal opportunity for BOEM to

---

[16] *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, § 388(a) (allowing offshore leases for activities that produce energy from sources other than oil and gas), § 1833 (requiring study of statutory and regulatory mechanisms to develop renewable energy).

directly receive public comment, BOEM initiates a threshold step in the process—WEA identification—by publishing in the Federal Register a Call for Information and Nominations (Call) for leasing in a specified area. 30 C.F.R. § 585.211(a). This Call is followed by a 45-day comment period. *Id*. During this time, BOEM requests comments on the areas to receive special consideration and analysis; seeks information on the conditions of the areas, including geological, archaeological, recreational, socioeconomic, biological, and environmental conditions, among others; and solicits other areas BOEM should consider for leasing. *Id*.

After BOEM considers the comments submitted on the Call, it proceeds to the second step, where the agency identifies the geographical area "for environmental analysis and consideration for leasing" in consultation with appropriate federal agencies, States, local governments, affected Indian Tribes, and other interested parties. 30 C.F.R. § 585.211(b). As explained in BOEM's regulations, the purpose of this (WEA identification) step is to "help industry and the Federal Government (and ultimately the taxpayer) focus on promising acreage and avoid needless expense."[17] WEA identification precedes leasing and is not a final decision on anything. BOEM reserves the right to issue leases in smaller or fewer areas, or to issue no leases.[18]

In the third step (not challenged in Plaintiffs' Complaint, which asserts legal error only in connection with WEA identification), after coordination and consultation with federal agencies

---

[17] *Renewable Energy and Alternate Uses of Existing Facilities*, 74 Fed. Reg. 19638, 19659 (Apr. 29, 2009).

[18] *See, e.g.,* Dep't of the Interior, *New York Bight Area Identification Memorandum Pursuant to 30 C.F.R. § 585.211(b)*, Mar. 26, 2021 ("WEA Identification Memorandum"), https://www.boem.gov/sites/default/files/documents/renewable-energy/Memorandum%20for%20Area%20ID%20in%20the%20NY%20Bight.pdf (stating that "BOEM reserves the right under its regulations to issue leases in smaller, fewer, and/or different areas - or issue no leases."). Because the memorandum is attached to and deemed incorporated into Plaintiffs' Complaint, the Court may consider it in the context of a motion to dismiss. *See* ECF No. 1-6.

and other entities, as required by relevant federal laws, BOEM may offer areas for lease sale by auction. 30 C.F.R. §§ 585.203, 585.211, 585.215, 585.216. To start this process, BOEM publishes a Proposed Sale Notice in the Federal Register, initiating a 60-day public comment period. BOEM will consult as necessary to develop measures, including lease stipulations and conditions, to mitigate adverse impacts, and may hold public hearings on the environmental analysis. After consultation and outreach on the environmental analysis and the Proposed Sale Notice, BOEM will publish a final environmental analysis, typically in the form of an Environmental Assessment (EA) in compliance with NEPA.[19] BOEM will then publish a Final Sale Notice at least 30 days before the date of the lease sale. 30 C.F.R. § 585.211(c)-(d). Lease award does not authorize any activities to take place, but merely grants the lessees the exclusive right (*vis a vis* other developers) to submit plans for BOEM's consideration.[20]

In the fourth step of this process, after the lease sale, the lessee prepares and submits a Site Assessment Plan (SAP) to BOEM, which describes how the lessee will analyze the resource potential and commercial viability of the leasehold, in line with specific regulatory requirements. 30 C.F.R. § 585.600. NEPA analysis accompanies this stage,[21] and BOEM maintains the discretion to approve or deny the SAP based on its review.

At the fifth and final stage, once site exploration and characterization have better disclosed the character, condition, and wind resources of the leased areas, lessees use the survey data and other information obtained under authority of the SAP to develop a Construction and Operations

---

[19] *See* WEA Identification Memorandum; 42 U.S.C. §§ 4321–4370m.
[20] *Fisheries Survival*, 2018 WL 4705795, at *9 (citations omitted) ("[T]he lease sale does not represent the final word on anything, nor does it commit any resources, even putting aside the question of whether it does so irretrievably."); WEA Identification Memorandum at 2 (reserving right to "issue leases in smaller, fewer and/or different areas—or issue no leases at all"))
[21] 30 C.F.R. § 585.613(b).

