UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAVE LONG BEACH ISLAND *et al.*,

    *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR *et al.*,

    *Defendants*.

No. 22-cv-55 (DLF)

**MEMORANDUM OPINION**

Plaintiffs Save Long Beach Island and its president, Robert Stern, bring this challenge under the Administrative Procedure Act to a U.S. Bureau of Ocean Energy Management (BOEM) memorandum designating certain areas in the New York Bight as "Wind Energy Areas." Compl., Dkt. 1. Before the Court is the defendants' motion to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See* Mot. to Dismiss, Dkt. 14. For the reasons that follow, the Court will grant the motion and dismiss the complaint for lack of jurisdiction.

**I.    BACKGROUND**

    **A.    Statutory and Regulatory Background**

        *1.    BOEM Wind Energy Leasing and Permitting*

The Secretary of the Interior is authorized to issue leases on the outer continental shelf of the United States to "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas." 43 U.S.C. § 1337(p)(1)(C). BOEM is the "agency within the Department of the Interior" with "primary regulatory authority over offshore renewable

energy projects." *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1080–81 (D.C. Cir. 2016); *see* 30 C.F.R. § 585.100 (delegating Secretary's authority to BOEM).

When BOEM has identified a potential area for renewable energy development, agency regulations provide for BOEM first to publish a "Call for Information and Nominations (Call) . . . for leasing in specified areas." 30 C.F.R. § 585.211(a). Second, after public comment, the agency proceeds to "[a]rea identification," the stage in which it selects from nominated and other areas certain "areas for environmental analysis and consideration for leasing." *Id.* § 585.211(b). Area identification does not, however, by itself grant any lease or permit any development. In the third step, BOEM may, from any part of the identified areas, offer up portions for a competitive lease sale through a Proposed Sale Notice, and in turn a Final Sale Notice. *Id.* §§ 585.215–216. Finally, after winning a lease, the lessee must still obtain further approvals in order to lawfully begin any construction activities; the lease itself grants the lessee only the right to operate "subject to" obtaining those approvals. *Id.* § 585.200(a); *see also id.* § 585.600.

        2.     *The Administrative Procedure Act (APA), National Environmental Policy Act (NEPA), and Endangered Species Act (ESA)*

The Administrative Procedure Act (APA) permits judicial review of "final agency action" unless it "is committed to agency discretion by law" or a "statute preclude[s] judicial review." 5 U.S.C. §§ 701(a), 704. It empowers the Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

The National Environmental Policy Act (NEPA) "establishes procedural requirements to ensure that the government gives 'appropriate consideration' to environmental impacts before undertaking major actions." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 798 (D.C. Cir. 2022) (quoting 42 U.S.C. § 4332(2)(B)–(C)). Among other things, it requires the agency "to take

a 'hard look' at the reasonably foreseeable impacts of a proposed major federal action" and to "consider alternatives to the proposed action." *Id.* (cleaned up). The agency must prepare and publish an environmental impact statement to that effect. *See* 42 U.S.C. § 4332(C); *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1055 (D.C. Cir. 2017). The statute is a procedural one, "designed to ensure fully informed and well-considered decision[s] by federal agencies," and it "does not mandate particular results." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1309–10 (D.C. Cir. 2014) (cleaned up).

The Endangered Species Act (ESA) likewise imposes requirements on federal agencies before taking certain actions. *See* 16 U.S.C. § 1531 *et seq.* For instance, "[i]f an agency concludes that its action 'may affect' a listed species or critical habitat, then the agency must pursue either formal or informal consultation with the [National Marine Fisheries Service] or Fish and Wildlife [Service]." *Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 474–75 (D.C. Cir. 2009) (citing 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.13, 402.14). "If the agency determines that its action will not affect any listed species or critical habitat, however, then it is not required to consult with [National Marine Fisheries] or Fish and Wildlife." *Id.* at 475.

