# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAVE LONG BEACH ISLAND, a nonprofit corporation,
P.O. Box 579, Ship Bottom, NJ 08008; and
ROBERT STERN, Ph.D., an individual,
329 4th Street, Beach Haven, NJ 08008;

       Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF THE INTERIOR,
1849 C Street NW, Washington, DC 20240;

DEB HAALAND, Secretary of the Interior, acting in her official capacity,
1849 C Street NW, Washington, DC 20240;

UNITED STATES BUREAU OF OCEAN ENERGY MANAGEMENT,
1849 C Street NW, Washington, DC 20240; and

~~AMANDA LEFTON~~ELIZABETH KLEIN,
Director of United States Bureau of Ocean Energy Management, acting in her official capacity,
1849 C Street NW, Washington, DC 20240;

       Defendants.

Case No. 22-cv-55 (DLF)

Judge Dabney L. Friedrich

### [Proposed] First Amended/Supplemental Complaint
**For Declaratory & Injunctive Relief under the National Environmental Policy Act, Endangered Species Act, & Administrative Procedure Act**

~~This is an action to reverse and set aside~~ **Nature of the Action**

The United States government, led by defendant Bureau of Ocean Energy ~~Management's~~

~~(BOEM's) decision, which determined the final Wind Energy Areas in the New York Bight,~~

because it is arbitrary, capricious, and otherwise not in accordance with the law.[1] Specifically, when selecting Wind Energy Areas within the New York Bight as part of the federal government's largeManagement (BOEM), has embarked on a comprehensive and aggressive campaign to develop more than 20 industrial-scale offshore wind (OSW) energy program forprojects along the Atlantic coast, Defendants failed to comply with the National Environmental Policy Act (NEPA)[2] and the Endangered Species Act (ESA).[3]

1. Defendants did not prepare a regional programmatic environmental impact statement that would (1) comprehensively address the cumulative impacts of the five Wind Energy Areas Defendants selected for the New York Bight and other connected Wind Energy Areas, and (2) consider alternative levels of wind energy development in the selected Wind Energy Areas and Wind Energy Area locations different from those that Defendants have proposed. Instead, Defendants elected to forego any such analysis, and has indicated that it will defer its NEPA review of wind energy development in the New York Bight until after wind leases are issued and the leaseholders submit specific wind energy projects. As a result, BOEM has not prepared, and will not prepare, any NEPA document that will adequately address the cumulative impacts of wind energy development within the five New York Bight Wind Energy Areas and other connected Wind Energy Areas, as required by NEPAMaine to North Carolina.

2. Further, Defendants' decision to not prepare a programmatic environmental impact statementJust days after his inauguration, President Biden confirmed his commitment to

---

[1] Attached as Exhibit 1, U.S. Bureau of Ocean Energy Management: New York Bight Area Identification Memorandum Pursuant to 30 C.F.R. § 585.211(b) (Mar. 26, 2021), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/Memorandum%20for%20Area%20ID%20in%20the%20NY%20Bight.pdf. Note that Wind Energy Areas are not the same as wind lease areas.

[2] 42 U.S.C. §§ 4321-4347.

[3] 16 U.S.C. §§ 1531-1544.

BOEM's OSW program by issuing Executive Order 14008, dated January 27, 2021, and titled "Tackling the Climate Crisis at Home and Abroad." Section 207 of the Executive Order expressly calls for a "doubling" of offshore wind energy production by 2030.

3.      In March 2021, the Departments of Interior, Energy, and Commerce responded to Executive Order 14008 by announcing a national goal to deploy 30 gigawatts of OSW by 2030.[4]

4.      As of September 2022, there were 27 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS).[5] All or most of these OSW lease areas overlap habitat of the federally-listed and highly endangered North Atlantic right whale (NARW).[6]

5.      As discussed below, the Atlantic coast OSW projects that BOEM is processing are part of a network of wind energy facilities that will operate synergistically to generate electricity for consumers along the eastern seaboard. Correspondingly, the OSW projects also work synergistically to create cumulative impacts on a host of environmental resources, including federally-protected marine mammals such as the NARW.

6.      The wind energy areas (WEAs) that BOEM has selected for OSW development are located within and along the very migration corridors that NARW use to travel from calving grounds in South Carolina to the zooplankton-rich foraging areas in New England Canada. In short, BOEM's industrial-scale OSW program for the Atlantic coast puts human development on a collision course with the endangered NARW; and, historically, that situation has resulted in tragedy for the whale.

---

[4]    www.doi.gov/news/interior-joins-government-wide-effort-advance-offshore-wind

[5]    Draft *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy*, October 2022, p. 3.

[6]    *Id.,* at p. 4.

2.7.    Despite evidence showing that the OSW projects will significantly affect marine mammals and, in the case of the NARW, push the species further toward extinction, BOEM has not prepared a programmatic Environmental Impact Statement (EIS) to analyze and disclose the OWS program's cumulative effects on these animals or any other natural resource. BOEMs' decision to not prepare a programmatic EIS effectively forecloses any opportunity for the public to comment upon, critique, and offer alternatives to the wind Energy Areaslease locations selected by DefendantsBOEM or to the number and power rating of the wind turbines to be used. In effect, BOEM and the other defendants have committed themselves to a particular course of action and the use of a particular public ocean resource without first conducting a full and adequate impact and alternatives analysis at the program level. This is a violation of NEPA.

In addition, the New York Bight Wind Energy Areas, as well as related Wind Energy Areas located immediately south of the New York Bight, lie within habitat used by various marine animals that have been listed as "threatened" or "endangered" under the ESA.[7] Among these is the critically-imperiled North Atlantic right whale, whose total population has declined sharply in the last decade and now stands at approximately 300 individuals. BOEM's selection of the New York Bight Wind Energy Areas, and the related Wind Energy Areas to the south, will directly facilitate construction and operation of offshore wind arrays within the habitat areas and migration corridors for North Atlantic right whale and other listed species, potentially affecting and resulting in take of these species. Pursuant to Section 7 of the ESA, any federal agency whose actions or decisions may affect a federally listed species must consult with the federal wildlife agency – the U.S. Fish and Wildlife Service – that has jurisdiction over the species in

---

[7] 16 U.S.C. § 1531, *et seq.*

question.[8] In this case, the affected species are marine animals and fall within the jurisdiction of the National Marine Fisheries Service. BOEM, therefore, was required under Section 7 to consult with the National Marine Fisheries Service prior to selecting the Wind Energy Areas challenged here to determine if installation of wind arrays in these locations would affect listed species, including the North Atlantic right whale. BOEM, however, failed to consult with the National Marine Fisheries Service on this issue. Consequently, no biological assessment or biological opinion has been prepared to analyze and disclose the potential effects of BOEM's actions on listed species. In failing to consult with the National Marine Fisheries Service, BOEM violated the ESA.

8.      In addition, BOEM has not initiated consultation with NMFS as required under Section 7 of the Endangered Species Act to determine whether BOEM's OSW program for the Atlantic coast might jeopardize the NARW and/or impede its recovery. Nor has BOEM consulted with NMFS to assess whether the OSW projects in a given WEA or region, when viewed cumulatively, would jeopardize the NARW or any other listed species. As a result, no programmatic Biological Opinion (BiOp) for the Atlantic OSW program – or any region within it – has been prepared.

9.      For its part, NMFS has issued, and continues to process, incidental take authorizations (ITAs) under the Marine Mammal Protection Act (MMPA) for various activities connected to the proposed OSW projects along the Atlantic Coast. These activities include seabed characterization surveys that involve the use of high-intensity sound pulses; cable laying along the seafloor; and pile-driving for wind turbine installation. As indicated in the ITAs themselves, these activities "harass" marine mammals, including the NARW, resulting in take of

_____

[8] 16 U.S.C. § 1536(a); 50 C.F.R. § 402.14.

the species. Worse, the evidence shows that the harassment permitted by the ITAs is cumulative and has the potential to be inflicted repeatedly on the same cohort of right whales.

