## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAVE LONG BEACH ISLAND, a nonprofit corporation,<br>P.O. Box 579, Ship Bottom, NJ 08008; and<br>ROBERT STERN, Ph.D., an individual,<br>329 4th Street, Beach Haven, NJ 08008;<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR,<br>1849 C Street NW, Washington, DC 20240;<br><br>DEB HAALAND, Secretary of the Interior, acting in her official capacity,<br>1849 C Street NW, Washington, DC 20240;<br><br>UNITED STATES BUREAU OF OCEAN ENERGY MANAGEMENT,<br>1849 C Street NW, Washington, DC 20240; and<br><br>ELIZABETH KLEIN, Director of United States Bureau of Ocean Energy Management, acting in her official capacity,<br>1849 C Street NW, Washington, DC 20240;<br><br>　　　Defendants. | Case No. 22-cv-55 (DLF)<br><br>Judge Dabney L. Friedrich |

### [Proposed] First Amended/Supplemental Complaint
### For Declaratory & Injunctive Relief under the National Environmental
### Policy Act, Endangered Species Act, & Administrative Procedure Act

### <u>Nature of the Action</u>

1.　　　The United States government, led by defendant Bureau of Ocean Energy

Management (BOEM), has embarked on a comprehensive and aggressive campaign to develop

more than 20 industrial-scale offshore wind (OSW) energy projects along the Atlantic coast,

from Maine to North Carolina.

2.      Just days after his inauguration, President Biden confirmed his commitment to BOEM's OSW program by issuing Executive Order 14008, dated January 27, 2021, and titled "Tackling the Climate Crisis at Home and Abroad." Section 207 of the Executive Order expressly calls for a "doubling" of offshore wind energy production by 2030.

3.      In March 2021, the Departments of Interior, Energy, and Commerce responded to Executive Order 14008 by announcing a national goal to deploy 30 gigawatts of OSW by 2030.[1]

4.      As of September 2022, there were 27 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS).[2] All or most of these OSW lease areas overlap habitat of the federally-listed and highly endangered North Atlantic right whale (NARW).[3]

5.      As discussed below, the Atlantic coast OSW projects that BOEM is processing are part of a network of wind energy facilities that will operate synergistically to generate electricity for consumers along the eastern seaboard. Correspondingly, the OSW projects also work synergistically to create cumulative impacts on a host of environmental resources, including federally-protected marine mammals such as the NARW.

6.      The wind energy areas (WEAs) that BOEM has selected for OSW development are located within and along the very migration corridors that NARW use to travel from calving grounds in South Carolina to the zooplankton-rich foraging areas in New England Canada. In short, BOEM's industrial-scale OSW program for the Atlantic coast puts human development on a collision course with the endangered NARW; and, historically, that situation has resulted in tragedy for the whale.

---

[1]      www.doi.gov/news/interior-joins-government-wide-effort-advance-offshore-wind

[2]      Draft *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy*, October 2022, p. 3.

[3]      *Id.,* at p. 4.

7.      Despite evidence showing that the OSW projects will significantly affect marine mammals and, in the case of the NARW, push the species further toward extinction, BOEM has not prepared a programmatic Environmental Impact Statement (EIS) to analyze and disclose the OWS program's cumulative effects on these animals or any other natural resource. BOEMs' decision to not prepare a programmatic EIS effectively forecloses any opportunity for the public to comment upon, critique, and offer alternatives to the wind lease locations selected by BOEM or to the number and power rating of the wind turbines to be used. In effect, BOEM and the other defendants have committed themselves to a particular course of action without first conducting a full and adequate impact and alternatives analysis at the program level.

8.      In addition, BOEM has not initiated consultation with NMFS as required under Section 7 of the Endangered Species Act to determine whether BOEM's OSW program for the Atlantic coast might jeopardize the NARW and/or impede its recovery. Nor has BOEM consulted with NMFS to assess whether the OSW projects in a given WEA or region, when viewed cumulatively, would jeopardize the NARW or any other listed species. As a result, no programmatic Biological Opinion (BiOp) for the Atlantic OSW program – or any region within it – has been prepared.

9.      For its part, NMFS has issued, and continues to process, incidental take authorizations (ITAs) under the Marine Mammal Protection Act (MMPA) for various activities connected to the proposed OSW projects along the Atlantic Coast. These activities include seabed characterization surveys that involve the use of high-intensity sound pulses; cable laying along the seafloor; and pile-driving for wind turbine installation. As indicated in the ITAs themselves, these activities "harass" marine mammals, including the NARW, resulting in take of

the species. Worse, the evidence shows that the harassment permitted by the ITAs is cumulative

and has the potential to be inflicted repeatedly on the same cohort of right whales.

10.     The purpose of this action is three-fold: ***First***, it is intended to force BOEM to

prepare a programmatic EIS that comprehensively assesses the impacts of BOEM's OSW energy

program along the Atlantic coast. The programmatic EIS should not only evaluate the cumulative

and synergistic impacts of all OSW projects currently being proposed for the eastern seaboard; it

must also identify and consider alternative locations for some or all of the OSW projects which

have the potential to adversely affect protected species, including the NARW. The alternatives

analysis must also address options regarding the size and power rating of the wind turbines.

***Second,*** the action is intended to force BOEM to consult with NMFS under Section 7 of the

Endangered Species Act and, through that consultation, determine whether the Atlantic coast

OSW projects, when considered cumulatively, could jeopardize federally-listed species,

including the NARW. The consultation effort should result in preparation of a programmatic

Biological Opinion (BiOp). ***Third,*** the action is intended to enjoin BOEM from processing or

approving any additional OSW projects, or any activities connected to such projects (e.g., seabed

characterization surveys), until the required programmatic EIS and programmatic BiOp are

issued and adopted.

