TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
SARA E. COSTELLO
MICHELLE M. SPATZ
Trial Attorneys
P.O. Box 7611
Washington, DC 20044-7611
(202) 305-0484 (Costello)
(202) 598-9741 (Spatz)
sara.costello2@usdoj.gov
michelle.spatz@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

SAVE LONG BEACH ISLAND, and
ROBERT STERN, Ph.D.

*Plaintiffs*,

     v.

No. 22-cv-00055 (DLF)

U.S. DEPARTMENT OF THE INTERIOR,
DEB HAALAND, in her official capacity as
Secretary of the Interior, U.S. BUREAU OF
OCEAN ENERGY MANAGEMENT, and
ELIZABETH KLEIN, in her official capacity
as Director of Bureau of Ocean Energy
Management,

*Defendants*.

---

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST
## AMENDED/SUPPLEMENTAL COMPLAINT

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), Defendants the U.S.

Department of the Interior; Debra Haaland, in her official capacity as Secretary of the U.S.

Department of the Interior; BOEM; and Elizabeth Klein, in her official capacity as Director of

BOEM, move to dismiss Plaintiffs' First Amended/Supplemental Complaint for lack of

jurisdiction.  Pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court lacks jurisdiction

over the First Amended/Supplemental Complaint.  Pursuant to Federal Rule of Civil Procedure

12(b)(6), Defendants also move to dismiss the First Amended/Supplemental Complaint for

failure to state a claim.  As is more fully detailed in the accompanying memorandum,

Defendants' motion should be granted, and the First Amended/Supplemental Complaint should

be dismissed in its entirety.

     Respectfully submitted this 25th day of September, 2023.

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division


_/s/ Sara E. Costello_____
SARA E. COSTELLO (KS Bar No. 20898)
Senior Trial Attorney
Natural Resources Section
(202) 305-0484
sara.costello2@usdoj.gov
MICHELLE M. SPATZ (D.C. Bar No. 1044400)
Trial Attorney
Wildlife & Marine Resources Section
(202) 598-9741
michelle.spatz@usdoj.gov

*Counsel for Defendants*

Of Counsel:

KATHRYN SARVER
ROBERT L. SEBASTIAN
Attorney-Advisors
Office of the Solicitor
Division of Mineral Resources
Department of the Interior
1849 C Street NW
Washington, D.C. 20240

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
SARA E. COSTELLO
MICHELLE M. SPATZ
Trial Attorneys
P.O. Box 7611
Washington, DC 20044-7611
(202) 305-0484 (Costello)
(202) 598-9741 (Spatz)
sara.costello2@usdoj.gov
michelle.spatz@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

SAVE LONG BEACH ISLAND, and
ROBERT STERN, Ph.D.

*Plaintiffs*,
     v.                         No. 22-cv-00055 (DLF)

U.S. DEPARTMENT OF THE INTERIOR,
DEB HAALAND, in her official capacity as
Secretary of the Interior, U.S. BUREAU OF
OCEAN ENERGY MANAGEMENT, and
ELIZABETH KLEIN, in her official capacity
as Director of Bureau of Ocean Energy
Management,

*Defendants*.

_____

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED/SUPPLEMENTAL COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

LEGAL FRAMEWORK ...................................................................................................... 2

    I.     Outer Continental Shelf Lands Act ................................................................. 2

    II.    National Environmental Policy Act ................................................................. 3

    III.   Endangered Species Act .................................................................................. 5

    IV.   The Administrative Procedure Act .................................................................. 6

BACKGROUND .................................................................................................................. 6

    I.     BOEM's commercial leasing program ........................................................... 6

         A.    The area identification process ........................................................... 6

         B.    Leases for renewable-energy production ............................................ 7

         C.    Approval requirements for on-site activities....................................... 8

    II.    Wind energy development in the New York Bight ......................................... 9

    III.   The litigation................................................................................................. 13

STANDARD OF REVIEW ................................................................................................ 15

ARGUMENT ..................................................................................................................... 16

    I.     Plaintiffs' claims should be dismissed because they are not ripe for review........ 16

         A.    Plaintiffs' amended NEPA claim relies on ripeness arguments that have already been rejected ......................................................... 16

         B.    Plaintiffs' amended ESA claim is still not ripe for review ...................... 21

    II.    Plaintiffs' claims should be dismissed due to lack of standing ........................... 24

         A.    The amendments regarding the New York Bight confirm Plaintiffs' lack of standing ................................................................... 25

         B.    Plaintiffs specifically lack standing to challenge projects located outside of the New York Bight .................................................. 27

         C.    Plaintiffs lack standing for their amended ESA claim because Section 7 consultation has already been completed for any action that may affect ESA-listed species ......................................... 29

III.  Plaintiffs' attempt to compel programmatic environmental review of all Atlantic coast offshore wind energy projects is non-justiciable ......................... 32

IV.  Plaintiffs' amended NEPA claim fails to state a cognizable claim for the preparation of a programmatic EIS ............................................................... 35

V.  Plaintiffs' amended ESA claim should be dismissed for two additional reasons ................................................................................................................ 38

    A.  Plaintiffs' ESA claim is barred by the statute of limitations. .................. 38

    B.  Plaintiffs failed to provide the mandatory 60-day notice for their ESA claim ............................................................................................... 40

CONCLUSION ...................................................................................................... 42

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Petroleum Inst. v. EPA,*
   683 F.3d 382 (D.C. Cir. 2012)................................................................ 24

*Arizonans for Off. English v. Arizona,*
   520 U.S. 43 (1997).............................................................................. 30

*Attias v. Carefirst, Inc.,*
   865 F.3d 620 (D.C. Cir. 2017)................................................................ 15

*Baker v. Carr,*
   369 U.S. 186 (1962)............................................................................ 15

*Bennett v. Spear,*
   520 U.S. 154 (1997)............................................................ 6, 18, 19, 41

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988)............................................................................ 41

*Chamber of Com. of the U.S. v. EPA,*
   642 F.3d 192 (D.C. Cir. 2011)................................................................ 25

*Citizens for Clean Energy v. U.S Dep't of the Interior,*
   384 F. Supp. 3d 1264 (D. Mont. 2019)...................................................... 36

*Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency,*
   812 F. Supp. 2d 1089 (E.D. Cal. 2011) ...................................................... 39

*Coal. for Underground Expansion v. Mineta,*
   333 F.3d 193 (D.C. Cir. 2003)................................................................ 15

*Conservation L. Found. v. Ross,*
   422 F. Supp. 3d 12 (D.D.C. 2019)............................................................ 41

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
   563 F.3d 466 (D.C. Cir. 2009)............................... 3, 17, 19, 21, 23, 25, 30, 31, 39

*Ctr. for Sustainable Econ. v. Jewell,*
   779 F.3d 588 (D.C. Cir. 2015)................................................................ 17

*Del Monte Fresh Produce N.A., Inc. v. United States,*
   706 F. Supp. 2d 116 (D.D.C. 2010).......................................................... 33

*Earle v. District of Columbia,*
   707 F.3d 299 (D.C. Cir. 2012)................................................................ 39

*Earth Island Institute v. United States Forest Service,*
   351 F.3d 1291 (9th Cir. 2003) ................................................................ 37

*Felter v. Kempthorne*,
 473 F.3d 1255 (D.C. Cir. 2007) ........................................................................ 39

*Fisheries Survival Fund v. Haaland*,
 858 F. App'x 371 (D.C. Cir. 2021) ............................................................... 17, 20

*Foundation on Economic Trends v. Heckler*,
 756 F.2d 143 (D.C. Cir. 1985) ..................................................................... 36, 37

*Friends of Animals v. Ashe*,
 808 F.3d 900 (D.C. Cir. 2015) ........................................................................ 41

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
 528 U.S. 167 (2000) ......................................................................................... 28

*Fund for Animals, Inc. v. U.S. BLM*,
 460 F.3d 13 (D.C. Cir. 2006) .......................................................................... 33

*Gov't of Manitoba v. Bernhardt*,
 923 F.3d 173 (D.C. Cir. 2019) .......................................................................... 4

*Gov't of Manitoba v. Zinke*,
 849 F.3d 1111 (D.C. Cir. 2017) ....................................................................... 4

*Hallstrom v. Tillamook Cnty.*,
 493 U.S. 20 (1989) ..................................................................................... 41, 42

*Hardaway v. D.C. Hous. Auth.*,
 843 F.3d 973 (D.C. Cir. 2016) ........................................................................ 30

*Izaak Walton League of Am. v. Marsh*,
 655 F.2d 346 (D.C. Cir. 1981) ........................................................................ 36

*Jackson v. Modly*,
 949 F.3d 763 (D.C. Cir. 2020) ........................................................................ 40

*Jerome Stevens Pharms. Inc. v. Food & Drug Admin.*,
 402 F.3d 1249 (D.C. Cir. 2005) ...................................................................... 15

*Kaempe v. Myers*,
 367 F.3d 958 (D.C. Cir. 2004) ........................................................................ 16

*Kleppe v. Sierra Club*,
 427 U.S. 390 (1976) ..................................................................................... 36, 37

*Kokkonen v. Guardian Life Ins. Co.*,
 511 U.S. 375 (1994) ......................................................................................... 15

*La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of Interior*,
 No. 2:11-cv-00395-ODW (OPx), 2012 WL 2884992 (C.D. Cal. July 13, 2012) ................... 36

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ................................................................... 15, 24, 25, 26, 29

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990)..................................................................... 18, 28, 30, 32, 33

*Marsh v. Or. Nat. Res. Council,*
    490 U.S. 360 (1989)........................................................................................ 3

*Mayo v. Reynolds,*
    875 F.3d 11 (D.C. Cir. 2017) ......................................................................... 36

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010).................................................................................... 25

*Nat'l Ass'n of Home Builders v. Norton,*
    415 F.3d 8 (D.C. Cir. 2005) ..................................................................... 19, 22

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) ....................................................................... 37

*Nevada v. Dep't of Energy,*
    457 F.3d 78 (D.C. Cir. 2006) ....................................................................... 36

*Norton v. Southern Utah Wilderness Alliance ("SUWA"),*
    542 U.S. 55 (2004) ................................................................................. 33, 35

*Oregon Natural Desert Ass'n v. Bureau of Land Mgmt.,*
    625 F.3d 1092 (9th Cir. 2010) ..................................................................... 19

*Papasan v. Allain,*
    478 U.S. 265 (1986)..................................................................................... 16

*Pub. Citizen v. U.S. Trade Representative,*
    5 F.3d 549 (D.C. Cir. 1993) ......................................................................... 19

*Pub. Citizen, Inc. v. NHTSA,*
    489 F.3d 1279 (D.C. Cir. 2007) ................................................................... 15

*Pub. Emps. for Env't. Resp. v. Hopper,*
    827 F.3d 107781 (D.C. Cir. 20 ....................................................................... 3

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Engineers,*
    636 F. Supp. 3d 33 (D.D.C. 2022).................................................................. 4

*Riverkeeper Network v. FERC,*
    753 F.3d 1304 (D.C. Cir. 2014) ..................................................................... 4

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989)....................................................................................... 4

*Safari Club Int'l v. Jewell,*
    960 F. Supp. 2d 17 (D.D.C. 2013) ............................................................... 41

*Sec'y of the Interior v. California,*
    464 U.S. 312 (1984)....................................................................................... 3

*Shiny Rock Mining Corp. v. United States,*
    906 F.2d 1362 (9th Cir. 1990) ................................................................. 39

*Sierra Club v. Peterson,*
    228 F.3d 559 (5th Cir. 2000) .............................................................. 30, 33

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016)................................................................................ 26

*States Legal Found. v. Babbitt,*
    140 F. Supp. 2d 185 (N.D.N.Y. 2001)..................................................... 29

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,*
    143 F.3d 515 (9th Cir. 1998) .................................................................. 42