Plan (COP) which they submit to BOEM for review. The COP includes a comprehensive description of project siting, the project through all phases, including decommissioning, and the potential impacts to physical, biological, cultural, and other resources. 30 C.F.R. §§ 585.620–627. BOEM analyzes the suitability of the specific COP with the benefit of "needed reviews and NEPA analysis." 30 C.F.R. § 585.601(c)(1). BOEM has the discretion to approve, disapprove, or approve the COP with modifications. 30 C.F.R. §§ 585.613(e), 585.628(f); *Fisheries Survival Fund v. Jewell*, No. 16-CV-2409, 2018 WL 4705795, at *9 (D.D.C. 2018). There is no guarantee that the lessee's SAP or COP will be approved simply because an applicant was granted a lease in the lease auction. The lessee cannot build any facilities for commercial operation unless and until BOEM approves the COP. 30 C.F.R. § 585.600.

The regulatory process provides developers with the exclusivity they require in order to complete the more involved site-specific activities that are necessary to analyze offshore wind development projects under NEPA, including procuring major equipment; reviewing transmission routes, turbine location studies and optimization; and undertaking other site characterization activities. The analysis required at each stage reflects the financing realities faced by the offshore wind industry. The regulations ensure that the government's review and approval is required at key stages commensurate to the likelihood of development, and the information available about potential sites and projects. The experience of the offshore wind industry shows that permitting, planning, financing, and ultimately building and operating an offshore wind project is a complex, years-long process, in which WEA identification is only an early step.

### B. The New York Bight WEA identification process was thorough, reflects years of work, and significantly narrowed the areas potentially available for leasing.

BOEM's 2018 Call for commercial leasing of wind power in the New York Bight included areas based on the recommendation BOEM received from New York State, incorporating research

and input from several New York state agencies and regional Task Forces.[22] BOEM asked for information and nominations of commercial interest on 1.7 million acres in the New York Bight. In response, BOEM received 132 comments and 8 nominations of areas for consideration.[23] Plaintiffs did not submit any comments.

Based on this information and nominations received though the Call, and applying its expertise, BOEM identified areas for environmental analysis and potential leasing, consistent with 30 C.F.R. § 585.211(b). The WEA Identification Memorandum, published in March 2021, was the culmination of three years of analysis and stakeholder engagement to identify areas most suitable for wind leasing.[24] In the memorandum, the agency provided the rationale for each of the five areas selected, analyzing issues related to navigation, fisheries, marine mammals, and commercial viability, among others.

Subsequent events, not included in the Plaintiffs' Complaint, are summarized here merely to provide context. The Proposed Sale Notice was made available for public comment on June 14, 2021.[25] After considering comments and concluding the environmental assessment of the lease sale, BOEM issued a Finding of No Significant Impact for the New York Bight lease sale on December 13, 2021.[26] BOEM published the Final Sale Notice on January 14, 2022.[27] On February

---

[22] NYSERDA, *Area for Consideration for the Potential Locating of Offshore Wind Energy Areas*, Report 17-25u (Sept. 2017), available at https://www.nyserda.ny.gov/All-Programs/Offshore-Wind/Focus-Areas/Leading-a-Regional-Industry/Siting-Offshore-Wind; *Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight—Call for Information and Nominations*, 83 Fed. Reg. 15602, 15603 (Apr. 11, 2018).

[23] WEA Identification Memorandum.

[24] *Id.*

[25] 86 Fed. Reg. 31524 (June 14, 2021).

[26] BOEM, *Finding of No Significant Impact* (Dec. 13, 2021), https://www.boem.gov/sites/default/files/documents/NYBightFinalEA_2021-073_FONSI.pdf.

[27] *Atlantic Wind Lease Sale 8 (ATLW-8) for Commercial Leasing for Wind Power on the Outer Continental Shelf (OCS) in the New York (NY) Bight—Final Sale Notice (FSN)*, 87 Fed. Reg. 2446 (Jan. 14, 2022).