B.   **Factual Background**

The New York Bight is "an offshore area that extends northeast from Cape May in New Jersey to Montauk Point on the eastern tip of Long Island, New York." Compl. ¶ 39. On April 11, 2018, BOEM published a "Call for Commercial Leasing for Wind [P]ower on the Outer Continental Shelf in the New York Bight," *id.* ¶ 41, the first step of an authorization process for potential wind energy development. *See* 83 Fed. Reg. 15,602 (Apr. 11, 2018). Nearly three years later, on March 26, 2021, BOEM issued the New York Bight Area Identification Memorandum ("Area ID Memorandum"), which "adopted five Wind Energy Areas in the New York Bight,

3

totaling a combined 807,383 acres." Compl. ¶ 42; *see id.* Ex. 1, Dkt. 1-6 (copy of Area ID Memorandum).[1]  According to BOEM, the New York Bight "contains three elements that are critical for successful offshore wind development—sustainable wind speeds, relatively shallow water depths with buildable substrate and robust regional energy demand." Area ID Memorandum at 7.  The Area ID Memorandum nominated, and the BOEM Director adopted, certain final Wind Energy Areas, which were a subset of those considered by the original Call for Commercial Leasing:



Area ID Memorandum at 2.

Before adopting the Area ID Memorandum and selecting the Wind Energy Areas enumerated therein, BOEM "did not prepare an environmental impact statement or conduct any

---

[1] The complaint at times also makes reference to certain identified areas "south of" the New York Bight. *See, e.g.*, Compl. ¶¶ 4, 67.  These areas are not identified in the complaint, and the Court will refer only to the New York Bight Wind Energy Areas in this opinion.  The Court's conclusion is the same, however, regardless.

4

kind of NEPA review." *Id.* ¶ 45.[2]  Rather, the Area ID Memorandum states that "BOEM will conduct an environmental review pursuant to NEPA" "[a]fter the Area ID determination is made, but before a lease sale occurs." Area ID Memorandum at 5. Such review is limited to "potential impacts from the activities that are reasonably foreseeable as a result of leasing." *Id.* Later in the process, before approving a lessee's construction and operations plan, BOEM also conducts "project-specific environmental analysis under NEPA." *Id.* Additionally, BOEM designated the Wind Energy Areas "without any consideration of the possible effects the program might have on listed endangered species like the North Atlantic right whale" and "failed to consult with the National Marine Fisheries Service." Compl. ¶¶ 67, 69.

Plaintiff Save Long Beach Island is a nonprofit New Jersey corporation whose members have a view of the designated areas "from public and private vantage points along the coast of Long Beach Island," a New Jersey beach area along the southern portion of the New York Bight, "and other locations in New York and New Jersey." *Id.* ¶ 4. Save Long Beach Island also asserts its members' interests in recreation in the affected areas, preservation of species in and the cultural heritage of the area, and "the natural beauty" and "unobstructed seascape" of the coastline. *Id.* The plaintiffs filed this suit on January 10, 2022, bringing two counts under the Administrative Procedure Act. *See* Compl. Count One alleges that BOEM violated NEPA by failing to conduct an environmental assessment prior to issuing the Area ID Memorandum, *id.* ¶¶ 50–64, and Count Two alleges that BOEM violated the ESA by failing to consult the National Marine Fisheries Service (NMFS), *id.* ¶¶ 65–70. In addition to BOEM, the plaintiffs sued the U.S. Department of

---

[2] The parties refer in their briefs to events taking place after the challenged Area ID Memorandum, including the sale of leases. *See, e.g.*, Mot. at 11–15. But because the complaint challenges only the memorandum itself, the Court's analysis does not depend on those subsequent events.

the Interior (DOI), Secretary of the Interior Deb Haaland, and BOEM Director Amanda Lefton. *Id.* ¶¶ 6–9.

## II. LEGAL STANDARD

The U.S. Constitution limits the federal courts to deciding cases or controversies, U.S. Const. art. III, § 2, and it is "presumed that a cause lies outside this limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017). To present a justiciable case or controversy, the party invoking federal jurisdiction must demonstrate standing and ripeness, among other requirements. *Kokkonen*, 511 U.S. at 377; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1289 (D.C. Cir. 2007).