10.     The purpose of this action is three-fold: ***First***, it is intended to force BOEM to prepare a programmatic EIS that comprehensively assesses the impacts of BOEM's OSW energy program along the Atlantic coast. The programmatic EIS should not only evaluate the cumulative and synergistic impacts of all OSW projects currently being proposed for the eastern seaboard; it must also identify and consider alternative locations for some or all of the OSW projects which have the potential to adversely affect protected species, including the NARW. The alternatives analysis must also address options regarding the size and power rating of the wind turbines. ***Second,*** the action is intended to force BOEM to consult with NMFS under Section 7 of the Endangered Species Act and, through that consultation, determine whether the Atlantic coast OSW projects, when considered cumulatively, could jeopardize federally-listed species, including the NARW. The consultation effort should result in preparation of a programmatic Biological Opinion (BiOp). ***Third,*** the action is intended to enjoin BOEM from processing or approving any additional OSW projects, or any activities connected to such projects (e.g., seabed characterization surveys), until the required programmatic EIS and programmatic BiOp are issued and adopted.

11.     In failing to prepare a programmatic EIS for the Atlantic Coast OSW projects, BOEM has violated the National Environmental Policy Act (NEPA).[9]  In failing to initiate Section 7 consultation with NMFS over the cumulative impacts of the OSW projects on listed species, BOEM also has violated the Endangered Species Act (ESA).[10] For these reasons, BOEM

---

[9]   42 U.S.C. §§ 4321-4347.
[10]   16 U.S.C. §§ 1531-1544.

has acted arbitrarily, capriciously, and not in accordance with law, resulting in a violation of the Administrative Procedures Act (APA).[11]

## JURISDICTION AND VENUE

~~3.~~12.   The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201 (declaratory judgment), and 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701 through 706 (APA).

~~1.       For all claims brought under the APA, Plaintiffs have exhausted all administrative remedies available to them. Following BOEM's selection of the New York Bight Wind Energy Areas—a final agency action under NEPA and the APA—Plaintiff Save Long Beach Island sent a letter to BOEM, dated July 22, 2021, asking BOEM to prepare the programmatic environmental impact statement demanded in this complaint. BOEM failed to do so or even acknowledge the request. Therefore, there was no administrative process under either NEPA or the APA leading up to the federal action in question—the selection of the Wind Energy Areas. For this same reason, there was no administrative process that resulted in the adoption of an environmental impact statement.~~

13.     For all claims brought under NEPA, the ESA, and the APA, Plaintiffs have exhausted all administrative remedies available to them.

~~4.~~14.   Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are federal agencies and officials whose offices are located in Washington, D.C.

## PARTIES

~~5.~~15.   Plaintiff, SAVE LONG BEACH ISLAND, is a 501(c)(3) non-profit corporation, organized under the laws of New Jersey, established to protect the natural and human

---

[11]   5 U.S.C. § 706(2)(A) and (E).

~~resources~~Plaintiff SAVE LONG BEACH ISLAND (SLBI) is a 501(c)(3)non-profit corporation, organized under the laws of New Jersey and created to guard human and natural resources that characterize Long Beach Island and its coastal waters. SLBI members have a legally protected interest in preserving the marine mammals that live off the New York and New Jersey coasts, some of which, like the NARW, are critically endangered species. Members of SLBI have observed NARW and other marine mammals, including humpback whales, off the coasts of New York and New Jersey, and they have concrete plans to observe them in the future. The proposed OSW projects, if constructed and operated in their currently-proposed locations, will harm NARW and other protected marine mammals and/or cause them to leave the area. Should this occur, SLBI members would lose further opportunities to observe and/or enjoy the natural and aesthetic qualities of these animals. SLBI seeks to protect the natural and human resources in and near the New Jersey coast, including but not limited to: the fish, marine mammals, and other species that reside in, use, or migrate through the New York Bight ~~Wind Energy Areas~~ and ~~the related Wind Energy Areas directly south of the~~ New ~~York Bight~~Jersey WEAs; the seascape and other aesthetic elements of Long Beach Island, the New York Bight, and the New ~~York Bight~~Jersey shore; the local economic interests that rely on the continued preservation of the environmental features that make Long Beach Island ~~and the waters of the New York Bight~~ a unique and desirable place to live and visit; and the cultural values that are tied to Long Beach Island and the waters that surround it, including the New York Bight. and the ocean areas off the coast of New Jersey. These natural and human resources are threatened by the BOEM's massive, ~~offshore wind~~ OSW energy program ~~and its component elements~~, including the wind arrays planned for the ~~five~~ New York Bight ~~Wind Energy Areas~~ and ~~other connected Wind Energy Areas south of the Bight. Save Long Beach Island has approximately 900~~New Jersey coast. SLBI

members ~~who~~ will be able to view the proposed wind farms from public and private vantage points along the coast of Long Beach Island and other locations in New York and New Jersey. ~~Save Long Beach Island's~~In addition, SLBI members routinely engage in recreation in coastal waters that would be affected by one or more ~~offshore wind~~OSW projects in the proposed New York Bight and ~~other connected Wind Energy Areas~~New Jersey WEAs, including waters that support marine mammals and turtles listed as endangered or threatened under the ESA. Such recreation includes sailing, fishing, whale watching, and diving. ~~Save Long Beach Island~~SLBI and its members have a legally protected interest in preserving the listed species that are native to the waters off the coast of New York ~~Bight~~and New Jersey and likely to be harmed by the proposed offshore wind arrays. ~~Save Long Beach Island~~SLBI and its members also have an interest in protecting the cultural and historical heritage of this part of the Atlantic seaboard, as well as an interest in protecting the natural beauty of Long Beach Island, New Jersey—an 18-mile-long barrier island with an unobstructed seascape. ~~Save Long Beach Island~~SLBI and its members also own or patronize businesses that will be adversely affected by the environmental degradation that will occur as a result of the proposed offshore wind projects ~~in~~proposed off the coast of New York ~~Bight~~and New Jersey. Finally, some members of Save Long Beach rent their properties to tourists and tenants so that they, too, can enjoy, recreate in, and use the natural resources described above.

~~6.~~16.   Plaintiff ROBERT STERN, Ph.D., is an individual who resides on Long Beach Island. He formerly managed the Office of Environmental Compliance within the United States Department of Energy. Dr. Stern is the President of ~~Save Long Beach Island.~~SLBI. He considers it his responsibility to protect those waters and all the plant and animal life within it. Dr. Stern has particular concern over the impacts of operational turbine noise on endangered whales

frequenting the area~~,;~~ he has researched the subject, and provided specific technical recommendations to BOEM regarding ~~North Atlantic right whale~~NARW migration through the areas proposed for OSW projects, including those slated for development off the coast of New York and New Jersey. Dr. Stern has concrete plans to observe NARW and other marine mammals off the coast of New Jersey. Defendants' industrial-scale OSW program, however, threatens these animals, potentially foreclosing Dr. Stern's ability to observe them in the ~~Wind Energy Areas~~future. As a resident of Long Beach Island, he routinely visits the beaches along the island's shores, where currently the vistas are unobstructed. This will change once ~~offshore wind~~the proposed New York Bight and New Jersey OSW projects are constructed ~~in the Wind Energy Areas selected by BOEM~~, as the wind turbines will be clearly visible from the Long Beach Island shoreline. BOEM's entire offshore wind program—including and especially the wind arrays proposed for the New York ~~Bight Wind Energy Areas and the Wind Energy Areas directly south of the Bight~~and New Jersey coasts—threatens the very resources that make Long Beach Island the unique place that Dr. Stern has chosen to call home. Dr. Stern is also deeply committed to the historical and cultural heritage of Long Beach Island, which the proposed wind energy projects are sure to damage. The failure of BOEM to comply with NEPA and the ESA will degrade the natural and human environment on Long Beach Island and the waters proximate to it, resulting in harm to Dr. Stern.

~~7.~~17.   Defendant~~, the~~ UNITED STATES DEPARTMENT OF THE INTERIOR~~,~~ is an agency of the federal government, which is authorized to grant ~~a lease, easement,~~leases, easements, and/or ~~right~~rights-of-way on the Outer Continental Shelf for activities that produce or support production of energy from sources other than oil and gas, such as wind power.[12]

---

[12]   43 U.S.C. § 1337(p)(1)(C).