11.     In failing to prepare a programmatic EIS for the Atlantic Coast OSW projects,

BOEM has violated the National Environmental Policy Act (NEPA).[4]  In failing to initiate

Section 7 consultation with NMFS over the cumulative impacts of the OSW projects on listed

species, BOEM also has violated the Endangered Species Act (ESA).[5] For these reasons, BOEM

---

[4]     42 U.S.C. §§ 4321-4347.
[5]     16 U.S.C. §§ 1531-1544.

has acted arbitrarily, capriciously, and not in accordance with law, resulting in a violation of the Administrative Procedures Act (APA).[6]

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201 (declaratory judgment), and 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701 through 706 (APA).

13.     For all claims brought under NEPA, the ESA, and the APA, Plaintiffs have exhausted all administrative remedies available to them.

14.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are federal agencies and officials whose offices are located in Washington, D.C.

## PARTIES

15.     Plaintiff SAVE LONG BEACH ISLAND (SLBI) is a 501(c)(3)non-profit corporation, organized under the laws of New Jersey and created to guard human and natural resources that characterize Long Beach Island and its coastal waters. SLBI members have a legally protected interest in preserving the marine mammals that live off the New York and New Jersey coasts, some of which, like the NARW, are critically endangered species. Members of SLBI have observed NARW and other marine mammals, including humpback whales, off the coasts of New York and New Jersey, and they have concrete plans to observe them in the future. The proposed OSW projects, if constructed and operated in their currently-proposed locations, will harm NARW and other protected marine mammals and/or cause them to leave the area. Should this occur, SLBI members would lose further opportunities to observe and/or enjoy the natural and aesthetic qualities of these animals. SLBI seeks to protect the natural and human

---

[6]   5 U.S.C. § 706(2)(A) and (E).

resources in and near the New Jersey coast, including but not limited to: the fish, marine mammals, and other species that reside in, use, or migrate through the New York Bight and New Jersey WEAs; the seascape and other aesthetic elements of Long Beach Island, the New York Bight, and the New Jersey shore; the local economic interests that rely on the continued preservation of the environmental features that make Long Beach Island a unique and desirable place to live and visit; and the cultural values that are tied to Long Beach Island and the waters that surround it, including the New York Bight and the ocean areas off the coast of New Jersey. These natural and human resources are threatened by the BOEM's massive, OSW energy program, including the wind arrays planned for the New York Bight and New Jersey coast. SLBI members will be able to view the proposed wind farms from public and private vantage points along the coast of Long Beach Island and other locations in New York and New Jersey. In addition, SLBI members routinely engage in recreation in coastal waters that would be affected by one or more OSW projects in the proposed New York Bight and New Jersey WEAs, including waters that support marine mammals and turtles listed as endangered or threatened under the ESA. Such recreation includes sailing, fishing, whale watching, and diving. SLBI and its members have a legally protected interest in preserving the listed species that are native to the waters off the coast of New York and New Jersey and likely to be harmed by the proposed offshore wind arrays. SLBI and its members also have an interest in protecting the cultural and historical heritage of this part of the Atlantic seaboard, as well as an interest in protecting the natural beauty of Long Beach Island, New Jersey—an 18-mile-long barrier island with an unobstructed seascape. SLBI and its members also own or patronize businesses that will be adversely affected by the environmental degradation that will occur as a result of the proposed offshore wind projects proposed off the coast of New York and New Jersey. Finally, some

members of Save Long Beach rent their properties to tourists and tenants so that they, too, can enjoy, recreate in, and use the natural resources described above.

16.    Plaintiff ROBERT STERN, Ph.D., is an individual who resides on Long Beach Island. He formerly managed the Office of Environmental Compliance within the United States Department of Energy. Dr. Stern is the President of SLBI. He considers it his responsibility to protect those waters and all the plant and animal life within it. Dr. Stern has particular concern over the impacts of operational turbine noise on endangered whales frequenting the area; he has researched the subject, and provided specific technical recommendations to BOEM regarding NARW migration through the areas proposed for OSW projects, including those slated for development off the coast of New York and New Jersey. Dr. Stern has concrete plans to observe NARW and other marine mammals off the coast of New Jersey. Defendants' industrial-scale OSW program, however, threatens these animals, potentially foreclosing Dr. Stern's ability to observe them in the future. As a resident of Long Beach Island, he routinely visits the beaches along the island's shores, where currently the vistas are unobstructed. This will change once the proposed New York Bight and New Jersey OSW projects are constructed, as the wind turbines will be clearly visible from the Long Beach Island shoreline. BOEM's entire offshore wind program—including and especially the wind arrays proposed for the New York and New Jersey coasts—threatens the very resources that make Long Beach Island the unique place that Dr. Stern has chosen to call home. Dr. Stern is also deeply committed to the historical and cultural heritage of Long Beach Island, which the proposed wind energy projects are sure to damage. The failure of BOEM to comply with NEPA and the ESA will degrade the natural and human environment on Long Beach Island and the waters proximate to it, resulting in harm to Dr. Stern.