*Trudeau v. Fed. Trade Comm'n,*
    456 F.3d 178 (D.C. Cir. 2006)................................................................ 16

*Ute Indian Tribe of the Uintah and Ouray Rsrv. v. U.S. Dept. of Int'r.,*
    560 F. Supp. 3d 247 (D.D.C. 2021)........................................................ 40

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978)................................................................................. 4

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990)................................................................................ 25

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
    165 F.3d 43 (D.C. Cir. 1999).................................................................. 19

**Statutes**

16 U.S.C. § 1532(15) ...................................................................................... 5

16 U.S.C. § 1536 ............................................................................................. 5

16 U.S.C. § 1536(a)(2)....................................................................... 2, 5, 22, 23

16 U.S.C. § 1540(g)(1)(A)............................................................................. 40

16 U.S.C. § 1540(g)(2)(A)............................................................................... 2

28 U.S.C. § 2401(a) ................................................................................. 39, 40

42 U.S.C. § 4332 ............................................................................................. 3

42 U.S.C. § 4332(C) .................................................................................. 4, 19

43 U.S.C. § 1331(a) ........................................................................................ 3

43 U.S.C. § 1332(3) ........................................................................................ 3

43 U.S.C. § 1337(p)(1)(C).............................................................................. 3

43 U.S.C. § 1337(p)(4) ................................................................................... 9

43 U.S.C. § 1337(p)(4)(A) .................................................................................. 3

43 U.S.C. § 1337(p)(8) ....................................................................................... 7

5 U.S.C. § 551(13) ....................................................................................... 32, 33

5 U.S.C. § 702 .................................................................................................... 6

5 U.S.C. § 704 ...................................................................................... 6, 19, 41

5 U.S.C. § 706(2)(A) .......................................................................................... 6

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ...................................... 1, 2, 15, 40

Federal Rule of Civil Procedure 12(b)(6) ........................................ 2, 15, 32

**Regulations**

30 C.F.R. § 585.100 ........................................................................................... 7

30 C.F.R. § 585.102(a) ....................................................................................... 3

30 C.F.R. § 585.200(a) ....................................................................................... 8

30 C.F.R. § 585.210 ........................................................................................... 7

30 C.F.R. § 585.211(a) ....................................................................................... 9

30 C.F.R. § 585.215 ........................................................................................... 7

30 C.F.R. § 585.613 ........................................................................................... 9

30 C.F.R. § 585.613(e) ....................................................................................... 9

30 C.F.R. § 585.626 ......................................................................................... 27

30 C.F.R. § 585.628(a) ..................................................................................... 27

30 C.F.R. § 585.628(f) ..................................................................................... 23

40 C.F.R. § 1501.11 ......................................................................................... 35

40 C.F.R. § 1501.5 ............................................................................................. 4

40 C.F.R. § 1501.6 ............................................................................................. 5

40 C.F.R. §§ 1500–1508 ..................................................................................... 4

43 C.F.R. § 46.140 ........................................................................................... 35

50 C.F.R. § 17.2(b) ............................................................................................. 5

50 C.F.R. § 402.01(b) ......................................................................................... 5

50 C.F.R. § 402.13(c) ......................................................................................... 6

50 C.F.R. § 402.13(c)(1) ................................................................................... 31

50 C.F.R. § 402.14(a) ................................................................................................ 5

50 C.F.R. Part 402 .................................................................................................... 5

**Other Authorities**

74 Fed. Reg. 19,638 (Apr. 29, 2009) ............................................................... 38, 39

74 Fed. Reg. 19,638, 19,659 (Apr. 29, 2009). ........................................................ 7

79 Fed. Reg. 76,987 (Dec. 23, 2014). ................................................................... 36

83 Fed. Reg. 15,602-01 (Ape. 11, 2018) ................................................................ 9

86 Fed. Reg. 31,524-01 (June 14, 2021) .............................................................. 10

86 Fed. Reg. 67,969 (Nov. 30, 2021) .................................................................... 20

87 Fed. Reg. 2,446-02, 2451-52 (Jan. 14, 2022) .................................................... 8

87 Fed. Reg. 42,495-01 (July 15, 2022) ............................................................... 12

87 Fed. Reg. 42,496 (July 15, 2022) ..................................................................... 13

87 Fed. Reg. 50,120 (Aug. 15, 2022) .................................................................... 20

88 Fed. Reg. 44,154 (July 11, 2023) ..................................................................... 20

88 Fed. Reg. 57,967 (Aug. 24, 2023) .................................................................... 20

U.S. Const. art. III, § 2 ........................................................................................... 15

**TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BOEM | Bureau of Ocean Energy Management |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| MMPA | Marine Mammal Protection Act |
| NARW | North Atlantic right whales |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| OCS | Outer Continental Shelf |
| OCSLA | Outer Continental Shelf Lands Act |
| OSW | Offshore Wind |

## INTRODUCTION

Plaintiffs Save Long Beach Island and Robert Stern, Ph.D., filed this lawsuit to challenge a U.S. Bureau of Ocean Energy Management (BOEM) memorandum identifying wind energy areas within the New York Bight to be considered for possible renewable energy leasing.  But the BOEM memorandum—called the Area ID Memorandum—did not authorize any activities on the outer continental shelf.  Rather, it was only a preliminary regulatory step that BOEM used to identify areas for environmental analysis and consideration for possible future leasing.  So, Defendants the U.S. Department of the Interior; Debra Haaland, in her official capacity as Secretary of the U.S. Department of the Interior; BOEM; and Elizabeth Klein, in her official capacity as Director of BOEM, moved to dismiss the complaint.

The Court granted Defendants' motion to dismiss.  The Court concluded that it lacked jurisdiction because Plaintiffs' claims were unripe.  The Court further held that Plaintiffs failed to show an imminent injury sufficient to satisfy Article III's standing requirements.

Now, Plaintiffs have amended their complaint.  But the amendments do not cure the fundamental problems with Plaintiffs' claims.  Plaintiffs' National Environmental Policy Act (NEPA) claim is still unripe because BOEM has neither approved a construction and operations plan for a wind energy facility in the New York Bight, nor otherwise made any irreversible and irretrievable commitment of resources for development of any wind energy project in the Bight.  Although Plaintiffs now broadly challenge all Atlantic coast offshore wind projects, their amendments still do not present a ripe NEPA claim against BOEM.  BOEM has not made an irreversible and irretrievable commitment of resources to the actions that Plaintiffs claim would cause them harm.  Similarly, Plaintiffs' Endangered Species Act (ESA) claim remains unripe for review because BOEM has not taken any action that may affect ESA-listed species or designated

critical habitat for which it has not already completed ESA consultation. 16 U.S.C. § 1536(a)(2).

In addition, the amendments regarding the New York Bight confirm Plaintiffs' continued lack of standing. Plaintiffs *still* cannot show a concrete or imminent injury sufficient to demonstrate standing. Plaintiffs' alleged injuries are connected to the construction and operation of wind energy facilities in the New York Bight, which BOEM has yet to authorize. Plaintiffs also fail to demonstrate that they have standing to challenge any projects outside the Bight. Further, Plaintiffs lack standing for their amended ESA claim because Section 7 consultation has already been completed for any action that may affect ESA-listed species.

Moreover, Plaintiffs' amendments seeking to compel programmatic environmental review of all Atlantic coast offshore wind energy projects are not authorized by the Administrative Procedure Act (APA). Plaintiffs' attempt to "force" BOEM to prepare a programmatic NEPA document and conduct programmatic ESA consultation to assess all the Atlantic coast offshore wind projects also fails to state a cognizable APA claim. Plaintiffs' amended NEPA claim must be dismissed because the decision whether to prepare a programmatic NEPA document is committed to BOEM's discretion. Lastly, Plaintiffs' amended ESA claim must be dismissed for the additional reasons that it is barred by the statute of limitations and Plaintiffs have still failed to comply (or even take steps to comply) with the ESA's mandatory 60-day notice requirement. 16 U.S.C. § 1540(g)(2)(A). For all these reasons, the Court should dismiss the First Amended/Supplemental Complaint.

## LEGAL FRAMEWORK

### I.   Outer Continental Shelf Lands Act

The outer continental shelf consists of the submerged lands beneath the ocean within the jurisdiction of the United States rather than of individual states, generally the area from 3 to 200

nautical miles seaward of the coastline.  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a).  Under the Outer Continental Shelf Lands Act (OCSLA), the United States holds the outer continental shelf as a "vital national resource reserve . . . for the public," which Congress declared "should be made available for expeditious and orderly development, subject to environmental safeguards."  43 U.S.C. § 1332(3).  Congress enacted OCSLA in 1953 to authorize oil and gas leasing.  *Sec'y of the Interior v. California*, 464 U.S. 312, 336 (1984).  In 2005, Congress amended OCSLA to authorize the Secretary of the Interior to issue leases on the outer continental shelf to "support production, transportation, storage, or transmission of energy from sources other than oil and gas," including wind, waves, and ocean currents.  43 U.S.C. § 1337(p)(1)(C); *Pub. Emps. for Env't. Resp. v. Hopper*, 827 F.3d 1077, 1080–81 (D.C. Cir. 2016).  In Section 8(p)(4) of OCSLA, Congress directed that, in approving any lease, easement, or right-of-way, the Secretary "shall ensure" that all authorized activities within the outer continental shelf are "carried out in a manner that provides for" twelve enumerated goals.  43 U.S.C. § 1337(p)(4)(A)–(L).  These include, inter alia, protection of the environment; conservation of natural resources; prevention of interference with reasonable uses of the exclusive economic zone, high seas, and territorial seas; consideration of other uses of the sea and seabed, including fishing and navigation concerns; and the opportunity for public notice and comment on lease proposals.  *Id.*; *see also* 30 C.F.R. § 585.102(a).

## II.    National Environmental Policy Act

Congress passed NEPA to focus governmental and public attention on the potential environmental effects of any proposed "major federal action."  *See* 42 U.S.C. § 4332; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).  NEPA's requirements are "essentially

procedural," designed to ensure that agency decisions are "fully informed and well-considered." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1309–10 (D.C. Cir. 2014) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). NEPA imposes "action-forcing procedures" to ensure that agencies take a "hard look" at environmental consequences. *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 176 (D.C. Cir. 2019) (quoting *Gov't of Manitoba v. Zinke*, 849 F.3d 1111, 1115 (D.C. Cir. 2017)). NEPA "does not mandate particular results" for agency decision-making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "Agency actions with adverse environmental effects can thus be NEPA compliant where the agency has considered those effects and determined that competing policy values outweigh those costs." *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Engineers*, 636 F. Supp. 3d 33, 45 (D.D.C. 2022) (internal quotation marks omitted).

NEPA requires federal agencies to prepare an environmental impact statement (EIS) for any major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Council on Environmental Quality (CEQ) regulations provide guidance to agencies in applying NEPA. *See* 40 C.F.R. §§ 1500–1508.[1] If the significance of any potential effect is not readily apparent, agencies may prepare an environmental assessment (EA)—a much more concise document—to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.5, 1508.1(h). If, based upon an EA, an agency issues a finding of no significant impact, no EIS is

---

[1] Plaintiffs' amended NEPA claim (alleging failure to prepare a programmatic EIS) arises under the CEQ's 1978 regulations implementing NEPA, as amended in 1986, 2020, and 2022. And all citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. §§ 1500-1508 (2022). If the Court concludes that Plaintiffs have a viable challenge to a specific wind energy facility, the NEPA review may have been conducted pursuant to the 1978 regulations, as amended in 1986 or 2020, and that earlier version of the regulations may govern. But any differences between the various iterations of regulations are not relevant to Defendants' motion to dismiss.

required.  40 C.F.R. § 1501.6.