23–25, 2022, BOEM auctioned six areas in the New York Bight, totaling just under 500,000 acres, roughly 72 percent smaller than the area originally identified in the Call. Through the competitive bidding process, the total value of the auction reached $4.37 billion.[28]

> **C.     The deconfliction process that occurs during WEA identification may significantly reduce the geographic scope of areas ultimately offered for lease, as it did here.**

The order of operations in the OCSLA process for offshore wind leasing minimizes the premature environmental study of areas that are unlikely to be selected for development. Here, for instance, close to one million acres included in the Call ultimately did not find their way into the identified WEAs. OCSLA's scheme also minimizes the need for premature analysis of projects that are likely to change in scope, size, and technology before a COP is submitted. Even if BOEM may, through the site selection process and stakeholder outreach, believe that a particular area is viable for commercial wind development in a competitive leasing process, BOEM does not know when it identifies WEAs whether areas within the WEA will be leased, or by whom, let alone what technology, infrastructure, and layout for a future leased area may ultimately be proposed. Power purchase agreements and changes in technology will impact the size and spacing of turbines, construction costs and timeframes, and maintenance operations ultimately proposed.[29] BOEM does not know the project's overall generation capacity until the SAP and COP stage, which will be scaled to the amount of electricity the developer must supply in an executed long-term power purchase agreement. BOEM's regulations implementing OCSLA are consistent with NEPA's

---

[28] Dep't of the Interior, *Biden-Harris Administration Sets Offshore Energy Records with $4.37 Billion in Winning Bids for Wind Sale* (Feb. 25, 2022), https://www.doi.gov/pressreleases/biden-harris-administration-sets-offshore-energy-records-437-billion-winning-bids-wind.

[29] Regulations require that the COP demonstrate that the applicant's plan uses both the "best available and safest technology" and "best management practices." 30 C.F.R. § 585.621(e) & (f). Given the pace of innovation, these may be very different at the COP stage than they are at the WEA identification stage.

focus on analysis that provides meaningful information to agency decisionmakers. Requiring an EIS prior to WEA identification is not just legally unsound, as Federal Defendants ably explain in their brief,[30] but would also subject BOEM's preliminary plans and any pre-work to NEPA review at a time when a large proportion of the lands analyzed will not survive subsequent stages of winnowing analysis, and will never be made available for development. Moreover, any such EIS would be based on, at most, a conceptual plan of development that will be superseded when COPs are submitted, requiring the EIS to be redone at that time. Requiring an EIS at the WEA identification stage could prevent a developer from taking advantage of advances in technology that occur during the permitting process, thus stifling innovation and increasing costs.

In the New York Bight, based on a review of scientific data and extensive input from the commercial fishing industry, tribes, partnering agencies, key stakeholders and the public, BOEM reduced the acreage identified as WEAs by 0.9 million acres after the Call. Further, between the WEA identification and the Final Sale Notice, BOEM again reduced the size of the lease sale based on comments on the proposed lease sale, particularly those from ocean users, including the fishing industry, National Marine Fisheries Service, U.S. Coast Guard, and the Department of Defense.[31] Ultimately, the size of the lease areas offered represented an area 72 percent smaller than that identified in the Call.[32]

The Government's leasing process is efficient, involves stakeholder participation at all phases, and is designed to maximally achieve the overlapping goals of OSCLA, NEPA, and other

---

[30] Fed. Defs.' Mot. at 21-23.
[31] *Final Sale Notice*, 87 Fed. Reg. at 2448.
[32] Even with respect to the areas identified for sale, BOEM highlighted some potential future restrictions on the ability to construct within the lease boundaries due to national security or navigational considerations. Some lease areas may be subject to height restrictions or mitigation measures due to interference with national security air surveillance and radar. One lease area may also be subject to the USCG PARS. *Final Sale Notice*, 87 Fed. Reg. at 2451.

applicable statutes. BOEM's phased process allows for stakeholders to provide meaningful and productive public engagement and comment at prescribed stages for WEA identification, lease sale, SAP, and COP review. These comment opportunities occur early in the leasing process to encourage early identification and resolution of potential issues. Later, when developers submit plans for the lease areas, and formal NEPA begins, stakeholders and members of the public can respond to data that represent the developer's actual plans, rather than early-stage analysis by BOEM that might not correspond to any likely project development. Moreover, once a lease is awarded, stakeholders and members of the public have an identified entity with whom they can directly engage at the subsequent stages. This process is efficient and reduces unnecessary focus on areas that would never be considered for leasing.