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. DOI*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149 (1967)). Motions to dismiss on ripeness grounds consistently proceed under Rule 12(b)(1) because "[t]he question of ripeness goes to . . . subject matter jurisdiction." *Exxon Mobil Corp. v. FERC*, 501 F.3d 204, 207 (D.C. Cir. 2007) (quoting *Duke City Lumber Co. v. Butz*, 539 F.2d 220, 221 n.2 (D.C. Cir. 1976)); *see also Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 366 (D.C. Cir. 2005); *Beach TV Props., Inc. v. Solomon*, 254 F. Supp. 3d 118, 131 (D.D.C. 2017); *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 330 (D.D.C. 2016), *aff'd*, 851 F.3d 1 (D.C. Cir. 2017); *Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 32 (D.D.C. 2012).

6

When evaluating a Rule 12(b)(1) motion, "the court must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (cleaned up). The court, however, "must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011). Also, unlike in the Rule 12(b)(6) context, a court may consider documents outside the pleadings to evaluate whether it has jurisdiction; for example, the court may consider the complaint supplemented by undisputed facts evidenced by the record. *See Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *Venetian Casino*, 409 F.3d at 366; *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). If the court determines that it lacks jurisdiction, the court must dismiss the action. U.S. Const. art. III, § 2; Fed. R. Civ. P. 12(b)(1), 12(h)(3).

## III.   ANALYSIS

The defendants argue that, as a threshold matter, the Court lacks jurisdiction because both of the plaintiffs' claims are unripe. The Court agrees.

### A.   NEPA

The plaintiffs' first claim is that "designation of [the] Wind Energy Areas" required an environmental assessment under NEPA because "the installation of hundreds or thousands of wind turbines would have a significant effect on the human environment." Compl. ¶ 42. BOEM regulations, in contrast, provide for development-related NEPA review prior to approving a particular construction plan, 30 C.F.R. § 585.628(b), ensuring review before any construction

activities begin, *see id.* § 585.600.³  The plaintiffs' challenge presumes that a NEPA claim is ripe for review a full two steps earlier—before approval of construction and even before the granting of a lease—when BOEM identifies wind energy areas "for environmental analysis and consideration for leasing." *Id.* § 585.211(b).  The plaintiffs are incorrect.

A "NEPA challenge [is] unripe" until an "agency's NEPA obligations mature." *Ctr. for Biological Diversity v. DOI*, 563 F.3d 466, 480 (D.C. Cir. 2009).  Such maturation occurs "only once [the agency] reaches a 'critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment.'" *Id.* (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 164 F.3d 43, 49 (D.C. Cir. 1999) (internal quotation cleaned up)).  NEPA claims brought before these commitments are made accordingly "must be dismissed as unripe." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 600 (D.C. Cir. 2015).

For two reasons, the Area ID Memorandum does not initiate an "irreversible and irretrievable commitment[] of resources to an action that will affect the environment," *Ctr. for Biological Diversity*, 563 F.3d at 480 (cleaned up); indeed, without subsequent agency action, it authorizes no conduct that will affect the environment at all.  First, by its own terms, the Area ID Memorandum, approved by BOEM Director Lefton, "does not constitute a final leasing decision." Area ID Memorandum at 2.  To the contrary, the agency "reserves the right under its regulations to issue leases in smaller, fewer and/or different areas—or issue no leases." *Id.* at 2–3.  The Area

---

³ By regulation, site assessment plans also require NEPA review.  30 C.F.R. §§ 585.611, 613(b); *see id.* § 585.600.  The Area ID Memorandum contemplates NEPA reviews proceeding in two steps: at the leasing stage, a review of "potential impacts from the activities that are reasonably foreseeable as a result of leasing," including "site characterization activities . . . and site assessment activities"; and at the operations approval stage, a "project-specific environmental analysis." Area ID Memorandum at 5.  The complaint here, however, centers on the alleged harms caused by the development of wind energy infrastructure, not site assessment activity.  *See generally* Compl.