8.18.   Defendant, DEB HAALAND, is the Secretary of the United States Department of the Interior and, among other things, is charged with overseeing the management of the nation's Outer Continental Shelf lands and oceans, including those affected by the offshore windOSW projects that will ultimately be developed within the five New York Bight Wind Energy Areas described inand off the Area Identification Memorandumcoast of New Jersey. In this regard, Secretary Haaland oversees BOEM and is ultimately responsible for the decisions taken by BOEM. Further, Secretary Haaland is responsible for ensuring that all agencies within the Department of the Interior, including BOEM, comply with NEPA, the ESA, and the ESAAPA. In this action, Plaintiffs are suing Secretary Haaland in her official capacity as Secretary of the Interior.

9.19.   Defendant, UNITED STATES BUREAU OF OCEAN ENERGY MANAGEMENT (BOEM) is an agency of the United States government within and under the jurisdiction of the Department of the Interior. BOEM's stated mission "is to manage development of U.S. Outer Continental Shelf energy and mineral resources in an environmentally and economically responsible way."[13] For purposes of this action, BOEM is the federal agency responsible for implementing the U.S. government's OSW energy program. More specifically, BOEM is the federal agency that issues leases and permits for offshore windOSW projects within the New York Bight Wind Energy Areasand New Jersey WEAs and elsewhere along the Atlantic coast of the United States. More specifically, BOEM is the federal agency which, on April 11, 2018, published a Call for Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight, and on March 26, 2021, issued the New York

---

[13]   U.S. Department of the Interior: Bureau of Ocean Energy Management, About Us (last visited Jan. 5, 2022), available at https://www.boem.gov/about-boem.

~~Bight Area Identification Memorandum (the "Area Identification Memorandum") that~~ ~~recommended five Wind Energy Areas for offshore wind projects in the New York Bight. The~~ ~~five Wind Energy Areas identified in the memorandum are (1) the Fairways North Wind Energy~~ ~~Area, (2) the Fairways South Wind Energy Area, (3) the Hudson North Wind Energy Area, (4)~~ ~~the Central Bight Wind Energy Area, and (5) the Hudson South Wind Energy Area.~~ BOEM is also responsible for ensuring that its actions, including authorization of ~~offshore wind~~OSW projects, comply with NEPA and the ESA. To this end, BOEM must prepare ~~an environmental~~ ~~impact statement (environmental impact statement) to assess and disclose whether and to what~~ ~~extent "major~~a programmatic EIS when a federal ~~actions", such as the offshore wind~~ ~~development program in the New York Bight, will adversely affect the natural and human~~ plan or program has the potential to cause cumulative and/or synergistic impacts on the environment~~.~~ that might otherwise escape analysis and disclosure if each project within the program were studied individually. Here, BOEM has failed/refused to prepare a programmatic ~~environmental~~ ~~impact statement~~EIS that addresses the cumulative, connected, and synergistic impacts of implementing ~~offshore wind projects at the five New York Bight Wind Energy Areas described~~ ~~in the Area Identification Memorandum.~~the OSW projects slated for the Atlantic coast. Nor has BOEM prepared a programmatic EIS to evaluate the cumulative and synergistic effects of the multiple projects proposed off the coasts of New York and New Jersey, despite their close proximity to one another. In addition, Section 7 of the ESA requires that BOEM consult with the ~~National Marine Fisheries Service as to~~NMFS to determine whether and to what extent selection of the ~~Wind Energy Areas in question~~WEAs, as well as the ~~wind energy~~OSW projects ~~such~~ ~~selection will facilitate~~proposed within those WEAs, may affect federally listed species. ~~Here~~In this case, however, BOEM failed to ~~engage in consultation with the National Marine Fisheries~~

12

Service. consult with NMFS regarding the OSW program for the Atlantic coast or any region within it (e.g., New York/New Jersey).

10.20.   Defendant, AMANDA LEFTON, is the Director of BOEM. She issued the decision challenged here, approving the five Wind Energy Areas. She is responsible for the offshore wind projects that will ultimately be developed within the five New York Bight Wind Energy Areas described in the Area Identification Memorandum. In this regard, Director Lefton Defendant ELIZABETH KLEIN is the Director of BOEM. Director Klein oversees BOEM and is responsible for the decisions taken by BOEM. In this action, Plaintiffs are suing Director Lefton Klein in her official capacity as Director of BOEM.

## STATUTORY AND REGULATORY FRAMEWORK

### A.    The National Environmental Policy Act

11.21.   NEPA is the "basic national charter for protection of the environment."[14]

12.22.   The purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment."[15] NEPA's fundamental purpose is to guarantee that agencies take a "hard look" at the environmental consequences of their actions before such actions occur. To conduct a "hard look" the agency in question must (1) carefully consider detailed information regarding the action's potentially significant environment effects, and (2) make relevant information available to the public so that it may play a role in both the decision-making process and the implementation of the decision itself.[16]

2.       An environmental assessment under NEPA is a "concise public document . . . [that] provide[s] sufficient evidence and analysis for determining whether to prepare an

---

[14]   *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1072, (quoting 40 C.F.R. § 1500.1(a)).
[15]   42. U.S.C. § 4321.
[16]   *See, e.g.*, 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.

~~environmental impact statement or a finding of no significant environmental impact."[17] It is~~ ~~designed to help public officials make decisions that are based on an understanding of the human~~ ~~and physical environmental consequences of the proposed project and take actions, in the~~ ~~location and design of the project, that protect, restore and enhance the environment.~~

~~13.~~23.  For any "major federal action" that "significantly affects" the "human environment," NEPA requires the federal agency in question (here, BOEM) to prepare a detailed ~~environmental impact statement~~EIS that analyzes and discloses the action's environmental consequences.[18] If the agency does not conduct this analysis prior to the point of commitment, the agency deprives itself of the ability to "foster excellent action."[19]

~~3.     Major federal actions include the "adoption of formal plans, such as official~~ ~~documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal~~ ~~resources, upon which future agency actions will be based."[20] BOEM's issuance of the "New~~ ~~York Bight Area Identification Memorandum", dated March 26, 2021, which adopted five Wind~~ ~~Energy Areas in the New York Bight, totaling a combined 807,383 acres for future leasing~~ ~~actions, meets those criteria and therefore constituted such a formal plan and a major federal~~ ~~action.~~

~~14.~~24.  Relatedly, NEPA requires that an ~~environmental impact statement~~EIS fully analyze all direct, indirect, and cumulative impacts of a proposed federal action or project. Direct effects include those "which are caused by the action and occur at the same time and place."[21]

---

[17] ~~40 C.F.R. § 1508.9.~~
[18]   42 USC § 4332(c); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).
[19]   *See* 40 CFR § 1500.1(c); *Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 371 (1989).
[20] ~~40 C.F.R. § 1508.1 (q)(3)(ii).~~
[21]   40 CFR § 1508.8(a).

Indirect effects include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[22] Indirect effects may also include growth inducing impacts and other effects that prompt changes in land use patterns, population density or growth rates, and related effects on air and water and other natural systems, including ecosystems.[23] Cumulative impacts include those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over time.

4.      NEPA requires that agencies ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Impacts such as those to endangered species cannot be dealt with piecemeal, project by project, and be scientifically credible.