17.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an agency of the federal government, which is authorized to grant leases, easements, and/or rights-of-way on the Outer Continental Shelf for activities that produce or support production of energy from sources other than oil and gas, such as wind power.[7]

18.     Defendant DEB HAALAND is the Secretary of the United States Department of the Interior and, among other things, is charged with overseeing the management of the nation's Outer Continental Shelf lands and oceans, including those affected by the OSW projects that will ultimately be developed within the New York Bight and off the coast of New Jersey. In this regard, Secretary Haaland oversees BOEM and is ultimately responsible for the decisions taken by BOEM. Further, Secretary Haaland is responsible for ensuring that all agencies within the Department of the Interior, including BOEM, comply with NEPA, the ESA, and the APA. In this action, Plaintiffs are suing Secretary Haaland in her official capacity as Secretary of the Interior.

19.     Defendant UNITED STATES BUREAU OF OCEAN ENERGY MANAGEMENT (BOEM) is an agency of the United States government within and under the jurisdiction of the Department of the Interior. BOEM's stated mission "is to manage development of U.S. Outer Continental Shelf energy and mineral resources in an environmentally and economically responsible way."[8] For purposes of this action, BOEM is the federal agency responsible for implementing the U.S. government's OSW energy program. More specifically, BOEM is the federal agency that issues leases and permits for OSW projects within the New York Bight and New Jersey WEAs and elsewhere along the Atlantic coast of the United States. BOEM is also responsible for ensuring that its actions, including authorization of OSW

---

[7]   43 U.S.C. § 1337(p)(1)(C).
[8]   U.S. Department of the Interior: Bureau of Ocean Energy Management, About Us (last visited Jan. 5, 2022), available at https://www.boem.gov/about-boem.

projects, comply with NEPA and the ESA. To this end, BOEM must prepare a programmatic EIS when a federal plan or program has the potential to cause cumulative and/or synergistic impacts on the environment that might otherwise escape analysis and disclosure if each project within the program were studied individually. Here, BOEM has failed/refused to prepare a programmatic EIS that addresses the cumulative, connected, and synergistic impacts of implementing the OSW projects slated for the Atlantic coast. Nor has BOEM prepared a programmatic EIS to evaluate the cumulative and synergistic effects of the multiple projects proposed off the coasts of New York and New Jersey, despite their close proximity to one another. In addition, Section 7 of the ESA requires that BOEM consult with the NMFS to determine whether and to what extent selection of the WEAs, as well as the OSW projects proposed within those WEAs, may affect federally listed species. In this case, however, BOEM failed to consult with NMFS regarding the OSW program for the Atlantic coast or any region within it (e.g., New York/New Jersey).

20.     Defendant ELIZABETH KLEIN is the Director of BOEM. Director Klein oversees BOEM and is responsible for the decisions taken by BOEM. In this action, Plaintiffs are suing Director Klein in her official capacity as Director of BOEM.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     The National Environmental Policy Act

21.     NEPA is the "basic national charter for protection of the environment."[9]

22.     The purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment."[10] NEPA's fundamental purpose is to guarantee that agencies take a "hard look" at the environmental consequences of their actions before such actions occur. To

---

[9]     *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1072, (quoting 40 C.F.R. § 1500.1(a)).
[10]     42. U.S.C. § 4321.

conduct a "hard look" the agency in question must (1) carefully consider detailed information regarding the action's potentially significant environment effects, and (2) make relevant information available to the public so that it may play a role in both the decision-making process and the implementation of the decision itself.[11]

23.     For any "major federal action" that "significantly affects" the "human environment," NEPA requires the federal agency in question (here, BOEM) to prepare a detailed EIS that analyzes and discloses the action's environmental consequences.[12] If the agency does not conduct this analysis prior to the point of commitment, the agency deprives itself of the ability to "foster excellent action."[13]

24.     Relatedly, NEPA requires that an EIS fully analyze all direct, indirect, and cumulative impacts of a proposed federal action or project. Direct effects include those "which are caused by the action and occur at the same time and place."[14] Indirect effects include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[15] Indirect effects may also include growth inducing impacts and other effects that prompt changes in land use patterns, population density or growth rates, and related effects on air and water and other natural systems, including ecosystems.[16] Cumulative impacts include those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-

---

[11]   *See, e.g.*, 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.
[12]   42 USC § 4332(c); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).
[13]   *See* 40 CFR § 1500.1(c); *Marsh v. Oregon Nat. Resources Council*, 490 U.S. 360, 371 (1989).
[14]   40 CFR § 1508.8(a).
[15]   40 CFR § 1508(b).
[16]   *Id.*

Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over time.

25.     The EIS must provide a complete and accurate discussion of the proposed project's foreseeable environmental impacts, including those that cannot be avoided.[17] However, when information is incomplete or unavailable, the environmental impact statement must "always make clear that such information is lacking."[18] And if the missing information can be feasibly obtained and is necessary for a "reasoned choice among alternatives,"[19] the agency must include the information in the environmental impact statement. Where the cost of the data is too expensive to secure, the agency must still attempt to analyze the impacts in question.[20]

26.     The EIS must provide an accurate presentation of key facts and environmental impacts, as this is "necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA."[21] An EIS that is incomplete or provides misleading information can "impair[] the agency's consideration of the adverse environmental effects and . . . skew . . . the public's evaluation of the proposed agency action."[22] For this reason, erroneous factual assumptions and misrepresentations of important facts can fatally undermine the information value of the EIS to the public and decision-makers.[23]

---

[17]   5 USC § 706(2)(D); 40 CFR § 1502.22.
[18]   40 CFR § 1502.22.
[19]   *Id.*
[20]   *Id.*
[21]   *Natural Resources Defense Council v. U.S. Forest Serv.,* 421 F.3d 797, 812 (9th Cir. 2005).
[22]   *Id.* at 811.
[23]   *Id.* at 808.