## III.   Endangered Species Act

Section 7 of the ESA provides that federal agencies must, in consultation with the appropriate consulting agency,[2] ensure that "any action authorized, funded, or carried out by such agency" is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of designated "critical habitat" for listed species. 16 U.S.C. § 1536(a)(2).  To assist action agencies in complying with this provision, Section 7 of the ESA and its implementing regulations set out a detailed consultation process for determining the effects of a proposed action on ESA-listed species and critical habitat.  16 U.S.C. § 1536; 50 C.F.R. Part 402.

An action agency's duty to consult under Section 7 is triggered only when it proposes to authorize, fund, or carry out an action that "may affect" a listed species or critical habitat.  50 C.F.R. § 402.14(a).  If the action agency determines that its proposed action has no effect on listed species or critical habitat, the consultation requirements do not apply.  If the action agency determines that its proposed action "may affect" a listed species or critical habitat, the agency must engage in either "informal" or "formal" consultation with the consulting agencies.  50 C.F.R. § 402.14(a)–(b).  In informal consultation, if the action agency determines, "with the written concurrence of [the consulting agency], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is

---

[2] The Secretaries of the Interior and Commerce are responsible for implementing the ESA, and they have delegated their respective responsibilities to the U.S. Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS), respectively.  16 U.S.C. § 1532(15); 50 C.F.R. § 402.01(b).  As is relevant here, in general, NMFS is the consulting agency regarding most marine species and anadromous fish listed as threatened or endangered under the ESA as well as any critical habitat designated for such species.  *See* 50 C.F.R. §§ 17.2(b), 17.11, 402.01(b).

necessary."  50 C.F.R. § 402.13(c).  If, however, the action agency or consulting agency determines that the action is "likely to adversely affect" listed species or designated critical habitat, the agencies must engage in formal consultation, which culminates in the consulting agency's issuance of a "biological opinion," which, among other things, determines whether the proposed action is likely to jeopardize ESA-listed species or destroy or adversely modify critical habitat.  50 C.F.R. §§ 402.13(c), 402.14(a)–(b), (g)(4), (h)(3).

## IV.    The Administrative Procedure Act

The APA identifies who may challenge agency action and what actions may be challenged.  Section 702 provides a waiver of sovereign immunity for those suffering actual injury because of an agency action.  5 U.S.C. § 702.  A "final agency action" may be challenged judicially under the APA.  5 U.S.C. § 704 ("Agency action made reviewable by statute and *final agency action for which there is no other adequate remedy in a court* are subject to judicial review." (emphasis added)).  "Final agency action" is the consummation of the agency's decision-making process from which "legal consequences will flow" or "rights or obligations have been determined."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted).  Under the APA—and assuming all other threshold jurisprudential requirements are met—the court may "hold unlawful and set aside" final agency action that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## BACKGROUND

## I.    BOEM's commercial leasing program

### A.    The area identification process

Pursuant to agency regulations, BOEM exercises the Secretary's authority to issue leases

for renewable energy development on the outer continental shelf.  *See* 30 C.F.R. § 585.100; *see also* 43 U.S.C. § 1337(p)(8) (authority to issue regulations).  Under the regulations, BOEM may publish a notice to solicit interest in renewable energy leasing on the outer continental shelf, 30 C.F.R. § 585.210, and may publish a call for information and nominations of potential lease areas, *id.* § 585.211(a).  Based on information and nominations received and the agency's own consideration of relevant factors, BOEM will then "identify areas for environmental analysis and consideration for leasing."  *Id.* § 585.211(b).  In so doing, BOEM "will evaluate the potential effect of leasing on the human, marine, and coastal environments," *id.* § 585.211(b)(2), and will consult with "appropriate Federal agencies, States, local governments, affected Indian Tribes, and other interested parties." *Id.* § 585.211(b).  The goal of the area identification process is to identify "the geographical area of the proposed action to be analyzed in an ensuing environmental analysis document (e.g., EIS, EA), any alternatives to the proposed action, and mitigation measures and other issues to be analyzed and considered further" to "help industry and the Federal Government (and ultimately the taxpayer) focus on promising acreage and avoid needless expense."  Renewable Energy and Alternate Uses of Existing Facilities on the Outer Continental Shelf, 74 Fed. Reg. 19,638, 19,659 (Apr. 29, 2009).

   **B.     Leases for renewable-energy production**

   After identifying "wind energy areas," BOEM may (but is not obligated to) proceed to offer the identified areas or portions of those areas for lease sale by auction.  30 C.F.R. §§ 585.215, 585.216.  Prior to issuing any lease, BOEM "will coordinate and consult with relevant Federal agencies" and other governmental entities, as directed by OCSLA or other relevant Federal laws.  *Id.* § 585.203.  "BOEM will determine the size for each lease based on the area required to accommodate the anticipated activities."  *Id.* § 585.206(a).  BOEM may not lease any

area "within the exterior boundaries of any unit of the National Park System, National Wildlife

Refuge System, National Marine Sanctuary System, or any National Monument."  *Id.* § 585.204.

### C.    Approval requirements for on-site activities

Under BOEM's renewable energy program, a lease does not authorize any on-site

activities.  *See*, *e.g.*, Atlantic Wind Lease Sale 8 (ATLW-8) for Commercial Leasing for Wind

Power on the Outer Continental Shelf (OCS) in the New York (NY) Bight—Final Sale Notice

(FSN), 87 Fed. Reg. 2446-02, 2451–52 (Jan. 14, 2022) (discussing BOEM's most recent

renewable energy commercial form (BOEM-0008)).[3]  Rather, a lease only provides the lessee

with the exclusive right to submit plans (e.g., a site assessment plan and a construction and

operations plan) for BOEM's consideration.  ECF No. 1-6 at 5; *see also* BOEM-0008 at 2.

Therefore, even with a valid lease, a lessee's right to "install and operate facilities" for the

"production of energy from a renewable energy source" is still "subject to obtaining the

necessary approvals."  30 C.F.R. § 585.200(a); *id*. § 585.600.

Before conducting "any site assessment activities,"—for example, deployment of

meteorological buoys for data collection—on a leasehold, a lessee must submit and obtain

BOEM approval of a "site assessment plan" adhering to specified regulatory requirements.  *Id.* §

585.600 (referring to *id.* §§ 585.605–585.613).[4]

Likewise, before conducting "any activities pertaining to [the] construction of facilities

---

[3] For example, Section 2 of BOEM-0008 states: "This lease does not, by itself, authorize any
activity within the leased area."  BOEM-0008 can be found at BOEM, COMMERCIAL LEASE OF
SUBMERGED LANDS FOR RENEWABLE ENERGY DEVELOPMENT ON THE OUTER CONTINENTAL
SHELF (2016), https://www.boem.gov/sites/default/files/about-boem/Procurement-Business-
Opportunities/BOEM-OCS-Operation-Forms/BOEM-0008-Oct-2016.pdf.

[4] In some cases, a lessee may decide not to conduct site assessment activities and to, instead, rely
on existing data to assess the site.  *See*, *e.g.*, https://www.boem.gov/renewable-energy/state-
activities/invenergy-ocs-0542 (last visited Sept. 25, 2023).

for commercial operation," a lessee must submit and obtain BOEM's approval of a "construction and operations plan" that adheres to additional regulatory requirements. *Id.* § 585.600 (referring to *id.* §§ 585.620–585.628). After reviewing any site assessment or construction and operations plan for compliance with these requirements—and to ensure that the plan provides for the goals specified in OCSLA § 8(p)(4), 43 U.S.C. § 1337(p)(4)—BOEM may "approve, disapprove, or approve [the plan] with modifications." 30 C.F.R. §§ 585.613(e), 585.628(f). If BOEM disapproves a site assessment or construction and operations plan, BOEM will inform the lessee of the reasons and provide the lessee with an opportunity to submit a revised plan with corrective changes to address the concerns identified. *Id.* §§ 585.613(e)(2), 528.628(f)(2). But the regulations do not guarantee that the lessee will ultimately obtain an approval. *Id.*

NEPA analysis for BOEM decision points are specified in BOEM's regulations. *See* 30 C.F.R. §§ 585.613, 585.628. BOEM will conduct NEPA review prior to or in connection with lease issuance, the approval of any site assessment plan, *id*. §§ 585.214, 585.611, 585.613(b), and before any approval of a construction and operations plan, *id*. § 585.628(b). Lessees must provide detailed information at each stage to enable such review. *Id*. §§ 585.610–585.611, 585.626–585.627 (tables).

## II.     Wind energy development in the New York Bight

The New York Bight is an offshore area extending roughly from Cape May in New Jersey to Montauk Point on the eastern tip of Long Island. ECF No. 14-2 at 6. In 2018, BOEM issued a Call for Information and Nominations for Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight. 83 Fed. Reg. 15,602-01 (Apr. 11, 2018); *see also* 30 C.F.R. § 585.211(a). At this preliminary stage, BOEM invited the submission of information and nominations for commercial wind energy leases on the outer continental shelf in

the New York Bight.  83 Fed. Reg. at 15,602.  The "Call" contained four proposed areas for leasing.  *Id*. at 15,603.

In March 2021, the Chief of the Office of Renewable Energy Programs transmitted the Area ID Memorandum to the Director of BOEM recommending five wind energy areas in the New York Bight.  ECF No. 14-2 at 1, 29–39.  After considering public comments, input from the intergovernmental task forces, and other feedback, BOEM identified 807,383 acres of wind energy areas, a reduction from the more than 1,700,000 acres identified in the Call.  *Id.* at 1. Through the area identification process, BOEM identified the offshore locations for environmental analysis and consideration for leasing.  *Id.* at 4, 13–24.  The Director of BOEM concurred with the recommendation.  *Id*. at 39.

In June 2021, BOEM published a proposed lease sale notice for the New York Bight wind energy areas.  Atlantic Wind Lease Sale 8 (ATLW-8) for Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight, 86 Fed. Reg. 31,524-01 (June 14, 2021).  In the notice, BOEM once again reduced the proposed areas available to lease, this time to 627,331 acres.  *Id*. at 31,525–26.

In December 2021, BOEM published an EA under NEPA analyzing the potential effects of site characterization (i.e., geotechnical, geophysical, and biological surveys of the lease area) and site assessment activities in the New York Bight wind energy areas.  ECF No. 14-3 at 77– 78.[5]  In the EA, BOEM explained that the issuance of a lease did not constitute an "irreversible and irretrievable commitment" of resources for development activities:  BOEM retained the

---

[5] The EA explained that the issuance of the lease itself and the associated rights-of-way or rights-of-use and easement merely allow lessees the exclusive right to submit plans to BOEM for future development, and are thus not themselves "an irreversible and irretrievable commitment of resources."  ECF No. 14-3 at ES-1–2.

authority, as part of its review of any construction and operation plan, to "prevent" environmental impacts by "disapproving" any plan or any aspect of a plan for "failure to meet the statutory standards set forth in the Outer Continental Shelf Lands Act." *Id*. at 3. BOEM observed that the environmental effects of any construction and operations plan would depend in part on design parameters to be determined from data gathered during site characterization and size assessment activities. *Id*. at 4.