### III. Allowing Plaintiffs' claims to proceed could chill the industry by upending the legal certainty provided by *Fisheries Survival Fund v. Haaland* and related precedents.

The continued large investments required for an offshore wind project rely on BOEM providing consistency, clarity, and certainty in the regulatory process. Any decision destabilizing BOEM's well-established leasing process would chill the growth of this nascent industry in the United States, including *Amici*'s members, by introducing uncertainty into the leasing process for future developers and investors at a critical juncture. This uncertainty for the lease process could jeopardize future investments, and further delay the country's ability to reap the benefits of offshore wind.

In *Fisheries Survival*, this Circuit provided a measure of certainty by holding that NEPA challenges to wind development activity are not ripe until physical activities are authorized, which only occurs upon approval of the COP, in the fifth stage of the leasing process. The plaintiffs had argued that BOEM should prepare an EIS at the stage of lease award because, they posited, after the lease is awarded, the lessee has made a significant investment in the lease and the agency would

14

not realistically exercise its authority to disallow development. The district court rejected

plaintiffs' arguments that BOEM lacked legal authority to prohibit development:

> [The lease] . . . makes no promises other than giving the lessee the
> exclusive right to survey the area and submit a proposal. Indeed, at
> least part of the purpose of conducting site characterization in the
> leased area is to determine whether the site is suitable for the
> proposed purpose. …. Against this background, the lease sale does
> not represent the final word on anything, nor does it commit any
> resources, even putting aside the question of whether it does so
> irretrievably.

*Fisheries Survival*, 2018 WL 4705795, at *9 (citations omitted).

The court also rejected the plaintiffs' argument that, even if BOEM has legal authority to

prevent development after the lease is awarded, it lacked authority to do so as a practical matter.

Because the developer (Equinor) had spent $42 million on the lease and would spend even more

in the development of the SAP and COP, the plaintiffs argued that BOEM had made a "de facto"

commitment to allowing a windfarm, despite its claim that it could later disallow any

development.[33] The D.C. Circuit rejected this argument explicitly, noting that "Equinor's

willingness to risk so much money on the lease" was more reflective of the "potential profitability

rather than the likelihood of the project's ultimate approval."[34] Ultimately, the D.C. Circuit found

no evidence that BOEM had "committed to authorizing" the windfarm.[35] The same reasoning

applies with even greater force to the WEA identification challenged here: the identification memo

makes no commitment to authorize any operations in the identified WEAs.

Plaintiffs have failed to provide any legal reason why *Fisheries Survival* should not apply

here.  Beyond that, any departure from or modification to that case's holding would be extremely

disruptive to the efforts of BOEM and its State counterparts to increase the use of renewable

---

[33] *Fisheries Survival*, 858 F. App'x at 373.
[34] *Id.*
[35] *Id.*

energy, and to *Amici* to build clean energy infrastructure, create American jobs, and realize the economic value of their investments. Through *Fisheries Survival*, this Circuit granted legal certainty to third party wind energy developers that must make  business decisions about whether and when to invest significant capital in supply chains, ports, vessels, and workforce training, clarifying that they need not undertake costly environmental surveys and planning exercises before they even know whether they will obtain a lease for a desired area - let alone approval of a specific project with a known footprint - and before rapidly evolving changes in technology might render earlier plans obsolete. That rationale applies with even greater force to the WEA identification stage, which can begin years before the additional stages of lease sale, SAP approval, and COP approval, and before developers have the site access necessary to conduct meaningful analysis.