ID process itself merely "identif[ied] the offshore locations . . . most suitable for leasing." *Id.* at 4.  In fact, the Area ID Memorandum expressly contemplates future changes to which areas will be subject to leases.  For example, as of the time when the Area ID Memorandum was issued, BOEM had not finalized its collaboration with the United States Coast Guard in the latter's development of "proposed navigation corridors," which was still in "its early stages"; BOEM simply opted to include "areas with potential overlap" with navigation corridors within the Wind Energy Areas "for further consideration."  Area Memorandum at 28.  For that and other reasons, BOEM recognized, "some of the recommended [Wind Energy Areas] . . . may ultimately not be offered as lease areas."  *Id.*   In other words, the Area ID Memorandum did nothing more than what agency rules contemplated: It identified certain "areas for environmental analysis and consideration for leasing."  30 C.F.R. § 585.211(b).  At such a point of a "multiple-stage leasing program[]," *Ctr. for Biological Diversity*, 563 F.3d at 480, the D.C. Circuit has repeatedly rejected the argument that NEPA claims are ripe.  *See Wyo. Outdoor Council*, 165 F.3d at 45, 49–50 (dismissing challenge to "identification and mapping of areas that might be suitable for leasing" for lack of jurisdiction because claim was accordingly unripe); *Ctr. for Biological Diversity*, 563 F.3d at 480 (same); *Ctr. for Sustainable Econ.*, 779 F.3d at 594, 599–600 (dismissing as unripe NEPA challenge to "five-year schedule of proposed leases and related planning steps" that included "key national decisions as to the size, timing and location of [outer continental shelf] leasing").  Without granting a lease—or committing BOEM to ever grant a single lease within the identified Wind Energy Areas—the Area ID Memorandum did not trigger any matured NEPA obligations or render the plaintiffs' challenge ripe for review.

The plaintiffs' conclusory allegation that the Area ID Memorandum "effectively foreclosed discussion or consideration of alternative Wind Energy Areas," Compl. ¶ 45; *see also id.* ¶¶ 46, 48

(similar), is insufficient to make this case ripe for review. Again, the Area ID Memorandum expressly "reserves [to BOEM] the right under its regulations to issue leases in smaller, fewer and/or different areas—or issue no leases." *Id.* at 2–3. The Area ID Memorandum does nothing to prevent BOEM from identifying additional Wind Energy Areas and/or declining to allow any leasing in the New York Bight whatsoever. The plaintiffs assert that this is untrue in practice, but even crediting those assertions as nonconclusory, "the apparent expectations of third parties, and even the Bureau itself, hardly constitute an 'irreversible and irretrievable commitment of resources,' the critical issue for NEPA ripeness purposes." *Fisheries Survival Fund v. Haaland*, 858 F. App'x 371, 373 (D.C. Cir. 2021) (per curiam) (quoting *Wyo. Outdoor Council*, 165 F.3d at 49); *see id.* (rejecting arguments based on a commitment "as a practical matter" or a "*de facto* commitment" because agencies are granted a "'presumption of regularity' in their dealings" (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971))).

Second, even if the Court were to overlook the absence of any lease commitments in the Area ID Memorandum—which it cannot—the plaintiffs' NEPA claim would still be unripe because the granting of a wind energy lease itself is still not enough to constitute an "irreversible and irretrievable commitment" by the agency. The D.C. Circuit expressly considered this issue in *Fisheries Survival Fund*, 858 F. App'x 371. There, the plaintiff organizations sued under NEPA to challenge BOEM's "decision to issue a lease for a windfarm off the coast of New York." *Id.* at 372. The lease issued, as contemplated by BOEM regulations, *see* 30 C.F.R. §§ 585.600, 628(b), did not "by itself, authorize *any activity* within the leased area." *Fisheries Survival Fund*, 858 F. App'x at 372. And the lease reserved BOEM's authority, consistent with the agency's site assessment and construction regulations, to "disapprove" proposed activities "based on [BOEM's] determination that the proposed activities would have *unacceptable environmental consequences*"

or would violate other applicable regulations. *Id.* The Circuit thus concluded that even the granting of a lease did not render the plaintiffs' NEPA challenge in the wind energy context ripe for review. It necessarily follows—with even greater force—that a NEPA challenge to wind energy leasing at an earlier stage must be dismissed as unripe as well.