15.25.  The environmental impact statementThe EIS must provide a complete and accurate discussion of the proposed project's foreseeable environmental impacts, including those that cannot be avoided.[24] However, when information is incomplete or unavailable, the environmental impact statement must "always make clear that such information is lacking."[25] And if the missing information can be feasibly obtained and is necessary for a "reasoned choice among alternatives,"[26] the agency must include the information in the environmental impact

---

[22]  40 CFR § 1508(b).
[23]  *Id.*
[24]  5 USC § 706(2)(D); 40 CFR § 1502.22.
[25]  40 CFR § 1502.22.
[26]  *Id.*

statement. Where the cost of the data is too expensive to secure, the agency must still attempt to analyze the impacts in question.[27]

16.26.  ~~The environmental impact statement~~The EIS must provide an accurate presentation of key facts and environmental impacts, as this is "necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA."[28] ~~An environmental impact statement~~An EIS that is incomplete or provides misleading information can "impair[] the agency's consideration of the adverse environmental effects and . . . skew . . . the public's evaluation of the proposed agency action."[29] For this reason, erroneous factual assumptions and misrepresentations of important facts can fatally undermine the information value of the ~~environmental impact statement~~EIS to the public and decision-makers.[30]

17.27.  In addition, if the ~~environmental impact statement~~EIS identifies a significant effect, the environmental impact statement must propose and analyze "appropriate mitigation measures."[31] Finally, the ~~environmental impact statement~~EIS must examine a reasonable range of alternatives to the proposed action and focus on those that reduce the identified impacts of that action.[32]

18.28.  NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making and to guarantee "the [action]

---

[27]  *Id.*
[28]  *Natural Resources Defense Council v. U.S. Forest Serv.,* 421 F.3d 797, 812 (9th Cir. 2005).
[29]  *Id.* at 811.
[30]  *Id.* at 808.
[31]  40 CFR § 1502.14; *see Robertson v. Methow Valley Citizens Council*, 490 U.S. at 352-53 ("omission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA").
[32]  42 U.S.C. § 4332(2)(e); 40 CFR § 1502.1.

agency will not act on incomplete information, only to regret its decision after it is too late to correct."[33]

19.29.  NEPA regulations require that an environmental impact statement "[e]valuate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination."[34] NEPA regulations also state that the consideration of alternatives is "the heart of the environmental impact statement."[35]

20.30.  NEPA requires that agencies evaluate in a single environmental impact statementEIS proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action.

5.       NEPA requires that a programmatic environmental impact statement be relevant to the program decision and timed to coincide with meaningful points in agency planning and decision-making.

21.31.  A federal program, such as BOEM's offshore windOSW energy program in the New York Bight and other connected Wind Energy Area'salong the Atlantic coast, constitutes a "major federal action" and is defined as follows: "a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive."[36]

6.       A major federal action includes the "adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based."[37] BOEM's approval on March 26,

---

[33]  *Marsh v. Ore. Natural Resources Council*, 490 U.S. 360, 371 (1989).
[34]  40 C.F.R. § 1502.14(a).
[35]  40 C.F.R. § 1502.
[36]  40 C.F.R. § 1508.1(q)(3)(iii).
[37]  40 C.F.R. § 1508.1(q)(3)(ii).

~~2021 of the "New York Bight Area Identification Memorandum," which adopted five Wind Energy Areas in the New York Bight, totaling a combined 807,383 acres for future leasing actions meets those criteria precisely, and thus constituted such a formal plan and a final federal action that should have been preceded by a regional programmatic environmental impact statement.~~

32.     In some cases, NEPA requires that such a program – sometimes referred to as a "broad action" – be evaluated in a programmatic EIS. See, for example, *Kleppe v. Sierra Club*, 427 U.S. 390, 400-01 (1976) (noting that a single EIS may be required "where several proposed actions are pending at the same time"); see also *Earth Island Ins. v. U.S. Forest Serv.*, 351 F.3d 1291, 1304-05 (9th Cir. 2003) (noting that a single EIS is required where there is one plan governing the projects *or* the projects are connected, cumulative, or similar); see also *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 893-94 (9th Cir. 2002) ("A single NEPA review document is required when there is a single proposal governing the projects, *or* when the projects are 'connected', 'cumulative', or 'similar' actions under the regulations implementing NEPA.") See also *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990) ("Where there are large scale plans for regional development, NEPA requires both a programmatic and site-specific EIS. This court has held that where several foreseeable similar projects in a geographical region have a cumulative impact, they should be evaluated in a single EIS.")

~~22.~~33.  Such "broad actions" can be ~~evaluated~~analyzed in at least three ways:

(1) Geographically, including actions occurring in the same general location, such as a body of water, region, or metropolitan area;
(2) Generically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter;
(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new

technologies which, if applied, could significantly affect the quality of the human environment.[38]

23.34.  NEPA does not allow an acting federal agency to "segment" the overall program, as this would unreasonably restrict the scope of the environmental evaluation.[39] Nor does NEPA allow an agency to break up a "large or cumulative project into smaller components in order to avoid designating the project as a major federal action."[40] Moreover, a "programmatic environmental impact statement should be prepared if it can be forward-looking and if its absence will obstruct environmental review."[41]

24.35.  When there are multiple projects contemplated in a particular geographical region, "NEPA calls for an examination of their impact in a single [environmental impact statement]."[42] And "[w]here there are large-scale plans for regional development, NEPA requires both a programmatic and a site-specific [environmental impact statement]."[43]

36.     In this case, BOEM's large scale OSW program along the Atlantic coast constitutes a singular effort to develop an offshore wind energy system, much like the system of hydroelectric dams constructed along the Columbia River and its tributaries in the Pacific Northwest. The various OSW projects are interconnected and integrated components of BOEM's offshore wind energy program. In addition, they are cumulative and similar in their purpose, their construction, and their impacts on the environment. Thus, they need to be studied in a single programmatic EIS.

---

[38]  40 C.F.R. § 1502.4(c).
[39]  *Nat'l Wildlife Found'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 888 (D.C. Cir. 1981).
[40]  *Id.* at 890.
[41]  *Found'n on Economic Trends v. Heckler*, 756 F.2d 143, 159 (D.C. Cir. 1985).
[42]  *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990).
[43]  *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407; *see also* 40 C.F.R. §§ 1508.28, 1502.20.

25.37.  Failure to prepare an environmental impact statementa programmatic EIS where one is required is arbitrary and capricious and an abuse of federal agency discretion.

**B.     The Endangered Species Act**

26.38.  The ESA was enacted, in part, to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered species and threatened species . . . ."[44]

27.39.  The ESA vests the Secretary of Commerce with primary responsibility for administering and enforcing that statute with respect to marine and anadromous species. The Secretary has delegated this responsibility to the National Marine Fisheries ServiceNMFS.[45] The National Oceanic Atmospheric Administration of the Department of Commerce, through the National Marine Fisheries ServiceNMFS, is responsible for implementing the ESA with respect to marine and anadromous species. The United States Fish and Wildlife Service is responsible for implementing the ESA with respect to terrestrial and freshwater species.

28.40.  Section 2(c) of the ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act."[46] The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."[47]

---

[44]   16 U.S.C. § 1531(b).
[45]   50 C.F.R. § 402.01(b).
[46]   16 U.S.C. § 1531(c)(1).
[47]   16 U.S.C. § 1532(3).

~~29.~~41.  Section 7(a)(1) of the ESA requires that all federal agencies "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species . . . ."[48] Section 7(a)(1) also directs ~~that the National Marine Fisheries Service~~NMFS (or, as the case may be, the Fish and Wildlife Service) to review other programs administered by the Secretary and utilize such programs in furtherance of the purposes of the Act.[49]

~~30.~~42.  In order to fulfill the substantive purposes of the ESA, federal agencies (such as BOEM here) are required to engage in consultation with the ~~National Marine Fisheries Service~~NMFS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species . . . determined . . . to be critical . . . . ."[50]

~~31.~~43.  Section 7 consultation is required for "any action [that] may affect listed species or critical habitat."[51] Agency "action" is broadly defined in the ESA's implementing regulations to include "(a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air."[52] When engaging in Section 7 consultation, both ~~the National Marine Fisheries~~

---

[48]   16 U.S.C. § 1536(a)(1).
[49]   16 U.S.C. § 1536(a)(1).
[50]   16 U.S.C. § 1536(a)(2) ("Section 7 consultation").
[51]   50 C.F.R. § 402.14.
[52]   50 C.F.R. § 402.02.