27.     In addition, if the EIS identifies a significant effect, the environmental impact statement must propose and analyze "appropriate mitigation measures."[24] Finally, the EIS must examine a reasonable range of alternatives to the proposed action and focus on those that reduce the identified impacts of that action.[25]

28.     NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making and to guarantee "the [action] agency will not act on incomplete information, only to regret its decision after it is too late to correct."[26]

29.     NEPA regulations require that an environmental impact statement "[e]valuate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination."[27] NEPA regulations also state that the consideration of alternatives is "the heart of the environmental impact statement."[28]

30.     NEPA requires that agencies evaluate in a single EIS proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action.

31.     A federal program, such as BOEM's OSW energy program along the Atlantic coast, constitutes a "major federal action" and is defined as follows: "a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive."[29]

---

[24]   40 CFR § 1502.14; *see Robertson v. Methow Valley Citizens Council*, 490 U.S. at 352-53 ("omission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA").

[25]   42 U.S.C. § 4332(2)(e); 40 CFR § 1502.1.

[26]   *Marsh v. Ore. Natural Resources Council*, 490 U.S. 360, 371 (1989).

[27]   40 C.F.R. § 1502.14(a).

[28]   40 C.F.R. § 1502.

[29]   40 C.F.R. § 1508.1(q)(3)(iii).

32.     In some cases, NEPA requires that such a program – sometimes referred to as a

"broad action" – be evaluated in a programmatic EIS. See, for example, *Kleppe v. Sierra Club*,

427 U.S. 390, 400-01 (1976) (noting that a single EIS may be required "where several proposed

actions are pending at the same time"); see also *Earth Island Ins. v. U.S. Forest Serv.*, 351 F.3d

1291, 1304-05 (9th Cir. 2003) (noting that a single EIS is required where there is one plan

governing the projects *or* the projects are connected, cumulative, or similar); see also *Native*

*Ecosystems Council v. Dombeck,* 304 F.3d 886, 893-94 (9th Cir. 2002) ("A single NEPA review

document is required when there is a single proposal governing the projects, *or* when the projects

are 'connected', 'cumulative', or 'similar' actions under the regulations implementing NEPA.")

See also *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990) ("Where there

are large scale plans for regional development, NEPA requires both a programmatic and site-

specific EIS. This court has held that where several foreseeable similar projects in a geographical

region have a cumulative impact, they should be evaluated in a single EIS.")

33.     Such "broad actions" can be analyzed in at least three ways:

> (1) Geographically, including actions occurring in the same general
> location, such as a body of water, region, or metropolitan area;
> (2) Generically, including actions which have relevant similarities, such as
> common timing, impacts, alternatives, methods of implementation, media,
> or subject matter;
> (3) By stage of technological development including federal or federally
> assisted research, development or demonstration programs for new
> technologies which, if applied, could significantly affect the quality of the
> human environment.[30]

34.     NEPA does not allow an acting federal agency to "segment" the overall program,

as this would unreasonably restrict the scope of the environmental evaluation.[31] Nor does NEPA

---

[30]   40 C.F.R. § 1502.4(c).
[31]   *Nat'l Wildlife Found'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 888 (D.C. Cir. 1981).

allow an agency to break up a "large or cumulative project into smaller components in order to avoid designating the project as a major federal action."[32] Moreover, a "programmatic environmental impact statement should be prepared if it can be forward-looking and if its absence will obstruct environmental review."[33]

35.     When there are multiple projects contemplated in a particular geographical region, "NEPA calls for an examination of their impact in a single [environmental impact statement]."[34] And "[w]here there are large-scale plans for regional development, NEPA requires both a programmatic and a site-specific [environmental impact statement]."[35]

36.     In this case, BOEM's large scale OSW program along the Atlantic coast constitutes a singular effort to develop an offshore wind energy system, much like the system of hydroelectric dams constructed along the Columbia River and its tributaries in the Pacific Northwest. The various OSW projects are interconnected and integrated components of BOEM's offshore wind energy program. In addition, they are cumulative and similar in their purpose, their construction, and their impacts on the environment. Thus, they need to be studied in a single programmatic EIS.

37.     Failure to prepare a programmatic EIS where one is required is arbitrary and capricious and an abuse of federal agency discretion.

---

[32]   *Id.* at 890.
[33]   *Found'n on Economic Trends v. Heckler*, 756 F.2d 143, 159 (D.C. Cir. 1985).
[34]   *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990).
[35]   *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1407; *see also* 40 C.F.R. §§ 1508.28, 1502.20.

B.      **The Endangered Species Act**

38.     The ESA was enacted, in part, to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered species and threatened species . . . ."[36]

39.     The ESA vests the Secretary of Commerce with primary responsibility for administering and enforcing that statute with respect to marine and anadromous species. The Secretary has delegated this responsibility to NMFS.[37] The National Oceanic Atmospheric Administration of the Department of Commerce, through the NMFS, is responsible for implementing the ESA with respect to marine and anadromous species. The United States Fish and Wildlife Service is responsible for implementing the ESA with respect to terrestrial and freshwater species.