BOEM also engaged in informal ESA consultation with FWS prior to issuing the final sale notice. ECF No. 14-3 at 78. On August 10, 2021, BOEM submitted a biological assessment to FWS regarding species and critical habitat that may be affected by activities that are expected to take place after the issuance of a lease (i.e., site characterization and site assessment activities). On October 25, 2021, FWS concurred with BOEM's determination that the activities were "not likely to adversely affect" the ESA-listed species and critical habitat within FWS's purview. *Id.*

BOEM also engaged in informal ESA consultation with NMFS, on a programmatic basis. In February 2021, BOEM submitted a revised programmatic biological assessment to NMFS regarding the "effects of installing met buoys, conducting geophysical and geotechnical surveys with specified [high-resolution geophysical] equipment, and conducting associated vessel activities for offshore wind energy development projects off the U.S. Atlantic Coast." *Id.* In June 2021, NMFS issued a letter stating that the informal programmatic consultation was complete and concurring in the determination that, subject to the project design criteria, the analyzed site assessment and characterization activities were "not likely to adversely affect" listed species or critical habitat. *Id.*

11

Before approving any construction and operations plan submitted by a lessee, BOEM engages in further ESA consultation for any proposed activities that are not covered by its consultations with FWS and NMFS, including analyzing the impacts resulting from the construction and operation of any wind energy project. *Id.*; ECF No. 14-2 at 4 ("Potential impacts of a specific proposed renewable energy facility in the identified areas would be addressed during the review of a Construction and Operations Plan (COP), since it is then when project-specific information becomes available."); ECF No. 14-2 at 2–3, 5–6.

BOEM then issued a final notice of sale.  In response to the comments BOEM received after proposing the lease sale, BOEM again reduced the total acreage available to lease, this time to 488,201 acres.  87 Fed. Reg. at 2,447.  After issuing the Final EA and finding of no significant impact for lease issuance and site characterization and assessment activities, on January 14, 2022, BOEM published a final sale notice, announcing its intent to offer the modified lease area for sale by public auction.  *Id*. at 2,446, 2,450.

The lease sale was held in February 2022.  ECF No. 14 at 15.  Following the lease sale, BOEM executed six leases for areas within the New York Bight.  Decl. of Karen J. Baker (Decl.) ¶ 4, attached as Exhibit 1.  On July 15, 2022, BOEM published a notice of intent to prepare a programmatic EIS in the Federal Register.  87 Fed. Reg. 42,495-01; Decl. ¶ 5.  The programmatic EIS will analyze potential impacts from wind energy development activities in the New York Bight region and potential avoidance, minimization, and mitigation (AMMM) measures applicable to the projects in the New York Bight region.  *Id*.  Additional project-specific NEPA analysis will be performed for any construction and operations plans submitted for projects located within the New York Bight region.  87 Fed. Reg. at 42,496; Decl. ¶ 5.  Project-specific NEPA analysis for individual construction and operations plans will tier to or

incorporate by reference the programmatic EIS and could apply additional or different AMMM measures as needed.  87 Fed. Reg. 42,496.

As of September 25, 2023, BOEM has received the submission of three site assessment plans and no construction and operations plans for wind energy development within the New York Bight.  Decl. ¶ 6.[6]  But BOEM has not authorized the installation of facilities for site assessment purposes on any lease located within the New York Bight.  *Id*.  Nor has BOEM approved any construction and operations plans within the New York Bight.  *Id*.

## III.    The litigation

Plaintiffs filed their original two-count complaint in January 2022 before BOEM published its final sale notice.  Plaintiffs include a nonprofit organization, Save Long Beach Island, allegedly established to protect the natural and human resources of the New York Bight Wind Energy Area and those directly to the south, and Robert Stern, Ph.D., who resides on Long Beach Island and is the president of Save Long Beach Island.  ECF No. 1, ¶¶ 4–5; ECF No. 39, ¶¶ 15–16.[7]  Plaintiffs allege that they are headquartered on Long Beach Island in New Jersey, and "are most immediately affected by" the offshore wind facilities "proposed off the coasts of New York and New Jersey."  ECF No. 39, ¶ 69.

In their original complaint, Plaintiffs contended that BOEM's Area ID Memorandum identifying wind energy areas in the New York Bight was "arbitrary, capricious, and otherwise

---

[6] *See also* https://www.boem.gov/renewable-energy/state-activities/attentive-energy-ocs-0538; https://www.boem.gov/renewable-energy/state-activities/atlantic-shores-offshore-wind-bight-ocs-0541; https://www.boem.gov/renewable-energy/state-activities/vineyard-mid-atlantic-ocs-0544 (last visited Sept. 25, 2023).

[7] For purposes of this brief, Defendants cite the Complaint and First Amended/Supplemental Complaint for applicable background.  But in the event the case proceeds, Defendants reserve the right to challenge the validity of any of Plaintiffs' allegations.

not in accordance with law." ECF No. 1 at 1. Specifically, Plaintiffs alleged that BOEM violated NEPA by failing to prepare a programmatic EIS (1) evaluating the impacts of developing the New York Bight Wind Energy Areas and other "connected" wind energy areas, and (2) considering alternative levels of wind energy development and locations. *Id*. ¶¶ 50–64. Plaintiffs also alleged that BOEM violated the ESA by failing to consult with NMFS prior to selecting the New York Bight wind energy areas. *Id*. ¶¶ 65–70.

Defendants moved to dismiss the Complaint, arguing that: Plaintiffs' claims were unripe; Plaintiffs lacked standing; Plaintiffs did not challenge any final agency action as required by the APA and the ESA; and Plaintiffs failed to provide the mandatory 60-day notice prior to filing suit under the ESA. ECF Nos. 14, 18.

The Court granted Defendants' motion and dismissed the complaint for lack of jurisdiction. ECF Nos. 28, 29. The Court held that it "lack[ed] jurisdiction because both of the plaintiffs' claims are unripe." ECF No. 29 at 7. The Court found that Plaintiffs' NEPA claim was not ripe because: "the Area ID Memorandum does not authorize any development activity with an environmental impact, or even commit BOEM to issuing any leases granting a party the right to request authorization to engage in such activity." *Id*. at 13. Similarly, the Court concluded that Plaintiffs' ESA claim was not ripe because "the Area ID Memorandum authorizes no real activity that could harm wildlife; thus, no duty to consult under the ESA attached by virtue of the memorandum's publication and adoption." *Id*. at 14. The Court also held that "the plaintiffs have not shown an imminent injury sufficient to satisfy Article III's standing requirements." *Id*. at 14 n.6.

Subsequently, the Court granted Plaintiffs to motion for leave to amend their complaint. ECF Min. Order of Aug. 7, 2023. In Plaintiffs' First Amended/Supplemental Complaint,

Plaintiffs allege that BOEM violated NEPA and the ESA by committing to a program of installing wind turbines along the Atlantic coast without preparing a programmatic EIS or initiating Section 7 consultation over the impacts of the offshore wind projects.  ECF No. 39, ¶¶ 58–75.

## STANDARD OF REVIEW

"The U.S. Constitution limits the federal courts to deciding cases or controversies, U.S. Const. art. III, § 2, and it is 'presumed that a cause lies outside this limited jurisdiction,' *Kokkonen v. Guardian Life Ins. Co*., 511 U.S. 375, 377 (1994); *Attias v. Carefirst, Inc*., 865 F.3d 620, 625 (D.C. Cir. 2017)."  ECF No. 29 at 6.  "To present a justiciable case or controversy, the party invoking federal jurisdiction must demonstrate standing and ripeness, among other requirements." *Id*. (citing *Kokkonen*, 511 U.S. at 377; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1289 (D.C. Cir. 2007)).

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of claims where the court lacks jurisdiction.  *Baker v. Carr*, 369 U.S. 186, 198 (1962).  Generally, the Court must accept the factual allegations in the complaint as true but may also consider materials outside of the pleadings.  ECF No. 29 at 7;  *Jerome Stevens Pharms. Inc. v. Food & Drug Admin*., 402 F.3d 1249, 1253–54 (D.C. Cir. 2005); *see also Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (the court may resolve "disputed facts" when ruling on a motion under Rule 12(b)(1)).  "If the [C]ourt determines that it lacks jurisdiction, the court must dismiss the action."  ECF No. 29 at 7 (citing U.S. Const. art. III, § 2; Fed. R. Civ. P. 12(b)(1), 12(h)(3)).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of claims where Plaintiffs have failed to state a claim upon which relief can be granted.  While the Court must treat every factual allegation as true, the Court need not accept as true "a legal conclusion couched as a

15

factual allegation," nor inferences that are unsupported by the facts set out in the complaint. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Additionally, the Court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."  *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

## ARGUMENT

The Court should dismiss Plaintiffs' First Amended/Supplemental Complaint.  The amendments fail to cure any of the problems associated with Plaintiffs' claims: (1) Plaintiffs' amended claims are still unripe; (2) Plaintiffs still have not demonstrated standing; (3) Plaintiffs still cannot bring a non-justiciable programmatic challenge; (4) Plaintiffs have not identified and cannot identify a mandatory duty requiring BOEM to prepare a programmatic NEPA document; and (5) Plaintiffs' amended ESA claim is barred by the statute of limitations and Plaintiffs still have not complied with the ESA's mandatory notice requirement.

## I.    Plaintiffs' claims should be dismissed because they are not ripe for review.

In its memorandum opinion, the Court concluded that Plaintiffs' NEPA and ESA claims were not ripe.  ECF No. 29 at 7–15.  That has not changed.  Although Plaintiffs added allegations to their First Amended/Supplemental Complaint about the New York Bight and other Atlantic coast offshore wind energy projects, they fail to meet their burden of proving ripeness.

### A.    Plaintiffs' amended NEPA claim relies on ripeness arguments that have already been rejected

Plaintiffs' amendments fail to rescue their NEPA claim.  Plaintiffs' NEPA claim is unripe because BOEM has neither approved a construction and operations plan for a wind energy facility in the New York Bight nor otherwise made an irreversible and irretrievable commitment of resources towards the development of any wind energy project in the Bight.  Outside the

Bight, Plaintiffs challenge preliminary stages in the renewable energy leasing process, a draft policy document, and actions taken by a different federal agency.  These amendments do not show that Plaintiffs' NEPA claim is ripe.  For similar reasons, Plaintiffs fail to demonstrate that they are challenging final agency action on which they could focus a NEPA claim.

As the Court explained, "a 'NEPA challenge [is] unripe' until an 'agency's NEPA obligations mature.'"  ECF No. 29 at 8 (alternation in original) (quoting *Ctr. for Biological Diversity*, 563 F.3d at 480).  "Such maturation occurs only once [the agency] reaches a critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment."  *Id.* (alternation in original) (internal quotation marks and citation omitted).  "NEPA claims brought before these commitments are made accordingly 'must be dismissed as unripe.'"  *Id.* (quoting *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 600 (D.C. Cir. 2015)).

Plaintiffs challenge preliminary actions taken by BOEM, many of which the Court has already concluded are not ripe for review.  For example, Paragraph 48 of the First Amended/Supplemental Complaint challenges the designation of "10 [offshore wind] wind energy areas (WEAs) along the Atlantic coast."  ECF No. 39, ¶ 48.  But the Court found that the identification of wind energy areas does "not trigger any matured NEPA obligations or render the plaintiffs' challenge ripe for review."  ECF No. 29 at 9.  Similarly, Paragraph 50 alleges that BOEM violated NEPA by auctioning leases for wind energy development.  ECF No. 39, ¶ 50. The Court, however, has held that "the granting of a wind energy lease itself is still not enough to constitute an 'irreversible and irretrievable commitment' by the agency."  ECF No. 29 at 10; *see also Fisheries Survival Fund v. Haaland*, 858 F. App'x 371, 371–72 (D.C. Cir. 2021).

Paragraph 50 of Plaintiffs' First Amended/Supplemental Complaint asserts that BOEM has "received" construction and operations plans from wind energy developers.  ECF No. 39, ¶ 50.  But as of September 25, 2023, none of the leaseholders have submitted any proposals for constructing or operating wind energy facilities in the New York Bight to BOEM.  Decl. ¶ 6. And Plaintiffs do not allege that BOEM has issued a decision approving (or approving with modifications) any of these *unidentified* construction and operations plans.  Indeed, Plaintiffs do not identify any approved construction and operations plans for wind energy development within the Atlantic except for those associated with the Vineyard Wind 1 and the South Fork facilities— which Plaintiffs do not challenge (*infra* p. 20).  ECF No. 39, ¶ 51.  As a result, Plaintiffs' amendments do not show that their NEPA claim is ripe or that they are challenging final agency actions.  *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891 (1990) (a case is not "'ripe' for judicial review under the APA until . . . some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him"); *Bennett*, 520 U.S. at 177– 78 (detailing the conditions that must be satisfied for agency action to be challenged under the APA).