## ARGUMENT

Federal Defendants' motion to dismiss presents several persuasive and independently sufficient legal grounds for dismissing Plaintiffs' claims, including (1) that the NEPA and Endangered Species Act (ESA) claims are not ripe (because BOEM has not made an irretrievable commitment of resources to wind energy development in the New York Bight and its identification of WEAs is not an "agency action" that will affect ESA-listed species or habitat); (2) that Plaintiffs lack standing because WEA identification, which does not alter the status quo, inflicts no harm on them; and (3) that the WEA Identification Memorandum is not reviewable "final agency action" under the APA because it does not consummate any agency decision-making process, nor do any legal consequences flow from the Memorandum.

Although *Amici* as third parties to this lawsuit are not able to move for dismissal, there are additional, compelling reasons why Plaintiffs' Complaint should be dismissed for failing to state a claim upon which relief may be granted, which *Amici* discuss in this brief to provide context for

the Court's consideration of Federal Defendants' jurisdictional motion to dismiss. First, Plaintiffs failed to state a claim under NEPA upon which relief can be granted because the WEA identification is not a "major federal action" sufficient to trigger BOEM's obligations under NEPA. Second, BOEM's decision whether to complete programmatic review is discretionary and not subject to review by this Court. Third, Plaintiffs' claims should be dismissed as they have failed to articulate any harms from the absence of formal NEPA at the WEA identification stage, as they have not alleged how drawing these lines on a map will diminish their claimed aesthetic and recreational values.

## I.      Plaintiffs' Complaint fails to state a claim under NEPA.

In evaluating Federal Defendants' motion to dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations omitted). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quote and citation omitted). Plaintiffs have failed to state a claim under NEPA upon which relief can be granted because the WEA Identification Memorandum is not a "major federal action" subject to NEPA, and because NEPA does not require programmatic analysis of actions, even where a geographic relationship among those actions exists.

### A.      WEA identification is not a "major federal action."

Federal Defendants' brief explains that Plaintiffs' NEPA claim is unripe for review: because BOEM has made no irreversible nor irretrievable commitment of resources to wind power development in that area; the WEA Identification Memorandum authorizes no physical activities, and BOEM retains the discretion not to offer any areas for lease and the right, if leases are issued,

to preclude construction of any facilities. In addition, as BOEM expressly noted in the memorandum,[36] area identifications do not even qualify as a "major federal action" sufficient to trigger NEPA. NEPA's requirement of "major federal action," like the APA's requirement for "final agency action," recognizes that the federal government engages in an unfathomable number of daily, threshold, preliminary activities, and that it would be paralyzing to provide judicial review of any action an agency might take over the (often lengthy) course of its decision-making. *Kleppe v. Sierra Club*, 427 U.S. 390, 406 (1976) ("Such an assertion of judicial authority would leave the agencies uncertain as to their procedural duties under NEPA, would invite judicial involvement in the day-to-day decisionmaking process of the agencies, and would invite litigation."); *Pub. Citizen v. Off. of U.S. Trade Representatives*, 970 F.2d 916 (D.C. Cir. 1992) (draft NAFTA treaties did not trigger NEPA review). NEPA obligations thus do not come into existence until a "major federal action" is proposed.[37]

NEPA, of course, only requires federal agencies to prepare an EIS for "proposals" for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The CEQ's regulations provide that a "proposal" exists at the stage when the agency "is actively preparing to make a decision on one or more alternative means of accomplishing [a] goal." 40 C.F.R. § 1508.1(x). A WEA identification memorandum does not require BOEM to make any decision on a means of accomplishing a goal; the earliest decision point will occur later, when it selects areas to offer for competitive lease (at which time, under the law of this Circuit, NEPA claims still are not ripe, *see* Fed. Defs.' Mot. at 20). Indeed, WEA identification is not even required under the regulations governing award of an unsolicited lease, and merely provides

---

[36] *See* WEA Identification Memorandum.

[37] NEPA regulations' requirement of an "irretrievable commitment of resources" is one way to apply this limiting principle, but it is not the only one.

additional analysis for competitive lease sales that improves decision-making at the later regulatory stages when NEPA *is* required. 30 C.F.R. §§ 585.230–231.