The plaintiffs' attempts to evade the application of *Fisheries Survival Fund* are unavailing. First, the case on which they principally rely, *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113 (D.D.C. 2022), is inapposite. In *Friends of the Earth*, an oil and gas leasing case, the court concluded (without any objection by the federal government) that a NEPA challenge was ripe for review at the lease sale stage. *Id.* at 130–31. That conclusion, the court reasoned, was left open by *Center for Biological Diversity* and *Center for Sustainable Economy*, which both dismissed as unripe NEPA challenges to oil and gas leasing programs at an even *earlier* stage, the development of a five-year leasing plan. *See id.* (citing *Ctr. for Biological Diversity*, 563 F.3d at 480; *Ctr. for a Sustainable Economy*, 779 F.3d at 599). But as *Fisheries* expressly contemplated, the level of agency commitment can differ based on the lease conditions issued by the agency and authorized by the relevant statute. *See id.* at 372 (explaining that whether an "issuance of an energy lease triggers NEPA" is a question of whether the lease "reserves both the authority to preclude all activities pending submission of site-specific proposals and the authority to prevent proposed activities if the environmental consequences are unacceptable" (second quotation quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983))); *see also Wyo. Outdoor Council*, 165 F.3d at 49 (discussing that agency commitment was irreversible when "leases are issued" so long as the agency took "such action that it no longer retain[ed] the authority to preclude all surface disturbing activities" (cleaned up)). The *Friends of the Earth* court explained that its analysis had to address "whether the [agency] relinquished control of at least some activities with foreseeable

11

environmental impacts" by entering a lease sale, 583 F. Supp. 3d at 133.  There, perhaps most importantly, unlike in *Fisheries*, which did not involve "any transfer of authority to prevent lease activities out of BOEM's hands," *id.* at 135–36 (citation omitted), the lease sale "represent[ed] an irretrievable commitment of resources in the sense that once a lease is issued, BOEM cannot unilaterally undo that decision for at least five years and the government must pay a penalty if it does so," *id.* at 136.  But as the plaintiffs concede, the *Fisheries* regime, *not* the one in *Friends of the Earth*, is "the same . . . renewable energy lease framework at issue here," Opp'n at 18, Dkt. 16; the challenged Area ID Memorandum notes that even if a lease were granted, BOEM would conduct a construction-related NEPA review when "wind energy facilities are proposed on those leases."  Area ID Memorandum at 3; *see also* 30 C.F.R. §§ 585.600, 628(b).

Second, the plaintiffs unpersuasively argue that even if *Fisheries* controls at the leasing stage, its holding should not apply to the area identification stage at issue here.  In other words, the plaintiffs suggest that while a NEPA claim might be unripe for review once an agency reaches a particular leasing decision, it is nonetheless ripe at the *earlier* stage of area identification, which, in the plaintiffs' view, requires a contemporaneous "programmatic environmental impact statement" considering "cumulative effects on the environment."  Compl. ¶ 49.  This theory—presupposing that a NEPA claim can be ripe, unripe, and then ripe again—is contradicted by the framework the D.C. Circuit has articulated: A NEPA claim is "premature" "[u]ntil the point of irreversible and irretrievable commitment of resources."  *Wyo. Outdoor Council*, 165 F.3d at 50; *see also Fisheries*, 858 F. App'x at 372 (explaining that the question pivots on whether an agency "reserves" authority or has already exercised it); *Sec'y of the Interior v. California*, 464 U.S. 312, 341 (1984) (discussing that, in a similar statutory context, multistage programs are designed to "forestall premature litigation regarding adverse environmental effects that all agree will flow, if