~~Service~~NMFS and the "action agency" must "use the best scientific and commercial data available."[53]

~~32.~~44.   ~~The National Marine Fisheries Service and~~NMFS and the Fish and Wildlife Service follow a jointly prepared consultation handbook which states that a "may affect" determination is:

> [T]he appropriate conclusion when a proposed action may pose **any** effects on listed species or designated critical habitat. When the Federal agency proposing the action determines that a "may affect" situation exists, then they must either initiate formal consultation or seek written concurrence from the Services that the action 'is not likely to adversely affect' listed species.[54]

~~33.~~45.   A "may affect" determination triggering formal consultation is required when "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character"[55] occurs. Further, when determining whether any such effects may occur, ~~the National Marine Fisheries Service~~NMFS (or the Fish and Wildlife Service) and the action agency must consider not only the direct effects of the action, but also the "indirect effects", which are defined as those that are "caused by the proposed action and are later in time, but still are reasonably certain to occur."[56]

~~34.~~46.   Once an action agency makes a "may affect" determination, the agency may elect to enter informal consultation with either the ~~National Marine Fisheries Service or~~NMFS or the Fish and Wildlife Service, depending on which Service has jurisdiction over the species in question. The action agency then must complete a Biological Assessment (BA) and make one of

---

[53]   16 U.S.C. § 1536(a)(2).
[54]   *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* at xiv (hereafter "Joint Consultation Handbook") (emphasis in original).
[55]   51 Fed. Reg. 19,926, 19,949 (June 3, 1986).
[56]   50 C.F.R. § 402.02.

two determinations – a "not likely to adversely affect" (NLAA) determination or a "likely to adversely affect" (LAA) determination. If the action agency arrives at an LAA determination, then formal consultation is required. Joint Consultation Handbook at 2-6. If the relevant Service does not concur with the NLAA determination, or if the action agency elects to bypass the informal consultation process and initiate formal consultation, then the relevant Service works towards the completion of a ~~biological opinion~~BiOp for the proposed action. If ~~the National Marine Fisheries Service~~NMFS issues a ~~biological opinion~~BiOp that concludes the proposed action is likely to jeopardize the species, the opinion may specify reasonable and prudent alternatives that will avoid jeopardy and allow the agency to proceed with the action.[57] ~~The National Marine Fisheries Service~~NMFS may also suggest modifications to the action during the course of consultation to "avoid the likelihood of adverse effects"[58] to the listed species even when not necessary to avoid jeopardy.

47.     Ultimately, however, it is the action agency – here, BOEM – that must accept and implement the conditions set forth in the BiOp. Accordingly, the action agency is responsible for ensuring the BiOp is legally adequate.

**FACTUAL BACKGROUND**

**A.    The New York Bight**

7.    The New York Bight is an offshore area that extends northeast from Cape May in New Jersey to Montauk Point on the eastern tip of Long Island, New York. The New York Bight supports a variety of uses and resources, including commercial fisheries and marine mammal habitat. The Bight also contains the third largest port in the United States, which services more

---

[57]  16 U.S.C. § 1536(b).
[58]  50 C.F.R. § 402.13.

than 8,500 deep-sea vessel transits per year. In the southern portion of the New York Bight lies Long Beach Island, New Jersey, an 18-mile-long barrier island that is home to approximately 10,000 year-round residents. The island is also a popular tourist destination during the summer.

8.	The New York Bight supports more than 35 marine mammal species, including the listed sei whale, sperm whale, fin, and North Atlantic right whale; five sea turtle species, including the listed green sea turtle, loggerhead sea turtle, Kemp's ridley sea turtle, and leatherback sea turtle; more than 50 bird species; and hundreds of fish species.

**B.	BOEM's Competitive Wind Lease Process for the New York Bight**

9.	BOEM's competitive offshore wind lease process begins with the publication of a Call for Information and Nominations, which seeks information regarding areas within the Outer Continental Shelf that should receive special consideration for potential development of renewable energy. In this case, BOEM, on April 11, 2018, published a Call for Commercial Leasing for Wind power on the Outer Continental Shelf in the New York Bight. BOEM delineated the Call Areas in consultation with various parties and government entities, including the State of New York and the Intergovernmental Renewable Energy Task Force.

10.	BOEM then spent the better part of three years deciding which areas within the New York Bight should be selected as Wind Energy Areas. On March 26, 2021, BOEM issued the "New York Bight Area Identification Memorandum," which adopted five Wind Energy Areas in the New York Bight, totaling a combined 807,383 acres. BOEM's designation of these Wind Energy Areas was a major federal action that triggered the agency's NEPA obligation to prepare an environmental assessment and, since the installation of hundreds or thousands of wind turbines would have a significant effect on the human environment, to commence preparation of an environmental impact statement.

11.      The five Wind Energy Areas are:

(1) Fairways North — consisting of 88,246 acres, with a power production of 3,754,037 megawatt hours per year;

(2) Fairways South — consisting of 23,841 acres, with a power production of 1,014,210 megawatt hours per year;

(3) Hudson North — consisting of 43,056 acres, with a power production of 1,831,628 megawatt hours per year;

(4) Central Bight — consisting of 84,688 acres, with a power production of 3,602,678 megawatt hours per year; and

(5) Hudson South — consisting of 567,552 acres, with a power production of 24,143,998 megawatt hours per year.

12.      The Fairways North and Fairways South Wind Energy Areas are located approximately 15 miles from the New York shoreline and approximately 69 miles from the New Jersey shoreline. The Hudson North Wind Energy Area is located approximately 21 miles from the New York shoreline and approximately 36 miles from the New Jersey shoreline. The Central Bight Wind Energy Area is located approximately 38 miles from the New York shoreline and approximately 53 miles from the New Jersey shoreline. The Hudson South Wind Energy Area is located approximately 45 miles from the New York shoreline and approximately 30 miles from the New Jersey shoreline.

13.      BOEM did not prepare an environmental impact statement or conduct any kind of NEPA review prior to selecting the Wind Energy Areas and issuing the Area Identification Memorandum. When it issued the Area Identification Memorandum and adopted the Wind Energy Areas described therein, BOEM took a final agency action that effectively foreclosed discussion or consideration of alternative Wind Energy Areas.

14.      Now that the New York Bight Wind Energy Areas have been identified, BOEM will initiate the lease issuance stage of the process. BOEM has indicated that, pursuant to NEPA, it will prepare a "Lease Sale Environmental Assessment" to assess the potential environmental

25

impacts associated with lease issuance. However, this belated attempt to comply with NEPA comes too late in the process, well after BOEM has made a substantial commitment of resources by designating the areas of the New York Bight that will be open for leasing and excluding other areas where this activity might be far less environmentally damaging. Based on BOEM's past practice in the Rhode Island/Massachusetts Wind Energy Area, this environmental review will be very limited and will not address the impacts of constructing and operating the actual wind energy projects. Nor will this review consider alternative Wind Energy Area locations. Instead, the only alternatives to be discussed in the proposed "Lease Sale Environmental Assessment" will be survey and measurement alternatives within the identified Wind Energy Areas.

15.     Once BOEM offers leases for sale within the five Wind Energy Areas, the winning bidders will prepare and submit to BOEM draft Construction and Operations Plans for the actual wind energy projects they intend to build.

16.     For each proposed Construction and Operations Plan, BOEM will prepare a Draft environmental impact statement that is designed to evaluate the environmental impacts of constructing and operating the wind energy project in question. Pursuant to BOEM's pattern and practice, as established in its review of the Vineyard Wind 1 project in the Rhode Island/Massachusetts Wind Energy Area, the Construction and Operations Plan-specific environmental impact statements for the New York Bight Wind Energy Areas will not consider alternatives that involve locations other than the Wind Energy Areas previously described in the Area Identification Memorandum, dated March 26, 2021. Instead, each Construction and Operations Plan-specific environmental impact statement will only consider limited project alternatives that are located within the now-established Wind Energy Areas.

17.    Under existing procedures, after BOEM's NEPA review is completed and other required federal authorizations are secured, BOEM will issue a Record of Decision (ROD) adopting the Final environmental impact statement. Soon thereafter, BOEM will approve the Construction and Operations Plan. This process will be repeated for each Construction and Operations Plan at each leasehold within the five New York Bight Wind Energy Areas. However, there is no indication that BOEM will prepare an environmental impact statement that covers all the Construction and Operations Plans collectively or analyzes their cumulative and synergistic effects. And, even if BOEM did prepare a programmatic environmental impact statement at this late date, it would be far too late to alter the commitments of resources BOEM will have made by that time to the construction of hundreds or thousands of wind energy turbines up and down the Atlantic coast—without ever considering their cumulative effects on the environment or on listed endangered species.