40.     Section 2(c) of the ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act."[38] The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."[39]

41.     Section 7(a)(1) of the ESA requires that all federal agencies "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species . . . ."[40] Section 7(a)(1) also directs NMFS (or, as the case

---

[36]   16 U.S.C. § 1531(b).
[37]   50 C.F.R. § 402.01(b).
[38]   16 U.S.C. § 1531(c)(1).
[39]   16 U.S.C. § 1532(3).
[40]   16 U.S.C. § 1536(a)(1).

may be, the Fish and Wildlife Service) to review other programs administered by the Secretary and utilize such programs in furtherance of the purposes of the Act.[41]

42.     In order to fulfill the substantive purposes of the ESA, federal agencies (such as BOEM here) are required to engage in consultation with the NMFS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species . . . determined . . . to be critical . . . ."[42]

43.     Section 7 consultation is required for "any action [that] may affect listed species or critical habitat."[43] Agency "action" is broadly defined in the ESA's implementing regulations to include "(a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air."[44] When engaging in Section 7 consultation, both NMFS and the "action agency" must "use the best scientific and commercial data available."[45]

44.     NMFS and the Fish and Wildlife Service follow a jointly prepared consultation handbook which states that a "may affect" determination is:

> [T]he appropriate conclusion when a proposed action may pose ***any*** effects on listed species or designated critical habitat. When the Federal agency proposing the action determines that a "may affect" situation exists, then they must either initiate formal consultation or seek written concurrence from the Services that the action 'is not likely to adversely affect' listed species.[46]

---

[41]   16 U.S.C. § 1536(a)(1).
[42]   16 U.S.C. § 1536(a)(2) ("Section 7 consultation").
[43]   50 C.F.R. § 402.14.
[44]   50 C.F.R. § 402.02.
[45]   16 U.S.C. § 1536(a)(2).
[46]   *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* at xiv (hereafter "Joint Consultation Handbook") (emphasis in original).

45.     A "may affect" determination triggering formal consultation is required when "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character"[47] occurs. Further, when determining whether any such effects may occur, NMFS (or the Fish and Wildlife Service) and the action agency must consider not only the direct effects of the action, but also the "indirect effects", which are defined as those that are "caused by the proposed action and are later in time, but still are reasonably certain to occur."[48]

46.     Once an action agency makes a "may affect" determination, the agency may elect to enter informal consultation with either the NMFS or the Fish and Wildlife Service, depending on which Service has jurisdiction over the species in question. The action agency then must complete a Biological Assessment (BA) and make one of two determinations – a "not likely to adversely affect" (NLAA) determination or a "likely to adversely affect" (LAA) determination. If the action agency arrives at an LAA determination, then formal consultation is required. Joint Consultation Handbook at 2-6. If the relevant Service does not concur with the NLAA determination, or if the action agency elects to bypass the informal consultation process and initiate formal consultation, then the relevant Service works towards the completion of a BiOp for the proposed action. If NMFS issues a BiOp that concludes the proposed action is likely to jeopardize the species, the opinion may specify reasonable and prudent alternatives that will avoid jeopardy and allow the agency to proceed with the action.[49] NMFS may also suggest modifications to the action during the course of consultation to "avoid the likelihood of adverse effects"[50] to the listed species even when not necessary to avoid jeopardy.

---

[47]   51 Fed. Reg. 19,926, 19,949 (June 3, 1986).
[48]   50 C.F.R. § 402.02.
[49]   16 U.S.C. § 1536(b).
[50]   50 C.F.R. § 402.13.

47.     Ultimately, however, it is the action agency – here, BOEM – that must accept and implement the conditions set forth in the BiOp. Accordingly, the action agency is responsible for ensuring the BiOp is legally adequate.

## FACTUAL BACKGROUND

48.     BOEM has established more than 10 OSW wind energy areas (WEAs) along the Atlantic coast. The WEAs define where the OSW leaseholds will be located. Once the WEAs are established, no alternative WEA locations are considered. They become fixed. As a result, the OSW lease areas also become fixed. BOEM does not, and will not, consider project alternatives that involve placing the OSW facility outside the established lease areas or WEAs. In fact, BOEM recently adopted an internal guidance document for preparing EISs for OSW projects, and it expressly discourages consideration of alternatives that would move the proposed project to a location outside its established leasehold or the established WEA.

49.     At no time, however, has BOEM prepared a programmatic EIS or any other NEPA document to analyze the impacts of selecting the WEAs in question. Nor has BOEM prepared a programmatic EIS or any other NEPA document to analyze the impacts of selecting the leasehold locations within the WEAs.

50.     Within the identified WEAs, BOEM has auctioned more than 23 OSW leases to wind energy developers. BOEM has received from such developers at least 15 Construction and Operations Plans (COPS), each providing details for the particular OSW project they intend to build. BOEM conducted no NEPA review – programmatic or otherwise – of the lease sales, even though such sales establish with metes and bounds where the OSW projects will be constructed and operated.

51.     BOEM has already approved two such projects – the Vineyard Wind 1 facility off the coast of Massachusetts and the South Fork facility off the coast of Rhode Island. BOEM adopted the Record of Decision (ROD) for the Vineyard Wind 1 project on May 10, 2021 and the ROD for South Fork on November 24, 2021. BOEM prepared EISs for these projects, but those EISs did not analyze how the projects, when considered in conjunction with the entire OSW program for the Atlantic coast, will affect key environmental resources, including the federally-listed and endangered NARW. Nor did the EISs consider any alternative that called for moving the project to a location where its impacts – including impacts on NARW – would be reduced.