Plaintiffs also allege that BOEM has released draft NEPA documents for several offshore wind projects, ECF No. 39, ¶ 52, and issued notices of intent to prepare EISs for three more projects, *id*. ¶ 53, but has not "programmatically" assessed the impacts of such projects. Likewise, Paragraph 54 of Plaintiffs' First Amended/Supplemental Complaint challenges BOEM's plan to prepare a Programmatic EIS to analyze potential impacts from wind energy development activities in the New York Bight region.  *Id*. ¶ 54; Decl. ¶ 5.  But as the Court points out: "A NEPA claim is premature until the point of irreversible and irretrievable commitment of resources."  ECF No. 29 at 12 (cleaned up) (citation omitted).  "The fact that an

agency can prepare an environmental impact statement in earlier planning stages if it so chooses does not alter this analysis." *Id*. at 13 (citing *Ctr. for Biological Diversity*, 563 F.3d at 475, 480–82; *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 46–47, 49 (D.C. Cir. 1999)).  None of these amendments show that BOEM has made an irreversible and irretrievable commitment of resources that will affect the environment or any of Plaintiffs' alleged interests.[8]

A similar analysis applies to Paragraph 67 of Plaintiffs' First Amended/Supplemental Complaint, which discusses a "draft" agency document regarding marine animals.  ECF No. 39, ¶ 67.  Along with being non-final, the document specifies that it "does not define new policy or regulatory actions;" rather, it "identifies areas where BOEM and NOAA Fisheries will work together . . . ."[9]  This document is not a final agency action subject to challenge under the APA, 5 U.S.C. § 704.  *See Bennett*, 520 U.S. at 177–78; *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) ("if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review").  Nor does it show that Plaintiffs' NEPA claim is ripe.

Some of Plaintiffs' amendments are also misdirected at non-parties.  Plaintiffs added allegations to their First Amended/Supplemental Complaint related to NMFS's actions.  *See*, *e.g.*, ECF No. 39, ¶¶ 9, 57, 68.  But Plaintiffs have not pleaded a claim challenging NMFS's compliance with NEPA in this case.  Indeed, Plaintiffs have challenged NMFS's actions in a

---

[8] Further, the preparation of a NEPA document is not, in itself, final agency action.  *See*, *e.g.*, *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993); *Oregon Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118–19 (9th Cir. 2010).  Rather, the preparation of an EIS (or EA) is a preliminary procedural step that must be completed before taking some substantive action.  *See* 42 U.S.C. § 4332(C).

[9] https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_DRAFT_NARW_OSW_Strategy.pdf.

separate lawsuit, *Save Long Beach Island, et al. v. U.S. Dept. of Commerce, et al.*, Case No.

3:23-cv-01886 (D.N.J.). In any event, Plaintiffs cannot use *NMFS's* actions to show that *BOEM*

has made any irreversible and irretrievable commitment of resources. BOEM retains the

authority to approve or disapprove any construction and operations plans, or any aspect of plans,

based upon the plan's compliance with OCSLA's standards. *See* ECF No. 29 at 10–11;

*Fisheries Survival Fund*, 858 F. App'x at 372.

Lastly, Plaintiffs allege that BOEM has approved two offshore wind energy projects

outside the Bight, the Vineyard Wind 1, and the South Fork facilities. ECF No. 39, ¶ 51; *see*

*also* 87 Fed. Reg. 50,120 (Aug. 15, 2022); 86 Fed. Reg. 67,969 (Nov. 30, 2021).[10] But the

Amended/Supplemental Complaint does not include a direct challenge to either approval, and

Plaintiffs do not allege any harm to themselves emanating from either project. Rather, Plaintiffs

seem to add these allegations to support their claim—which is not authorized by the APA, *see*

*infra* Section III—that BOEM must undertake a programmatic environmental review of all the

proposed Atlantic coast projects. For example, Plaintiffs allege that "BOEM has committed

itself to an extensive program" that "involves multiple steps and multiple [offshore wind]

facilities" that "represent a *singular* course of action pursued by BOEM." ECF No. 39, ¶ 61

(emphasis added). Similarly, Plaintiffs contend that the EISs prepared for the Vineyard Wind 1

and the South Fork facilities did not analyze them "in conjunction with the entire [offshore wind]

program for the Atlantic coast." *Id*. ¶ 51. However, if Plaintiffs do seek to challenge BOEM's

---

[10] BOEM has also signed records of decision approving construction and operation plans for the
Ocean Wind 1 Offshore Wind Farm and Revolution Wind Farm. 88 Fed. Reg. 44,154 (July 11,
2023); 88 Fed. Reg. 57,967 (Aug. 24, 2023). Neither of these projects is within the New York
Bight. *Id*.

approval of these projects, the claim should be dismissed because Plaintiffs have not adequately pled a claim seeking judicial review of those approvals.[11]

In short, Plaintiffs cannot meet the burden of showing that their NEPA claim is ripe or that they are challenging final agency action.  Accordingly, their NEPA claim should be dismissed.

### B.      Plaintiffs' amended ESA claim is still not ripe for review

Plaintiffs' broadening of their ESA claim does not cure the claim's lack of ripeness.  As asserted in their original complaint (which the Court dismissed based on lack of ripeness, *see* ECF No. 29), Plaintiffs alleged that "BOEM violated Section 7 of the ESA by failing to consult with [NMFS] regarding whether and to what extent the selection of the New York Bight Wind Energy Areas and the Wind Energy Areas directly south of the Bight . . . could affect North Atlantic right whales and other listed species."  ECF No. 1, ¶ 67.  The Court dismissed Plaintiffs' ESA claim as unripe because "BOEM's duty to consult with NMFS must be evaluated 'on a stage-by-stage basis[,]'" and the "'completion of the first stage of a leasing program'—before any action is authorized—'does not cause any harm to anything because it does not require any action or infringe on the welfare of animals.'"  ECF No. 29 at 14 (citing *Ctr. for Biological Diversity*, 563 F.3d at 483).  To date, BOEM has still not authorized any action within the New

---

[11] Both projects are or have been subject to OCSLA, NEPA, MMPA, and ESA lawsuits in other courts.  *See*, *e.g.*, *Allco Renewable Energy Ltd v. Haaland,* No. 21-cv-11171 (D. Mass. filed July 18, 2021); *Kinsella v. Bureau of Ocean Energy Management*, No. 23-cv-2915 (E.D.N.Y. filed Apr. 19, 2023); *Mahoney v. U.S. Dep't of the Interior*, No. 22-cv-1305 (E.D.N.Y. filed Mar. 9, 2022); *Melone v. Coit*, No. 23-1736 (1st Cir. docketed Sept. 8, 2023); *Nantucket Residents Against Turbines v. U.S. BOEM*, No. 21-cv-11390 (D. Mass. filed Aug. 25, 2021); *Responsible Offshore Dev. All. v. Haaland*, No. 22-cv-11172 (D. Mass. Jan. 31, 2022); *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, No. 22-cv-11091 (D. Mass. filed Dec. 15, 2021).  If the Court denied Defendants' motion, Defendants reserve the right to file a motion to transfer Plaintiffs' First Amended/Supplemental Complaint.

York Bight that may cause harm to ESA-listed species for which it has not already completed Section 7 consultation.  *See* Decl. ¶ 6; *supra* p. 11 (discussing BOEM's programmatic consultation with NMFS); *infra* p. 31 (discussing same).

In a futile attempt to circumvent the Court's dismissal, Plaintiffs have amended their claim to allege that "BOEM violated Section 7 of the ESA by failing to consult with NMFS regarding the potential cumulative impacts of BOEM's Atlantic coast [offshore wind (OSW)] program on listed species" and that BOEM was "legally required to initiate consultation with NMFS for purposes of ensuring that a programmatic BiOp is prepared."  ECF No. 39, ¶ 74; *see also* ECF No. 38 at 41–42.  But Plaintiffs' broader phrasing—i.e., reframing their claim to encompass BOEM's "Atlantic coast OSW program" instead of its "selection of the New York Bight Wind Energy Areas" (*compare* ECF. No. 39, ¶ 74 *with* ECF No. 1, ¶ 67)—does not change the fact that BOEM has still not taken any "agency action" that "may affect" ESA-listed species or designated critical habitat for which it has not already completed Section 7 consultation.  16 U.S.C. § 1536(a)(2).

Indeed, the First Amended/Supplemental Complaint fails to allege any such action. Rather, it asserts that, "[w]ithin the identified WEAs, BOEM has auctioned more than 23 OSW leases to wind energy developers" and has "*received* from such developers at least 15 Construction and Operations Plans."  ECF No. 39, ¶ 50 (emphasis added).[12]  But with respect to

---

[12] There are two offshore wind projects (the Vineyard Wind 1 and the South Fork facilities) outside of the New York Bight—one located off the coast of Massachusetts and the other off the coast of Rhode Island—for which Plaintiffs allege BOEM has *approved* construction and operations plans.  ECF No. 39 at ¶ 51; *see also supra* n. 10 (noting two other approved construction and operations plans for projects outside of the New York Bight).  However—even if Plaintiffs had a justiciable claim regarding these projects outside of the New York Bight (which they do not, *see infra* Sections II., B and III)—they lack Article III standing for a claim regarding these projects because BOEM already *has* completed Section 7 consultation for each of them (*see infra* Section II., C).

BOEM's auctioning of leases, BOEM has *already completed* a programmatic ESA consultation with NMFS for site assessment and characterization activities that may occur after a lease is issued.  *See* ECF No. 14-3 at 78.  And with respect to developers' submittal of proposed construction and operations plans, the mere *submittal* of such a plan does not present a federal action for judicial review.  Under BOEM's regulations, when a lessee submits a construction and operations plan, BOEM may "approve, disapprove, or approve [the plan] with modifications," 30 C.F.R. § 585.628(f).  In other words, a lessee's submittal of a plan does not dictate what operations will look like, nor does it guarantee that operations will be approved at all.  *Id.*

While the submission of a proposed construction and operations plan may prompt BOEM to *begin* consultation, BOEM's obligation under the ESA is to complete consultation prior to issuing any final decision to approve (or disapprove) the developer's proposed plan.  16 U.S.C. § 1536(a)(2) (federal agencies are required to consult with the relevant expert wildlife agency to insure that actions "*authorized, funded, or carried out*" by the agency are not likely to jeopardize the continued existence of ESA-listed species or to destroy or adversely modify their critical habitat) (emphasis added); *Ctr. for Biological Diversity*, 563 F.3d at 483 (recognizing that preliminary steps in an energy program do not themselves "cause any harm to anything because [they] do[] not require any action or infringe on the welfare of animals," as the program is intentionally designed in a way that "[t]he welfare of animals is . . . only implicated at later stages of the program, each of which requires ESA consultation and additional environmental review").  Consequently, Plaintiffs do not have a ripe ESA claim unless and until BOEM has *approved* a construction and operations plan for which Section 7 consultation has not been completed.  Plaintiffs have not (and cannot) point to any such instances.

In sum, Plaintiffs' amended ESA claim must be dismissed because it remains unripe.[13]

## II.     Plaintiffs' claims should be dismissed due to lack of standing

The Court previously concluded that "the plaintiffs have not shown an imminent injury sufficient to satisfy Article III's standing requirements."  ECF No. 29 at 14 n.6 (citing *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012)).  The new factual allegations involving the New York Bight that Plaintiffs added to their First Amended/Supplemental Complaint to bolster their standing similarly fail to meet Plaintiffs' burden.  While Plaintiffs try to expand their allegations of injury, the fact remains that BOEM has not approved any construction and operations plans for wind energy development within the New York Bight. Plaintiffs also have not alleged injuries sufficient to demonstrate standing to challenge any projects outside the Bight.  Hence, Plaintiffs' claims should also be dismissed for lack of standing.