Plaintiffs' Complaint relies on CEQ's regulations stating that a "formal plan" or "program" can be a major federal action.[38] By its terms, though, the WEA Identification Memorandum is neither a formal plan nor a program. The memorandum is not a "formal plan" because it does not "prescribe" anything regarding the uses of Federal resources.[39] Instead, the memorandum is a preliminary document that develops recommendations as to areas in the New York Bight, subject to further refinement, that might be available for leasing and for environmental analysis. The memorandum commits no federal resources simply by identifying WEAs.[40] Absent a formally promulgated plan, NEPA is not required. *Kleppe*, 427 U.S. at 402. In *Kleppe*, which presented a challenge to the government's coal leasing in a particular region, the Supreme Court explained:

> A regional plan would define fairly precisely the scope and limits of the proposed development of the region. Where no such plan exists, any attempt to produce an impact statement would be little more than a study . . . containing estimates of potential development and attendant environmental consequences. There would be no factual predicate for the production of an environmental impact statement of the type envisioned by NEPA.

*Id.*;[41] *see also Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998) ("Long-range aims are quite different from concrete plans.").

---

[38] 40 C.F.R. § 1508.1(q)(3)(ii).

[39] *Id.*

[40] Even the subsequent step of offering the lease areas for auction—which Plaintiffs' complaint does not challenge—does not commit any federal resources; BOEM still retains the right to deny authorization for any activities proposed for the lease area. *See, e.g., Final Sale Notice*, 87 Fed. Reg. at 2551–52.

[41] *Kleppe*'s holding under NEPA complements the Supreme Court's holding in *Ohio Forestry* that plaintiffs do not have license to declare an agency's activities to be a "plan" for purposes of the APA's final agency action requirement.

The WEA memorandum also is not a "program" under CEQ's definitions; it does not contain "a group of concerted actions to implement a specific policy or plan," with "systemic and connected agency decisions allocating agency resources." 40 C.F.R. § 1508.1(q)(3)(iii). No agency resources were allocated as a result of the WEA identification memorandum. Nor could BOEM approve any plan until such time as the lessees submit SAPs and COPs for the agency's approval. 30 C.F.R. § 585.600. It is not until the SAP review stage that leasing WEAs in the New York Bight requires BOEM to take any "actions" to implement specific policies or plans, or to make any "decisions allocating agency resources." *See* 40 C.F.R. § 1508.1(q)(3)(iii); *Northcoast Env't Ctr.*, 136 F.3d at 670 (guidelines for inter-agency management of tree fungus were not major federal action where they "neither propos[ed] any site-specific activity nor d[id] they call for specific actions directly impacting the physical environment."). A memorandum identifying areas on a map that does not affect the status quo on the ground allocates no agency resources. *Cf. Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 86 (D.C. Cir. 1991) ("[M]erely because agency activities are termed a 'program' does not mean that there is 'identifiable final agency action for purposes of the APA.'") (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990)).

Instead, the WEA memorandum is simply an administrative classification exercise. *See Center for Biological Diversity v. Ilano*, 928 F.3d 774, 782 (9th Cir. 2019). In *Center for Biological Diversity*, the Ninth Circuit held that the paper exercise of merely delineating areas of land or water for future, more targeted management actions is not a major federal action. Environmental plaintiffs had alleged that the U.S. Forest Service violated NEPA by designating large, landscape-level areas of national forests that were especially vulnerable to insect or disease infestation based on their condition. Under the Healthy Forest Restoration Act, site-specific projects within those designated areas are eligible for streamlined NEPA consideration and limitations on judicial

review. Pub. L. No. 113-79, § 8204, 128 Stat. 649 (2014). Affirming the agency's decision not to perform NEPA before making the designations, the Ninth Circuit held that administratively designating landscape-scale areas did not alter the status quo; the designation "does not mark the commencement of any particular projects; it only identifies swaths of land suffering from the harms of insect or disease infestation where certain priority projects *may* be implemented." *Ilano*, 928 F.3d at 780.