12

at all, only from the later stages of [outer continental shelf] exploration and production").[4] The fact that an agency can prepare an environmental impact statement in earlier planning stages if it so chooses does not alter this analysis. *See Ctr. for Biological Diversity*, 563 F.3d at 475, 480–82 (noting that the Department of Interior had prepared a statement for an oil and gas leasing program, and then rejecting as unripe a NEPA claim against that program); *Wyo. Outdoor Council*, 165 F.3d at 46–47, 49 (noting that the agency released a draft statement but declined to find that its NEPA review was yet adequate, and then concluding that the "the point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA [did] not mature"). Nor does this conclusion change simply because the type of evaluation the plaintiffs demand is "programmatic"; the Area ID Memorandum by itself authorizes no construction or development of any kind, on a programmatic basis or otherwise.

In sum, the Area ID Memorandum does not authorize any development activity with an environmental impact, or even commit BOEM to issuing any leases granting a party the right to request authorization to engage in such activity. The plaintiffs' NEPA claim is thus not ripe for review.

### B. ESA

In their second claim, the plaintiffs allege that BOEA "fail[ed] to consult with the National Marine Fisheries Service regarding whether and to what extent the selection of the New York Bight Wind Energy Areas . . . could affect North Atlantic right whales and other" endangered

---

[4] The plaintiffs also misread language in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998), stating that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id.* at 737. In that case, as the D.C. Circuit has explained, "[t]he Court noted only that NEPA claims do not get any riper than they are at the moment a violation occurred. It was not resolving the point at which such a violation would occur." *Ctr. for Biological Diversity*, 563 F.3d at 481.

13

species. Compl. ¶ 67. For this claim too, D.C. Circuit caselaw forecloses the possibility of ripeness. BOEM's duty to consult with NMFS must be evaluated "on a stage-by-stage basis"; the "completion of the first stage of a leasing program"—before any action is authorized—"does not cause any harm to anything because it does not require any action or infringe on the welfare of animals." *Ctr. for Biological Diversity*, 563 F.3d at 483. For the reasons already stated above, the Area ID Memorandum authorizes no real activity that could harm wildlife; thus, no duty to consult under the ESA attached by virtue of the memorandum's publication and adoption.

The plaintiffs do not engage with this D.C. Circuit authority, but instead rely on nonbinding case law from the Ninth Circuit. Even their cases, however, do not contradict the Court's conclusion because in each of those cases, the agency's action had some real effect. *See Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994) (explaining that the challenged actions "set forth criteria for harvesting resources" through "zoning decisions" that "set[] guidelines for logging, grazing, and road-building activities"); *Friends of the River v. U.S. Army Corps of Engineers*, 870 F. Supp. 2d 966, 970 (E.D. Cal. 2012) (describing a letter that established "mandatory" standards).[5] Here, in contrast, the Area ID Memorandum does not commit the agency to any decisions about leasing or rules governing offshore development.

## CONCLUSION

For the foregoing reasons, the Court grants the defendants' motion to dismiss.[6] Anticipating this possibility, in their opposition, the plaintiffs request an opportunity for leave to

---

[5] Because the plaintiffs' ESA claim must be dismissed as unripe, the Court does not reach the defendants' separate argument that it fails for noncompliance with the 60-day notice provision, 16 U.S.C. §1540(g)(2)(A). *See* Mot. at 37.

[6] For the same reasons that this dispute is constitutionally unripe, the plaintiffs have not shown an imminent injury sufficient to satisfy Article III's standing requirements. *See Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012).

amend their complaint. Although the defendants argue that such amendment would "likely . . . be futile," Reply at 25 n.15, Dkt. 18, the Court cannot assess futility without evaluating the proposed amendments and any other concerns with granting leave to amend. Accordingly, the Court will dismiss the complaint, leave the case open, and allow the plaintiffs to file a motion for leave to amend, if they so choose, within 30 days. If no such motion is filed, the Court will dismiss this action in full without prejudice and close the case.

    A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

March 9, 2023