48.    BOEM has established more than 10 OSW wind energy areas (WEAs) along the Atlantic coast. The WEAs define where the OSW leaseholds will be located. Once the WEAs are established, no alternative WEA locations are considered. They become fixed. As a result, the OSW lease areas also become fixed. BOEM does not, and will not, consider project alternatives that involve placing the OSW facility outside the established lease areas or WEAs. In fact, BOEM recently adopted an internal guidance document for preparing EISs for OSW projects, and it expressly discourages consideration of alternatives that would move the proposed project to a location outside its established leasehold or the established WEA.

49.    At no time, however, has BOEM prepared a programmatic EIS or any other NEPA document to analyze the impacts of selecting the WEAs in question. Nor has BOEM

prepared a programmatic EIS or any other NEPA document to analyze the impacts of selecting the leasehold locations within the WEAs.

50.     Within the identified WEAs, BOEM has auctioned more than 23 OSW leases to wind energy developers. BOEM has received from such developers at least 15 Construction and Operations Plans (COPS), each providing details for the particular OSW project they intend to build. BOEM conducted no NEPA review – programmatic or otherwise – of the lease sales, even though such sales establish with metes and bounds where the OSW projects will be constructed and operated.

51.     BOEM has already approved two such projects – the Vineyard Wind 1 facility off the coast of Massachusetts and the South Fork facility off the coast of Rhode Island. BOEM adopted the Record of Decision (ROD) for the Vineyard Wind 1 project on May 10, 2021 and the ROD for South Fork on November 24, 2021. BOEM prepared EISs for these projects, but those EISs did not analyze how the projects, when considered in conjunction with the entire OSW program for the Atlantic coast, will affect key environmental resources, including the federally-listed and endangered NARW. Nor did the EISs consider any alternative that called for moving the project to a location where its impacts – including impacts on NARW – would be reduced.

52.     BOEM has released Draft EISs for six other OSW projects: (1) Sunrise Wind in the Rhode Island/Massachusetts WEA; (2) Revolution Wind in the Rhode Island/Massachusetts WEA; (3) SouthCoast Wind off the coast of Massachusetts; (4) Ocean Wind off the coast of New Jersey; (5) Empire Wind off the coast of New York; and (6) Commonwealth of Virginia Offshore Wind (CVOW) off the coast of Virginia. None of these EISs evaluates the proposed project's cumulative impacts in a programmatic way that considers the entire OSW program for

the Atlantic coast. In fact, the EISs do not even evaluate each respective project's cumulative impacts on a *regional* or *WEA* scale. As a result, the projects' cumulative and synergistic impacts on sensitive environmental resources, such as the NARW, have been left unstudied and undisclosed. Further, none of the EISs considers alternative locations for the projects in question, even though the data show that the current leaseholds overlap NARW habitat, including migration corridors and foraging areas. The EISs also fail to consider alternatives that contemplate changes in the number and power rating of the wind turbines themselves.

53.     BOEM has issued Notices of Intent to prepare EISs for three additional projects: (1) Atlantic Shores South off the coast of New Jersey; (2) U.S. Wind off the coast of Maryland; and (3) Kitty Hawk North off the coast of North Carolina. There is no indication that the EISs for these proposed OSW facilities will programmatically assess cumulative impacts on marine mammals or other sensitive environmental resources. Nor is there any indication that these EISs will consider alternative locations for the projects, even though they, like nearly all projects in the Atlantic OSW program, overlap NARW habitat.

54.     On July 15, 2022, BOEM issued a "Notice of Intent to Prepare a Programmatic Environmental Impact Statement for Future Wind Development in the New York Bight." Purportedly, the proposed Programmatic EIS (PEIS) will cover six OSW leaseholds in the New York Bight WEAs: OCS-A 0537; OCS-A 0538, OCS-A 0539; OCS-A 0541; OCS-A 0542, and OCS-A 0544. Contrary to its title, however, the proposed document will ***not*** be a true programmatic EIS. It is not designed to analyze the cumulative effects of the six New York Bight windfarms contemplated on the leaseholds listed above. Instead, the proposed PEIS will only assess "the impacts expected from a ***representative*** project in the New York Bight." (See 87 Fed.Reg. 42495, 42496 (emphasis added.) BOEM will then use that assessment later to

determine whether the other five projects will have impacts greater or less than the "representative" case. (*Id.*) In other words, the so-called "PEIS" will study only ***one*** of the proposed New York bight OSW projects, not all six. And it will likewise not address other OSW projects planned off the New Jersey coast.

55.     The best available scientific and commercial data show that many of the proposed OSW facilities – including the projects proposed off the coasts of Massachusetts, New York, New Jersey, and Virginia – will be located within or very near NARW feeding areas and migration routes. Consequently, implementation of these projects will obstruct the movement of NARW and interfere with foraging activities and other critical "life history" activities (e.g., calving) necessary to the survival and recovery of the species, whose total population continues to decline and now rests at approximately 330 individuals.

56.     These same OSW projects also intersect and interfere with the feeding and movement behaviors of other federally-protected marine mammals, including the humpback whale. Under the Marine Mammal Protection Act (MMPA), such animals may not be "taken" without an incidental harassment authorization from the National Marine Fisheries Service (NMFS).

57.     In addition, NMFS has issued, and continues to process, incidental take authorizations (ITAs) under the MMPA for various activities connected to the proposed OSW projects along the Atlantic Coast. These activities include seabed characterization surveys that involve the use of high-intensity sound pulses; cable laying along the seafloor; and pile-driving for wind turbine installation. As indicated in the ITAs themselves, these activities "harass" marine mammals, including the NARW, resulting in take of the species. Worse, the evidence shows that the harassment permitted by the ITAs is cumulative and has the potential to be

inflicted repeatedly on the same cohort of right whales. To date, NMFS has issued eleven (11) ITAs for OSW-related activities off the coast of New York and New Jersey alone, with another five (5) pending. For the Atlantic OSW program as a whole, NMFS has issued – or is poised to issue – ITAs allowing for take of 915 NARW by Level B harassment noise (i.e., noise that will cause avoidance behavior on the part of the whales). And there is evidence that the Level B harassment caused by current and ongoing seabed characterization surveys could be contributing to whale deaths along the New York and New Jersey shores and elsewhere along the Atlantic coast. All of this permitting, and all of these activities and impacts, are taking place without benefit of a programmatic EIS or programmatic BiOp.

**COUNT ONE:**
**VIOLATION OF NEPA AND THE APA**

35.58.  Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

36.59.  NEPA requires federal agencies, such as BOEM, to analyze the direct, indirect, and cumulative impacts of the proposed actionOSW program for the Atlantic coast and to take a hard look at those impacts. In addition, NEPA requires federal agenciesBOEM to consider mitigation measures and alternatives that are capable of minimizing the environmental impacts of a proposed actionthe Atlantic OSW program.

37.60.  NEPA compliance, which is intended to inform the agency decision-maker of the environmental impacts of proposed actions, must occur before the agency has made a decision or an irretrievable commitment of resources to a particular action. In designating large areas of the New York Bight as available for wind energy development, Defendants failed to comply with NEPA's requirements to prepare an environmental assessment and where, as here, the project

~~will significantly impact the quality of the human environment, take a hard look at those environmental impacts by preparing an environmental impact statement.~~

61.     As the facts discussed in this Complaint make clear, BOEM has committed itself to an extensive program for installing thousands of wind turbines along the Atlantic coast. While that program involves multiple steps and multiple OSW facilities, the program nevertheless represents a singular course of action pursued by BOEM. The OSW projects proposed along the Atlantic coast are connected, cumulative, and similar, and they are the manifestation of a clearly articulated plan to develop offshore wind energy on an industrial scale. BOEM has established an elaborate set of procedures for (i) identifying and selecting the WEAs; (ii) defining the leaseholds within the WEAs that will be sold to developers; (iii) auctioning the wind leaseholds; (iv) reviewing the Construction and Operations Plans for each proposed OSW project; and (v) assisting project applicants navigate federal permitting requirements, including those that involve NEPA review.

~~38.~~62.  NEPA prohibits a federal agency from segmenting into pieces an action that is part of a single, connected program, as doing so often results in an underreporting (or non-reporting) of the program's cumulative impacts.