52.     BOEM has released Draft EISs for six other OSW projects: (1) Sunrise Wind in the Rhode Island/Massachusetts WEA; (2) Revolution Wind in the Rhode Island/Massachusetts WEA; (3) SouthCoast Wind off the coast of Massachusetts; (4) Ocean Wind off the coast of New Jersey; (5) Empire Wind off the coast of New York; and (6) Commonwealth of Virginia Offshore Wind (CVOW) off the coast of Virginia. None of these EISs evaluates the proposed project's cumulative impacts in a programmatic way that considers the entire OSW program for the Atlantic coast. In fact, the EISs do not even evaluate each respective project's cumulative impacts on a *regional* or *WEA* scale. As a result, the projects' cumulative and synergistic impacts on sensitive environmental resources, such as the NARW, have been left unstudied and undisclosed. Further, none of the EISs considers alternative locations for the projects in question, even though the data show that the current leaseholds overlap NARW habitat, including migration corridors and foraging areas. The EISs also fail to consider alternatives that contemplate changes in the number and power rating of the wind turbines themselves.

53.     BOEM has issued Notices of Intent to prepare EISs for three additional projects: (1) Atlantic Shores South off the coast of New Jersey; (2) U.S. Wind off the coast of Maryland; and (3) Kitty Hawk North off the coast of North Carolina. There is no indication that the EISs for these proposed OSW facilities will programmatically assess cumulative impacts on marine mammals or other sensitive environmental resources. Nor is there any indication that these EISs will consider alternative locations for the projects, even though they, like nearly all projects in the Atlantic OSW program, overlap NARW habitat.

54.     On July 15, 2022, BOEM issued a "Notice of Intent to Prepare a Programmatic Environmental Impact Statement for Future Wind Development in the New York Bight." Purportedly, the proposed Programmatic EIS (PEIS) will cover six OSW leaseholds in the New York Bight WEAs: OCS-A 0537; OCS-A 0538, OCS-A 0539; OCS-A 0541; OCS-A 0542, and OCS-A 0544. Contrary to its title, however, the proposed document will ***not*** be a true programmatic EIS. It is not designed to analyze the cumulative effects of the six New York Bight windfarms contemplated on the leaseholds listed above. Instead, the proposed PEIS will only assess "the impacts expected from a ***representative*** project in the New York Bight."  (See 87 Fed.Reg. 42495, 42496 (emphasis added.) BOEM will then use that assessment later to determine whether the other five projects will have impacts greater or less than the "representative" case. (*Id*.) In other words, the so-called "PEIS" will study only ***one*** of the proposed New York bight OSW projects, not all six. And it will likewise not address other OSW projects planned off the New Jersey coast.

55.     The best available scientific and commercial data show that many of the proposed OSW facilities – including the projects proposed off the coasts of Massachusetts, New York, New Jersey, and Virginia – will be located within or very near NARW feeding areas and

migration routes. Consequently, implementation of these projects will obstruct the movement of NARW and interfere with foraging activities and other critical "life history" activities (e.g., calving) necessary to the survival and recovery of the species, whose total population continues to decline and now rests at approximately 330 individuals.

56.    These same OSW projects also intersect and interfere with the feeding and movement behaviors of other federally-protected marine mammals, including the humpback whale. Under the Marine Mammal Protection Act (MMPA), such animals may not be "taken" without an incidental harassment authorization from the National Marine Fisheries Service (NMFS).

57.    In addition, NMFS has issued, and continues to process, incidental take authorizations (ITAs) under the MMPA for various activities connected to the proposed OSW projects along the Atlantic Coast. These activities include seabed characterization surveys that involve the use of high-intensity sound pulses; cable laying along the seafloor; and pile-driving for wind turbine installation. As indicated in the ITAs themselves, these activities "harass" marine mammals, including the NARW, resulting in take of the species. Worse, the evidence shows that the harassment permitted by the ITAs is cumulative and has the potential to be inflicted repeatedly on the same cohort of right whales. To date, NMFS has issued eleven (11) ITAs for OSW-related activities off the coast of New York and New Jersey alone, with another five (5) pending. For the Atlantic OSW program as a whole, NMFS has issued – or is poised to issue – ITAs allowing for take of 915 NARW by Level B harassment noise (i.e., noise that will cause avoidance behavior on the part of the whales). And there is evidence that the Level B harassment caused by current and ongoing seabed characterization surveys could be contributing to whale deaths along the New York and New Jersey shores and elsewhere along the Atlantic

coast. All of this permitting, and all of these activities and impacts, are taking place without benefit of a programmatic EIS or programmatic BiOp.

## COUNT ONE:
## VIOLATION OF NEPA AND THE APA

58.     Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

59.     NEPA requires federal agencies, such as BOEM, to analyze the direct, indirect, and cumulative impacts of the OSW program for the Atlantic coast and to take a hard look at those impacts. In addition, NEPA requires BOEM to consider mitigation measures and alternatives that are capable of minimizing the environmental impacts of the Atlantic OSW program.

60.     NEPA compliance, which is intended to inform the agency decision-maker of the environmental impacts of proposed actions, must occur before the agency has made a decision or an irretrievable commitment of resources to a particular action.

61.     As the facts discussed in this Complaint make clear, BOEM has committed itself to an extensive program for installing thousands of wind turbines along the Atlantic coast. While that program involves multiple steps and multiple OSW facilities, the program nevertheless represents a singular course of action pursued by BOEM. The OSW projects proposed along the Atlantic coast are connected, cumulative, and similar, and they are the manifestation of a clearly articulated plan to develop offshore wind energy on an industrial scale. BOEM has established an elaborate set of procedures for (i) identifying and selecting the WEAs; (ii) defining the leaseholds within the WEAs that will be sold to developers; (iii) auctioning the wind leaseholds; (iv) reviewing the Construction and Operations Plans for each proposed OSW project; and (v)

assisting project applicants navigate federal permitting requirements, including those that involve NEPA review.