Article III standing is an "irreducible constitutional minimum" for federal court jurisdiction.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly

---

[13] Not only does the broadening of Plaintiffs' ESA claim fail to cure its lack of ripeness, it presents additional reasons why the claim must be dismissed.  First, Plaintiffs' amended claim seeking a "programmatic" ESA consultation with respect to BOEM's entire "Atlantic coast OSW program" must be dismissed because it fails to identify any specific, challengeable agency action as required under the APA.  *See infra* Section III.  Further, even if Plaintiffs' broadened ESA claim identified a challengeable agency action that may affect listed species (it does not), the claim would be barred by the statute of limitations, as BOEM established its program to grant leases for Atlantic coast OSW projects over 14 years ago, in 2009.  *See infra* Section V., A. Additionally, Plaintiffs fail to allege a live controversy and therefore lack standing because Section 7 consultation has already been completed with respect to any construction and operations plans that BOEM has approved, and a programmatic consultation was completed for site assessment and characterization activities that may occur after leases are issued.  *See infra* Section II., C.  Finally, Plaintiffs have still failed to comply (or even take steps to comply) with the ESA's mandatory 60-day notice requirement.  *See infra* Section V., B.

traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *Lujan*, 504 U.S. at 560–61.  Allegations of speculative future injury, like those made by Plaintiffs, cannot establish standing.  *See Chamber of Com. of the U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011).  "A threatened injury must be certainly impending to constitute injury in fact." *Ctr. for Biological Diversity*, 563 F.3d at 478 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

### A. The amendments regarding the New York Bight confirm Plaintiffs' lack of standing

Plaintiffs added allegations to their First Amended/Supplemental Complaint about potential impacts to marine mammals in the Bight.  *See, e.g.,* ECF No. 39, ¶¶ 5, 7.  Plaintiffs' alleged injuries are still tied, at most, to speculative and distant—and as yet unauthorized—construction and operation of wind energy facilities in the New York Bight.  For example, Plaintiffs allege that "the proposed [offshore wind] projects, *if constructed and operated* in their currently proposed locations, will harm NARW [North Atlantic right whales] and other protected marine mammals and/or cause them to leave" the coasts of New York and New Jersey.  ECF No. 39, ¶ 15 (emphasis added); *see also id.* ¶ 66 ("the construction and operation of the OSW projects will adversely affect NARW").  Plaintiffs also allege that "implementation" of projects, including those proposed off the coasts of New York and New Jersey, "will obstruct the movement of NARW and interfere with foraging activities and other critical 'life history' activities." *Id.* ¶ 55; *see also id.* ¶ 56 (making similar allegations about "other federally-protected marine mammals").  But, of course, BOEM must approve "implementation" of any planned construction or operation.

Plaintiffs lack standing because they have not plausibly alleged a "causal connection" between these alleged injuries to marine mammals and BOEM's (speculative) approval of

construction and operation plans.  *Lujan*, 504 U.S. at 560-61 (Article III standing requires a

"causal connection between the injury and the conduct complained of").  Plaintiffs' causation

argument relies, in part, on unspecified "evidence," ECF No. 39, ¶ 7, that construction and

operation of offshore wind projects will harm marine mammals.  *Id.* ¶ 15.  But BOEM has yet to

approve any construction and operation plans in the Bight.  Decl. ¶ 6.  Further, Plaintiffs'

conclusory allegations regarding harm are insufficient.  *Spokeo, Inc. v. Robins*, 578 U.S. 330,

338 (2016) ("at the pleading stage, the plaintiff must clearly allege facts demonstrating each

element." (internal quotation marks and citation omitted)); *cf.* ECF No. 14-3 at 68 ("Overall,

impacts from site characterization and site assessment activities to marine mammals in the

WEAs are expected to be minor.").

Plaintiffs do no more than tweak their other allegations of injury.  *Compare* ECF No. 1,

¶¶ 5, 6 *with* ECF No. 39, ¶¶ 15, 16.  In any event, these allegations continue to fall short of

showing injury-in-fact because they hinge on the *potential* future approvals for construction and

operation of wind energy facilities in the Bight.  ECF No. 39, ¶ 15 (alleging that "the seascape

and other aesthetic elements of Long Beach Island, the New York Bight, and the New Jersey

shore" will be affected by offshore wind projects); *id.* (contending that the proposed projects

threaten the view, recreation opportunities, and local economic interests); *id.* ¶ 16 (Plaintiff

Robert Stern is concerned about "operational turbine noise"); *id.* (alleging that the proposed

projects will obstruct the view along the Long Beach Island shoreline).

Leaseholders have not submitted any proposals for constructing or operating wind energy

facilities in the New York Bight to BOEM, Decl. ¶ 6, nor is it guaranteed that leaseholders will

ever submit proposals, or that these proposals will be approved.  Try as they might, Plaintiffs

cannot alter the reality that an entire sequence of events would need to take place before the

harms alleged by Plaintiffs could occur.  For example, the lessees would need to finish assessing

the suitability of their leases for offshore wind production and submit a construction and

operations plan for BOEM's approval.  *See* 30 C.F.R. § 585.626; *id*. § 585.627; Decl. ¶ 6 (no

construction and operations plans for wind energy development have been submitted).  BOEM

would then need to review the construction and operations plan, 30 C.F.R. § 585.628(a); prepare

an appropriate NEPA analysis, *id*. § 585.628(b); coordinate and consult with relevant federal,

state, and local agencies and Native American Tribes, *id*. § 585.628(d); complete additional

technical and environmental reviews and other reviews required by federal law (such as the

ESA), *id*. § 585.628(f); and then issue a decision approving (or approving with modifications)

the construction and operations plan, *id*.  Should all those events occur—and assuming all other

threshold jurisprudential requirements were met—Plaintiffs would be free to challenge those

federal approvals.  But Article III prevents them from doing so now.

Plaintiffs' amendments concerning the Bight reinforce Plaintiffs' reliance on speculative,

potential future harms rather than alleging concrete, actual "imminent injury sufficient to satisfy

Article III's standing requirements."  ECF No. 29 at 14 n.6.  Thus, their claims should be

dismissed.

**B.      Plaintiffs specifically lack standing to challenge projects located outside of
         the New York Bight.**

Plaintiffs have now amended their claims to reference offshore wind projects outside of

the New York Bight.  *See* ECF No. 39, ¶ 59 (expanding Plaintiffs' NEPA claim to seek relief

with respect to "the OSW program for the Atlantic coast," instead of the "proposed action"); *id*. ¶

73 (expanding Plaintiffs' ESA claim to seek Section 7 consultation with respect to "BOEM's

Atlantic coast OSW program," instead of BOEM's "selection of the New York Bight Wind

Energy Areas").  But here, too, Plaintiffs lack standing.  Plaintiffs fail to allege any connection to

areas outside of the New York Bight, let alone any concrete injury to their interests that would support standing to challenge offshore wind projects outside of the Bight.

Indeed, even as amended, Plaintiffs' alleged interests are limited to the resources of Long Beach Island and its surrounding waters, specifically the waters within the New York Bight and, in particular, those within view of Long Beach Island's shore. *See, e.g., id.* ¶ 15 (alleging that Plaintiff Save Long Beach Island has an interest in: the "human and natural resources that characterize Long Beach Island and its coastal waters"; "the marine mammals that live off the New York and New Jersey coasts"; "the seascape and other aesthetic elements of Long Beach Island, the New York Bight, and the New Jersey shore"; the "local economic interests" of Long Beach Island; and "the New York Bight and the ocean areas off the coast of New Jersey"); *id.* at ¶ 16 (alleging that Plaintiff Robert Stern, Ph.D.—a resident of Long Beach Island and President of Save Long Beach Island—has an interest in: "the beaches along [Long Beach] [I]sland's shores, where currently the vistas are unobstructed"; the "resources that make Long Beach Island the unique place that Dr. Stern has chosen to call home"; and "the natural and human environment on Long Beach Island and the waters proximate to it").

Despite their broadened NEPA and ESA claims alleging statutory duties with respect to BOEM's entire "Atlantic coast OSW program," Plaintiffs fail to allege any interest in or connection to areas along the Atlantic coast outside of the New York Bight. Mere proximity to Long Beach Island is insufficient to establish standing to challenge offshore wind projects along the entire Atlantic coast. *See Nat'l Wildlife Fed'n,* 497 U.S. at 887 (plaintiffs lacked standing where they did not allege use of the affected area but instead used land "in the vicinity" of the affected area); *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the

*affected area* and are persons 'for whom the aesthetic and recreational values *of the area* will be

lessened' by the challenged activity.") (emphasis added, citation omitted); *Lujan*, 504 U.S. at

566–67 (rejecting "'animal nexus' approach, whereby anyone who has an interest in studying or

seeing [an] endangered animal[] anywhere on the globe has standing" to challenge an action

affecting that species in areas with which he has no specific connection); *see also States Legal*

*Found. v. Babbitt*, 140 F. Supp. 2d 185, 192 (N.D.N.Y. 2001) (environmental organization

lacked standing because its members failed to establish that they visited the affected area to

observe the impacted species prior to commencing the lawsuit).

    In sum, even if Plaintiffs presently had standing with respect to speculative wind energy

development in the New York Bight, Plaintiffs' claims broadly attacking BOEM's entire

"Atlantic coast [offshore wind] program" must be dismissed for lack of standing to the extent the

claims encompass areas outside of the New York Bight.

### C.    Plaintiffs lack standing for their amended ESA claim because Section 7 consultation has already been completed for any action that may affect ESA-listed species.

    To the extent Plaintiffs' amended ESA claim even arguably identifies agency action that

"may affect" ESA-listed species, Plaintiffs fail to allege a live controversy and therefore lack

Article III standing.  No live controversy exists because BOEM has already completed ESA

consultation for all approved construction and operations plans (none of which are for projects

within the New York Bight) and has completed a programmatic ESA consultation for site

assessment and characterization activities that may occur after leases are issued.  In other words,

Plaintiffs lack standing because their request for relief was moot before they even filed their ESA claim.[14]

A court's review is constrained to "narrow and concrete actual controversies." *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000) (citing *Nat'l Wildlife Fed'n*, 497 U.S. at 891–94). Plaintiffs fail to satisfy Article III's standing requirements with respect to their ESA claim because no "actual controversy" has been (or could be) alleged.  *See Arizonans for Off. English v. Arizona*, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review[.]'" (citation omitted)).

Here, there are two offshore wind projects outside of the New York Bight—one located off the coast of Massachusetts and the other off the coast of Rhode Island—for which Plaintiffs allege BOEM has approved construction and operations plans.  ECF No. 39, ¶ 51; *see also supra* n.10 (noting that BOEM has signed records of decision approving construction and operation plans for two additional projects outside of the New York Bight).[15]  But Plaintiffs lack standing to challenge BOEM's alleged failure to consult with respect to these construction and operations plans because Section 7 consultation *was* completed for each approved plan before Plaintiffs filed their First Amended/Supplemental Complaint.[16]

---

[14] "[S]tanding is measured by the plaintiff's 'concrete stake' at the outset of the litigation, [and] mootness depends on whether the parties maintain 'a continuing interest' in the litigation today." *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 979 (D.C. Cir. 2016) (citation omitted).

[15] As discussed *supra*, up until BOEM authorizes a construction and operations plan, its actions do not present a ripe claim under the ESA, as the "'completion of the first stage of a leasing program' . . . 'does not cause any harm to anything because it does not require any action or infringe on the welfare of animals.'" ECF No. 29 at 14 (citing *Ctr. for Biological Diversity*, 563 F.3d at 483).