Similarly, in this case, identification of the WEAs is not a major federal action within the meaning of NEPA, because it represents only the most preliminary step of the agency's leasing process under the Outer Continental Shelf Lands Act, indicating the boundaries of areas that are to be subjected to NEPA's environmental analysis for the subsequent stage of the process, lease issuance. Identifying the boundaries does not alter the status quo, result in the sale of leases, or mark the commencement of any particular projects. *See id.*

This understanding of WEA identification is consistent with how the agency understands its obligations. BOEM/MMS regulations have never contemplated NEPA attaching at the Area Identification stage, instead (and corresponding to OCSLA's language for "leases, easements, or rights-of-way for energy and related purposes") requiring NEPA review at the leasing, SAP, and COP phases, where the "major federal action" threshold is met. In both the proposed and final versions of the rule, BOEM/MMS notes that the purpose of the Area Identification step is to merely *identify* the area to be considered for leasing, which will later be analyzed under NEPA:

> After the comment period for the Call closes, MMS will use the information received to develop, evaluate, and recommend options for continued environmental analysis and for consideration of leasing. This process step is known as Area Identification, and it determines the geographical area of the proposed action to be analyzed in *an ensuing* environmental analysis document (e.g., EIS, EA), any alternatives to the proposed action, and mitigation measures and other issues to be analyzed and considered further.

74 Fed. Reg. 19638, 19659 (Apr. 29, 2009) (emphasis added); *see also* 73 Fed. Reg. 39376, 39397 (July 9, 2008). Area Identification is a threshold step to which NEPA does not apply.

BOEM's staged approach to offshore wind leasing, discussed in Section II (Policy Framework . . . ), *supra*, under which NEPA analysis begins at the lease sale stage and becomes broader as the likely scope of development is refined over successive stages (culminating in a full EIS at the COP stage), supports the argument that NEPA is not required for WEA identification; at the WEA identification stage, potential projects are too inchoate and ill-defined to support meaningful NEPA analysis. Requiring BOEM to prepare a full-scale EIS before lease award would make little sense because the agency has no "specific action of known dimensions," *Kleppe*, 427 U.S. at 402 n.14, about particular offshore wind development projects to evaluate. *Cf. Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (Article III ripeness doctrine considers "whether the courts would benefit from further factual development of the issues presented."). As a practical matter, wind developers cannot collect survey data and prepare other site-specific analyses regarding particular lease sites until they have access to the site and a fully fleshed out development plan, which they obtain only when they have a lease interest in the Outer Continental shelf. Such an interest is often a prerequisite for state procurement, which in turn provides the long-term income stream necessary to support development and capital expenditures. Yet, it is the site-specific analysis that is necessary to flesh out projects such that their individual and collective impacts can be evaluated in a meaningful way. Only with this data, which will become available at later stages of OCSLA's leasing process, can NEPA analysis contribute in a meaningful way to agency decision-making.

**B.     Under NEPA, federal agencies have discretion to determine whether to analyze related actions programmatically.**

Plaintiffs' Complaint fails to state a claim for the additional reason that the APA does not permit courts to second-guess an agency's choice under NEPA whether to use a PEIS to analyze its actions. CEQ regulations provide that "environmental impact statements may be prepared for programmatic Federal actions." 40 C.F.R. § 1502.4(b). Although NEPA regulations allow and arguably encourage agencies to analyze like actions in a single EIS, or programmatically, NEPA requires only that the effects of major federal actions with significant environmental effects be analyzed—not that they be analyzed in a PEIS.

Courts have held that the decision whether to prepare a programmatic environmental analysis, as the U.S. Supreme Court explained in *Kleppe*, "requires a high level of technical expertise" and is therefore "properly left to the informed discretion of the responsible federal agencies." *Kleppe*, 427 U.S. at 412; *see also Nevada v. Dep't of Energy*, 457 F.3d 78, 92 (D.C. Cir. 2006) ("The decision whether to prepare a programmatic EIS is committed to the agency's discretion"). Guidance issued by CEQ also recognizes the agencies' discretion "to determine whether a programmatic approach is appropriate." *Final Guidance for Effective Use of Programmatic NEPA Reviews*, 79 Fed. Reg. 76986, 76987 (Dec. 23, 2014).