~~39.~~63.  Instead, NEPA requires the connected elements of a program to be assessed in a single ~~environmental impact statement~~EIS that covers the entire action being contemplated by the federal agency in question. (See federal cases discussed in paragraph 32, supra, of this First Amended Complaint.)

~~18.     NEPA requires that BOEM evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action.~~

40.64.   NEPA requires that the federal agency prepare such a "programmatic" environmental impact statement before committing itself to a particular course of action. This allows the acting agency and the public to present and consider alternatives to the proposed action – including "offsite" alternatives – while there is still time to change direction.

19.     The designation of Wind Energy Areas constitutes a final agency action and is perhaps the most environmentally critical decision that BOEM makes, as it commits large public ocean areas to wind energy development versus other uses, and forecloses other areas, and should have been supported by a regional programmatic environmental impact statement. Further, the adoption of the Wind Energy Areas constitutes a major and final federal action triggering BOEM's legal obligation under NEPA and the APA to prepare a programmatic environmental impact statement. As explained above, BOEM will eventually prepare project-specific environmental impact statements for the individual wind projects in the New York Bight region, but these will not consider or evaluate any alternative that calls for construction of the project outside the boundaries of the Wind Energy Areas described and adopted in the Area Identification Memorandum. Plaintiffs know this to be the case because BOEM recently approved RODs for two offshore wind projects—Vineyard Wind 1 off the coast of Nantucket and South Fork off the coast of Rhode Island—and in each case, the environmental impact statement for the project in question included no alternative that contemplated construction of the wind array at a location other than in the predetermined Wind Energy Areas. Therefore, as a practical matter, the issuance of the Area Identification Memorandum permanently fixes the future locations of the wind energy projects and thus constitutes a final agency action on the part of BOEM. For this reason, NEPA requires that BOEM conduct a full environmental review of

the proposed Wind Energy Areas at the Area Identification stage of the process. BOEM, however, failed to accomplish this task, resulting in a violation of the statute.

20.     BOEM has embarked on a large-scale campaign to develop offshore wind energy projects along much of the U.S. Atlantic coast, from Massachusetts to South Carolina. BOEM's goal is to issue at least 17 wind energy leases covering thousands of square miles of near-shore ocean. When fully developed, BOEM's Atlantic wind energy system will include more than 2,000 wind turbines, many of them located in or near habitat and migration corridors used by listed marine species, such as the North Atlantic right whale.

21.     As part of its overall offshore wind energy program, BOEM has identified five Wind Energy Areas for the New York Bight, just as it had previously identified a New Jersey Wind Energy Area and Wind Energy Areas in the Rhode Island and Massachusetts Outer Continental Shelf.

22.     The New Jersey Wind Energy Area is in the New York Bight. It and the five recent New York Bight Wind Energy Areas are connected actions under NEPA implementing rule §1501.9(e)(1)(iii) because wind energy development in both areas is needed to meet New Jersey's offshore wind plan for 7500 megawatts of power to the State by 2035, which plan the BOEM has been adhering to in its project proposals, and therefore are interdependent parts of a larger action.

23.     Significant new project circumstances and highly relevant new information relevant to environment concerns has come to light since the New Jersey Wind Energy Area was adopted. That includes the explosion in turbine size and attendant increase in turbine operational noise that is expected to have a severe impact on several endangered whale species using the area, thus requiring supplemental NEPA documentation.

24.     The five New York Bight Wind Energy Areas and the New Jersey Wind Energy Area therefore comprise a connected and synergistic offshore wind energy system that is itself part of BOEM's larger offshore wind energy program for the Atlantic seaboard. Because these Wind Energy Areas are part of a singular, connected system/program, will serve distinct electric power markets, and are located within the same Outer Continental Shelf region and will be developed into fully functioning wind arrays within the next three to six years, BOEM was required to prepare a regional programmatic environmental impact statement that assesses all six Wind Energy Areas at once, in combination with one another. By law, this programmatic environmental impact statement should have been prepared prior to, and as part of, BOEM's decision to select the five recent New York Bight Wind Energy Area locations.

65.     BOEM, however, failed to prepare the requisite programmatic environmental impact statement for the Wind Energy Areas. BOEM has not prepared a programmatic EIS for its Atlantic coast OSW program. Nor has it prepared a programmatic EIS for any region or WEA within the Atlantic OSW program. BOEM has only prepared – and will only prepare – project-specific EISs which, by definition, do not evaluate program-wide impacts to the environment. As a result, the impacts of BOEM's Atlantic coast OSW program – including and especially impacts on NARW migration, feeding, and other life history events – have been and will remain unstudied, undisclosed, and unaddressed through the adoption of mitigation measures or alternatives. This is a violation of NEPA and the APA.

66.     BOEM's failure to prepare a programmatic EIS for the entire Atlantic OSW program is inexcusable given that BOEM knows (i) the OSW WEAs and leaseholds are located in and/or near NARW habitat; (ii) the construction and operation of the OSW projects will adversely affect NARW; and (iii) the NARW population is already so low that additional human

interference, such as that caused by industrial scale OSW projects, will drive the species toward extinction.

67.     In October 2022, BOEM and NOAA issued a draft document titled *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy* (the "NARW and OSW Strategy", which effectively admits that BOEM's Atlantic OSW program, when viewed in its entirety, has the potential to harm NARW and cause population scale impacts to the species. Key statements from the NARW and OSW Strategy include the following:

- "In March 2021, in response to Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, the Departments of Interior, Energy, and Commerce announced a national goal to deploy 30 gigawatts of OSW by 2030, while protecting biodiversity and promoting ocean co-use." (p. 1.)

- "BOEM and the National Oceanic and Atmospheric Administration's (NOAA's) National Marine Fisheries Service (NOAA Fisheries) recognize [OSW] development (from siting to decommissioning) must be undertaken responsibly including managing and mitigating the impacts to endangered species like the North Atlantic right whale. The NARW population is currently in decline, mainly due to vessel strikes and entanglement in fishing gear, necessitating precaution to ensure that OSW development is carried out in a way that minimizes the potential for adverse effects to the species and the ecosystems on which it depends." (p. 1.)

- "The agencies are working to understand the effects of OSW development on NARWs and their ecosystem, and to develop strategies to mitigate and monitor impacts to NARWs from OSW development."

- "BOEM and NOAA Fisheries initiated development of this shared draft *North Atlantic Right Whale and Offshore Wind Strategy* (hereinafter called "Strategy") to focus and integrate past, present, and future efforts related to NARW and OSW development. In response to Executive Order 14008, both agencies share a common vision *to protect and promote the recovery of North Atlantic right whales while responsibly developing offshore wind energy.* This vision reflects the combined legislative mandates of the two agencies and commitment to the Administration's goal of developing OSW while protecting biodiversity and promoting ocean co-use." (pp. 1-2.)

- "As of September 2022, there were 27 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS) and there are 42 megawatts of installed OSW capacity. The OCS is the area of the continental shelf that begins at the edge of state marine boundaries (typically 3 nautical miles offshore except 9 miles for Texas and the west coast of Florida) and extends to 200 nautical miles, and more in some places." (p. 3.)

- "Additional lease sales are expected to be held in the Gulf of Maine and the Central Atlantic. In total, the area in existing leases and being considered for leasing in planning areas in the Atlantic OCS covers 22.237 million acres (about 8% of the Atlantic OCS). The OSW infrastructure currently proposed for installation by 2030 would be located on about 2.349 million acres, use fixed turbine technologies, and include 3,441 turbines and foundations and 9,874 miles of export and inter-array submarine cables." (p. 3.)

- "In addition, the Biden-Harris Administration has announced the goal of 15 gigawatts of floating OSW capacity by 2035. These metrics of development will change over time; but for purposes of this Strategy, the metrics demonstrate the large-scale nature of the development planned and underway." (p. 3.)

- "Due to the declining status of NARWs, the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction, and the population is small enough that the death of even some individuals can have a measurable effect on its population status, trend, and population dynamics. Further, the loss of even one individual a year may reduce the likelihood of recovery and the species achieving optimum sustainable population." (pp. 6-7.)