62.     NEPA prohibits a federal agency from segmenting into pieces an action that is part of a single, connected program, as doing so often results in an underreporting (or non-reporting) of the program's cumulative impacts.

63.     Instead, NEPA requires the connected elements of a program to be assessed in a single EIS that covers the entire action being contemplated by the federal agency in question. (See federal cases discussed in paragraph 32, supra, of this First Amended Complaint.)

64.     NEPA requires that the federal agency prepare such a "programmatic" environmental impact statement before committing itself to a particular course of action. This allows the acting agency and the public to present and consider alternatives to the proposed action – including "offsite" alternatives – while there is still time to change direction.

65.     BOEM has not prepared a programmatic EIS for its Atlantic coast OSW program. Nor has it prepared a programmatic EIS for any region or WEA within the Atlantic OSW program. BOEM has only prepared – and will only prepare – project-specific EISs which, by definition, do not evaluate program-wide impacts to the environment. As a result, the impacts of BOEM's Atlantic coast OSW program – including and especially impacts on NARW migration, feeding, and other life history events – have been and will remain unstudied, undisclosed, and unaddressed through the adoption of mitigation measures or alternatives. This is a violation of NEPA and the APA.

66.     BOEM's failure to prepare a programmatic EIS for the entire Atlantic OSW program is inexcusable given that BOEM knows (i) the OSW WEAs and leaseholds are located in and/or near NARW habitat; (ii) the construction and operation of the OSW projects will

adversely affect NARW; and (iii) the NARW population is already so low that additional human interference, such as that caused by industrial scale OSW projects, will drive the species toward extinction.

67.     In October 2022, BOEM and NOAA issued a draft document titled *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy* (the "NARW and OSW Strategy", which effectively admits that BOEM's Atlantic OSW program, when viewed in its entirety, has the potential to harm NARW and cause population scale impacts to the species. Key statements from the NARW and OSW Strategy include the following:

- "In March 2021, in response to Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, the Departments of Interior, Energy, and Commerce announced a national goal to deploy 30 gigawatts of OSW by 2030, while protecting biodiversity and promoting ocean co-use." (p. 1.)

- "BOEM and the National Oceanic and Atmospheric Administration's (NOAA's) National Marine Fisheries Service (NOAA Fisheries) recognize [OSW] development (from siting to decommissioning) must be undertaken responsibly including managing and mitigating the impacts to endangered species like the North Atlantic right whale. The NARW population is currently in decline, mainly due to vessel strikes and entanglement in fishing gear, necessitating precaution to ensure that OSW development is carried out in a way that minimizes the potential for adverse effects to the species and the ecosystems on which it depends." (p. 1.)

- "The agencies are working to understand the effects of OSW development on NARWs and their ecosystem, and to develop strategies to mitigate and monitor impacts to NARWs from OSW development."

- "BOEM and NOAA Fisheries initiated development of this shared draft *North Atlantic Right Whale and Offshore Wind Strategy* (hereinafter called "Strategy") to focus and integrate past, present, and future efforts related to NARW and OSW development. In response to Executive Order 14008, both agencies share a common vision *to protect and promote the recovery of North Atlantic right whales while responsibly developing offshore wind energy.* This vision reflects the combined legislative mandates of the two agencies and commitment to the Administration's goal of developing OSW while protecting biodiversity and promoting ocean co-use." (pp. 1-2.)

- "As of September 2022, there were 27 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS) and there are 42 megawatts of installed OSW capacity. The OCS is the area of the continental shelf that begins at the edge of state marine boundaries (typically 3 nautical miles offshore except 9 miles for Texas and the west coast of Florida) and extends to 200 nautical miles, and more in some places." (p. 3.)

- "Additional lease sales are expected to be held in the Gulf of Maine and the Central Atlantic. In total, the area in existing leases and being considered for leasing in planning areas in the Atlantic OCS covers 22.237 million acres (about 8% of the Atlantic OCS). The OSW infrastructure currently proposed for installation by 2030 would be located on about 2.349 million acres, use fixed turbine technologies, and include 3,441 turbines and foundations and 9,874 miles of export and inter-array submarine cables." (p. 3.)

- "In addition, the Biden-Harris Administration has announced the goal of 15 gigawatts of floating OSW capacity by 2035. These metrics of development will change over time; but for purposes of this Strategy, the metrics demonstrate the large-scale nature of the development planned and underway." (p. 3.)

- "Due to the declining status of NARWs, the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction, and the population is small enough that the death of even some individuals can have a measurable effect on its population status, trend, and population dynamics. Further, the loss of even one individual a year may reduce the likelihood of recovery and the species achieving optimum sustainable population." (pp. 6-7.)

- "NOAA Fisheries' *North Atlantic Right Whale Priority Action Plan for 2021-2025* identifies the need to improve our knowledge of factors that may limit NARW recovery, such as OSW development (NOAA Fisheries 2021)." (p. 7.)

- "NARWs engage in migration, foraging, socializing, reproductive, calving, and resting behaviors critical to their survival (Leiter et al. 2017; Muirhead et al. 2018; Quintana-Rizzo et al. 2021; Zoidis et al 2021). The overlap begeween OSW development (planned, leased, and permitted) and NARW habitat extends to corridors outside the immediate development sites, where vessel traffic between ports and offshore sites would further overlap with the distribution of NARW." (p. 7.)