[16] *See* https://www.boem.gov/sites/default/files/documents/renewable-energy/2021-Vineyard-Wind-1-BiOp-Final_0.pdf (NMFS October 2021 Biological Opinion, concluding Section 7 consultation on BOEM's proposed approval of the construction and operations plan for the

Moreover, with respect to BOEM's issuance of leases to potential developers for Atlantic Coast wind energy projects—as Plaintiffs themselves have acknowledged, *see* ECF No. 16 at 12—BOEM has already completed a programmatic consultation for site assessment and site characterization activities that may occur after a lease is issued. Specifically, BOEM initiated consultation with NMFS in February 2021 (before Plaintiffs even filed their Complaint), and, in June 2021, NMFS conducted an assessment of "the effects of installing met buoys, conducting geophysical and geotechnical surveys with specified HRG equipment, and conducting associated vessel activities for offshore wind energy development projects off the U.S. Atlantic Coast." ECF No. 14-3 at 78. The consultation culminated in NMFS concurring with BOEM's determination that such activities are "not likely to adversely affect" ESA-listed species or critical habitat when undertaken using the applicable project design criteria and mitigation measures identified in the consultation. *Id.* NMFS's concurrence concluded Section 7 consultation. *See* 50 C.F.R. § 402.13(c)(1) ("If during informal consultation it is determined by the [action] agency, with the written concurrence of the [consulting agency], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.").

---

Vineyard Wind 1 offshore wind project);
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SF-BiOp-Final_0.pdf (NMFS October 2021 Biological Opinion, concluding Section 7 consultation on BOEM's proposed approval of the construction and operations plan for the South Fork offshore wind project); *see also* https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Ocean-Wind-1_final-biop.pdf (NMFS April 2023 Biological Opinion, concluding Section 7 consultation on BOEM's proposed approval of the construction and operations plan for the Ocean Wind 1 Offshore Wind Farm);
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf (NMFS July 2023 Biological Opinion, concluding Section 7 consultation on BOEM's proposed approval of the construction and operations plan for the Revolution Wind Offshore Energy Project).

Thus, even if Plaintiffs' amended ESA claim presented a justiciable claim (which it does not), there is no live controversy sufficient to support Article III standing.[17]

## III.  Plaintiffs' attempt to compel programmatic environmental review of all Atlantic coast offshore wind energy projects is non-justiciable.

Along with challenging wind energy development within the New York Bight, Plaintiffs expanded the scope of their complaint to seek programmatic NEPA review and ESA consultation for all "offshore wind (OSW) energy projects along the Atlantic coast, from Maine to North Carolina."  ECF No. 39, ¶ 1.  But the Supreme Court has made clear that the APA does not authorize suits seeking *wholesale* improvement of [a governmental] program by court decree." *Nat'l Wildlife Fed'n,* 497 U.S. at 891.  Plaintiffs' suit is a non-justiciable programmatic challenge and should be dismissed.

An entity seeking review under the APA "must identify some 'agency action' that affects him in the specified fashion[.]'" *Id.* at 882 (citing 5 U.S.C. § 551(13), 701(b)(2), 702).  In *Nat'l Wildlife Fed'n*, the Supreme Court held that it was "impossible" for the plaintiff to challenge a "land withdrawal review program" because the "program" was not an "agency action" under the APA.  *Id.* at 890.  The Court clarified that a plaintiff cannot circumvent the prohibition on programmatic judicial review by seeking wholesale programmatic remedies based on a challenge to discrete final agency actions.  *Id.* at 892–93.  "[T]he flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA,

---

[17] For the same reasons, Plaintiffs' amended ESA claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs have failed to identify any agency action for which BOEM has failed to consult under the ESA and have therefore failed to "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

simply because one of them that is ripe for review adversely affects one of respondent's members," the Court explained. *Id*. at 893.

The Supreme Court again specified that the APA's "limitation to discrete agency action precludes . . . broad programmatic attack[s]" in *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 64 (2004). The APA's bar on programmatic challenges "is motivated by institutional limits on courts which constrain [their] review to narrow and concrete actual controversies." *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000) (citation omitted). This prohibition applies equally to agency actions as well as to alleged "failures to act." *See* 5 U.S.C. § 551(13) ("agency action" includes an agency's "failure to act"); *SUWA*, 542 U.S. at 62–63.

*Lujan* and *SUWA* show that broad, programmatic challenges are not justiciable. The D.C. Circuit has applied these principles to reject a challenge seeking programmatic review of the federal government's management of wild horses and burros. *Fund for Animals, Inc. v. U.S. BLM*, 460 F.3d 13, 19–22 (D.C. Cir. 2006). Consistent with these precedents, a court within this District also dismissed a plaintiff's challenge to the U.S. Food and Drug Administration's imported food inspection practices. *Del Monte Fresh Produce N.A., Inc. v. United States*, 706 F. Supp. 2d 116, 118–19 (D.D.C. 2010). "Such broad review of agency operations is just the sort of 'entanglement' in daily management of the agency's business that the Supreme Court has instructed is inappropriate," the court explained. *Id*. at 119.

Plaintiffs attempt to lodge precisely the sort of programmatic attack that the APA limitations addressed in *Lujan* and *SUWA* are designed to guard against. Plaintiffs challenge BOEM's alleged "extensive interconnected Atlantic coast [offshore wind] program." ECF No. 39, ¶ 71. In Plaintiffs' view, the alleged "large scale [offshore wind] program along the Atlantic

coast constitutes a *singular* effort to develop an offshore wind energy system." *Id.* ¶ 36 (emphasis added).  Likewise, Plaintiffs claim that "BOEM has committed itself to an extensive program for installing thousands of wind turbines along the Atlantic coast." *Id.* ¶ 61.  Although Plaintiffs purport to identify many BOEM actions, *see id.* ¶¶ 48–54, they contend that the "various [offshore wind] projects are interconnected and integrated components of BOEM's offshore wind energy program." *Id.* ¶ 39.  And Plaintiffs claim that BOEM has violated NEPA, the ESA, and the APA by developing this program without preparing a programmatic EIS or programmatic BiOp.  *Id.* ¶¶ 58–75.  To that end, Plaintiffs repeatedly claim that BOEM has failed to undertake programmatic environmental review[18] and seek to compel such review.  *Id.* ¶ 10.

Indeed, Plaintiffs' prayer for relief confirms that they seek the kind of wholesale improvement of an agency program that is prohibited by the Supreme Court.  Plaintiffs request prospective relief in the form of an order that BOEM "prepare a programmatic EIS addressing the cumulative and synergistic impacts of its *entire* Atlantic coast [offshore wind] program" and conduct programmatic ESA consultation for the *entire* "Atlantic coast [offshore wind] program." *Id.* at 29 (emphasis added).  Plaintiffs also seek an "order enjoining BOEM from processing or approving *any additional* [offshore wind] projects, or any activities connected to such projects . . ., until the required programmatic EIS and programmatic BiOp are issued and adopted." *Id.* (emphasis added).  Plaintiffs seek the kind of comprehensive change of an agency program that is prohibited by the Supreme Court.  Thus, their claims should be dismissed.

---

[18] *See* ECF No. 39, ¶¶ 7, 8, 11, 19, 49, 50, 52–54, 65, 66, 68–71, 74.

**IV.    Plaintiffs' amended NEPA claim fails to state a cognizable claim for the preparation of a programmatic EIS**

Even if the First Amended/Supplemental Complaint were otherwise justiciable, the NEPA claim would still need to be dismissed.  Plaintiffs state that one of the purposes of their lawsuit is "to force BOEM to prepare a programmatic EIS" to assess "the impacts of BOEM's OSW [offshore wind program] along the Atlantic coast."  ECF No. 39, ¶ 10.  And many of their allegations center on BOEM's alleged failure to do so.[19]  But Plaintiffs' NEPA claim should be dismissed because there is no legally enforceable requirement that BOEM prepare a programmatic EIS.

In *SUWA*, the Supreme Court clarified that "a claim under [APA] § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*"  542 U.S. at 64.  Nothing in NEPA or NEPA's implementing regulations require BOEM, as Plaintiffs allege, to prepare a programmatic EIS to analyze the "wind energy areas (WEAs) along the Atlantic coast" or "the impacts of selecting the leasehold locations within the WEAs."  ECF No. 39, ¶¶ 48, 49.  NEPA and its implementing regulations are silent about any requirement to complete programmatic EISs.  Rather, agencies are "encouraged," but not required, to tier EISs to eliminate repetition, which is particularly appropriate when broad program or policy issues are implicated.  40 C.F.R. §§ 1501.11, 1508.1(ff); 43 C.F.R. § 46.140.  "Tiering" simply means that more focused, site-specific NEPA analyses may "tier to"—that is, rely on—more general, overarching programmatic EISs.  This, however, in no way creates a

---

[19] *See*, *e.g.*, ECF No. 39, ¶¶ 7, 10, 11, 19, 32, 36, 37, 49, 53, 54, 57, 65, 66, 68–71.

nondiscretionary obligation upon an agency to prepare a programmatic EIS in the first instance.[20]

Instead, "the decision whether to prepare a programmatic EIS is committed to the agency's discretion." *Nevada v. Dep't of Energy*, 457 F.3d 78, 92 (D.C. Cir. 2006); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). Indeed, the D.C. Circuit has explained that "even when the proposal is one of a series of closely related proposals, the decision whether to prepare a programmatic impact statement is committed to the agency's discretion." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 374 n.73 (D.C. Cir. 1981). Thus, BOEM has discretion to perform its environmental analysis "in either a programmatic or site-specific format." *Mayo v. Reynolds*, 875 F.3d 11, 23 (D.C. Cir. 2017) (internal quotation marks and citation omitted). The CEQ has also issued guidance explaining that "agencies have discretion to determine whether a programmatic approach is appropriate." 79 Fed. Reg. 76,987 (Dec. 23, 2014).

District courts have reached similar conclusions finding that the preparation of a programmatic EIS is a discretionary act not reviewable under the APA, *La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of Interior*, No. 2:11-cv-00395-ODW (OPx), 2012 WL 2884992, at *4–5 (C.D. Cal. July 13, 2012), and that courts cannot compel preparation of a programmatic EIS, *Citizens for Clean Energy v. U.S Dep't of the Interior*, 384 F. Supp. 3d 1264, 1281 (D. Mont. 2019).

Plaintiffs cite *Foundation on Economic Trends v. Heckler* for the proposition that a programmatic EIS should be prepared. ECF No. 39, ¶ 34, n.33 (citing 756 F.2d 143, 159 (D.C.

---

[20] As noted earlier, the preparation of a NEPA document is not a final agency action. Thus, if a freestanding EIS is not final agency action, then a claim to compel preparation of a programmatic EIS—divorced from any challenge to a discrete, substantive action that allegedly requires further environmental analysis—is not a claim to compel final agency action.

Cir. 1985)).  But *Foundation on Economic Trends* does not establish that Plaintiffs' claim is justiciable.  There, the court found that a federal agency should *consider* whether a programmatic EIS was warranted.  756 F.2d at 160.  But the D.C. Circuit did *not* hold that a programmatic EIS was required, as Plaintiffs allege in this case.  Rather, the D.C. Circuit reversed the district court's finding that the plaintiffs were likely to show that NEPA required a federal agency to complete a programmatic EIS.  *Id*. at 159.

Nor does *Kleppe v. Sierra Club* support Plaintiffs' argument.  In *Kleppe*, the Supreme Court held that whether to prepare a programmatic EIS "is properly left to the informed discretion of the responsible federal agencies."  427 U.S. at 412.  In addition, *Earth Island Institute v. United States Forest Service* held that "the agency was not required to prepare a single EIS" for post-fire timber sales even though there were "many similarities in underlying cause, proposed solution, and general geography." 351 F.3d 1291, 1306 (9th Cir. 2003).  Likewise, in *Native Ecosystems Council v. Dombeck*, the Ninth Circuit concluded that the Forest Service need not "prepare one comprehensive environmental statement" analyzing forest plan amendments. 304 F.3d 886, 894–95 (9th Cir. 2002).