As the D.C. Circuit—where Plaintiffs chose to bring their lawsuit—held in 1981, "even when the proposal is one of a series of closely related proposals, the decision whether to prepare a programmatic impact statement is committed to the agency's discretion." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 374 n.73 (D.C. Cir. 1981). Notably, of the two D.C. Circuit cases cited in Plaintiffs' Complaint, neither held that a PEIS was required.[42]

---

[42] Compl. nn.33–35 (*Nat'l Wildlife Found'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 888 (D.C. Cir. 1981); *Found'n on Economic Trends v. Heckler*, 756 F.2d 143, 159 (D.C. Cir. 1985)).

Courts in the Ninth Circuit have also recognized that the decision whether to undertake programmatic analysis lies well within the agency's discretion. Courts have dismissed challenges to federal agency decisions—including decisions regarding renewable energy facilities—premised on the misconception that a PEIS was required at some particular stage of the agency's decisionmaking process.[43] Plaintiffs' challenge in the present case should be similarly dismissed. NEPA did not apply at the WEA identification stage because there was not yet a major federal action. Moreover, the Court cannot compel BOEM to prepare a PEIS, which is a decision committed to the agency's discretion under NEPA.

The WEA identification stage serves a valuable role by allowing BOEM to explore the potential for site conflicts, seek stakeholder input, and broker consensus outcomes at an early phase. BOEM's use of discretion not to prepare a PEIS at this stage is reasonable.

## II. Plaintiffs have not articulated any harms from the absence of formal NEPA at the WEA identification stage.

Plaintiffs allege that the harm resulting from the absence of formal NEPA at the WEA identification stage is a procedural injury: their inability to provide NEPA-style input on BOEM's proposed WEA locations, and to propose alternatives to those locations in a NEPA forum.[44] Plaintiffs fail to mention the years of public outreach that preceded the Call and informed BOEM's identification of the WEAs. Plaintiffs did not submit any comments on the Call—the appropriate opportunity to suggest alternate locations for BOEM to consider. Further, Plaintiffs fail to identify any concrete injury resulting from the identification of WEAs.

---

[43] *See La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U. S. Dep't of the Interior*, No. 2:11-cv-00395, 2012 WL 12888325, at *4 (C.D. Cal. Mar. 21, 2012) (solar project) ("Defendants' decision not to prepare a PEIS is not reviewable"); *see also Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011 (9th Cir. 2021), (rejecting claim that agency needed to prepare programmatic NEPA for immigration-related activities where plaintiffs failed to identify a "final agency action" other than broad program).

[44] Pls.' Opp. Mot. at 35, ECF No. 16.

As Plaintiffs note in their Opposition, "a procedural injury claim must nonetheless be tethered to some concrete interest adversely affected by the procedural deprivation." Pls.' Opp. Mot. at 35 (citation omitted). They continue by stating that they have adequately alleged injury in fact because they will use the affected area and their aesthetic and recreational value for the area will be lessened by the challenged activity. *Id.* What Plaintiffs have failed to do, however, is describe how the identification of WEAs themselves (the challenged activity) will diminish their aesthetic and recreational values. Nothing has changed and nothing will change the area in which these Plaintiffs claim to recreate as a result of the WEA boundary identification. The absence of any injury is an additional reason supporting the motion to dismiss.

## CONCLUSION

For the foregoing reasons, *Amici* support Federal Defendants' motion to dismiss Plaintiffs' claims.

Dated:  May 9, 2022

Respectfully submitted,

**PERKINS COIE LLP**

By:   *s/ Stacey M. Bosshardt*

Stacey M. Bosshardt, Bar No. 458645
Edward Boling, Bar No. 1741920
Thomas Jensen, Bar No. 459555
Kerensa Gimre (*admission pending*)
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Telephone: 202.661.5862
Facsimile:  202.624.9577
SBosshardt@perkinscoie.com
TedBoling@perkinscoie.com
TJensin@perkinscoie.com
KGimre@perkinscoie.com

*Counsel for Proposed Amici*