- "NOAA Fisheries' *North Atlantic Right Whale Priority Action Plan for 2021-2025* identifies the need to improve our knowledge of factors that may limit NARW recovery, such as OSW development (NOAA Fisheries 2021)." (p. 7.)

- "NARWs engage in migration, foraging, socializing, reproductive, calving, and resting behaviors critical to their survival (Leiter et al. 2017; Muirhead et al. 2018; Quintana-Rizzo et al. 2021; Zoidis et al 2021). The overlap begeween OSW development (planned, leased, and permitted) and NARW habitat extends to corridors outside the immediate development sites, where vessel traffic between ports and offshore sites would further overlap with the distribution of NARW." (p. 7.)

- "Effects to NARWs could result from exposure to a single project and may be compounded by exposure to multiple projects. ***It is important to recognize that***

*NARW migrating along the U.S. Atlantic Coast travel through or nearby every proposed OSW development.*" (p. 11 [Emphasis added].)

68.     Despite these clear statements from the Whale and Wind Strategy, BOEM has not prepared a programmatic EIS for the Atlantic OCS offshore wind energy program. Nor has BOEM initiated consultation with NMFS over the impacts of the Atlantic OSW program on the NARW.

69.     The plaintiffs here, SLBI and Robert Stern, are headquartered on Long Beach Island in New Jersey. Thus, they are most immediately affected by the multiple OSW facilities proposed off the coasts of New York and New Jersey, many of which will be located in NARW migration and feeding areas. BOEM did not prepare a programmatic EIS when it established the WEAs for New York and New Jersey. Nor did BOEM prepare a programmatic EIS for the lease auctions covering the now-fixed OSW leaseholds off the coasts of New York and New Jersey. The proposed Programmatic EIS for the New York Bight is nothing of the sort, as it will analyze only *one* "representative" OSW project. It will not consider all of the OSW projects slated for the New York Bight or evaluate their cumulative impacts. The two draft EISs released for New York and New Jersey OSW projects – Empire Wind and Ocean Wind – do not assess the cumulative and/or synergistic impacts of all OSW projects proposed off the coasts of New York and New Jersey. Consequently, these DEISs fail to provide the necessary programmatic analysis NEPA requires.

~~41.~~70.  BOEM's actions indicate that, absent a court order, it will not prepare the requisite programmatic EIS for all or any portion of its Atlantic coast OSW program. Instead, BOEM has decided it will prepare project-specific (or Construction and Operations Plan-specific) ~~environmental impact statements~~EISs only, where the locations of the ~~Wind Energy~~

~~Areas~~WEAs, the leaseholds, and the projects themselves are fixed and not subject to debate. These project-specific ~~and Construction and Operations Plan-specific environmental impact statements~~EISs will not fully or adequately evaluate the cumulative impacts of all wind energy projects contemplated within the ~~Wind Energy Areas.~~WEAs or along the Atlantic coast as a whole. Nor will these project-specific ~~and Construction and Operations Plan-specific environmental impact statements~~EISs consider (a) alternative power levels within and among the various Wind Energy Areas that collectively can meet the State's power objective in a more environmentally benign manner or (b) "offsite" alternatives, i.e., alternatives at locations outside the boundaries of the previously adopted Wind Energy Areas.

~~42.~~71.  By failing to prepare ~~an environmental assessment~~a programmatic EIS for all or any portion of its extensive and ~~an environmental impact statement prior to designating areas of the New York Bight for wind energy production~~interconnected Atlantic coast OSW program, BOEM has ~~taken final agency action that is arbitrary, capricious,~~ acted arbitrarily and capriciously, resulting in an abuse of discretion~~, and otherwise not in accordance with the law because it fails to comply with NEPA~~. Accordingly, ~~BOEM's final agency action violates the Administrative Procedure Act and must be vacated and set aside.~~BOEM cannot lawfully continue processing OSW projects until such time that it prepares a programmatic EISs as requested herein.

<div align="center">

**COUNT TWO:**
**VIOLATION OF THE ESA**

</div>

~~43.~~72.  Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

~~44.~~73.  Consultation under Section 7 of the ESA is required whenever a discretionary agency action "may affect" any listed species or its critical habitat, and the assessment of whether that low threshold has been satisfied must be based on the "best available" science.

~~25.~~     BOEM violated Section 7 of the ESA by failing to consult with ~~the National Marine Fisheries Service~~NMFS regarding ~~whether and to what extent the selection of the New York Bight Wind Energy Areas and the Wind Energy Areas directly south of the Bight, in facilitating construction and operation of wind energy arrays, could affect North~~ the potential cumulative impacts of BOEM's Atlantic ~~right whales and other listed species. Such effects~~coast OSW program on listed species, including the NARW. Such impacts will likely occur, given that most of the proposed OSW projects will be located within or very near NARW migration corridors and foraging areas. These impacts include, but are not limited to, noise-induced physical damage; noise-induced behavioral changes and related sublethal impacts; vessel collisions; fishing gear entanglement; loss of foraging opportunities; and alteration of key life history stages and elements.

~~26.     The best available science indicates that BOEM's selection of the New York Bight Wind Energy Areas and those Wind Energy Areas directly south of the Bight (1) will lock BOEM into these particular locations~~ Consequently, the projects, when ~~approving offshore wind energy projects for this part of the eastern seaboard and (2)~~ "may affect" listed species, including ~~the North Atlantic right whale.~~

~~27.     BOEM'S designation of five Wind Energy Areas within the New York Bight, without any consideration of the possible effects the program might~~considered in a cumulative and programmatic way, have ~~on listed endangered species like the North Atlantic right whale,~~

acted arbitrarily, capriciously, and contrary to the mandates of law, including the ESA and Marine Mammal Protection Act.[59]

74.    BOEM's adoption of the designated Wind Energy Areas whilethe potentially to jeopardize the species. Yet, this potential for jeopardy has not been analyzed in a programmatic Biological Opinion (BiOp). The fault for this failing to consultlies with the National Marine Fisheries Service,BOEM, which is legally required to initiate consultation with NMFS for purposes of ensuring that a programmatic BiOp is prepared.

45.75.  BOEM's failure to initiate consultation with NMFS as herein described above, wasis arbitrary, capricious, an abuse of discretion, and violates the ESAand its implementing regulations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)    Enter an order reversingrequiring BOEM to prepare a programmatic EIS addressing the cumulative and setting aside BOEM's March 26, 2021 Decision designating the five Wind Energy Areas within the New York Bightsynergistic impacts of its entire Atlantic coast OSW program, as arbitrary, capricious, and contrary to law, includingrequired by NEPA,;

(1)(2)  Enter an order requiring BOEM to initiate consultation with NMFS under Section 7 of the ESA, to determine whether and to what extent BOEM's Atlantic coast OSW program will jeopardize NARW and Marine Mammal Protection Actother listed species;

(3)    Enter an order enjoining BOEM from processing or approving any additional OSW projects, or any activities connected to such projects (e.g., seabed characterization surveys), until the required programmatic EIS and programmatic BiOp are issued and adopted.

---

[59] 16 U.S.C. §§ 1361-1423h.

(2)(4)   Award Plaintiffs reasonable attorneys' fees and costs under the Equal Access to

Justice Act; and

(3)(5)   Provide such other and further relief as the Court may deem just.


Dated: JanuaryApril 10, 20222023                                        Respectfully

                                                      submitted,


                                                      /s/Roger J. Marzulla
                                                      Roger J. Marzulla
                                                      Nancie G. Marzulla
                                                      Marzulla Law, LLC
                                                      1150 Connecticut Ave NW,
                                                      Suite 1050
                                                      Washington, D.C. 20036
                                                      (202) 822-6760
                                                      roger@marzulla.com
                                                      nancie@marzulla.com
                                                      D.C. Bar No. 394907
                                                      D.C. Bar No. 400985


                                                      /s/David P. Hubbard
                                                      David P. Hubbard
                                                      Gatzke Dillon & Ballance LLP
                                                      2762 Gateway Road
                                                      Carlsbad, CA 92009
                                                      (760) 431-9501
                                                      dhubbard@gdandb.com
                                                      *Pro Hac Vice pending*
                                                      (CA Bar No. 148660)

                                                      *Counsel for Plaintiffs*