- "Effects to NARWs could result from exposure to a single project and may be compounded by exposure to multiple projects. ***It is important to recognize that***

*NARW migrating along the U.S. Atlantic Coast travel through or nearby every proposed OSW development.*" (p. 11 [Emphasis added].)

68.     Despite these clear statements from the Whale and Wind Strategy, BOEM has not prepared a programmatic EIS for the Atlantic OCS offshore wind energy program. Nor has BOEM initiated consultation with NMFS over the impacts of the Atlantic OSW program on the NARW.

69.     The plaintiffs here, SLBI and Robert Stern, are headquartered on Long Beach Island in New Jersey. Thus, they are most immediately affected by the multiple OSW facilities proposed off the coasts of New York and New Jersey, many of which will be located in NARW migration and feeding areas. BOEM did not prepare a programmatic EIS when it established the WEAs for New York and New Jersey. Nor did BOEM prepare a programmatic EIS for the lease auctions covering the now-fixed OSW leaseholds off the coasts of New York and New Jersey. The proposed Programmatic EIS for the New York Bight is nothing of the sort, as it will analyze only *one* "representative" OSW project. It will not consider all of the OSW projects slated for the New York Bight or evaluate their cumulative impacts. The two draft EISs released for New York and New Jersey OSW projects – Empire Wind and Ocean Wind – do not assess the cumulative and/or synergistic impacts of all OSW projects proposed off the coasts of New York and New Jersey. Consequently, these DEISs fail to provide the necessary programmatic analysis NEPA requires.

70.     BOEM's actions indicate that, absent a court order, it will not prepare the requisite programmatic EIS for all or any portion of its Atlantic coast OSW program. Instead, BOEM has decided it will prepare project-specific (or Construction and Operations Plan-specific) EISs only, where the locations of the WEAs, the leaseholds, and the projects

themselves are fixed and not subject to debate. These project-specific EISs will not fully or

adequately evaluate the cumulative impacts of all wind energy projects contemplated within the

WEAs or along the Atlantic coast as a whole. Nor will these project-specific EISs consider (a)

alternative power levels within and among the various Wind Energy Areas that collectively can

meet the State's power objective in a more environmentally benign manner or (b) "offsite"

alternatives, i.e., alternatives at locations outside the boundaries of the previously adopted Wind

Energy Areas.

71.     By failing to prepare a programmatic EIS for all or any portion of its extensive

and interconnected Atlantic coast OSW program, BOEM has acted arbitrarily and capriciously,

resulting in an abuse of discretion. Accordingly, BOEM cannot lawfully continue processing

OSW projects until such time that it prepares a programmatic EISs as requested herein.

**COUNT TWO:**
**VIOLATION OF THE ESA**

72.     Plaintiffs hereby incorporate by this reference each paragraph and allegation set

forth above.

73.     Consultation under Section 7 of the ESA is required whenever a discretionary

agency action "may affect" any listed species or its critical habitat, and the assessment of

whether that low threshold has been satisfied must be based on the "best available" science.

74.     BOEM violated Section 7 of the ESA by failing to consult with NMFS regarding

the potential cumulative impacts of BOEM's Atlantic coast OSW program on listed species,

including the NARW. Such impacts will likely occur, given that most of the proposed OSW

projects will be located within or very near NARW migration corridors and foraging areas.

These impacts include, but are not limited to, noise-induced physical damage; noise-induced

behavioral changes and related sublethal impacts; vessel collisions; fishing gear entanglement;

28

loss of foraging opportunities; and alteration of key life history stages and elements. Consequently, the projects, when considered in a cumulative and programmatic way, have the potentially to jeopardize the species. Yet, this potential for jeopardy has not been analyzed in a programmatic Biological Opinion (BiOp). The fault for this failing lies with BOEM, which is legally required to initiate consultation with NMFS for purposes of ensuring that a programmatic BiOp is prepared.

75.     BOEM's failure to initiate consultation with NMFS as herein described is arbitrary, capricious, an abuse of discretion, and violates the ESA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     Enter an order requiring BOEM to prepare a programmatic EIS addressing the cumulative and synergistic impacts of its entire Atlantic coast OSW program, as required by NEPA;

(2)     Enter an order requiring BOEM to initiate consultation with NMFS under Section 7 of the ESA to determine whether and to what extent BOEM's Atlantic coast OSW program will jeopardize NARW and other listed species;

(3)     Enter an order enjoining BOEM from processing or approving any additional OSW projects, or any activities connected to such projects (e.g., seabed characterization surveys), until the required programmatic EIS and programmatic BiOp are issued and adopted.

(4)     Award Plaintiffs reasonable attorneys' fees and costs; and

(5)     Provide such other and further relief as the Court may deem just.

Dated: April 10, 2023                                Respectfully submitted,

<u>/s/Roger J. Marzulla</u>
Roger J. Marzulla
Nancie G. Marzulla
Marzulla Law, LLC
1150 Connecticut Ave NW,
Suite 1050
Washington, D.C. 20036
(202) 822-6760
roger@marzulla.com
nancie@marzulla.com
D.C. Bar No. 394907
D.C. Bar No. 400985

<u>/s/David P. Hubbard</u>
David P. Hubbard
Gatzke Dillon & Ballance LLP
2762 Gateway Road
Carlsbad, CA 92009
(760) 431-9501
dhubbard@gdandb.com
*Pro Hac Vice pending*
(CA Bar No. 148660)

*Counsel for Plaintiffs*