Plaintiffs' NEPA claim should be dismissed because Plaintiffs cannot identify any source of a mandatory duty requiring BOEM to prepare a programmatic EIS.[21]

---

[21] As Defendants noted in their previous briefing, BOEM *has* completed a programmatic EIS for its alternative energy program.  ECF No. 18 at 5 n.2.  The programmatic EIS identified the types of environmental impacts that might result from all phases of wind-energy development on the outer continental shelf, including site assessment activities, facility construction, project operation, and decommissioning.  *Id*.  And as Plaintiffs allege in their First Amended/Supplemental Complaint, ECF No. 39, ¶ 54, in July 2022, BOEM issued a "Notice of Intent to Prepare a Programmatic Environmental Impact Statement for Future Wind Development in the New York Bight 87 Fed. Reg. 42,495-01.  *See also* Decl. ¶ 5.  In doing so, "BOEM explained that the PEIS will analyze potential impacts from wind energy development activities in the New York Bight region, which contains multiple lease areas for offshore wind."

**V.      Plaintiffs' amended ESA claim should be dismissed for two additional reasons.**

Plaintiffs' amended ESA claim, which challenges BOEM's alleged failure to consult over the potential impacts of BOEM's "Atlantic coast OSW program" to ESA-listed species, ECF No. 39, ¶ 74, should be dismissed for the additional reasons that it is barred by the statute of limitations, and Plaintiffs failed to provide notice under the ESA's mandatory 60-day notice requirement.

**A.      Plaintiffs' ESA claim is barred by the statute of limitations**.

Even if Plaintiffs' amended ESA claim were ripe or otherwise justiciable, the claim would be barred by the statute of limitations.  While Plaintiffs' original ESA claim alleged that "BOEM violated Section 7 of the ESA by failing to consult with [NMFS] regarding whether and to what extent *the selection of the New York Bight Wind Energy Areas* . . . could affect North Atlantic right whales and other listed species," ECF No. 1, ¶ 67 (emphasis added), their amended ESA claim alleges that "BOEM violated Section 7 of the ESA by failing to consult with NMFS regarding the potential cumulative impacts of *BOEM's Atlantic coast OSW program* on listed species, " ECF No. 39, ¶ 74 (emphasis added).

This amendment is fatal to Plaintiffs' claim because, while the agency action at issue in Plaintiffs' original complaint occurred in March 2021—i.e., BOEM's issuance of its "Area ID Memorandum" identifying wind energy areas within the New York Bight to be considered for possible renewable energy leasing, *see* ECF No. 1 at 1, ¶¶ 8, 14, 25, 42—the broader program under which BOEM grants leases for Atlantic coast OSW projects on the Outer Continental Shelf was developed in April 2009.  *See* 74 Fed. Reg. 19,638, *Renewable Energy and Alternate*

---

Decl. ¶ 5.  But Plaintiffs' demand that BOEM complete some kind of different programmatic EIS is not justiciable.

*Uses of Existing Facilities on the Outer Continental Shelf* (Apr. 29, 2009) (BOEM's "final

regulations to establish a program to grant leases, easements, and rights-of-way (ROW) for

renewable energy project activities on the Outer Continental Shelf (OCS)").

Setting aside the fact that BOEM's development of such a regulatory program is not an

agency action that can "cause any harm to anything because it does not require any action or

infringe on the welfare of animals," *Ctr. for Biological Diversity*, 563 F.3d at 483, and therefore

does not trigger a duty to consult under the ESA, Plaintiffs' claim would be barred by the statute

of limitations anyway.  Under 28 U.S.C. § 2401(a), "every civil action commenced against the

United States shall be barred unless the complaint is filed within six years after the right of

action first accrues." 28 U.S.C. § 2401(a).  "Because the ESA contains no express statute of

limitations, the applicable statute of limitations is found in title 28 U.S.C. § 2401(a), the general

statute of limitations for civil actions against the federal government."  *Coal. for a Sustainable

Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1106 (E.D. Cal. 2011); *Felter v.

Kempthorne*, 473 F.3d 1255, 1259 (D.C. Cir. 2007) ("Section 2401(a) generally applies to all

civil actions whether legal, equitable, or mixed.") (internal quotation marks and citation omitted).

Here, as pled, Plaintiffs' claim would have accrued on April 29, 2009, when BOEM

published its final regulations establishing a program for granting leases for OSW projects on the

Outer Continental Shelf.  74 Fed. Reg. 19,638; *see Earle v. District of Columbia*, 707 F.3d 299,

306 (D.C. Cir. 2012) ("As a general rule, a claim normally accrues when the factual and legal

prerequisites for filing suit are in place.") (cleaned up) (internal quotation marks and citation

omitted); *Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362, 1364 (9th Cir. 1990)

("Publication in the Federal Register is legally sufficient notice to all interested or affected

persons regardless of actual knowledge[.]") (citation omitted).  But Plaintiffs did not bring their

claim alleging that BOEM failed to consult on the potential impacts of its "Atlantic coast OSW program" to ESA-listed species until over 14 years after the program was developed—more than twice the amount of time afforded by the six-year statute of limitations.  ECF No. 39 at ¶ 74. Plaintiffs' amended ESA claim is therefore time-barred under 28 U.S.C. § 2401(a) and should be dismissed.[22]

### B.    Plaintiffs failed to provide the mandatory 60-day notice for their ESA claim

Despite being made aware of their failure to provide the requisite 60-day notice for their ESA claim, *see* ECF No. 14 at 37–39, ECF No. 33 at 31–33, and the elapsing of ample time to prepare and submit such notice, Plaintiffs have failed to bring themselves in compliance with the ESA citizen-suit provision (or to even take steps to do so).  The ESA citizen suit provision— which permits lawsuits against agencies "alleged to be in violation of any provision of [the ESA]," 16 U.S.C. § 1540(g)(1)(A)—provides that "[n]o action may be commenced . . . prior to sixty days after written notice of the violation has been given to the [agency], and to any alleged violator of any such provision or regulation."  *Id.* at § 1540(g)(2)(A).  But Plaintiffs' First Amended/Supplemental Complaint lacks any allegation that they have provided 60-day notice. *See* ECF No. 39.  And indeed, no such notice has been received by BOEM.  Decl. ¶ 7 (Defendants have "no record of receiving the mandatory 60-day notice prior to Plaintiffs' filing

---

[22] The D.C. Circuit has held that the statute of limitations provided by 28 U.S.C. § 2401(a) is no longer treated as a jurisdictional defense.  *Jackson v. Modly*, 949 F.3d 763, 776 (D.C. Cir. 2020) (holding that "precedent treating § 2401(a)'s statute of limitations as jurisdictional" was overruled by a 2015 Supreme Court case).  But in the wake of *Jackson*, there appears to be some uncertainty as to whether the defense should be reviewed pursuant to Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6).  *See, e.g., Ute Indian Tribe of the Uintah and Ouray Rsrv. v. U.S. Dept. of Int'r.*, 560 F. Supp. 3d 247, 256 (D.D.C. 2021) (analyzing a statute of limitations argument asserted post-*Jackson* as a threshold "jurisdictional" issue).  Out of an abundance of caution, Defendants move for dismissal on these grounds under both Rule 12(b)(1) and Rule 12(b)(6).  Under either standard, Defendants' arguments are the same, and both compel the same result—dismissal of Plaintiffs' amended ESA claim as time-barred.

suit under the ESA.").

Because Plaintiffs have failed to satisfy the ESA's mandatory prerequisite for suit, the

Court must dismiss the ESA claim. *See, e.g., Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31

(1989) (interpreting analogous 60-day notice requirement under a federal statute as a "mandatory

condition[] precedent to commencing suit"); *Friends of Animals v. Ashe*, 808 F.3d 900, 903–04

(D.C. Cir. 2015) (applying *Hallstrom* to the 60-day notice provision in the ESA citizen-suit

provision and dismissing an ESA suit for insufficient notice).

To the extent that Plaintiffs continue to rely on their argument that the 60-day notice

requirement does not apply because they are seeking relief under the APA, *see* ECF No. 16 at

42–43, ECF No. 35 at 21, it fails to save their ESA claim from mandatory dismissal.  The ESA

claim in Plaintiffs' First Amended/Supplemental Complaint asserts that "BOEM violated Section

7 of the ESA by failing to consult with NMFS regarding the potential cumulative impacts of

BOEM's Atlantic coast OSW program on listed species."  ECF No. 39, ¶ 74.  Plaintiffs'

allegation falls squarely within the realm of lawsuits permitted by the ESA citizen-suit provision

and, therefore, cannot be alternatively raised under the APA to avoid the 60-day notice

requirement.  *See Bennett*, 520 U.S. at 161–62 (holding that, when a claim could lie under both

the APA and ESA, courts must "look first at the ESA . . . because the APA by its terms

independently authorizes review only when 'there is no other adequate remedy in a court'")

(quoting 5 U.S.C. § 704); *Conservation L. Found. v. Ross*, 422 F. Supp. 3d 12, 16 (D.D.C. 2019)

(finding that the ESA, not the APA, provides the cause of action for a Section 7 claim); *Safari

Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 58–59 (D.D.C. 2013) (same); *Bowen v.

Massachusetts,* 487 U.S. 879, 903 (1988) ("Congress did not intend the general grant of review

in the APA to duplicate existing procedures for review of agency action.").[23]

In sum, Plaintiffs' amended ESA claim is still barred because it may be raised only under the ESA citizen-suit provision and Plaintiffs have failed to comply (or even take steps to comply) with the provision's mandatory 60-day notice requirement.

**CONCLUSION**

Even after amendment, Plaintiffs' claims suffer from numerous deficiencies. Plaintiffs' claims are not ripe and are based on speculative, potential future harms rather than alleging concrete, actual imminent injury sufficient to satisfy Article III's standing requirements. Plaintiffs cannot demonstrate standing for their amended ESA claim because Section 7 consultation has already been completed for any action that may affect ESA-listed species. Further, Plaintiffs' non-justiciable programmatic challenge and a demand that BOEM prepare a programmatic NEPA document are futile. Finally, Plaintiffs' ESA claim violates the statute of limitations and Plaintiffs still have not provided the requisite 60-day notice for their ESA claim. For all these reasons, Defendants' motion to dismiss should be granted and Plaintiffs' First Amended/Supplemental Complaint dismissed.

---

[23] Further, Plaintiffs cannot cure their failure to provide the requisite notice by simply providing a 60-day notice letter now, as they have violated the requirement for a 60-day litigation free window, which necessitates dismissal. *See Hallstrom*, 493 U.S. at 26–31 (noting that, even if staying the case to allow the sixty-day period to run is the functional equivalent of waiting sixty days before suing, the statute bars courts from doing so); *see also Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 521 (9th Cir. 1998) (finding that the ESA requires a sixty-day "litigation-free window")

Respectfully submitted this 25th day of September, 2023.

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division


_ /s/ Sara E. Costello_____
SARA E. COSTELLO (KS Bar No. 20898)
Senior Trial Attorney
Natural Resources Section
(202) 305-0484
sara.costello2@usdoj.gov
MICHELLE M. SPATZ (D.C. Bar No. 1044400)
Trial Attorney
Wildlife & Marine Resources Section
(202) 598-9741
michelle.spatz@usdoj.gov

*Counsel for Defendants*

Of Counsel:

KATHRYN SARVER
ROBERT L. SEBASTIAN
Attorney-Advisors
Office of the Solicitor
Division of Mineral Resources
Department of the Interior
1849 C Street NW
Washington, D.C. 20240